SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
STEPHEN S. KORNICZKY, Cal. Bar No. 135532
MARTIN R. BADER, Cal. Bar No. 222865
MATTHEW W. HOLDER, Cal. Bar No. 217619
12275 El Camino Real, Suite 200
San Diego, California 92130
Telephone:   858.720.8900
Facsimile:   858.509.3691
E mail        skorniczky@sheppardmullin.com
                 mbader@sheppardmullin.com
                 mholder@sheppardmullin.com

MICHAEL W. SCARBOROUGH, Cal. Bar No. 203524
MONA SOLOUKI, Cal. Bar No. 215145
Four Embarcadero Center
Seventeenth Floor
San Francisco, California 94111
Telephone:   415.434.9100
Facsimile:   415.434.3947
E mail        mscarborough@sheppardmullin.com
                 msolouki@sheppardmullin.com

Attorneys for Plaintiff Continental
Automotive Systems, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC.,<br><br>            Plaintiff,<br><br>      v.<br><br>AVANCI, LLC, et al.,<br><br>            Defendants. | Case No. 5:19-cv-02520-NC<br><br>**CONTINENTAL'S MOTION FOR ANTI-SUIT INJUNCTION**<br><br>Hearing Date:  July 31, 2019<br>Time:  1:00 p.m.<br>Place:  Courtroom 5<br>Judge:  Hon. Nathanael Cousins<br><br><span style="color:red">**PUBLIC REDACTED VERSION**</span> |

TO THE COURT, DEFENDANTS AVANCI, LLC, AVANCI PLATFORM INTERNATIONAL LIMITED, NOKIA CORPORATION, NOKIA OF AMERICA CORPORATION, NOKIA SOLUTIONS AND NETWORKS US LLC, NOKIA SOLUTIONS AND NETWORKS OY, NOKIA TECHNOLOGIES OY, CONVERSANT WIRELESS LICENSING SARL, OPTIS UP HOLDINGS, LLC, OPTIS CELLULAR TECHNOLOGY, LLC, OPTIS WIRELESS TECHNOLOGY, LLC (COLLECTIVELY, "DEFENDANTS"), AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on July 31, 2019 at 1:00 p.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Nathanael M. Cousins, located at 280 South 1st Street, San Jose, California 95113, Plaintiff Continental Automotive Systems, Inc. ("Continental") respectfully requests that this Court enjoin Defendants Nokia Solutions and Networks Oy, Nokia Technologies Oy, and any related entities (collectively, "Nokia") from prosecuting the patent infringement actions filed in Germany against Continental's customer, Daimler AG (the "German Actions"). The German Actions are more specifically identified as follows:

- *Nokia Solutions and Networks Oy v. Daimler AG*, First Munich Regional Court, Patent Division, No. 21 O 3889/19.
- *Nokia Technologies Oy v. Daimler AG*, First Munich Regional Court, Patent Division, No. 7 O 3890/19.
- *Nokia Technologies Oy v. Daimler AG*, First Munich Regional Court, Patent Division, No. 21 O 3891/19.
- *Nokia Technologies Oy v. Daimler AG*, Düsseldorf Regional Court, Patent Division, No. 4a O 26/19.
- *Nokia Technologies Oy v. Daimler AG*, Düsseldorf Regional Court, Patent Division, No. 4a O 27/19.

- *Nokia Technologies Oy v. Daimler AG*, Düsseldorf Regional Court, Patent Division, No. 4c O 17/19.

- *Nokia Technologies Oy v. Daimler AG*, Mannheim Regional Court, Patent Division, No. 2 O 37/19.

- *Nokia Technologies Oy v. Daimler AG*, Mannheim Regional Court, Patent Division, No. 2 O 36/19.

- *Nokia Solutions and Networks Oy v. Daimler AG*, Mannheim Regional Court, Patent Division, No. 2 O 35/19.

- *Nokia Solutions and Networks Oy v. Daimler AG*, Mannheim Regional Court, Patent Division, No. 2 O 34/19.

In addition, Continental seeks an order enjoining Defendants from instituting against Continental or any of its customers (or their subsidiaries or affiliates) any action alleging infringement of their global 2G, 3G and 4G SEPs during the pendency of the FRAND proceeding in this Court, or from acting in concert with anyone to institute such an action.

This motion is based on this notice of motion and supporting memorandum of points and authorities, the supporting declarations of Matthew W. Holder and Dr. Frank-Erich Hufnagel, the accompanying exhibits, reply briefing in further support of this motion and supporting declarations and accompanying exhibits, as well as other written or oral argument that Continental may present to the Court.

1  Dated:  June 11, 2019

2                                   SHEPPARD, MULLIN, RICHTER & HAMPTON
3                                   LLP

4

5                                   By      _____
                                                   /s/ Matthew W. Holder
6                                            STEPHEN S. KORNICZKY
                                              MARTIN R. BADER
7                                            MATTHEW W. HOLDER
                                          MICHAEL W. SCARBOROUGH
8                                              MONA SOLOUKI
9
                                   Attorneys for Plaintiff Continental Automotive
10                                              Systems, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................ 1

II.    FACTUAL BACKGROUND .................................................................... 4

    A.    The Nature and Risks of Standardization .................................... 4

    B.    Nokia's Prior Advocacy on the Issues Addressed in This Motion ........ 7

    C.    The Dispute Between the Parties ................................................. 8

        1.    Continental sought a direct license to Nokia's SEPs. ........ 8

        2.    Daimler and others filed complaints with the European Commission regarding Nokia's refusal to license suppliers. ........ 9

        3.    Nokia then filed retaliatory infringement lawsuits against Daimler. ........ 10

        4.    Continental filed the present action against Nokia and the other Defendants to resolve the global dispute between the parties. ........ 12

III.   APPLICABLE LEGAL STANDARD .................................................... 13

IV.    NOKIA AND THE OTHER DEFENDANTS SHOULD BE ENJOINED FROM PURSUING SEP INFRINGEMENT CLAIMS AGAINST CONTINENTAL AND ITS CUSTOMERS. ............... 15

    A.    The Parties and Issues Are Functionally the Same. ................ 15

        1.    Continental, as a manufacturer of the accused products, is the real party-in-interest. ........ 15

        2.    This lawsuit is dispositive of the actions to be enjoined. ........ 18

    B.    Multiple *Unterweser* Factors Justify an Anti-Suit Injunction. ........ 20

        1.    Nokia's German Actions frustrate important U.S. policies. ........ 20

        2.    Nokia's German Actions are vexatious and oppressive. ........ 22

        3.    Nokia's German Actions present a risk of inconsistent judgments. ........ 23

    C.    The Impact of an Injunction on Comity Is Tolerable. ........ 24

V.     CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Apple v. Motorola*
    757 F.3d 1286 (Fed. Cir. 2014) ..................................................................21

*Applied Med. Distrib. Corp. v. Surgical Co. BV*
    587 F.3d 909 (9th Cir. 2009) ......................................................................14

*Codex Corp. v. Milgo Electronic Corp.*
    553 F.2d 735 (1st Cir. 1977) ................................................................16, 17

*E. & J. Gallo Winery v. Andina Licores S.A.*
    446 F.3d 984 (9th Cir. 2006) .................................................13, 14, 20, 24, 25

*Ericsson, Inc. v. D-Link Sys., Inc.*
    773 F.3d 1201 (Fed. Cir. 2014) ....................................................................5

*FTC v. Qualcomm*
    No. 17-CV-00220-LHK, 2019 WL 2206013 (N.D. Cal. May 21,
    2019) ..............................................................................................2, 3, 21

*Gilbane Fed. v. United Infrastructure Projects Fzco*
    Case No. 14-cv-03254-VC, 2014 WL 4950011 (N.D. Cal. Sep. 24,
    2014) ...........................................................................................................15

