# EXHIBIT 1

EFiled: Mar 12 2008 11:01PM EDT
Transaction ID 18968687
Case No. 2330-VCS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NOKIA CORPORATION and NOKIA INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2330-VCS |
| | ) | |
| QUALCOMM INCORPORATED, | ) | **REDACTED PUBLIC VERSION** |
| | ) | **MARCH 12, 2008** |
| Defendant. | ) | |

### FIRST AMENDED VERIFIED COMPLAINT

Plaintiffs Nokia Corporation and Nokia Inc. (jointly, "Nokia"), by and through their undersigned counsel, allege the following as and for their First Amended Verified Complaint against defendant Qualcomm Incorporated ("Qualcomm"):[1]

### PRELIMINARY STATEMENT

1. This action involves two separate and distinct contractual relationships between Nokia and Qualcomm.

**ETSI Relationship**

2. One contractual relationship derives from the parties' membership in the European Telecommunications Standards Institute ("ETSI"), a European Standard-Setting Organization ("SSO"), and rights and obligations stemming from this membership and voluntary undertakings stating that the IPR holder is prepared to grant irrevocable licenses to intellectual

---

[1] Nokia reserves the right to add additional claims for Phase 2 of this proceeding (if any Phase 2 occurs) based on rulings in Phase 1 to the extent allowed by the Court in its discretion. Additionally, Nokia reserves the right to add additional claims to address issues raised by Qualcomm in its impending counterclaims to the extent allowed by Delaware law and by the Court in its discretion.

property ("IPR") declared as essential to standards promulgated by ETSI. Specifically, Nokia seeks to resolve a real and adverse dispute involving the legal relations stemming from individual contracts formed through voluntary undertakings made to ETSI stating that the IPR holder is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ("FRAND") terms to intellectual property the party has declared to be essential to ETSI standards.

3.      Through their participation in ETSI, Qualcomm and Nokia are contractually bound by the ETSI Rules of Procedure, including the ETSI Intellectual Property Rights Policy ("ETSI IPR Policy"). In accordance with Clause 4.1 of the ETSI IPR Policy both Qualcomm and Nokia are obligated to inform ETSI in a timely manner of essential IPR they believe is or is likely to become essential to a standard. Additionally, as to declared essential IPR, Qualcomm and Nokia may voluntarily give an undertaking in writing stating that in respect of the standard they are prepared to grant irrevocable licenses on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy.

4.      Qualcomm and Nokia have each submitted declarations of essentiality for thousands of patents, each claiming to hold specified IPR that they believe are or are likely to become essential to an ETSI standard. Additionally, Qualcomm and Nokia have each voluntarily submitted undertakings for each of those declared essential patents stating that they are prepared to grant irrevocable licenses on FRAND terms and conditions in accordance with ETSI IPR Policy, Clause 6.1 to the IPR referenced within the undertakings.

5.      Such voluntary FRAND undertakings make the respective IPR available and limit the right of Qualcomm and Nokia to exclude others, including each other, from utilizing the IPR subject to a FRAND undertaking in implementing the relevant ETSI standard. In return for the

2

inclusion of its IPR into the standard, the IPR holder is entitled to compensation on FRAND terms and conditions.

6.      Through their voluntary FRAND undertakings made within the ETSI framework, Qualcomm and Nokia have given their consent to others, including each other, to practice the relevant IPR when used in implementing the applicable ETSI standards and not to prevent the practicing of the applicable ETSI standards provided that the implementer accepts the benefit of individual ETSI FRAND Contracts formed separately for each valid IPR the implementer actually uses and the implementer agrees to compensate the IPR holder on FRAND terms and conditions.

7.      Accordingly, Nokia through this action asks this Court for an order: (1) declaring that Nokia has a right to implement ETSI standards under each patent that is subject to a voluntary FRAND undertaking by Qualcomm; (2) declaring that Qualcomm has contractually waived its right to seek injunctive relief against Nokia's implementation of ETSI standards; (3) declaring that in the event of a dispute between the parties, including the filing of any infringement action in any country, Qualcomm's sole compensation is limited to FRAND terms for each individual valid patent shown to be practiced by Nokia in a court of competent jurisdiction; (4) declaring that Qualcomm has never proposed terms and conditions for the patents subject to its FRAND undertakings that could be FRAND regardless of their economic valuation; and (5) declaring that Qualcomm has the same right to implement the ETSI standards under each individual Nokia patent as Nokia has under individual Qualcomm patents, and Nokia has the same rights and obligations as a patentee as Qualcomm.

8.      Therefore, Nokia seeks an order of specific performance ordering Qualcomm not to breach its FRAND commitment by seeking an injunction or exclusionary order against Nokia,

and an order enjoining Qualcomm from seeking an injunction or exclusionary order against Nokia as a remedy for alleged infringement of any declared essential patent it has contractually agreed to license on FRAND terms.

**SULA Relationship**

9.      The other contractual relationship between Nokia and Qualcomm involves a bilateral agreement the parties negotiated for convenience licenses to a group of essential and non-essential patents.

10.      In 1992, the parties entered into the 1992 Subscriber Unit License Agreement ("1992 SULA"), pursuant to which Nokia agreed to pay royalties for the right to use Qualcomm's patents

Redacted

Beginning in 1998, the parties engaged in negotiations regarding a modification or extension of the 1992 SULA, ultimately executing the 2001 Subscriber Unit and Infrastructure Equipment License Agreement ("2001 SULA").  As part of the 2001 SULA, Nokia continued to pay royalties for Qualcomm's          Patents.  Nokia's license to those          Patents became fully Redacted paid up on April 9, 2007, so that no further royalties under those          Patents could ever be Redacted owed after that date.

Redacted

11.      In 2001, the parties were unable to agree on the value of

Redacted

4

Redacted

12.    Accordingly, Nokia seeks: (1) a declaration that it has not exercised either of the 2001 SULA options and as a result has no obligation to pay 2001 SULA royalties for Redacted        and is no longer bound by the now-expired non-assert provision of the 2001 SULA and (2) a declaration that Nokia has a paid-up and royalty free license to Qualcomm's     Patents as defined by the 2001 SULA. Redacted

## PARTIES AND JURISDICTION

13.    Plaintiff Nokia Corporation is a corporation organized under the laws of Finland and headquartered in Espoo, Finland.

14.    Plaintiff Nokia Inc. is a corporation organized under the laws of the State of Delaware and headquartered in Irving, Texas.  Nokia Inc. is a subsidiary of Nokia Corporation. Nokia Corporation and Nokia Inc. are jointly described herein as "Nokia."

15.    Nokia is a world leader in mobile communications.  Nokia's primary businesses are making and selling cellular telephone handsets and the provision of certain wireless services. Nokia also owns substantial intellectual property rights in wireless and related technologies.

16.    Defendant Qualcomm Incorporated is a corporation organized under the laws of Delaware.  Qualcomm's primary businesses are making and selling chipsets for use in cellular

RLF1-3258714-1

telephones and the provision of certain wireless services. Qualcomm also licenses intellectual property rights in wireless and related technologies.

17.     ETSI is a SSO which has standardized technologies including those used in cellular telephones and wireless networks compliant with the GSM and UMTS standards.

18.     Both Qualcomm and Nokia are members of ETSI, either directly or through their affiliates. As a result, both Qualcomm and Nokia have rights and obligations stemming from the ETSI IPR Policy, including the obligation to disclose in a timely manner any IPR which it believes to be or likely to become essential to a standard or part thereof called technical specification. Additionally, both Qualcomm and Nokia have submitted voluntary FRAND undertakings for each of the IPR they have declared as essential, and committed in writing in those undertakings that they are prepared to grant irrevocable licenses on FRAND terms and conditions in accordance with Clause 6.1 of the ETSI IPR Policy.

19.     French law governs the interpretation of the ETSI IPR Policy and contractual rights and obligations stemming from the ETSI IPR policy. According to Section 12 of the ETSI IPR Policy:

> The Policy shall be governed by the laws of France. However, no member shall be obliged by the policy to commit a breach of the laws or regulations of its country or to act against supranational laws or regulations applicable to its country insofar as derogation by agreement between parties is not permitted by such laws. Any right granted to, and any obligation imposed on, a member which derives from French law and which are not already contained in the national or supranational law applicable to that member is to be understood as being solely contractual in nature.

ETSI IPR Policy, ¶ 12.

6

20.                        Redacted


## I.    THE PARTIES' ETSI / FRAND CONTRACTUAL RELATIONSHIP

### A.    The Development Of Cellular Telephone Technology Standards

21.     A mobile phone cannot be used for telephony without a supporting network.  For a mobile phone to work, it must communicate with a network of cellular base stations; for example, should the phone's location change, the network and phone must cooperate to maintain the connection by "handing off" the call from one base station to the next.

22.     Each component of this network – including telephones, base stations, switches, and chipsets that allow telephones and base stations to communicate – must work efficiently and effectively with all the other components, regardless of which company made each component. For such a network to work, wireless carriers as well as telephone, chipset and base station manufacturers must agree to follow a common set of standards, which control how each part of a network communicates with the other parts.  Only if each component follows the applicable standards will the components work seamlessly with each other.  Thus, for decades, cellular service providers and wireless product manufacturers have formed and joined SSOs, which exist to create a common set of standards for all members to follow.