*Huawei Techs., Co. v. Samsung Elecs. Co.*
    Case No. 3:16-CV-02787-WHO, 2018 WL 1784065 (N.D. Cal. Apr.
    13, 2018) .................................................................14, 15, 18, 19, 20, 21

*Kahn v. General Motors Corp.*
    889 F.2d 1078 (Fed. Cir. 1989) ..................................................................16

*Katz v. Lear Siegler, Inc.*
    909 F.2d 1459 (Fed. Cir. 1990) ..................................................................16

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*
    731 F.2d 909 (D.C. Cir. 1984).................................................................20, 21

*Medtronic, Inc. v. Catalyst Research Corp.*
    518 F. Supp. 946 (D. Minn. 1981), *aff'd*, 664 F.2d 660 (8th Cir.
    1981) ...........................................................................................................18

*Microsoft Corp. v. Motorola Inc.*
   696 F.3d 872 (9th Cir. 2012) ....................2, 3, 6, 13, 14, 18, 19, 20, 21, 22, 23, 24

*Microsoft Corp. v. Motorola Inc.*
   795 F.3d 1024 (9th Cir. 2015) .................................................................2, 5, 21

*Microsoft Corp. v. Motorola, Inc.*
   871 F. Supp. 2d 1089 (W.D. Wash. 2012), aff'd, 696 F.3d 872 (9th
   Cir. 2012) ........................................................................................... 13, 23

*In re Nintendo of Am., Inc.*
   756 F.3d 1363 (Fed. Cir. 2014) ...................................................................... 16

*In re Personalweb Techs., LLC Patent Litig.*
   Case No. 18-md-02834-BLF, 2019 WL 1455332 (N.D. Cal. April 2,
   2019) ...................................................................................................... 17

*Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*
   361 F.3d 11 (1st Cir. 2004) ........................................................................... 20

*Quanta Computer, Inc. v. LG Electronics, Inc.*
   553 U.S. 617 (2008) .................................................................................... 19

*Realtek Semiconductor Corp. v. LSI Corp.*
   946 F. Supp. 2d 998 (N.D. Cal. 2013)............................................................3, 6

*Spread Spectrum Screening LLC v. Eastman Kodak Co.*
   657 F.3d 1349 (Fed. Cir. 2011) ...................................................................... 17

*T-Jat Sys. 2006 Ltd. v. Amdocs Software Sys. Ltd.*
   Case No. 13-CV-5356, 2013 WL 6409476 (S.D.N.Y. Dec. 9, 2013)................. 13

*TCL Communication Technology Holdings, Ltd. v.*
   *Telefonaktienbolaget LM Ericsson*
   No. 8:14-cv-00341-JVS-DFM, Dkt. 279-1 (C.D. Cal. June 29, 2015)............... 18

*In re Unterweser Reederei, GmbH*
   428 F.2d 888 (5th Cir. 1970) .........................................................14, 20, 22, 24

*Zynga, Inc. v. Vostu USA, Inc.*
   816 F. Supp. 2d 824 (N.D. Cal. 2011).............................................................. 15

<u>Other Authorities</u>

Fed. R. Civ. P. 65(d)(2)(C) ................................................................................ 13

## I.     __INTRODUCTION__

Plaintiff Continental Automotive Systems, Inc. ("Continental") is a leading supplier of telematics control units ("TCUs") for cars which incorporate 2G, 3G, and/or 4G cellular communications.  Continental filed this lawsuit after Defendants refused to grant Continental a direct license to their standard essential patents ("SEPs") for the relevant standards, despite being bound by commitments to license their SEPs on fair, reasonable, and non-discriminatory ("FRAND") terms to implementers like Continental.  Instead, Defendants—both individually and through the "licensing platform" Avanci—have conspired to demand non-FRAND royalties from Continental's customers, which are the automotive vehicle manufacturers ("OEMs").  Continental, in turn, risks bearing the financial burden of the inflated royalties in the form of indemnity demands to Continental by the OEMs.

With respect to Nokia, Continental tried for more than a year to obtain a direct license to Nokia's cellular SEPs.  In violation of its FRAND obligation, Nokia refused to consider a direct license to Continental and instead insisted on licensing only OEMs, such as Continental's customer Daimler AG ("Daimler"), ████████ ████████████████████████████████████████.  Once it became clear that Nokia would not reconsider its improper policy, Daimler and some of its suppliers, including Continental, individually asked the European Commission to investigate Nokia's refusal to directly license anyone other than OEMs.  Yet rather than adjust course and comply with its FRAND obligation, Nokia instead doubled-down on its efforts to hold-up the OEMs by filing ten retaliatory patent infringement lawsuits against Daimler in Germany.  Each suit alleges that Daimler's vehicles infringe one of Nokia's SEPs based on inclusion of a TCU which includes cellular functionality.  Then, almost simultaneous with Continental's filing of this lawsuit, Nokia expanded the German lawsuits to also request injunctive relief against Daimler's products (which, by extension, would also have the practical effect, in economic terms, of enjoining Continental's ability to further supply Daimler).

Nokia's lawsuits against Daimler are clearly not intended as a comprehensive adjudication of the FRAND terms and conditions of a license to Nokia's SEPs, because Nokia claims it holds up to 20% of 3G and 4G SEPs, and yet the lawsuits cover only a handful of alleged SEPs.  Rather, the purpose of Nokia's German lawsuits is to pressure Daimler to accept a license on non-FRAND terms by using the threat of an injunction to stop automobile production, and the financial burden of litigating Nokia's scattershot infringement actions.

Nokia's German lawsuits are an attempt to force Daimler and other OEMs to accept non-FRAND licenses before this Court has an opportunity to adjudicate the case on the merits, and thus should be enjoined.  Nokia's stated policy of only licensing at the OEM level is directly contrary to Ninth Circuit precedent, which states that SEP owners are required "to license . . . all comers on [FRAND] terms," *Microsoft Corp. v. Motorola Inc.*, 696 F.3d 872, 876 (9th Cir. 2012) ("*Microsoft I*"), and "cannot refuse a license to a manufacturer who commits to paying the RAND rate."  *Microsoft Corp. v. Motorola Inc.*, 795 F.3d 1024, 1031 (9th Cir. 2015) ("*Microsoft II*").  In a recent decision in this district, Judge Lucy H. Koh likewise concluded that the FRAND commitment "require[s] Qualcomm to license its SEPs to rival modem chip suppliers," and also that Qualcomm (one of the founders of Defendant Avanci) instituted the unlawful practice of only licensing OEMs "because Qualcomm determined that it was far more lucrative" to license OEMs rather than suppliers.  *FTC v. Qualcomm*, No. 17-CV-00220-LHK, 2019 WL 2206013, at *75-81 (N.D. Cal. May 21, 2019).  Notably, Judge Koh's decision also addressed the fact that Nokia "followed Qualcomm's lead and refuse[s] to license modem chip suppliers because it is more lucrative to license only OEMs," despite Nokia making prior statements to the European Commission that the FRAND commitment establishes an "unequivocal" obligation to license to component suppliers.  *Id.* at *79.  Nokia now seeks to use burdensome patent infringement litigation to pressure Daimler and other OEMs to quickly sign license agreements

1  before this Court can enter an injunction that Nokia "must make exhaustive SEP

2  licenses available" on FRAND terms to Continental, similar to the relief granted by

3  Judge Koh in the *FTC v. Qualcomm* matter.  *Id.* at \*138.

4         Nokia's decision to seek injunctive relief in at least eight of the German

5  Actions, and thereby acutely increase the pressure on Daimler and other OEMs to

6  accede to Nokia's unfair royalty demands, is also directly contrary to U.S. policy.