23.     Wireless standards have evolved in distinct generations, as consumers demanded more features and the industry responded by developing new innovations.  The earliest cellular telephones and networks used analog technology which allowed only voice transmission and very slow data transmission.  This first generation or "1G" technology suffered from deficiencies including capacity limitations, poor data transfer, and low security.

RLF1-3258714-1

24.     Consumers' increased demand for wireless service and their preference for added performance drove the industry to develop second generation, or "2G", cellular technologies.  2G telephones, based on digital technology, provide improved voice and data capacity, support additional functions such as paging and e-mail, and offer greater privacy and security at lower prices.  Most cellular telephones in use today use 2G technology and standards.

25.     The principal 2G standards in use today are GSM and 2G CDMA, also referred to as CDMAone or TIA/EIA IS-95.

26.     GSM stands for Global Systems for Mobile Communications ("GSM").  This standard was based on one form of a Time Division Multiple Access ("TDMA") technology.  It was and is an open standard developed with the benefit of collaboration among many contributors.  It was developed through ETSI and remains, by a wide margin, the most successful and widely deployed cellular standard ever.

27.     2G CDMA, also called the Common Air Interface ("CAI") or CDMAone, was a proprietary wireless technology that Qualcomm had developed for commercial exploitation and was based on one form of a Code Division Multiple Access ("CDMA") technology.[2]  2G CDMA was not developed through ETSI.

28.     The technical parameters and specifications of each 2G technology were reviewed and approved by various SSOs.   These two second generation standards are based on

_____

[2] Like TDMA, CDMA had been invented decades earlier but Qualcomm, with its CAI system, sought to commercialize this technology to the exclusion of others.  Around 1990, Qualcomm developed and wrote specifications for its CAI system.  Those specifications were then distributed to certain industry members, and Qualcomm applied for patents conforming to the specifications.  In that sense, Qualcomm's variant of the CDMA technology was proprietary technology that was subsequently made public and well-known in the industry as a result of Qualcomm's intense standardization and lobbying efforts.

8

incompatible technologies. Thus, GSM-based equipment and components will not work on a 2G CDMA network, and 2G CDMA equipment and components will not work on a GSM network.

29.     Third generation ("3G") wireless technologies include UMTS (also commonly known by the name of its so called air interface "WCDMA") and CDMA2000 ("3G CDMA"), which allow further increased data speed and capacity and are currently being deployed by the wireless industry.  UMTS is an extension to GSM, and CDMA2000 is an extension to 2G CDMA.  The 2G and 3G technologies continue to be simultaneously deployed in products and, in fact, devices with only 3G technology – whether UMTS or CDMA2000 technology – rarely exist.  Instead, both UMTS and CDMA2000 products continue to function in combination with 2G technology.  For example, Qualcomm's CDMA2000 chips are sold together with a GSM chip, and Nokia's UMTS phones always also contain GSM functionality.  GSM technology is used for most voice functionalities, and the 3G technology is used mainly to carry out data transfers of various kinds.

30.     Future wireless technologies, sometimes called fourth generation ("4G") wireless technologies, will no longer be based on CDMA.  Instead, they will be generally based on technologies called orthogonal frequency division multiplexing ("OFDM").

**B.     The Lock-In Effect And The Hold-Up Problem**

31.     Although standardization provides significant benefits by allowing different companies' components to form a seamless network, it is difficult, time-consuming, and expensive to agree on and implement a new standard.  The industry must expend significant resources in capital investments to develop, refine, test, and deploy technology compliant with the standard.

RLF1-3258714-1

32.     Without some contractual or other legal restraint, the incorporation of a patent into a standard would provide a hold-up ability to owners of patents needed to practice the standard. This "hold-up problem" is inextricably linked to a patent holder's customary right as a patent holder to enjoin others from practicing its patents. In infringement litigation outside the standard-setting context, patent holder plaintiffs routinely request injunctions barring future use of their patents.

33.     If such injunctions were issued in the standard-setting context in the normal course, a patent holder of even one patent essential to the standard could bar a user of the standard from any future practice of the standard. It could also use the threat of an injunction to extract higher royalties than it would be able to gain in the absence of a standard and higher than the true worth of the patented technology before being adopted as part of the standard.

34.     Because the effects of an injunction itself could be devastating and irreparable, the possibility of an injunction could substantially distort royalty negotiations, as patent holders may seek unreasonable royalties through the mere threat of lawsuits and injunctions thus practically holding hostage the entire revenue stream and profits of the target company's relevant business. Additionally, patent holders could threaten litigation based on the patents relating to one standard or technology in an attempt to extort higher royalties for patents relating to another standard or technology. Manufacturers, unable to risk being excluded from the market of standard-compliant products, could be forced to pay a price reflecting the value not of a patent itself, but of an entire standard – not just a monopoly royalty, but a super-monopoly royalty.

35.     If the user of a standard paid excessive compensation as a result of a "hold up" or as the result of the improper threat of an injunction instead of paying compensation based on the ex ante-standard value of the patent or the essential technology, it would: (1) slow, and possibly

10

prevent, the implementation of the standard; (2) harm consumers forced to pay higher prices for cellular services; and (3) harm the whole industry by depriving it of the benefits of widespread implementation of the standard. This is especially true if there are many patents and patent holders relevant to a given standard such that an excessive royalty charged by one patent owner could result in a prohibitively high aggregate royalty level even if all other owners of essential patents complied with their obligations to license the patents on FRAND terms.

36.     Once a standard is selected, the essential patents gain value because competing technologies are effectively eliminated from the marketplace, the value of all the patents in the standard is increased by the complementarities between them, the patent holder's technology will be used by those implementing the relevant part of the standard, and the IPR is given an expanded market and enhanced royalty base. Without a standard, in contrast, it is far less likely that IPR holders will use the essential IPR. Additionally, the value of the patent rights is limited by inter-technology competition and the difficulties identifying and combining the necessary complementary technologies owned by multiple parties.

37.     If the industry participants are indeed using the standard – as is the case in the wireless industry – patents may well have no value at all absent inclusion into a standard. Essential patent holders thus gain a significant base of royalty payers and an accompanying revenue stream.

### C.     ETSI's Mechanism For Preventing The Hold-Up Problem

38.     ETSI is a non-profit SSO organized under French law and based in France.

39.     The 2G standard GSM and the 3G standard UMTS were originally developed through ETSI. Further development has been done in conjunction with the 3rd Generation

11

Partnership Project ("3GPP"), a collaboration between groups of telecommunications associations, including ETSI.

40.    ETSI's IPR policy has the objective of providing the best technological standards and reducing the risk to ETSI and those implementing ETSI standards that investment in the standards could be wasted by the unavailability of essential IPR. Thus, Section 3.1 of the ETSI IPR Policy provides:

> STANDARDS and TECHNICAL SPECIFICATIONS shall be based on solutions which best meet the technical objectives of the European telecommunications sector, as defined by the General Assembly. In order to further this objective the ETSI IPR POLICY seeks to reduce the risk to ETSI, MEMBERS, and others applying ETSI STANDARDS and TECHNICAL SPECIFICATIONS, that investment in the preparation, adoption and application of standards could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable. In achieving this objective, the ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs.

ETSI IPR Policy, ¶ 3.1.

41.    ETSI also requires members to use their reasonable endeavors, especially during the development of a standard, to inform ETSI of essential IPRs in a timely fashion. Thus, Section 4.1 of the ETSI IPR Policy provides:

> [E]ach MEMBER shall use its reasonable endeavors, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

ETSI IPR Policy, ¶ 4.1.

12

42.     Once a patent is declared essential under Section 4.1, and if the declarant has not proactively made a FRAND undertaking (which is a standard practice in the industry), ETSI requests that its owner give an undertaking in writing that it is prepared to grant irrevocable licenses on FRAND terms:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory terms and conditions under such IPR to at least the following extent:
>
> MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;
>
> ● sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;
>
> ● repair, use, or operate EQUIPMENT; and
>
> ● use METHODS.

ETSI IPR Policy, ¶ 6.1. The "licensing declarations of IPRs received by ETSI" are also published with the "undertaking to grant licence." *See* ETSI Guide on IPR, Art. 3.1.2.

43.     However, if a patent holder will not voluntarily undertake to grant such licenses on FRAND terms, ETSI will make every effort to avoid technology arguably covered by the patents, using instead a non-infringing alternative. *See* ETSI IPR Policy, ¶ 8.

**D.     <u>French Law Regarding Formation Of Contracts</u>**

44.     Under French law, one way that a contract is formed is through a stipulation in favor of a third party (*stipulation pur autrui*). The stipulation in favor of a third party is an operation involving three parties in which the promisor commits to the stipulator to grant a right to one or more beneficiaries. In this situation, the promisor becomes contractually bound to the

13

stipulator as soon as it makes its promise to the stipulator to grant that right to third parties. It is also bound to the stipulator and to those third parties insofar as it may not withdraw its stipulation to grant those rights to the third parties.