7  Under well-established case law, it is inappropriate for a SEP-holder to seek

8  injunctive relief on FRAND-encumbered patents against a willing licensee like

9  Continental.  The Ninth Circuit has previously upheld an anti-suit injunction in

10 similar situations because "injunctive relief against infringement is arguably a

11 remedy inconsistent with the [FRAND] licensing commitment." *Microsoft I*, 696

12 F.3d at 885; *see also Realtek Semiconductor Corp. v. LSI Corp.*, 946 F. Supp. 2d

13 998, 1006–08 (N.D. Cal. 2013).  When Nokia previously litigated against

14 Qualcomm (and before Nokia exited the handset business), it similarly

15 acknowledged that the "effects of an injunction itself could be devastating and

16 irreparable," with the potential to "substantially distort royalty negotiations, as

17 patent holders may seek unreasonable royalties through the mere threat of lawsuits

18 and injunctions thus practically holding hostage the entire revenue stream and

19 profits of the target company's relevant business." (Decl. of Matthew W. Holder,

20 Ex. 1 at ¶ 34.)  Yet now, unburdened by the need to obtain SEP licenses for its own

21 user equipment, Nokia is engaging in the very same tactics it previously contended

22 were breaches of the FRAND commitment.  Moreover, Nokia's requests for

23 injunctive relief against Daimler based on the incorporation of Continental's TCUs

24 are, in economic terms, effectively requests for injunctive relief against Continental

25 in direct violation of Nokia's FRAND obligations not to seek injunctive relief

26 against a willing licensee.

27         Continental is a willing licensee, as evidenced by its sincere but ultimately

28 futile efforts to obtain a direct license from Nokia, and the subsequent filing of the

present action to adjudicate the FRAND terms of a license with Nokia and the other Defendants.  In contrast to Nokia's piecemeal infringement litigation in Germany, Continental's complaint here is intended to fully resolve the dispute between Continental, its customers, and Nokia by making clear that Continental is entitled to a direct license, and determining the FRAND royalty rates for a license to Nokia's entire cellular SEP portfolio.  Nokia's numerous infringement lawsuits against Daimler interfere with the Court's ability to reach a just result in this case by exerting undue pressure on Daimler to accept "a super-monopoly royalty" under threat of injunction.  (Holder Decl., Ex. 1 at ¶ 34.)  This, in turn, exerts undue pressure on Continental, as OEMs typically demand indemnity of such licensing costs as a condition of purchasing any TCUs from suppliers like Continental.

Accordingly, Continental respectfully requests that the Court temporarily enjoin Nokia from prosecuting its lawsuits in Germany against Daimler until the FRAND issues are finally resolved in this case.  Likewise, because the other Defendants should not be permitted to do what Nokia has already done, Continental further requests that the Court enjoin Defendants from filing additional actions against Continental or its customers alleging infringement of the SEPs at issue in this litigation, or otherwise acting in concert with anyone else to file or pursue additional such actions, while the FRAND action here remains pending.

## II.   FACTUAL BACKGROUND

### A.   The Nature and Risks of Standardization

Avanci's Members own alleged standard-essential patents that are subject to the obligations of various standard-setting organizations ("SSOs") relevant to this action—the European Telecommunications Standards Institute ("ETSI"), the Alliance for Telecommunications Industry Solutions ("ATIS"), and the Telecommunications Industry Association ("TIA").  (Dkt. 1, ¶¶ 80–94.)  These SSOs have been involved in standardizing numerous 2G, 3G, and 4G cellular technologies.  (Dkt. 1, ¶¶ 64–70.)  The development of technology standards such as

those at issue in this litigation has many benefits, including for companies who participate in standardization, companies who manufacture products compliant with the standards, consumers, and society as a whole.

Along with the many advantages of standardization, however, the incorporation of technology into a standard also carries the risk that SEP owners will engage in anti-competitive behavior. *See Microsoft II*, 795 F.3d at 1030–31. As the Ninth Circuit has recognized, once a standard becomes widely adopted, SEP holders obtain substantial leverage over manufacturers of standard-compliant products and can abuse that leverage by demanding more for a license than the patented technology would be worth had it not been adopted by the SSO. *See id.* at 1031. The tactic of withholding a license unless and until a manufacturer agrees to pay an unduly high royalty rate for an SEP is referred to as "hold-up." *Id.*; *Ericsson, Inc. v. D-Link Sys., Inc.,* 773 F.3d 1201, 1209 (Fed. Cir. 2014).

To mitigate the risk that SEP holders will extract more than the fair value of their patented technology, SSOs require SEP holders to declare potentially essential patents and commit to license those patents on FRAND terms and conditions. For example, the ETSI IPR Policy requires SEP owners to commit to provide "irrevocable licenses on fair, reasonable and nondiscriminatory ('FRAND') terms and conditions." (Holder Decl., Ex. 14 at § 6.1.) The TIA policy requires any SEP holder that wishes to monetize its essential patents to commit to license SEPs "to all applicants under terms and conditions that are reasonable and non-discriminatory . . . to the extent necessary for the practice of . . . the Standard." (*Id.*, Ex. 15 at § 3.1.1(2)(a).) The ATIS policy requires SEP holders to commit that a license "will be made available . . . to the applicants desiring to utilize the license for the purpose of implementing the standard . . . under reasonable terms and conditions that are demonstrably free of any unfair discrimination." (*Id.*, Ex. 16.)

Avanci's Members have directly declared many of their patents as essential, or are successors-in-interest to patents that were directly declared essential to the

1    2G, 3G, and 4G telecommunications standards established by the above SSOs.

2    (Dkt. 1, ¶¶ 80–94.)  Therefore, Avanci's Members are bound to license their patents

3    consistent with the SSO's policies.  (*See id.*)  According to these policies, owners of

4    intellectual property that may be considered essential to a particular standard or

5    technical specification are contractually bound to grant irrevocable licenses to third

6    parties on FRAND terms and conditions.  (Dkt. 1, ¶¶ 71–79.)

7            Unfortunately, the mere existence of the FRAND commitment alone, without

8    judicial enforcement, does not protect against the efforts of some SEP owners to act

9    in an anti-competitive manner.  As the Federal Trade Commission has explained,

10   SEP owners seeking to inappropriately exploit value added by virtue of

11   standardization (as opposed to the value of their patents) "may have especially

12   severe consequences for innovation and competition in the context of standardized

13   technology."  (Holder Decl., Ex. 17 at p. 22.)  This pursuit of overcompensation

14   would raise the price to consumers or even "threaten to undermine the collaborative

15   innovation that can result from the standard setting process."  (*Id.*, p. 28.)

16           Courts and commentators also have recognized that "injunctive relief against

17   infringement is arguably a remedy inconsistent with the [FRAND] licensing

18   commitment." *Microsoft I,* 696 F.3d at 885; *Realtek v. LSI*, 946 F. Supp. 2d at

19   1006–08; Holder Decl., Ex. 18 at pp. 6-7 ("Patent holders should not generally be

20   allowed to obtain injunctions in the presence of a FRAND commitment.  As a

21   matter of economics, injunctions are inimical to some of the fundamental objectives

22   of FRAND, such as fostering broad licensing of SEPs and adoption of the

23   standard.").  This inconsistency arises from a recognition that the mere threat of

24   injunctive relief gives the SEP owner additional power to hold up implementers.

25   *Microsoft I*, 696 F.3d at 886 (the threat of injunctive relief "compromis[es] the

26   court's ability to reach a just result in the case before it free of external pressure on

27   [the accused infringer] to enter into a 'holdup' settlement before the litigation is

28   complete"); Holder Decl., Ex. 18 at p. 7 ("An injunction provides a means for a

1   patent holder to exercise the additional market power gained by inclusion of a patent

2   in a standard, and the threat of an injunction places at risk the investment and

3   ongoing profits of firms using the standard.  This allows the patent holder to engage

4   in hold-up and ask for payment in excess of the *ex ante* value of the patent.").