45.    The promisor becomes contractually bound to the third party beneficiary when the third party beneficiary accepts the promise. Upon acceptance by the third party, a bilateral contract is formed between the promisor and the third party, with rights and obligations attaching to each.

46.    Under French law, there must be sufficient specification of terms to understand the main obligations of the contract so that the subject matter can be determined.

47.    A patent license agreement is validly created and binding once the parties have consented to its essential elements.

48.    It is not necessary for the parties to have agreed on the precise compensation for a license to be enforceable. There is no specific rule for patent licenses that requires that compensation be determined or determinable for a contract to have been validly formed, and absent such a specific rule, it is not necessary for the price to be determined or determinable at the time of formation of the contract. If a certain contract has price as its essential element, and is not subject to a specific rule, it is enough that the parties have agreed to have a price, regardless of whether further negotiations are required to determine what that price will be.

49.    In the case where a contract is formed with an obligation to pay compensation but without an agreement to the amount of compensation, the party with the right to receive the compensation may set the price, but only within the limits provided in the contract and subject to rules and remedies limiting pricing abuse. At any time after formation of the contract, the party with the obligation to compensate can request that the other party provide the price term

consistent with the limitations described above, in which case the party with the right to receive the compensation has an obligation to provide the price.

50.     Unless the contract specifies a certain method for acceptance, an acceptance can be implicit or explicit.  However, there cannot be implicit acceptance if the beneficiary has otherwise explicitly rejected the contract or stated that it will not be bound by its terms.

51.     Under French law, a contract can only have a single subject matter.

**E.      Application Of French Law Principles To The ETSI Contracts**

52.     In the ETSI context, holders of IPRs make contractual commitments through voluntary written undertakings to ETSI stating that the IPR holder is prepared to grant irrevocable licenses on FRAND terms to those using the IPR in conjunction with implementing the standards.

53.     Upon submission of a FRAND undertaking to ETSI, the IPR holder becomes contractually bound to ETSI for the benefit of third party beneficiaries to license its declared essential patent on FRAND terms in accordance with Clause 6.1 of the ETSI IPR Policy.  The written FRAND undertaking referred to in Clause 6.1 of ETSI's IPR Policy is an enforceable, binding and irrevocable commitment made to ETSI in favor of third parties.  The beneficiaries of this undertaking, i.e. the "(third-party) potential licensees," are the manufacturers who wish to implement an ETSI standard including the use of declared-essential IPRs.

54.     It is not the case that an implementer of the standard necessarily uses all patents declared as essential to the standard, or needs licenses to all such patents.  In fact, not all declared essential patents end up being truly essential to the standard despite the declarant's belief that the declared patent is or, if the standard or technical specification is not yet finalized, is likely to become essential if adopted.  Such a determination requires a technical evaluation of

15

the standard and application of the ETSI definition for essentiality.  Moreover, some truly essential patents relate to optional parts of the standard not used by all, or even any, of those who implement the standard.  Also, different parts of the standard apply to different parts of the cellular network process such that a manufacturer of handsets may not use the same parts of the standard as manufacturers of infrastructure or chipsets.  Finally, declared patents are frequently found to be invalid.  Thus, although the IPR holder is contractually bound by its commitment to grant licenses to each patent for which it has submitted a FRAND undertaking, implementers of the standard do not necessarily actually use such patent and, therefore, do not need the patent holder's permission to practice the patented inventions.  Accordingly, the determination whether the implementer actually uses a declared essential patent, and whether such patent is valid, is a necessary step in determining compensation under ETSI FRAND rules.

55.    Nevertheless, when a manufacturer does accept the ETSI FRAND undertaking made for its benefit, a bilateral contract for that specific IPR is formed between the IPR holder and the manufacturer creating the right to implement the standard and practice the patent and not to be precluded from doing so by the patent holder.  Such right comes with an obligation to compensate the IPR holder on FRAND terms for the IPR. ("ETSI FRAND Contact" or "ETSI FRAND License").  Under French law, the contract becomes executed and binding between the IPR holder and implementer of the standard when acceptance of the Clause 6.1 undertaking takes place as it already contains all essential elements of the license agreement.  There may be terms and conditions that are missing, but there is a commitment that they will be determined on FRAND basis.

56.    The specific FRAND terms and conditions, including the price of the license agreements, are part of the "commercial terms" to be negotiated between the interested

16

companies outside ETSI. *See* ETSI Guide on IPRs, Arts. 22 and 4.1. At the point of acceptance, therefore, an individual ETSI FRAND undertaking confers the right to use that IPR in implementing an ETSI standard subject to compensation limited to FRAND terms, which may be determined and paid at a later time provided that the value for that particular IPR is sought from the implementer and that the patent holder is entitled to such compensation.

57.     Acceptance of a FRAND undertaking by a manufacturer can be implicit or explicit, given that the ETSI policies and FRAND undertakings do not call for a specific form of acceptance. Implicit acceptance in this context occurs through use of the patent while implementing the standard, absent some express rejection of the terms of the contract. Explicit acceptance occurs by informing the IPR holder that the manufacturer accepts the terms of the undertaking and commits to compensating the IPR holder with FRAND terms for the patent covered by that acceptance. If a manufacturer expressly rejects the license itself, no bilateral contract exists between the IPR declarant and the manufacturer.

58.     Implied acceptance is based on the actual and voluntary performance of the contract. Consequently, if a manufacturer does not practice a patent subject to the FRAND undertaking, one cannot consider that it has implicitly accepted an ETSI FRAND License for that patent nor that it undertook the obligation to compensate the IPR holder on FRAND terms and conditions for that patent.

59.     Once accepted, a FRAND undertaking gives rise to a patent-specific ETSI FRAND License providing the right to use the patent in implementing the standard subject to FRAND terms. Each contract is limited to the specific patent because the contractual FRAND undertakings involve specified patents and because under French law, a contract (here a license agreement) can only have a single subject matter (here the patent declared essential).

17

60.     Following formation of the contract, the manufacturer has the right to practice the patented invention while implementing the standard and has the obligation to pay FRAND compensation for each individual valid patent that is practiced by the implementer.[3]

61.     As a result, the implementer is granted a right to implement the standard and use the relevant patents for that purpose without the patent holder, except for possible special circumstances, being able to prevent such use.   That contract is executed without any new consent being needed from the IPR holder because the declaration under Clause 6.1 stands irrevocably as its consent to the future licensees.

62.     This contractual mechanism fulfils the ETSI IPR Policy's purpose to ensure that its Standards and Technical Specifications are "available to potential users in accordance with the general principles of standardization." *See* ETSI IPR Policy, ¶ 3.3.  If the availability of an IPR license depended on individual agreements being concluded between each user and the patent owner before a manufacturer could implement the standard, it would not be feasible to carry out manufacturing of standards compliant products and the whole standardization process itself would become unworkable.  There would also be a risk of restrictive agreements between certain market players.

63.     In the situation where an ETSI FRAND License is created and the parties later agree on a separate, specific, fixed-term license agreement on the same patent specifying the amount of the compensation and the other terms of the license, the relevant terms of such specific license agreement cover the use of the patent for the contractually specified time period.

---

[3] When disputes about patent infringement, validity, and enforceability arise, these issues are to be decided in a national court of competent patent jurisdiction.

18

If and when the relevant terms of the specific license agreement expire or cease to apply, the manufacturer may continue to use the patent subject to FRAND compensation, even if the precise license terms for future use have not yet been determined.

64.     Even though the parties may enter into negotiations about a portfolio-wide convenience license, the implementer has no obligation to accept such license. At any time, the implementer may request that the patent holder sets the terms and conditions that correspond with its needs and are consistent with FRAND. The patent holder is obliged to provide terms and conditions for individual patents, unbundled from other rights and obligations outside the ETSI FRAND Contract, and subject to the contractual requirement that terms and conditions be FRAND and that this pricing power not be abused.

65.     The ETSI FRAND framework is intended to make the standard publicly available and provide protection beyond what would be the case without such framework. Accordingly, nothing in the ETSI IPR Policy or FRAND contractual process prevents an implementer of the patented invention from exercising the patent defenses that would have been available to the patent owner without the ETSI IPR Policy or the ETSI FRAND Contract, including the right to challenge the validity, actual use and enforceability of any specific patent subject to a FRAND undertaking.

66.     Further, the patent holder may, subject to the rules of local law, decide from whom it collects its compensation. Therefore, nothing in the ETSI IPR Policy or the ETSI FRAND Contract precludes the possibility that the compensation is provided by the supplier or the customer of the implementer, and as a result, the implementer has no obligation to compensate the IPR holder.

RLF1 1268714 1

**F.    Formation Of ETSI Contracts Between Qualcomm and Nokia For Qualcomm Patents**

67.    Qualcomm is a member of ETSI because its affiliates, Qualcomm Europe S.A.R.L. and Qualcomm UK Ltd, are members and ETSI defines "member" to include affiliates. Therefore, Qualcomm is subject to ETSI's obligations, including those related to disclosing potentially essential IPR.