5   **B.    Nokia's Prior Advocacy on the Issues Addressed in This Motion**

6   Importantly, Nokia itself has acknowledged in a prior statement before the

7   European Commission that "the FRAND commitment is fundamentally about

8   ensuring access to patented technology in standards and avoiding anti-competitive

9   effects."  (Holder Decl., Ex. 2 at p. 1.)  According to Nokia, "[t]o be fully effective,

10  a FRAND commitment has to be both ***meaningful and binding***."  (*Id.* (emphasis

11  added).)  As Nokia explained at the time, "it would ***not make sense*** if it was

12  possible for an essential patent owner ***to obtain an injunction against anyone***

13  ***prepared to take a license*** on FRAND terms . . . ."  (*Id.* (emphasis added).)

14  Similarly, in 2014—amid concerns that Nokia would "abuse its position" as a

15  SEP owner after divesting its handset business to Microsoft—Nokia reaffirmed its

16  FRAND obligation and outlined the very limited circumstances under which it

17  believed injunctive relief appropriate:

18  Nokia confirms its support for a principle that, subject to

19  reciprocity, injunctions with SEPs should not be enforced to

20  prevent the implementation of a standard subject to FRAND

21  undertakings, unless a patent holder has made a FRAND

22  license available and the prospective licensee has been

23  unwilling to enter into such FRAND license or to comply with

24  its terms.

25  (*Id.*, Ex. 3 at p. 2.)

26  Indeed, Nokia argued fervently against the availability of injunctive relief on

27  SEPs in an earlier dispute with Qualcomm.  In that case, when it was in the position

28  of the prospective licensee, Nokia advocated that Qualcomm, by virtue of its

1  FRAND declarations for patents it had declared essential to the ETSI standards,

2  "gave up the remedy of an injunction in the event of a dispute with Nokia over the

3  amount of a FRAND royalty."  (*Id.*, Ex. 4 at pp. 1–2.)  As Nokia admitted, a SEP

4  owner "using the threat of injunctions against a willing licensee to gain leverage in

5  its demand for excessive royalty rates" is exactly the type of hold-up that the

6  "voluntary FRAND contracts were designed to preclude."  (*Id.*, Ex. 1 at ¶ 79.)

7        **C.    The Dispute Between the Parties**

8              1.    Continental sought a direct license to Nokia's SEPs.

9        Continental is one of the leading providers of TCUs to OEMs in the

10 automotive industry.  (Dkt. 1, ¶¶ 1, 17–18.)  No later than early 2017, Defendants

11 began targeting certain Continental customers, asserting that their connected cars

12 practice the cellular standards covered by Defendants' alleged SEPs, and insisting

13 that they pay excessive royalty rates in return for a license.  (*See id.*, ¶¶ 128–141.)

14 But in the automotive industry, intellectual property licenses have historically been

15 handled by the suppliers of the relevant components (given, for example, that there

16 are hundreds, if not thousands, of separate components which are incorporated into

17 the vehicle).  As the parties responsible for implementing the technology,

18 component suppliers are in a much better position than OEMs to determine whether

19 or not a given component practices a patented technology.  As the supplier of TCUs

20 to Daimler and a willing licensee, Continental attempted to negotiate with each

21 Defendant in a good-faith effort to obtain FRAND licenses to all relevant SEPs, but

22 was continually rebuffed by Avanci and various of its members.  (*See id.*)  Rather,

23 Defendants insist they are only willing to grant direct licenses to OEMs, and refuse

24 to grant direct licenses to any other parties in the supply chain.

25       With respect to Nokia, Continental sent a letter to Nokia in October 2017,

26 which specifically referenced the fact that Nokia had approached Daimler,

27 confirmed that Continental is a willing licensee, and sought to negotiate a license

28 covering Continental's products.  (Holder Decl., Ex. 8.)  In addition, Continental

1   requested further information regarding Nokia's portfolio, as well as claim charts, so

2   that it could examine whether Nokia's patents were truly essential, and whether it

3   would indeed require a license from Nokia for its products.  (*See id.*)

4          Despite Nokia's FRAND obligation to license its SEPs, Nokia refused to

5   directly license Continental.  Rather, when it responded to Continental in November

6   2017, Nokia stated that its policy is ███████████████████████████████

7   ████████████████████████████████████████████████████████

8   ███████████ (*Id.*, Ex. 9 (emphasis added).)  Instead of a direct license, Nokia

9   proposed an alternative model in which ███████████████████████████

10  █████████████████████████████████████████████████████████████

11  ████████████████████████████ (*Id.*)

12         Throughout 2018 and into 2019, Continental and its affiliates continually

13  attempted to negotiate a direct license with Nokia.  However, Nokia refused to

14  consider a direct license to suppliers.  (*See id.*, Ex. 10.)  In an October 2018 letter,

15  Continental expressed its concern regarding Nokia's offer, including the lack of a

16  direct license to Continental.  (*See id.*, Ex. 11.)  In December 2018, Continental sent

17  another letter to Nokia explaining in detail why Nokia's position is inconsistent with

18  its FRAND obligations and also contradicts Nokia's own prior position that it had

19  outlined to the European Commission in earlier proceedings.  (*See id.*, Ex. 12.)

20  Continental urged Nokia to reconsider and asked Nokia to submit a license offer.

21  Nokia finally replied in April 2019, ███████████████████████████████

22  ██████████████████████████████. (Decl. of Dr. Frank-Erich

23  Hufnagel, Ex. 6 at pp. 5–6.)  Continental responded on May 7, 2019, to further

24  explain why Nokia's proposal was not FRAND, and why Continental both needed,

25  and was entitled to, a direct FRAND license.  (Holder Decl., Ex. 13.)

26         2.     Daimler and others filed complaints with the European Commission

27                regarding Nokia's refusal to license suppliers.

28         After years of Nokia refusing to engage in direct licensing discussions with

Daimler's suppliers of TCUs and insisting, contrary to its FRAND obligation, that it will only directly license at the OEM level, Daimler filed a complaint against Nokia with the European Commission Directorate-General for Competition in November 2018, wherein Daimler asked for an investigation of Nokia's SEP licensing practices in the automotive industry.  (Hufnagel Decl., ¶¶ 2–4, Ex. 1.)  Daimler noted that "[f]air and non-discriminatory access to these standards for ***all users*** of the essential patents for telecommunications standards is a key prerequisite for the development of new products and services for connected driving."  (*Id.* (emphasis added).)

Daimler's complaint was followed by similar individual complaints from some of Daimler's Tier-1 suppliers, including Continental, Bury, and Valeo, as well as chipmaker Gemalto.  (*Id.*, ¶ 5, Ex. 2.)  Continental's complaint to the European Commission related directly to Nokia's refusal to license SEPs for mobile telecommunication standards on FRAND terms to any supplier of automotive components seeking a license, including Continental and its supply chain.  (*See id.*)

3.      Nokia then filed retaliatory infringement lawsuits against Daimler.

Rather than adjust course and offer direct FRAND licenses to Daimler's suppliers, Nokia further exacerbated the dispute by filing a wide array of retaliatory patent infringement lawsuits intended to pressure Daimler into taking a non-FRAND license.  On March 20, 2019, Nokia filed ten patent infringement suits against Daimler in Germany:  three each in Munich and Düsseldorf, and four in Mannheim (collectively, the "German Actions").  (*See id.*, ¶ 6.)  All of the patents asserted against Daimler in the German Actions were declared by Nokia to ETSI, and thus are subject to the FRAND obligation.  (*See id.*, ¶¶ 9, 15, 20, 25, 30, 36, 41, 45, 50, 55, Exs. 4, 8, 11, 14, 19, 22, 24, 27, 30.)  Nokia's complaints against Daimler also claim that the asserted patents are essential to the 3G and 4G standards.  (*See, e.g.*, *id.*, ¶¶ 8–9; Ex. 3 §§ II, V.)  Nokia's German Actions expressly concern Daimler vehicles with TCUs, including those supplied by Continental:

This complaint is challenging Defendant's ***automobiles***

manufactured, imported, exported, offered or sold, whether
directly or indirectly, by Defendant, which are (i) **compliant
with one or more of the following standards: GSM/GPRS
standard, UMTS standard, CDMA standard and/or LTE
standard** (as promulgated by ETSI, 3GPP, TIA or 3GPP2
standard developing organizations) to which the patent in suit
with the asserted claims is essential; and (ii) **incorporating
components** (such as telematics control units, wireless modules
or other network access devices) from **Continental AG** . . . .