68.    Over time, Qualcomm has submitted disclosures covering thousands of patents it declares are or are likely to become essential to an ETSI standard or a part of an ETSI standard. For each of those declared essential patents, Qualcomm has voluntarily submitted FRAND undertakings in accordance with ETSI IPR Policy Clause 6.1 committing to grant irrevocable licenses on FRAND terms and conditions to the IPR that is subject to the undertaking. Specifically, Qualcomm has submitted these voluntary FRAND undertakings covering at least 5,208 patents. Of these, Qualcomm has declared that it believes that at least 390 of the patents are or are likely to become essential to the GSM standard and at least 2,490 of the patents are or are likely to become essential to the UMTS standard. A non-exclusive collection of Qualcomm's FRAND undertakings is attached as Exhibit A.

69.    Additionally, Qualcomm expressed its intent to license any patents essential to ETSI's UMTS standards on FRAND terms even before it made its Clause 6.1 declarations that formed the basis of the specific contractual agreements for the relevant patents. On June 25, 1999, Louis Lupin, Qualcomm's Senior Vice President at the time, wrote to ETSI's Director General Karl Rosenbrock stating that: "Qualcomm hereby commits to [ETSI] to license its essential patents for such single [third generation] CDMA standard or any of its modes on a fair and reasonable basis free from unfair discrimination." The June 25, 1999 letter also expressly

withdrew Qualcomm's earlier letter where it declined to commit to licensing its essential patents for the UMTS standard on FRAND terms.

70.     Under French law, which governs the contractual interpretation of the ETSI IPR Policy, Qualcomm's voluntary undertakings to grant irrevocable licenses on FRAND terms given to ETSI functioned as valid and binding commitments made to the organization, ETSI, for the benefit of those who would wish to manufacture, use, or sell products compliant with ETSI standards.

71.     Nokia has accepted Qualcomm's undertakings for those patents that are subject to FRAND undertakings and are valid and actually used by Nokia, if any.   As part of this acceptance, Nokia has agreed to be bound by the terms of those contracts for such patents, including the payment of FRAND compensation.  Specifically:

- Nokia has implicitly accepted each FRAND undertaking covering a patent that is valid and practiced in implementing the standard, if any.  Nokia is a member of ETSI, has implemented the standard knowing the rights and obligations stemming from that implementation, and has never explicitly rejected the terms of such ETSI FRAND Contracts.  Thus, its use in implementing the standard of any patent subject to a FRAND undertaking acted as implicit acceptance of that contract, including the right to implement the standard and the obligation to compensate Qualcomm on FRAND terms for patents practiced.

- On June 14, 2006 Nokia wrote to Qualcomm, stating: "Nokia has never rejected any FRAND offer made by Qualcomm, but to the contrary, we have several times told you that we are willing to take a license to valid and essential patents on FRAND terms."

- On April 4, 2007, Nokia wrote to Qualcomm, "Despite Qualcomm's failure to make any FRAND offer to Nokia for the terms and conditions of such licenses, Nokia continues to accept licenses on FRAND terms to Qualcomm's valid ETSI essential patents."

- On April 5, 2007, Nokia wrote to Qualcomm, "Nokia continues to be willing to pay for Nokia UMTS subscriber units on FRAND terms under those Qualcomm essential patents that are valid and actually used by Nokia."

21

- On April 5, 2007, Nokia made a $20 million prepayment to Qualcomm covering the period from April 10, 2007 through June 30, 2007 to show its good faith at reaching agreement on the amount of FRAND compensation for any truly essential, valid and used Qualcomm patents, if any.

- Nokia has paid $80 million into escrow to cover the possible compensation for Qualcomm essential patents that are found to be valid and used by Nokia (if any).

- On February 8, 2008, Nokia again reiterated "its acceptance to take a license, on (F)RAND terms, to any and all valid essential Qualcomm patents actually practiced by Nokia."

72.   As part of Qualcomm's voluntary FRAND undertakings made within the ETSI framework and the resulting ETSI FRAND Contracts between Qualcomm and Nokia for each individual declared essential patent that is used by Nokia, Qualcomm contractually limited its right to seek injunctive relief or exclusionary orders that would restrain Nokia's practice of Qualcomm's ETSI declared essential patents for the purpose of implementing the ETSI standards.   Instead, Qualcomm voluntarily agreed to limit its remedy for Nokia's possible practice of Qualcomm's ETSI declared essential patents to FRAND compensation which Nokia is committed to pay for relevant patents.

**G.    Qualcomm Has Failed To Provide Any Unbundled, Patent-Specific Terms That Could Ever Be FRAND Terms, Regardless Of Their Rates**

73.   To date, Qualcomm has not specified to Nokia any individual patents, apart from those patents currently asserted in ongoing patent litigations, that it believes Nokia uses, and has not provided any terms and conditions that could be FRAND for any of the patents subject to its FRAND undertakings.   In particular, Qualcomm has never provided terms and conditions for such a patent, unbundled from the rights and obligations beyond the ETSI FRAND Contract, unbundled from other standards and other patents, and unbundled from any requirement of a royalty-free grant-back to Nokia's patents.

22

74.     Instead, Qualcomm has repeatedly insisted that it will not provide such terms and
conditions.

<center>Redacted</center>

- On June 14, 2007, Qualcomm said,

<center>Redacted</center>

- Days before the SULA's expiration, Nokia advanced a payment of $20 million to
  Qualcomm.   Nokia made clear its intention was "to continue making these
  payments to Qualcomm until the parties have agreed on the royalties or other
  consideration" for any of Qualcomm's actually valid, used and essential patents,
  if any, including those declared essentials previously subject to SULA's non-
  assert provision.

- Rather than propose FRAND terms for its essential patents, Qualcomm
  responded:

<center>Redacted</center>

75.     The SULA's options are not, and could never be, considered FRAND terms and
conditions for any patent subject to a FRAND undertaking regardless of the economic valuation
of the royalty rate or value of the patents contained within those options because:

- 

- <center>Redacted</center>

- 

76.

<center>23</center>

Redacted        Qualcomm does not seek to justify

its rates by grounding the rates in its actual patent holdings, the value of its patents, or the

geographic scope of its patents.

### H. Qualcomm Has Breached Its FRAND Commitment By Seeking Injunctive Relief Against Nokia, Which Is Willing To Compensate Qualcomm On FRAND Terms For Each Valid Patent That Is Practiced By Nokia

77.     Qualcomm has breached its obligations under certain of its FRAND undertakings

by filing lawsuits seeking to enjoin Nokia, a company truly committed to compensate Qualcomm

on FRAND terms for the IPR it practices, from manufacturing or selling products that allegedly

practice some Qualcomm patents that are subject to FRAND undertakings.  Qualcomm has

further threatened to seek additional injunctions against Nokia that would, if granted, prohibit

Nokia from practicing the standard.  Assuming that Qualcomm was able to prove that it had

essential patents practiced by Nokia, which Nokia contests, such patents would be subject to

ETSI FRAND Contracts limiting Qualcomm's relief to FRAND compensation.

78.     As of the date of this complaint, Qualcomm has filed ten patent infringement

lawsuits based on patents for which Qualcomm has submitted a FRAND undertaking concerning

patents declared as essential to ETSI regarding the GSM standard in San Diego, CA;

Washington, D.C. (International Trade Commission); Beijing, China; Shanghai, China (two);

London, England; Milan, Italy; Düsseldorf, Germany (two); and Paris, France.  In each of these

complaints, Qualcomm, notwithstanding its voluntary FRAND undertakings, has requested

injunctions, exclusionary orders, or accounts of profit asking that products be taken off the

market and/or destroyed without even making such request conditional upon Nokia's refusal to

pay FRAND compensation for the patents in suit.  These attempts to exclude Nokia – a

24

manufacturer who is willing to accept a FRAND proposal and is committed to pay FRAND compensation for each Qualcomm patent that is valid and practiced by Nokia – from implementing the GSM standard breach Qualcomm's FRAND commitments, made within the ETSI framework, to grant irrevocable licenses to such patents on FRAND terms.

79.     Through its strategy of threatening and seeking injunctions and attempting to extort higher royalties for 3G UMTS patents by using litigation over 2G GSM patents, Qualcomm has engaged in a classic hold-up – precisely the maneuver the ETSI IPR Policy and FRAND undertaking process were designed to prevent.  Qualcomm is using the threat of injunctions against a willing licensee to gain leverage in its demand for excessive royalty rates and other contractual rewards that far exceed the economic value that those patents actually contribute to the standard, and the value of those patents absent the lock-in effect that enables the hold-up that Qualcomm's voluntary FRAND contracts were designed to preclude.

## I.     **Nokia's Declared Essential Patents And FRAND Undertakings**

80.     Nokia too is a member of ETSI.

81.     Over time, Nokia too has submitted thousands of disclosures of patents it believes are or are likely to become essential to an ETSI standard.  For each of those declared essential patents, Nokia has voluntarily submitted FRAND undertakings committing to grant irrevocable licenses on FRAND terms and conditions to the IPR that is subject to the undertaking. Specifically, Nokia has submitted these voluntary FRAND undertakings for at least 3,436 patents.  Of these, Nokia has declared that it believes that at least 1,447 of its patents are or are likely to become essential to the GSM standard and 1,537 of its patents are or are likely to become essential to the UMTS standard.  A non-exclusive collection of Nokia's FRAND undertakings is attached as Exhibit B.