(*Id.*, ¶ 8; Ex. 3 at § III (emphasis added).)

In each of the German Actions, Nokia pursues (1) claims for information and rendering of account as to the extent of the infringing activities for the relevant patent at issue (including, *e.g.*, requests to disclose the quantities of products manufactured or sold, the names of customers and suppliers, and costs and profits), (2) a motion for a declaratory judgment holding Daimler liable to pay damages for the infringing activities, (3) an order requiring Daimler to pay the costs of the proceedings, and (4) to declare a judgment provisionally enforceable against security.  (*See id.*, ¶¶ 10, 16, 21, 26, 31, 37, 42, 46, 51, 56.)  In eight of the German Actions, Nokia has already expanded its original complaint to include a request for injunctive relief against Daimler's products incorporating Continental TCUs.  (*See id.*, ¶¶ 17, 22, 27, 32, 38, 47, 52, 57; Exs. 9, 12, 15, 17, 20, 25, 28, 31.)  Nokia added these requests for injunctive relief very close in time to when Continental filed the current action seeking a FRAND license to the wireless SEPs of Nokia and all Avanci Members.[1]  These requests for injunctive relief are clearly directed not toward protecting any of Nokia's rights, but rather toward pressuring Daimler to

---

[1] Nokia's injunction requests were made on May 8, two days before Continental filed this action, and were served on Daimler on May 15 and May 28, after Continental filed and served this action.  (Hufnagel Decl., ¶¶ 17, 22, 27, 32, 38, 47, 52, 57; Exs. 9, 12, 15, 17, 20, 25, 28, 31.)

accept a license on non-FRAND terms.  In none of the German Actions does Nokia request that the court adjudicate and impose a global FRAND license between the parties, as Continental does here.

Continental's interests are further intertwined in the outcome of Nokia's German Actions because Daimler asserts that Continental is contractually obligated to indemnify Daimler for allegations of infringement related to Continental's products.  (Holder Decl., Ex. 7.)  In fact, no later than August 7, 2017, Continental received an indemnification request from Daimler regarding license requests Daimler received from Nokia (and others) regarding its cellular patent portfolio.  (*See id.*)  Therefore, Continental may be liable for the damages Nokia seeks to obtain from Daimler in the German Actions.

Moreover, on May 17, 2019, Daimler served Continental and its relevant subsidiaries with a formal Third Party Notice of the dispute in Docket No. 7 O 3890/19, which permit Continental to participate in the proceeding as an intervenor.  (Hufnagel Decl., ¶ 11, Ex. 5.)  Under German law, Daimler is only entitled to file a Third Party Notice against any third party against which it "believes to be able to raise indemnification claims . . . in case of a negative outcome of the proceedings."  (*Id.*, ¶ 11.)  A Third Party Notice is only appropriate where a third party has a legitimate legal interest in the outcome of the litigation.  (*See id.*)  On May 31, 2019, Continental formally intervened in the above-stated German Action pursuant to the Third Party Notice received from Daimler.  (*See id.*, ¶ 12, Ex. 6.)

    4.    <u>Continental filed the present action against Nokia and the other Defendants to resolve the global dispute between the parties.</u>

On May 10, 2019, Continental initiated this litigation ("the California Action") because Defendants' collusive agreement to refuse licenses to Continental and other suppliers on FRAND terms breaches Defendants' FRAND commitments and constitutes anticompetitive conduct, and also because the royalties demanded by Defendants are far higher than what should be considered FRAND.  (Dkt. 1, ¶¶ 8–

15.)  Continental asks the court to "[a]djudge and decree that Continental and other suppliers in the automotive supply chain are entitled to a license from Defendants" for all relevant SEPs, and to "set the FRAND terms and conditions" of the license. (Dkt. 1, Prayer For Relief D-E.)

In contrast to Nokia's piecemeal patent infringement lawsuits, this litigation is intended to broadly resolve all disputed issues between Continental on the one hand, and Nokia and Defendants on the other hand, related to Defendants' wireless SEPs. Indeed, an adjudication on the merits here in this action that Nokia and Defendants are required to license suppliers like Continental on FRAND terms will demonstrate why it was improper for Nokia to sue Daimler in the first place.

## III.   **APPLICABLE LEGAL STANDARD**

This Court has the power to enjoin parties from proceeding with an action in the courts of a foreign country.  *See Microsoft I*, 696 F.3d at 880–81; *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006) ("*Gallo*").  "Courts derive the ability to enter an anti-suit injunction from their equitable powers.  Such injunctions allow the court to restrain a party subject to its jurisdiction from proceeding in a foreign court in circumstances that are unjust."  *Gallo*, 446 F.3d at 989.  Anti-suit injunctions are appropriate when a party's foreign actions "frustrate[] this court's ability to adjudicate issues properly before it" or when "[w]ithout the issuance of an anti-suit injunction, the integrity of the action before this court will be lessened."  *Microsoft Corp. v. Motorola, Inc.*, 871 F. Supp. 2d 1089, 1100 (W.D. Wash. 2012), aff'd, 696 F.3d 872 (9th Cir. 2012).  The Ninth Circuit emphasizes that district courts have "a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants."  *Gallo*, 446 F.3d at 995. Anti-suit injunctions can properly extend to all "other persons who are in active concert or participation with" the parties addressed in the motion.  Fed. R. Civ. P. 65(d)(2)(C); *T-Jat Sys. 2006 Ltd. v. Amdocs Software Sys. Ltd.*, Case No. 13-CV-5356, 2013 WL 6409476, at *4 (S.D.N.Y. Dec. 9, 2013) (enjoining "Respondents . .

1  . and all other persons who are in active concert or participation with Respondents'

2  from prosecuting any action in Israel").

3        In *Microsoft I*, the Ninth Circuit used a three-part test to evaluate the propriety

4  of an anti-suit injunction in a case similar to this one (*i.e.*, a case involving a global

5  FRAND dispute).  *See Microsoft I*, 696 F.3d at 881.  Under that test, the court

6  should first determine "whether or not the parties and the issues are the same" in

7  both actions, and whether the current action is dispositive of the action to be

8  enjoined.  *Id.* at 881, citing *Gallo*, 446 F.3d at 991 (citations omitted); *see also*

9  *Applied Med. Distrib. Corp. v. Surgical Co. BV*, 587 F.3d 909, 914–15 (9th Cir.

10 2009) ("*Applied Medical*") (explaining the first step of the *Gallo* test is a "functional

11 inquiry concerning dispositiveness," not a requirement that the claims be identical).

12 Second, the court should determine whether at least one of the "*Unterweser* factors"

13 applies, asking whether the litigation to be enjoined would "(1) frustrate a policy of

14 the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the

15 issuing court's *in rem* or *quasi in rem* jurisdiction; or (4) where the proceedings

16 prejudice other equitable considerations."  *Microsoft I*, 696 F.3d at 881-82; *In re*

17 *Unterweser Reederei, GmbH*, 428 F.2d 888, 890 (5th Cir. 1970) ("*Unterweser*").