RLF1-3258714-1

82.     Under French law, which governs the contractual interpretation of the ETSI IPR Policy, Nokia's voluntary undertakings to grant irrevocable licenses on FRAND terms given to ETSI functioned as valid and binding commitments made to the organization, ETSI, for the benefit of those who would wish to manufacture, use, or sell products compliant with ETSI standards.

83.     Qualcomm may explicitly or implicitly accept each FRAND undertaking for any patent Nokia has declared as essential by using it to implement the standard.  In fact, subject to any statement by Qualcomm to the contrary, its use in implementing the standard of any patent subject to a FRAND undertaking will act as implicit acceptance of ETSI FRAND Contracts, including the right to implement the standard under each patent, and the obligation to compensate Nokia on FRAND terms, provided that Nokia seeks FRAND compensation from Qualcomm for such a patent.  There are several parties that are potentially liable for the FRAND compensation, because they design, manufacture, sell or use products or services that practice an essential patent and a patent holder may, subject to the rules of the local law, generally choose the party from whom it collects the compensation.

84.     Nokia stands by its commitment to grant irrevocable licenses to those patents subject to FRAND undertakings on FRAND terms, and to limit its relief to FRAND compensation so long as Qualcomm commits to abide by its contractual commitment to Nokia to compensate Nokia on FRAND terms and conditions.

85.     Nokia believes that its contractual commitments, and the rights and obligations derived from those commitments, are in all material aspects similar to those of Qualcomm's.

## II.   THE PARTIES' CONTRACTUAL RELATIONSHIP UNDER THE 1992 SULA AND THE 2001 SULA

86.                              Redacted


This agreement              Redacted

Redacted                    was not limited to terms for licenses to standard-essential

patents for UMTS, unbundled from non-essential patents and patents essential to other

standards.[4]

### A.   The Original 1992 SULA

87.     In 1992, Nokia and Qualcomm entered into the first Subscriber Unit License

Agreement ("1992 SULA").  At the time, the first generation of analog-based mobile telephony

technology was giving way to 2G digital technology.  As discussed above, there were two

competing species of 2G technology, GSM and CAI/CDMAone, which are not compatible or

interoperable.

88.     Before the 2001 SULA, Nokia had focused its cellular handset business almost

entirely on the manufacture and sale of GSM products.  To open the possibility of expanding into

the CAI/CDMAone market, Nokia executed the 1992 SULA, which was a hybrid know-how and

---

[4] Nokia's claims related to the SULA are being brought in this Court pursuant to an agreement between the parties not to arbitrate claims previously pending in *Qualcomm Inc. v. Nokia Corp.*, 50 494 T 00116 07, an arbitration previously filed by Qualcomm.  Nokia is not herein asserting claims that are pending elsewhere in other litigation between the parties.  For example, Nokia is not bringing a claim in this action concerning the proper definition of "Components" under the SULA (or under a separate "BREW" agreement between the parties), as this issue is in litigation filed and pending in the Eastern District of Texas.  Similarly, Nokia is not asserting herein claims slated solely for Phase II of the previously bifurcated arbitration hearing.  Nokia expressly preserves and does not waive its right to add claims should they become relevant to the issues pending before this Court.

RLF1 22568714 1

patent license agreement that gave Nokia access to Qualcomm's proprietary CAI/CDMAone technology, specifications and intellectual property. At that time, Qualcomm represented that it held all or almost all of the intellectual property needed to use the CDMAone standard.

89.     Under that agreement, Nokia agreed to pay royalties for, among other things, the right to use Qualcomm's patents

Redacted

90.     Because it was Qualcomm's proprietary technology, executing the 1992 SULA was the only way that Nokia could access this know-how and the needed specifications.

91.     In the 1992 SULA, Nokia did not seek or obtain meaningful value for its own patents – even though it held a significant portfolio of wireless technology patents essential to the practice of the GSM standard – because at the time Qualcomm was *only* marketing products compliant with its own CAI/CDMAone system. Qualcomm was not marketing products that used GSM.

Redacted

---

5

Redacted

6

92.     The 1992 SULA therefore required Nokia to pay high royalty rates -- based on the "one way" street and the supposed importance of Qualcomm's proprietary specifications and earlier patents to the CAI/CDMAone systems – until April 2007.

Redacted

**B.      Industry And Technological Change Leads To An Amendment**

93.     Thereafter, there were at least three important developments that necessarily caused the parties to reconsider the 1992 SULA.

- *First,*          Redacted

    Unsurprisingly, Qualcomm claimed that Nokia also needed a license to these newer patents to make or sell products that functioned in CDMA based systems, including its proprietary CAI/CDMAone system.

- *Second,* by the late 1990s, 2G was giving way to the third generation of mobile telephony technology.  ETSI was developing a 3G technology called Universal Mobile Telecommunications System ("UMTS"), an open standard based on patented technology contributed by many entities -- *including heavy contributions from Nokia* – which was expected to succeed GSM as the predominant global wireless communication standard.[7]

Redacted

- *Third,* Qualcomm began to require access to Nokia's technology so that Qualcomm could manufacture UMTS chipsets that were also compatible with

Redacted

--------

[7] UMTS is sometimes referred to as WCDMA because it uses Wideband Code Division Multiple Access as one ingredient in the air interface technology to accomplish the radio link between mobile telephones and the base stations (*i.e.*, cell towers).

PI FI 3369714 1

GSM systems (because UMTS chipsets are in fact first and foremost GSM chipsets given, among other things, the limited coverage of the UMTS networks[8]), as well as newer chips using the "CDMA2000" standard (those chipsets also now often implementing the GSM standard).

94.     Against this backdrop, between 1998 and 2001 Nokia and Qualcomm engaged in intense negotiations regarding a modification or expansion of the 1992 SULA, which had granted Nokia a          license only to the          Patents and only until April 2007 (at which Redacted time Nokia would have a fully paid up and royalty-free          license for these          Patents). Redacted

95.

Redacted

96.

_____

[8] It is commercially necessary that all UMTS mobile telephones also have 2G GSM functionality (known as "multi-mode" or "dual mode" functionality). This is true in part because it will take many years to deploy the necessary UMTS infrastructure (cell towers) to sustain consistent wireless coverage across broad geographic areas. Thus, if a mobile handset could only operate in a 3G UMTS network, it might work well in parts of certain large metropolitan areas but coverage would not exist in most geographic areas unless it could also take advantage of and work in the ubiquitous GSM networks available throughout all of the United States and Europe.

RLF1-3258714-1

Redacted

on July 2, 2001, the parties amended and restated the 1992 SULA by executing the 2001 SULA.[9]

C.     **The 2001 SULA "Truce"**

97.     The 2001 SULA expanded the scope of the 1992 SULA somewhat

Redacted                 and left many of the payment

terms that were already required under the 1992 SULA.

Redacted

- *First*, Nokia agreed to keep paying          royalties for Qualcomm's Redacted
  Patents until April 2007   Redacted
                                           The 2001 SULA re-
  affirmed that after April 9, 2007, Nokia would have a fully paid up and royalty-
  free          license to these        Patents. (2001 SULA        ).   Redacted

- 

Redacted

- 

_____

[9] The 2001 SULA expressly states that

Redacted

[10] These four items do not, of course, represent the sum total of the bargain struck in the 2001 SULA.  Suffice it to say, the parties also reached other agreements that made the truce sustainable through 2007,          Redacted

Redacted

- **_Fourth,_** Qualcomm agreed that at any time between April 10, 2007 and December 31, 2008, Nokia could, if it elected to do so <u>in writing</u>, accept Redacted on the same royalty terms that the parties had previously agreed would apply to the Patents.  If Nokia so elected, other 2001 SULA obligations would be extended, including Nokia's obligation not to assert its patents against Qualcomm

Redacted

98.    In essence, these provisions of the 2001 SULA reflected the parties' hope that, by 2007, the evolution of the UMTS standard and the extent of that standard's market penetration would be clear, allowing the parties to more accurately assess and even possibly agree upon the relevance of Qualcomm's    Redacted    and the full value of Nokia's own patent portfolio.

99.    Crucially, the 2001 SULA required Nokia to continue paying a very high royalty rate to Qualcomm    Redacted    – which Nokia was already required to do under the 1992 SULA.

Redacted

100.    Indeed, this is exactly what has come to pass: Nokia has not yet exercised either of the options and Nokia has no obligation to pay    royalties for the    Patents or Redacted Patents under the 2001 SULA (unless and until Nokia exercises an option in writing).  Instead, Qualcomm may seek the remedies generally available to parties under applicable law, *by suing in court.*

32

**D.    Qualcomm's "Exercise By Use" Theory Is Belied By The SULA's Plain Language, By Qualcomm's Own Prior Statements, And By Common Sense**

101.                          Redacted

opening the door for Nokia to assert its patents against Qualcomm (at a time when Qualcomm had filed ten lawsuits against Nokia's GSM products), Qualcomm initiated an arbitration against Nokia claiming that Nokia had "impliedly exercised" one of the two 2001 SULA options by allegedly using Qualcomm's UMTS patents. Notably, Qualcomm did not specify a single UMTS patent that Nokia was allegedly using, and in fact has never proved in any court that Nokia has used any Qualcomm patent.