18 Finally, the court should assess whether the proposed injunction's impact on comity

19 is tolerable.  *See Microsoft I*, 696 F.3d at 881.  "Comity is less likely to be

20 threatened in the context of a private contractual dispute than in a dispute

21 implicating public international law or government litigants."  *Id.* at 887.

22       A request for an anti-suit injunction is evaluated only under the *Gallo* test, not

23 the traditional four factor test for a preliminary injunction.  *See Microsoft I*, 696

24 F.3d at 881 (addressing only the *Gallo* factors); *Applied*, 587 F.3d at 913 (same); *see*

25 *also Huawei Techs., Co. v. Samsung Elecs. Co.*, Case No. 3:16-CV-02787-WHO,

26 2018 WL 1784065, *4 (N.D. Cal. Apr. 13, 2018) ("*Huawei*") ("The Ninth Circuit's

27 analysis [in *Microsoft*] convinces me that I need only focus on the three-part inquiry

28 under *Gallo*. . .").

IV.   **NOKIA AND THE OTHER DEFENDANTS SHOULD BE ENJOINED FROM PURSUING SEP INFRINGEMENT CLAIMS AGAINST CONTINENTAL AND ITS CUSTOMERS.**

    A.   **The Parties and Issues Are Functionally the Same.**

"The threshold consideration for a foreign anti-suit injunction is whether or not the parties and the issues are the same in both the domestic and foreign actions, and whether or not the first action is dispositive of the action to be enjoined.  The consideration should be approached functionally, not in a technical or formal sense, but in the sense that all the issues in the foreign action can be resolved in the local action."  *Huawei,* 2018 WL 1784065 at *6 (internal citations and quotations omitted).  Continental, as a manufacturer of the allegedly infringing products, is the real party-in-interest in any patent infringement lawsuits filed by Defendants against Continental's customers (*e.g.*, Nokia's pending actions against Daimler in Germany).  Moreover, the relief sought by Continental in this action—namely, that the Court "set the FRAND terms and conditions that Continental is entitled to under Defendants' obligations to the relevant SSOs . . . for a license to Defendants' 2G, 3G, and 4G SEPs"—would resolve any patent infringement claims relating to Defendants' SEPs against Continental and its customers.  (Dkt. 1, pp. 63–64.)

        1.   Continental, as a manufacturer of the accused products, is the real party-in-interest.

"Perfect identity of parties is not required for an anti-suit injunction."  *Zynga, Inc. v. Vostu USA, Inc.*, 816 F. Supp. 2d 824, 828 (N.D. Cal. 2011).  Rather, the relevant inquiry is whether the parties are "affiliated in such a way that their interests coincide."  *Id.*; *see also Gilbane Fed. v. United Infrastructure Projects Fzco*, Case No. 14-cv-03254-VC, 2014 WL 4950011, at *5 (N.D. Cal. Sep. 24, 2014) (finding identity of the parties where their "interests are practically identical and are well represented by each other").  In any lawsuit filed by a Defendant in this action targeting Continental products purchased and installed by a Continental

customer, Continental's interests align with its customer's interests such that the "same parties" requirement is satisfied.

In particular, the parties in Nokia's German Actions are either the same as those in this lawsuit, or are functionally the same.  The complaints against Daimler in Germany were filed by Nokia Technologies Oy and Nokia Solutions and Networks Oy.  (Hufnagel Decl., ¶¶ 7, 13, 18, 23, 28, 33, 39, 43, 48, 53; Exs. 3, 7, 10, 13, 16, 18, 21, 23, 26, 29.)  Both are defendants to this action.  Even though the complaints in Germany target products which come from Tier 1 suppliers like Continental, Nokia initially listed Continental's customer Daimler AG as the sole defendant.  But in accordance with German procedures, Daimler thereafter served Continental with a Third Party Notice of the dispute in at least one of the cases, and Continental now has joined that case as an intervenor.  (*Id.*, ¶¶ 11–12, Exs. 5, 6.)  Daimler's notice recognizes Continental's legal interest in the German Actions, and the alignment of Continental's interests with Daimler's interests in those suits.

Separate and apart from the fact that Continental has intervened in one of the German Actions, Continental's status as the real party-in-interest in the German Actions is further demonstrated by the fact that under the "customer suit exception," federal courts regularly enjoin patentees from litigating first-filed lawsuits against the customer of a manufacturer when there is a separate proceeding involving the manufacturer.  *See In re Nintendo of Am., Inc.*, 756 F.3d 1363, 1365 (Fed. Cir. 2014); *Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1464 (Fed. Cir. 1990).  "The customer suit exception is based on the manufacturer's presumed greater interest in defending its actions against charges of patent infringement; and to guard against possibility of abuse."  *Kahn v. General Motors Corp.*, 889 F.2d 1078, 1081 (Fed. Cir. 1989).  "At the root of the preference for a manufacturer's declaratory judgment action is the recognition that, in reality, the manufacturer is the true defendant in the customer suit."  *Codex Corp. v. Milgo Electronic Corp.*, 553 F.2d 735, 737–38 (1st Cir. 1977).  As recognized in *Codex*, "it is a simple fact of life that a manufacturer

1   must protect its customers, either as a matter of contract, or good business, or in

2   order to avoid the damaging impact of an adverse ruling against its products." *Id.* at

3   738.  The "guiding principles" of the customer suit exception are "efficiency and

4   judicial economy."  *Spread Spectrum Screening LLC v. Eastman Kodak Co.*, 657

5   F.3d 1349, 1357 (Fed. Cir. 2011).

6          The rationale underlying the customer suit exception is equally applicable

7   here.  In any instance where Defendants file suit for patent infringement targeting

8   Continental's products (as Nokia has already done vis-à-vis Daimler in the German

9   Actions), Continental is the functional defendant in that lawsuit regardless of

10   whether it is a named party.  In addition to the business need to protect its

11   customers, recognized repeatedly by the federal courts in the "customer suit

12   exception" line of cases, Continental has also received requests for indemnification

13   from its customers related to Defendants' infringement allegations related to the

14   SEPs at issue in this litigation.  (*See, e.g.*, Holder Decl., Ex. 7.)  Under similar

15   circumstances, courts have recognized that a manufacturer and customer are in

16   privity based on an indemnification obligation "because they share the same interest

17   in the unfettered use of" an allegedly infringing product and the manufacturer

18   "adequately represent[s] this interest." *In re Personalweb Techs., LLC Patent Litig.*,

19   Case No. 18-md-02834-BLF, 2019 WL 1455332, at *8 (N.D. Cal. April 2, 2019)

20   (finding Amazon and its customers were privies based on their indemnity

21   agreement).  Moreover, resolving Defendants' claims against Continental's products

22   through this litigation, rather than individually litigating the issue in a piecemeal

23   fashion against different customers in any number of jurisdictions, certainly

24   promotes efficiency and judicial economy.  *See Spread Spectrum Screening LLC*,

25   657 F.3d at 1357.

26          For the above reasons, the interests of Continental and its customers in

27   defending against patent infringement claims which target Continental's products

28   are sufficiently aligned, such that the identity of parties requirement for granting an

1    anti-suit injunction is satisfied.

2             2.      This lawsuit is dispositive of the actions to be enjoined.