102.   Through its "exercise by use" theory, Qualcomm contends that Nokia has by conduct become obligated to (a) pay a certain royalty rate for Qualcomm's  Redacted Patents, and (b) refrain from bringing patent infringement actions against Qualcomm.

                          Redacted

103.   Qualcomm's distorted interpretation of the parties' agreement has no relation to what the parties actually intended when they executed the 2001 SULA. On the contrary, both sides anticipated                  Redacted                  if negotiations failed, patent litigation would commence in court, which would test the relative

33

strength of each company's patent portfolio.[11]   Qualcomm's contention to the contrary (*i.e.*, its "exercise by use" theory) is foreclosed by (a) the 2001 SULA's plain language, (b) Qualcomm's own statements, including statements made to this Court and to the investing public, and (c) common sense.

104.    ***The SULA's Plain Language***.   Qualcomm's "exercise by use" theory means that, even though the parties' respective ***non-assert obligations expressly ended***   Redacted the SULA nonetheless should be read to mean precisely the opposite – *i.e.*, that the parties are somehow barred from suing each other after that date.

<div align="center">Redacted</div>

105.    Likewise, the 2001 SULA dictates, in no uncertain terms, that an election to exercise one of the options must be "in writing":

<div align="center">Redacted</div>

---

[11]  To the extent that this patent litigation relates to patents that the parties declared essential to an ETSI standard, the patent holder would be limited in its relief to FRAND compensation absent exceptional circumstances.

[12]  The non-assert provision barring Nokia from suing Qualcomm for infringement of Nokia's patents by Qualcomm's chipsets expressly expired

<div align="center">Redacted</div>

<div align="center">34</div>

Redacted

106.   The 2001 SULA also includes a general provision specifying that

Redacted

107.

108.   **_Qualcomm's Public Statements_**.   Qualcomm's own statements made in this

action – and to the investing public – contradict Qualcomm's "implied exercise" theory.

Redacted

35

109.   In this action, Qualcomm's representatives have stated that after April 9, 2007, Qualcomm fully expected that the parties would engage in patent litigation in the event that Nokia allegedly "used" Qualcomm's         Patents:   Redacted

- 

Redacted

- "So if by that date [after April 9, 2007] they [i.e., Nokia] decided to let SULA terminate unextended, then they won't have a license, we won't have a cross-license, and both parties – *both parties are going to have patents they are in a position to assert against the other's products*, and we will have a classic Mexican standoff."  Roger Brooks for Qualcomm, Oral Argument on Motion to Compel, Jan. 8, 2007, at p. 21, line 5 (emphasis added).

- 

Redacted

- 

110.   Qualcomm's public statements to shareholders and analysts further confirm Qualcomm's understanding that after April 9, the parties would commence litigation concerning alleged patent "use" if negotiations failed:

- In June 2006, Qualcomm's Chief Executive Officer told reporters that there would be negotiations,       Redacted
  Redacted      *See* "Paul Jacobs Interview," Financial Times (June 11, 2006) ("in April of 2007, we're going to be back negotiating the license terms of Nokia again").

36

- In July 2006, Qualcomm's President told investors that "I think that once we get past April 9, if there's no agreement, they will be infringing our patents, so we will take all appropriate measures. . . .  In addition to damages, we would look and seek injunctions in a variety of markets where there [sic] are shipping certainly WCDMA at that time."  Qualcomm Q3 2006 Earnings Conference Call (July 19, 2006).

- In November 2006, Qualcomm's General Counsel told Qualcomm's investors that "[w]e believe that if we are unable to resolve the current impasse in the negotiations before April that there is likely to be litigation going both ways. . . . [T]hat [license dispute], if not resolved through some kind of amicable arrangement, will get sorted out in the courts and various other bodies that have the responsibility for deciding patent matters."   Q4 2006 Earnings Conference Call (Nov. 2, 2006).

- As late as January 2007, Qualcomm specifically informed its investors in its Form 10-Q filing that "[w]e intend to pursue and obtain injunctions . . . as well as damages (which will include interest from the date of infringement) for Nokia's **unlicensed** sales after April 9, 2007." *See* Qualcomm Form 10-Q (Jan. 24, 2007) (emphasis added).

111.    ***Common Sense.***  Finally, Qualcomm's interpretation of the 2001 SULA is at odds with common sense.

<div align="center">Redacted</div>

this would mean that, according to Qualcomm, on April 9, Nokia's "choices" would be to either (a) pay the high SULA rates, or (b) *shut down its business* (since Qualcomm claims that some of its patents are "essential" for Nokia to make its standard-compliant phones and that Qualcomm has the right to seek injunctions).

<div align="center">Redacted</div>

<div align="center">37</div>

E.    **Qualcomm Is Afraid To Test The Value Of The Parties' Respective Patent Portfolios**

112.    As reflected in the 2001 SULA and Qualcomm's prior statements to this Court and the investing public, the parties plainly agreed that post-April 9, 2007 disputes concerning alleged patent "use" would be fought on a patent-by-patent basis in courts of competent jurisdiction.

113.    Qualcomm's "exercise by use" theory – combined with Qualcomm's exploitation of the stay of litigation available under the Federal Arbitration Act (a stay now approximated in the parties' agreement to consolidate arbitration issues into this action) – is designed to deny Nokia the right to test the true value of Qualcomm's newer patents against Nokia's portfolio in courts of competent jurisdiction, despite the parties' long-standing expectation of such litigation if negotiations failed.

114.    As described below, Qualcomm is now attempting to avoid that litigation because it apparently fears the outcome.  The world has changed considerably for Qualcomm since Nokia agreed to pay the high royalty rate in the 1992 SULA:

- 
            Redacted


                                                                    Fifteen years later,
        Nokia has paid over *$1 billion* in licensing fees for Qualcomm's        Patents – Redacted
        and Nokia's license to Qualcomm's alleged "crown jewel" patents is now paid up
        and royalty-free.[13]        Redacted

---

    [13] The 2001 SULA provided that Nokia's        license for Qualcomm's        Patents Redacted
became fully paid up and royalty free after April 9, 2007 (the "Paid Up License"):

                            Redacted

(footnote continued)

Redacted

UMTS, which is a standard that reflects *heavy contributions from Nokia.*

- 

- 

Redacted

———————————

RLF1-3258714-1

Redacted

- <u>Qualcomm's Patents In Today's Cell Phones Are Diminished In Value</u>: While in 1992 the voice communications functionality of a telephone (to which Qualcomm's patents are allegedly relevant) may have represented nearly all of the device's market value, today's cellular devices are much more complex, offering numerous non-voice features (such as camera phones) that represent a large percentage of their value. Thus, the proportionate value represented by Qualcomm's patents (even assuming that any are valid) has dramatically diminished.

- <u>Qualcomm Keeps Losing Patent Suits – It Has Never Proven That Nokia Infringes A *Single* Valid Patent</u>: Qualcomm has never once proven that Nokia infringes a single valid patent, despite filing at least eleven infringement suits against Nokia in the past two years. Although Qualcomm presumably scrutinized its portfolio to cherry-pick its strongest patents for its opening salvo against Nokia, Qualcomm has gotten nowhere. In December 2007, in what Merrill Lynch called "one of Qualcomm's three top legal cases ... filed to build some leverage in the royalty rate negotiations with Nokia," the International Trade Commission determined that (a) Nokia does not infringe any of Qualcomm's three patents in suit (two of which Qualcomm declared as "essential" to practicing the relevant standard), and (b) one of these patents is *invalid*. On February 27, 2008, the ITC further informed the parties that it would not reconsider that determination. This is not the first time that Qualcomm's well-publicized allegations of "use" by industry participants allegedly using "essential" patents have been rejected when Qualcomm was put to its proof.[14]

115.    Qualcomm feigns ignorance as to what the parties intended would happen if they could not agree on the royalties owed after April 9, 2007. Nothing could be further from the truth. As clearly demonstrated by the SULA's plain language, as well as the parties' statements in litigation and to the investing public, after the truce ended on April 9, 2007, the parties agreed they would again be free to press their rights against each other in patent suits.

---

[14] For example, in January 2007, Broadcom was found not to infringe either of two supposedly "essential" Qualcomm patents.

## CLAIMS FOR RELIEF

### COUNT I

**Declaratory Judgment That Qualcomm's ETSI FRAND Undertakings Confer A Right To Implement ETSI Standards Under Each Individual Qualcomm Patent That Is Subject To A Voluntary FRAND Undertaking**

116.   Nokia repeats and realleges the allegations set forth in the foregoing paragraphs as if set forth fully herein.

117.   An actual justiciable controversy ripe for judicial determination has arisen and now exists between Nokia and Qualcomm with respect to Nokia's right to implement the standard under each individual Qualcomm patent declared essential and subject to FRAND undertaking.