3            In deciding whether to issue an anti-suit injunction, the Ninth Circuit has

4    explained that a court should assess "whether the issues are the same not in a

5    technical or formal sense, but [rather] in the sense that all the issues in the foreign

6    action . . . can be resolved in the local action." *Microsoft I*, 696 F.3d at 882–83

7    (citations omitted).  In *Microsoft I*, the Ninth Circuit affirmed the anti-suit injunction

8    issued by the district court, agreeing that Microsoft's RAND claim was capable of

9    resolving Motorola's infringement claim in Germany because Motorola's licensing

10   offers included the German patents and Motorola promised to license those German

11   patents on RAND terms.  *See id.* at 883–84; *see also Medtronic, Inc. v. Catalyst*

12   *Research Corp.*, 518 F. Supp. 946 (D. Minn. 1981), *aff'd*, 664 F.2d 660 (8th Cir.

13   1981) (issuing an anti-suit injunction against the enforcement of foreign patents

14   based on a contract between the parties not to enforce the patents).

15           Indeed, several other courts have recognized the propriety of resolving

16   FRAND licensing disputes between two parties first, rather than allowing piecemeal

17   infringement suits on individual SEPs.  In *TCL v. Ericsson,* the court granted an

18   anti-suit injunction to prevent Ericsson from pursuing foreign patent claims on

19   individual SEPs that were the subject of the court's global FRAND determination

20   because "the [domestic] FRAND action should resolve [the parties'] global

21   licensing dispute." *TCL Communication Technology Holdings, Ltd. v.*

22   *Telefonaktiebolaget LM Ericsson*, No. 8:14-cv-00341-JVS-DFM, Dkt. 279-1 at 5

23   (C.D. Cal. June 29, 2015).  Similarly, in *Huawei*, the court found that the parties'

24   competing breach of contract claims based on the alleged failure to abide by their

25   respective FRAND commitments to ETSI controlled the disputes between the

26   parties and dictated that the action Samsung filed in California was "dispositive of

27   Huawei's Chinese actions."  *Huawei*, 2018 WL 1784065 at *7-8.

28           Like the cases discussed above, Continental's complaint against Defendants

alleges that Defendants have breached their contractual commitments to the relevant SSOs, including ETSI, TIA, and/or ATIS, by refusing to license their alleged 2G, 3G, and/or 4G SEPs to Continental.  (Dkt. 1, Prayer For Relief D–G.)  Continental asks this Court to declare that "Continental and other suppliers in the automotive supply chain are entitled to a license from Defendants" for all 2G, 3G, and 4G SEPs and to "set the FRAND terms and conditions that Continental is entitled to under Defendants' obligations to the relevant SSOs."  (*Id.* at Prayer For Relief D, E.) Continental seeks a worldwide license to Defendants' SEPs, consistent with Defendant Avanci's representations that the "Avanci license covers *the entire* essential 2G, 3G and 4G patent portfolio" of its members.  (Holder Decl., Ex. 19 (emphasis added).)  Nokia's patent infringement claims in the German Actions against Daimler, based on its use of Continental's products, likewise relate to patents which are allegedly essential to the 2G, 3G, and/or 4G standards, and which are subject to declarations that Nokia will license the patents on FRAND terms. (*See, e.g.*, Hufnagel Decl. ¶¶ 8–9; Ex. 3 §§ II, V.)  Nokia's infringement claims stem from the implementation of these standards by the TCUs incorporated into Daimler's vehicles.  (*Id.*)

Given the above facts, the California Action is capable of resolving the issues in the German Actions.  Indeed, if this Court determines that Nokia is obligated to license its 2G, 3G, and 4G SEPs to Continental in the first instance, and sets the FRAND terms and conditions of the license, then Nokia's (and any other Defendant's) infringement claims against all Continental products—whether sold to Daimler or any other of Continental's customers—will be mooted.  Once this Court enters the requested declaratory judgment and injunction, Continental's sales to its customers will be licensed and Defendants' patent rights exhausted. *See Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 625 (2008) ("The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item.").  As in *Microsoft* and

*Huawei*, "the availability of injunctive relief for [Nokia's] SEPs depends on the breach of contract claims" at issue in the California Action. *Huawei*, 2018 WL 1784065 at *12; *Microsoft I*, 696 F.3d at 883. Accordingly, the issues in the California Action are functionally the same as the issues in the German Actions, and an anti-suit injunction is appropriate against Nokia and the other Defendants, in order to prevent them from doing what Nokia has already improperly done in Germany.

### B.  Multiple *Unterweser* Factors Justify an Anti-Suit Injunction.

The second step of the framework followed in *Microsoft* is to determine if any of the *Unterweser* factors apply. Importantly, ***only one*** factor needs to apply for injunctive relief to be appropriate. *See Gallo*, 446 F.3d at 991. Here, multiple *Unterweser* factors support the requested anti-suit injunction. Nokia's German actions are vexatious and oppressive, will frustrate U.S. law and policy, and prejudice multiple equitable considerations.

### 1.  Nokia's German Actions frustrate important U.S. policies.

Courts have repeatedly found foreign litigation to frustrate domestic policy when defendants seek to use the foreign litigation to evade contractual obligations or compliance with U.S. law. *See Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 20 (1st Cir. 2004); *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927 (D.C. Cir. 1984) ("Injunctions are most often necessary to protect the jurisdiction of the enjoining court, or to prevent the litigant's evasion of the important public policies of the forum."). Nokia's German Actions implicate several important policies.

First, this Court should grant Continental's motion because Nokia's filing of the German Actions against Daimler is a direct extension of Defendants' breach of contract and anticompetitive behavior. Continental's breach of contract and antitrust claims arise of out Defendants collectively "refusing to offer individual fully exhaustive direct FRAND licenses to suppliers in the automotive supply chain

in order to preserve Avanci's ability to extract supra-competitive prices at the OEM level." (Dkt. 1, pp. 45–46, 48–50.)  Ninth Circuit precedent clearly states that Nokia cannot refuse to license Continental, which is willing to pay a FRAND royalty rate. *See Microsoft II*, 795 F.3d at 1031.  In the *FTC v. Qualcomm* case, Judge Koh also recently determined that the policy of Qualcomm (again, one of the founders of Avanci) to license only at the OEM level was inconsistent with Qualcomm's FRAND obligation and U.S. antitrust law.  *See FTC v. Qualcomm*, 2019 WL 2206013, at *75-81.  Moreover, Judge Koh's decision specifically identified Nokia (as well as Ericsson, another Avanci founder) as copying Qualcomm's anticompetitive conduct by "refus[ing] to license modem chip suppliers because it is more lucrative to license only OEMs."  *Id.*  An anti-suit injunction is proper in this case where Nokia is "attempting to escape application of the antitrust laws to [its] conduct" by using the German Actions to pressure Continental's customer to accept non-FRAND terms, all while trying to avoid or otherwise delay an adjudication by this Court that its refusal to license Continental is a breach of FRAND and in violation of U.S. antitrust law.  *See Laker Airways*, 731 F.2d at 932.

Second, Nokia seeks injunctive relief against Daimler in the German Actions, and yet the Ninth Circuit, several regulatory bodies, and prominent economists all have declared that seeking injunctive relief against a willing licensee is antithetical to a FRAND commitment.  *See, e.g., Microsoft I*, 696 F.3d at 885 (upholding order preventing enforcement of German injunction, because injunctive relief was inconsistent with the contractual RAND obligation); *Apple v. Motorola*, 757 F.3d 1286, 1332 (Fed. Cir. 2014); Holder Decl., Ex. 18 at pp. 6–7 ("As a matter of economics, injunctions are inimical to some of the fundamental objectives of FRAND, such as fostering broad licensing of SEPs and adoption of the standard."). In *Huawei*, the district court granted a motion for anti-suit injunction in view of the important policy of preserving the "court's ability to determine the propriety of injunctive relief."  *Huawei*, at *17.