118.   This controversy between Nokia and Qualcomm is real and adverse.  As of the date of this complaint, Qualcomm has filed ten patent infringement lawsuits against Nokia concerning patents declared as to the GSM standard and subject to FRAND undertakings. Notwithstanding Qualcomm's written undertakings with regard to these patents committing to grant irrevocable licenses on FRAND terms, Qualcomm has attempted to seek injunctions and exclude Nokia from practicing such patents regardless of Nokia's willingness to abide by its contractual obligation to compensate Qualcomm on FRAND terms for any valid patent that is used by Nokia and for which Qualcomm is entitled to compensation.

119.   Qualcomm has declared thousands of patents as essential to GSM and UMTS standards and has voluntarily given FRAND undertakings stating that Qualcomm is prepared to grant irrevocable licenses to these patents on FRAND terms in accordance with ETSI IPR Policy Clause 6.1 making the IPR available, and allowing the implementation of the standard.

41

120.    Through its declarations and undertakings made within the ETSI framework, Qualcomm is contractually bound, for the benefit of third parties such as Nokia, to grant irrevocable licenses on FRAND terms and conditions under such IPR.

121.    Nokia has accepted the ETSI FRAND Contracts to the valid patents that have been declared as essential, are subject to FRAND undertakings, and are actually used by Nokia. Nokia is willing to pay FRAND compensation for these patents.

122.    Thus, there exist separate contracts for each Qualcomm declared essential patent that is subject to a FRAND undertaking, and is actually used by Nokia, providing Nokia the right to implement the ETSI standards under each individual Qualcomm patent and imposing an obligation on Nokia to pay FRAND compensation for any patent that is valid and actually used by Nokia.

123.    Accordingly, Nokia seeks an order declaring that Nokia has a right to implement the ETSI standards under each Qualcomm patent subject to a voluntary FRAND undertaking.

### COUNT II

**Declaratory Judgment That Qualcomm's Sole Compensation Is Limited To FRAND Terms For Each Individual Valid Patent Shown To Be Used By Nokia If Any; And Nokia Is Entitled To An Order Enjoining Qualcomm From Seeking An Injunction Or Exclusion Order Against Nokia's Implementation Of ETSI Standards Under Qualcomm's Patents Declared As Essential To An ETSI Standard**

124.    Nokia repeats and realleges the allegations set forth in the foregoing paragraphs as if set forth fully herein.

125.    An actual and justiciable controversy ripe for judicial determination has arisen and now exists between Nokia and Qualcomm with respect to whether Qualcomm's sole compensation is limited to FRAND terms for each individual valid patent practiced by Nokia and

RLF1-3258714-1

whether Qualcomm is entitled to seek and obtain injunctive relief against Nokia on patents declared as essential and subject to FRAND undertakings.

126.   By entering into contracts with ETSI and ETSI's members stating that it is prepared to grant irrevocable licenses on FRAND terms to patents it has declared to be essential to ETSI standards, Qualcomm limited its relief for utilization of any such IPR for the purpose of implementing the standard, to FRAND compensation. Furthermore, pursuant to Qualcomm's declarations of essentiality for certain GSM and UMTS patents, Qualcomm's provision of voluntary undertakings committing to license these patents on FRAND terms, and Nokia's acceptance of Qualcomm's FRAND undertakings for valid patents actually used by Nokia, Qualcomm may not preclude Nokia, who is willing to accept a FRAND proposal and compensate Qualcomm on FRAND terms for such patents, if any, from implementing the ETSI standards.

127.   This controversy between Nokia and Qualcomm is real and adverse. As of the date of this complaint, Qualcomm has filed ten patent infringement lawsuits against Nokia concerning patents declared as essential to ETSI's GSM standard and subject to a FRAND declaration. These attempts to exclude Nokia from practicing patents declared essential to GSM breach Qualcomm's commitment to allow Nokia to implement the ETSI standards.

128.   Accordingly, Nokia seeks a declaratory judgment that Qualcomm's sole compensation is limited to FRAND terms for each individual valid patent subject to a FRAND undertaking, and that Nokia is entitled to an order enjoining Qualcomm from seeking an injunction or exclusion order against Nokia's implementation of ETSI standards under Qualcomm's patents declared as essential to an ETSI Standard.

43

## COUNT III

**Specific Performance Ordering Qualcomm Not To Breach Its FRAND Commitment By Seeking An Injunction Or Exclusionary Order Against Nokia**

129.    Nokia repeats and realleges the allegations set forth in the foregoing paragraphs as if set forth fully herein.

130.    An actual and justiciable controversy ripe for judicial determination has arisen and now exists between Nokia and Qualcomm with respect to whether Qualcomm can obtain injunctive relief against Nokia on patents declared as essential and subject to FRAND undertakings.

131.    By entering into contracts with ETSI and ETSI's members stating that it is prepared to grant irrevocable licenses on FRAND terms to patents it has declared to be essential to ETSI standards, Qualcomm limited its relief for utilization of any such IPR for the purpose of implementing the standard, to FRAND compensation.  Furthermore, pursuant to Qualcomm's declarations of essentiality for certain GSM and UMTS patents, Qualcomm's provision of voluntary undertakings committing to license these patents on FRAND terms, and Nokia's acceptance of Qualcomm's FRAND undertakings for valid patents actually used by Nokia, Qualcomm may not preclude Nokia, who is willing to accept a FRAND proposal and compensate Qualcomm on FRAND terms for such patents, if any, from implementing the ETSI standards.

132.    This controversy between Nokia and Qualcomm is real and adverse.  As of the date of this complaint, Qualcomm has filed ten patent infringement lawsuits against Nokia concerning patents declared as essential to ETSI's GSM standard and subject to a FRAND declaration.  These attempts to exclude Nokia from practicing patents declared essential to GSM breach Qualcomm's commitment to allow Nokia to implement the ETSI standards.

44

133.    Accordingly, Nokia seeks a declaratory judgment that Qualcomm has contractually limited its right to seek injunctive relief against Nokia's implementation of the ETSI standards and that declaring that Qualcomm's sole compensation is limited to FRAND terms for each individual valid patent subject to a FRAND undertaking.

134.    Nokia also seeks an order of specific performance ordering Qualcomm not to breach its FRAND commitment by seeking an injunction or exclusionary order against Nokia; and an order enjoining Qualcomm from seeking an injunction or exclusionary order against Nokia as a remedy for alleged infringement of any declared essential patent it has contractually agreed to license on FRAND terms. Nokia has no adequate remedy at law.

## COUNT IV

### Declaratory Judgment That Qualcomm Has Failed To Provide FRAND Terms And Conditions For The Use Of Those Declared Essential Patents Subject To A FRAND Undertaking

135.    Nokia repeats and realleges the allegations set forth in the foregoing paragraphs as if set forth fully herein.

136.    An actual and justiciable controversy ripe for judicial determination has arisen and now exists between Nokia and Qualcomm with respect to whether Qualcomm has proposed terms that could be FRAND compensation, regardless of their economic value, in light of the fact that they are bundled with other rights and obligations beyond the FRAND contracts, and are not patent or country specific.

137.    This controversy between Nokia and Qualcomm is real and adverse. Qualcomm has claimed to Nokia and in this Court that it has discharged its obligations, if any, to propose FRAND terms and conditions for the use of its declared essential patents subject to FRAND undertakings by the fact that          Redacted

45

Redacted

138.   Whereby Qualcomm has given FRAND undertakings for patents it has declared as essential to ETSI standards, and whereby, when accepted, such an undertaking forms a contract allowing implementation of the ETSI standard through use of the covered patent despite the lack of agreement on the specific FRAND compensation and terms related thereto, and whereby Nokia has requested proposed terms and conditions for any patent subject to an undertaking and used by Nokia, if any, Qualcomm now has an obligation under French law to propose terms and conditions that are compliant with FRAND.

139.

140.                    Redacted

141.

142.   Accordingly, Nokia seeks a declaratory judgment that Qualcomm has never proposed terms and conditions for the IPR subject to its FRAND undertakings that could ever be FRAND regardless of their economic valuation.

## COUNT V

**Declaratory Judgment That Qualcomm Has The Right To Implement ETSI Standards Under Each Individual Nokia Patent That Is Subject To A Voluntary FRAND Undertaking And That Nokia Has The Same Rights And Obligations As A Patentee As Qualcomm**

143.     Nokia repeats and realleges the allegations set forth in the foregoing paragraphs as if set forth fully herein.

144.     An actual justiciable controversy ripe for judicial determination has arisen and now exists between Nokia and Qualcomm with respect to Qualcomm's right to implement the ETSI standards under each individual Nokia patent that is declared essential and to which a FRAND undertaking has been given.

145.     The controversy between Nokia and Qualcomm is real and adverse.  Qualcomm has claimed that there is no right to implement the standard under any declared essential patent subject to FRAND undertaking unless and until the parties agree to a specific price for the FRAND compensation whereas Nokia believes that Qualcomm has the same contractual rights and obligations on the basis of Nokia's ETSI undertakings and the subsequent use of any valid patent as Nokia has on the basis of Qualcomm's ETSI FRAND undertakings.