In previous litigation against Qualcomm, Nokia itself took the position that a SEP owner "is not entitled to an injunction or exclusion order that could prevent implementation of the standard—except in extraordinary circumstances, such as where the manufacturer refuses to pay judicially determined FRAND compensation for the actual infringement of a valid essential patent."  (Holder Decl., Ex. 5 at pp. 1–2.)  Here, Continental has clearly demonstrated that it is a willing licensee by first seeking a license from Nokia and the other Defendants, and then by initiating the present litigation to adjudicate the terms of a SEP license.  None of the extraordinary circumstances which may justify an exclusion order vis-à-vis the practice of SEPs are present in this case.  Nokia should not be permitted to circumvent the policy against enjoining a willing licensee in SEP cases by seeking injunctions against Continental's downstream customer in a foreign country, especially when the alleged infringement relates to a single component in a product (the car) that otherwise incorporates countless other technologies, and is obviously not fundamentally based on the use of the cellular standards.

In short, preventing SEP holders from abusing their dominant position by using injunctive relief to force a settlement of claims on non-FRAND terms, all while refusing to license a willing manufacturer further upstream in the supply chain, is exactly in line with U.S. law and policy.

2.    Nokia's German Actions are vexatious and oppressive.

An anti-suit injunction is also appropriate under the *Unterweser* factors because Nokia's litigation is vexatious and oppressive to Continental, and interferes with this Court's ability to reach a just result free of external pressure on the parties or Daimler to enter into a "hold-up" settlement before the litigation is complete.

In *Microsoft*, the court found that Motorola's actions raised concerns of "duplicative and vexatious litigation," which were "heightened by the fact that Motorola's commitments to the ITU involved approximately 100 Motorola owned patents, yet Motorola invoked the German Action implicating only two . . . of these

patents and sought injunctive relief in Germany before this court could adjudicate that precise issue." *Microsoft I*, 696 F.3d at 886.  Nokia has similarly chosen to file piecemeal infringement actions against Daimler in an effort to force it to sign a non-FRAND license.  Nokia filed the German Actions, including the requests for injunctive relief, *after* Daimler and Continental filed complaints with the European Commission and put Nokia on notice that its refusal to license Continental was a breach of its FRAND obligation.  (Hufnagel Decl., ¶¶ 2–6.)  Nokia then added the requests for injunctive relief at approximately the same time Continental filed and served the present action, and maintains these requests despite the ability of this Court to resolve the global licensing dispute between the parties on the merits.

Nokia is aware that the "effects of an injunction itself could be devastating and irreparable," and the mere threat of an injunction can "substantially distort royalty negotiations," because it previously argued exactly that in its prior litigation against Qualcomm.  (Holder Decl., Ex 1 at ¶ 34.)  This "substantial distortion" of royalty negotiations is precisely what Nokia wants here—it is using the threat of injunctive relief to pressure Continental's customer Daimler to capitulate before this Court has the opportunity to reach a just result on the merits.  The risk of distortion is even greater in this case because Nokia seeks injunctions to exclude entire vehicles from the market (with retail prices almost always well in excess of $30,000), based on their inclusion of a TCU which is obviously tangential to the overall functionality of the vehicle.

             3.     <u>Nokia's German Actions present a risk of inconsistent judgments.</u>

In *Microsoft*, the district court also found that injunctive relief was appropriate because allowing Motorola to continue the foreign litigation posed a risk of inconsistent judgments.  *See Microsoft,* 871 F. Supp. 2d at 1100.  Nokia's German Actions likewise present a significant risk of inconsistent judgments.

A finding by this Court that Defendants, including Nokia, breached their

1  FRAND obligation by failing to offer Continental a license on FRAND terms and

2  conditions would be inherently inconsistent with a German court issuing an

3  injunction against Daimler's vehicles based on their inclusion of a Continental TCU

4  implementing the cellular standards.  The present action also seeks to adjudicate the

5  FRAND terms and conditions of a license to all of Nokia's SEPs for the relevant

6  standards (as well as to all of the SEPs licensed by Avanci, of which Nokia is a

7  member).  In contrast, the German courts may set royalty rates for a handful of

8  patents which represent a fraction of Nokia's portfolio, which Nokia says "exceeds

9  20%" of all 3G and 4G SEPs.  (Hufnagel Decl., Ex. 3 at p. 34.)

10       Any of the factors discussed above, by itself, "may justify a foreign anti-suit

11  injunction."  *Microsoft I*, 696 F.3d at 882 n.9.  Because multiple *Unterweser* factors

12  apply here, Continental's request for an anti-suit injunction is especially appropriate.

## C.       The Impact of an Injunction on Comity Is Tolerable.

14       The final step of the *Gallo* analysis is to address whether the injunction's

15  "impact on comity is tolerable."  *Gallo*, 446 F.3d at 991.  "Comity is the

16  'recognition which one nation allows within its territory to the legislative, executive

17  or judicial acts of another nation, having due regard both to international duty and

18  convenience, and to the rights of its own citizens, or of other persons who are under

19  the protection of its laws.'"  *Gallo*, 446 F.3d at 994, citations omitted.  Comity is

20  "neither a matter of absolute obligation . . . nor of mere courtesy and good will."  *Id.*

21       The Court need not "calculate the precise quantum of the injunction's

22  interference with comity," but rather need only determine "whether any such

23  interference is so great as to be intolerable."  *Microsoft,* 696 F.3d at 886.  The Ninth

24  Circuit has made clear that private contractual disputes like this case have little, if

25  any, impact on comity.  *See id.* at 887 ("[C]omity is less likely to be threatened in

26  the context of a private contractual dispute than in a dispute implicating public

27  international law or government litigants.").  In *Gallo*, the Ninth Circuit held that the

28  fact the foreign suit was filed first "makes no difference as to the propriety of an

1  anti-suit injunction." *Gallo*, 446 F.3d at 994.  This is particularly true when the

2  competing actions are between private parties and do not directly involve a

3  governmental interest or a matter of international law.  *See id.*

4      The anti-suit injunction requested by Continental would have little impact on

5  comity.  This is a private commercial dispute between corporations based on the

6  contractual promise made by Nokia and the other Defendants to license their SEPs

7  to implementers like Continental on FRAND terms and conditions.  The purpose of

8  the present lawsuit is to enforce Defendants' obligation to license their SEPs to

9  Continental, obtain a ruling that Defendants' demanded royalty rates are not

10  FRAND, and establish the FRAND terms and conditions for a license to

11  Defendants' SEPs.  The requested anti-suit injunction merely prevents Nokia from

12  continuing its campaign of harassment against Continental and its customers in an

13  attempt to capture *supra*-FRAND royalty rates, while affording this Court the

14  opportunity to adjudicate Defendants' obligations under their FRAND commitments

15  without the risk of inconsistent, piecemeal judgments in a foreign court.

16  **V.    CONCLUSION**

17      For the reasons set forth herein, Continental respectfully requests that this

18  Court grant its motion for an anti-suit injunction and enter an order temporarily

19  barring Nokia and any related entities from prosecuting the German Actions against

20  Daimler.  Further, Continental requests an order prohibiting Defendants from filing,

21  or acting in concert with anyone else to file, any action against Continental or any of

22  its customers (or subsidiaries or affiliates) alleging infringement of their global 2G,

23  3G and 4G SEPs during the pendency of the FRAND proceeding in this Court.  The

24  other Defendants should not be permitted to do in the future what Nokia has already

25  improperly done in Germany.

26

27

28

1   Dated:  June 12, 2019

2                                   SHEPPARD, MULLIN, RICHTER & HAMPTON
3                                   LLP

4

5                         By        /s/ Matthew W. Holder
6                                   STEPHEN S. KORNICZKY
7                                   MARTIN R. BADER
                                    MATTHEW W. HOLDER
8                                   MICHAEL W. SCARBOROUGH
                                    MONA SOLOUKI
9
10                                  Attorneys for Plaintiff Continental Automotive
                                    Systems, Inc.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28