146.     Nokia has declared thousands of IPRs as essential to ETSI standards and given FRAND undertakings stating that it is prepared to grant irrevocable licenses on FRAND terms to those patents.

147.     Subject to statements rejecting these undertakings, Qualcomm will have accepted these undertakings by using Nokia's patents in implementing ETSI standards.

148.     Thus, ETSI FRAND Contracts currently exist between Qualcomm and Nokia permitting Qualcomm to use Nokia's declared essential patents in implementing the relevant

RLF1-3258714-1

ETSI standards subject to Qualcomm's agreement to compensate Nokia with FRAND terms for the patents for which Nokia seeks FRAND compensation from Qualcomm.

149.     Accordingly, Nokia seeks a declaratory judgment that Qualcomm has the right to implement the standard under Nokia's declared essential patents that are subject to a voluntary FRAND undertaking so long as Qualcomm agrees to provide FRAND compensation for any valid patent for which Nokia seeks compensation from Qualcomm and is used by Qualcomm.

## COUNT VI

### Redacted

150.     Nokia repeats and realleges the allegations set forth in the foregoing paragraphs as if set forth fully herein.

151.     Qualcomm contends that by virtue of Nokia's alleged use of certain Qualcomm patents, Nokia has impliedly exercised one of the two options.  Thus, argues Qualcomm, Nokia must pay        royalties for Qualcomm's        Patents   Redacted

Qualcomm further claims that as a result of the alleged implied exercise of the options, Nokia is currently bound by the 2001 SULA's non-assert with respect to Qualcomm's

152.

### Redacted

RLF1-3258714-1

Redacted

153.

154.   Moreover, Nokia's non-assert with respect to Qualcomm's

Redacted

155.

156.   It is undisputed that, to date, Nokia has not under        Redacted

elected in writing to exercise              In fact, Nokia has repeatedly informed Qualcomm that Redacted

it has not exercised either option.  Nokia thus has no obligation to pay royalties Redacted

under the 2001 SULA with respect to Qualcomm's        Patents and is not bound by the now- Redacted

expired non-assert    Redacted     .  As a consequence of the fact that Nokia has not elected

to exercise either of the options and that the        non-assert has expired, *inter alia*, (1) Nokia is Redacted

free to assert all of Nokia's Patents against Qualcomm; and

Redacted

49

157.             Redacted

158.    It is apparent that Qualcomm will seek to deny that, unless one of the options is exercised, Nokia has no obligation to pay          royalties under the 2001 SULA with respect to Redacted Qualcomm's        Patents and is not bound by the now-expired non-assert Redacted

159.    In order to resolve this dispute, Nokia requests that this Court declare the rights and obligations of the parties.  Nokia requests a declaration that because Nokia has **not** exercised either option in       Redacted       , Nokia has no obligation to pay royalties under the 2001 SULA with respect to Qualcomm's        Patents and is not bound by the now- Redacted expired non-assert in 2001 SULA  Redacted

160.             Redacted

**COUNT VII**

**Declaration That Nokia Has A Paid Up License To Qualcomm's        Patents** Redacted

161.    Nokia repeats and realleges the allegations set forth in the foregoing paragraphs as if set forth fully herein.

162.             Redacted

Nokia's license to Qualcomm's        Patents is paid up and royalty-free after April 9, 2007: Redacted

             Redacted

50

Redacted

163.

     Nokia's      license under the     Patents is now paid up and royalty-free after Redacted Nokia's payment of about $1 billion under the 1992 SULA and the 2001 SULA.

     164.   Nokia has a reasonable present belief that Qualcomm will seek to deny the fact that Nokia's    license under Qualcomm's    Patents is presently paid up, and that Redacted Qualcomm will assert that Nokia's    license to Qualcomm's    Patents is paid up only Redacted if Nokia exercises one of the options.

     165.   Nokia also has a reasonable present belief that Qualcomm will assert that because Nokia allegedly breached the 2001 SULA, Nokia's license under the    Patents is not paid up Redacted and royalty-free.

51

166. In order to resolve this dispute, Nokia requests that the Court declare the rights and obligations of the parties. Specifically, Nokia requests a declaration that Nokia presently has a paid up and royalty-free     license to Qualcomm's     Patents. Nokia has not breached Redacted the SULA, but Nokia nonetheless also seeks a declaration that, regardless of whether the 2001 SULA is deemed breached or terminated by either party, Nokia's     license under the     Redacted Patents is paid up and royalty-free and that the loss of the Paid Up License – after Nokia has fully paid about $1 <u>billion</u> -- would work an impermissible forfeiture that is barred by the controlling legal and equitable principles.

67.                 Redacted

## PRAYER FOR RELIEF

WHEREFORE, Nokia respectfully requests that this Court:

A. Adjudge and decree that Nokia has a right to implement ETSI standards under each individual Qualcomm patent that is subject to a voluntary FRAND undertaking by Qualcomm;

B. Adjudge and decree that Qualcomm's sole compensation is limited to FRAND terms for each individual valid patent shown to be used by Nokia in a court of competent jurisdiction;

C. Adjudge and decree that Qualcomm contractually waived its right to seek injunctive relief against Nokia's implementation of ETSI standards;

D. Enter an order of specific performance ordering Qualcomm not to breach its FRAND commitment by seeking an injunction or exclusionary order against Nokia's

RLF1-3258714-1

implementation of ETSI standards under Qualcomm patents declared as essential to an ETSI standard;

E.     Enter an order enjoining Qualcomm from seeking an injunction or exclusionary order against Nokia's implementation of ETSI standards under Qualcomm patents declared as essential to an ETSI standard;

F.     Adjudge and decree that Qualcomm has never proposed terms and conditions for the patents subject to its FRAND undertakings that could ever be FRAND regardless of their economic valuation;

G.     Adjudge and decree that Qualcomm has the same right to implement ETSI standards under each individual Nokia patent as Nokia has under individual Qualcomm patents and that Nokia has the same rights and obligations as a patentee as Qualcomm;

H.     Adjudge and decree that because Nokia has not exercised either option granted to it     Redacted     Nokia has no obligation to pay royalties     under the Redacted 2001 SULA with respect to Qualcomm's Redacted Patents and is not bound by the now-expired non-assert in 2001 SULA     and that Nokia is entitled to all relief, including without Redacted limitation any equitable relief, appropriate in view of Qualcomm's actions that have deprived Nokia of the benefit of its contractual bargain;

I.     Adjudge and decree that:  (1) Nokia presently has a paid up and royalty-free license to Qualcomm's     Patents; (2) this is so regardless of whether the 2001 SULA Redacted is deemed breached or terminated by either party; and (3) the loss of the Paid Up License – after Nokia has fully paid about $1 <u>billion</u> – would work an impermissible forfeiture that is barred by the controlling legal and equitable principles;

J.                                  Redacted

            and

K.       Grant Nokia such other and further relief as the Court deems just and proper.


<div style="text-align:right">/s/ Jeffrey L. Moyer</div>

OF COUNSEL:

A. William Urquhart

Kathleen Sullivan

Erica P. Taggart

Quinn Emanuel Urquhart Oliver & Hedges, LLP

865 South Figueroa Street

Los Angeles, CA 90017

(213) 443-3000

David Elsberg

Quinn Emanuel Urquhart Oliver & Hedges, LLP

51 Madison Avenue, 22nd Floor

New York, NY 10010

(212) 849-7000

Dated:  February 29, 2008

Thomas A. Beck (#2086)

Lisa A. Schmidt (#3019)

Jeffrey L. Moyer (#3309)

Steven J. Fineman (#4025)

Blake K. Rohrbacher (#4750)

Richards, Layton & Finger, P.A.

920 North King Street

Wilmington, DE 19899

(302) 651-7700

*Attorneys for Plaintiffs Nokia Corporation*
*and Nokia, Inc.*

54



## VERIFICATION

I, Ilkka Rahnasto, am the Vice President of IPR of Nokia Corporation and authorized to sign this verification on behalf of both Nokia Corporation and Nokia Inc. I hereby declare under penalty of perjury that I have read the foregoing Verified Amended Complaint, and that the facts alleged therein are true and correct to the best of my own personal knowledge, except for those matters alleged to be on information and belief, and as to such matters, I believe them to be true and correct.

Ilkka Rahnasto

STATE OF Finland )
COUNTY OF Helsinki )

SWORN TO AND SUBSCRIBED before me this 29th day of February, 2008.

Notary Public: PAULA OJANIEMI Notary Public
My Commission Expires: Permanent

RLF1-3257546-1

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of February 2008, true and correct copies of the foregoing document were caused to be served on counsel of record at the following address as indicated:

**BY E-FILE**
Brian C. Ralston, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899

Steven J. Fineman (#4025)

RLF1-3053491-1

## CERTIFICATE OF SERVICE

I hereby certify that, on the 12th day of March 2008, true and correct copies of the foregoing document were caused to be served on counsel of record at the following address as indicated:

**BY E-FILE**
Brian C. Ralston, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899

Blake K. Rohrbacher (#4750)