# EXHIBIT 4

EFiled: Nov 3 2006 4:14PM EST
Transaction ID 12819586

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| NOKIA CORPORATION and NOKIA INC., | -REDACTED- |
| | **PUBLIC VERSION** |
| Plaintiffs, | |
| | |
| v. | C.A. No. 2330-N |
| | |
| QUALCOMM INC., | |
| | |
| Defendant. | |

**BRIEF OF PLAINTIFFS NOKIA INC. AND
NOKIA CORPORATION IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS OR STAY**

OF COUNSEL:

A. William Urquhart
Frederick Lorig
Patrick Shields
Erica Taggart
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street
Los Angeles, CA 90017
(213) 443-3000

Richard I. Werder, Jr.
Sanford I. Weisburst
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Dated: October 6, 2006

Thomas A. Beck (#2086)
beck@rlf.com
Lisa A. Schmidt (#3019)
schmidt@rlf.com
Jeffrey L. Moyer (#3309)
moyer@rlf.com
Steven J. Fineman (#4025)
fineman@rlf.com
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19899
(302) 651-7700

Attorneys for Plaintiffs Nokia Corporation
and Nokia, Inc.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

COUNTERSTATEMENT OF FACTS .....................................................................4

    A.    The Parties. .................................................................................4

    B.    The Need for Standard-Setting in Cellular Telecommunications and the
Challenge Presented by Intellectual Property Rights..................................5

    C.    ETSI's Selection of WCDMA Technology for the Third-Generation
UMTS Standard. ..........................................................................6

    D.    The Parties' Existing (and Soon-To-Expire) License Agreement. ..............7

    E.    Nokia's 2005 DG Comp Complaint Against Qualcomm. ...........................9

    F.    Qualcomm's Worldwide Counterattack. ..................................................10

    G.    The Instant Action.....................................................................................15

ARGUMENT .........................................................................................................15

I.    THIS COURT CLEARLY QUALIFIES AS AN APPROPRIATE FORUM
UNDER THE APPLICABLE FORUM-SELECTION CLAUSE........................16

    A.    Judicial Interpretations of a Similar Term in EU Law Confirm That
"National Courts of Law" Does Not Distinguish Between Federal and
State Courts................................................................................................16

    B.    The Drafting History of ETSI Guide § 4.2 Shows that "National Court of
Law" Is Synonymous with "Competent Court of the State of the
Signatory." ...............................................................................................19

    C.    If "National Courts of Law" Is Somehow Ambiguous, The Ambiguity
Must Be Resolved in Favor of this Court as an Appropriate Venue. .........21

II.    THE *MCWANE* PREFERENCE IS EITHER INAPPOSITE OR TRUMPED. .......22

    A.    *McWane* Is Inapposite Because its Doctrinal Elements Are Not Satisfied............23

        1.    Whereas Qualcomm's actions involve highly technical issues
relating to discrete 2G GSM patents, Nokia's action presents
overarching contractual issues concerning the meaning of FRAND........23

        2.    Qualcomm's lawsuits do not warrant deference. .............................27

| | | 3. | Qualcomm cannot sustain its burden under ordinary *forum non conveniens* analysis. | 28 |

| | B. | | Even if the *McWane* Preference Applies, It Is Trumped by the Need for the Expedited Treatment that this Court Is Uniquely Positioned To Provide. | 30 |

| III. | NOKIA'S FRAND-BARS-INJUNCTIVE-RELIEF CLAIM IS SUFFICIENT. | | | 35 |

| | A. | | The FRAND Obligation Unambiguously Covers Qualcomm's Declared-Essential Patents that Are Listed in its FRAND Contracts and Does Not Require that Nokia Prove Such Patents To Be Essential in Fact. | 35 |

| | B. | | FRAND Precludes the IPR Owner from Seeking Injunctive Relief. | 39 |

| | C. | | This Court Has Ample Authority To Grant Nokia's Requested Relief. | 41 |

| IV. | AN ACTUAL CONTROVERSY EXISTS CONCERNING NOKIA'S SECOND CLAIM FOR RELIEF. | | | 44 |

| V. | QUALCOMM'S DUTY TO NEGOTIATE UNDER THE FRAND METHODOLOGY ANNOUNCED BY THIS COURT IS SPECIFICALLY ENFORCEABLE. | | | 48 |

| CONCLUSION | | | | 50 |

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ackerman v. Stemerman,*
201 A.2d 173 (Del. 1964) ................................................................................ 35

*ANR Pipeline Co v. Shell Oil Co.,*
526 A.2d 930 (Del. 1987) (Order) ................................................................... 43

*Asten v. Wangner,*
1997 WL 634330 (Del. Ch. Oct. 3, 1997) ....................................................... 29

*Box v. Box,*
697 A.2d 395 (Del. 1997) ................................................................................ 31

*Clausen Co. v. Dynatron/Bondo Corp.,*
889 F.2d 459 (3d Cir. 1989) ...................................................................... 24, 43

*Collins & Aikman Corp. v. Compo Indus., Inc.,*
1981 WL 15116 (Del. Ch. May 14, 1981) ....................................................... 30

*Cornerstone Techs., LLC v. Conrad,*
2003 WL 21003402 (Del. Ch. April 22, 2003) ................................................ 28

*Crusader Enters., Inc. v. Del. Comm'n on Massage Establishments & Adult Bookstores,*
1978 WL 22000 (Del. Ch. Sept. 1, 1978) ........................................................ 30

*Donovan v. City of Dallas,*
377 U.S. 408 (1964), ........................................................................................ 42

*Dura Pharms., Inc. v. Scandipharm, Inc.,*
713 A.2d 925 (Del. Ch. 1998) ............................................................... 24, 25, 27

*Epstein v. Chatham Park, Inc.,*
153 A.2d 180 (Del. Super. 1959) ..................................................................... 42

*ESS Technology, Inc. v. PC-TEL, Inc.,*
1999 WL 33520483 (N.D. Cal. Nov. 4, 1999) ........................................... 48, 49

*Excelsior Wooden Pipe Co. v. Pac. Bridge Co.,*
185 U.S. 282 (1902) .................................................................................. 24, 43

*Fort James Corp. v. Beck,*
2005 WL 2000761 (Del. Ch. Aug. 16, 2005) ............................................ 23, 28

*Gen. Video Corp. v. Kertesz,*
2006 WL 2051023 (Del. Ch. July 19, 2006) ................................................... 25

*Metro. Edison Co. v. NLRB*,
    460 U.S. 693 (1983) ................................................................................................ 41

*Penobscot Nation v. Georgia-Pacific Corp.*,
    254 F.3d 317 (1st Cir. 2001) .................................................................................... 42

*Piasecki Aircraft Corp. v. Int'l Union*,
    129 A.2d 663 (Del. Ch. 1957) .................................................................................. 30

*Prestancia Mgmt. Group, Inc. v. Va. Heritage Found., II LLC*,
    2005 WL 1364616 (Del. Ch. May 27, 2005) ............................................................ 21

*Prod. Res. Group, L.L.C. v. NCT Group, Inc.*,
    863 A.2d 772 (Del. Ch. 2004) ............................................................................. 4, 35

*Rapoport v. Litig. Trust of MDIP Inc.*,
    2005 WL 3277911 (Del. Ch. Nov. 23, 2005) ..................................................... 23, 28

*Schick Inc. v. Amalgamated Clothing & Textile Workers Union*,
    533 A.2d 1235 (Del. Ch. 1987) ................................................................................ 47

*Seminole Tribe of Fla. v. Florida*,
    517 U.S. 44 (1996) ................................................................................................... 18

*Simon v. Navellier Series Fund*,
    2000 WL 1597890 (Del. Ch. Oct. 19, 2000) ........................................................... 16

*Teachers' Retirement Sys. of La. v. Scrushy*,
    2004 WL 423122 (Del. Ch. Mar. 2, 2004) .......................................................... 23, 24

*Tex. Instruments, Inc. v. Tandy Corp.*,
    1992 WL 103772 (Del. Ch. May 12, 1992) .............................................................. 26

*Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*,
    851 F.2d 342 (Fed. Cir. 1988) ......................................................................... 3, 13, 34

*Therien v. Trustees of the Univ. of Pa.*,
    2006 WL 83448 (E.D. Pa. Jan. 10, 2006) ................................................................ 24

*Tuff Torq Corp. v. Hydro-Gear Ltd. P'ship*,
    882 F. Supp. 359 (D. Del. 1994) .............................................................................. 30

*Ubiquitel Inc. v. Sprint Corp.*,
    2006 WL 44424 (Del. Ch. Jan. 4, 2006) ......................................................... 4, 47, 48

*United Phosphorus, Ltd. v. Micro-Flo, LLC*,
    808 A.2d 761 (Del. 2002) ........................................................................................ 23

*United States v. Glaxo Group Ltd.*,
    410 U.S. 52 (1973) ................................................................................................... 49

*United States v. U.S. Gypsum Co.*,
    340 U.S. 76 (1950) ................................................................................................... 49

v

*Genentech, Inc. v. Eli Lilly & Co.*,
  998 F.2d 931 (Fed. Cir. 1993),
  *abrogated on other grounds by Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) ............ 27

*General Atomic Co. v. Felter*,
  434 U.S. 12 (1977) *(per curiam)* ....................................................................................... 42

*General Foods Corp. v. Cryo-Maid, Inc.*,
  198 A.2d 681 (Del. 1964),
  *overruled on other grounds, Pepsico, Inc. v. Pepsi-Cola Bottling Co.*, 261 A.2d
  520 (Del. 1969) ............................................................................................................... 29

*Harbor Ins. Co. v. Newmont Mining Corp.*,
  564 A.2d 352 (Del. Super. 1989) ..................................................................................... 30

*Hoffman Constr. Co. v. Active Erectors & Installers, Inc.*,
  969 F.2d 796 (9th Cir. 1992) ........................................................................................... 12

*Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*,
  535 U.S. 826 (2002) ............................................................................................ 2, 24, 38

*Hydranautics v. Filmtec Corp.*,
  70 F.3d 533 (9th Cir. 1995) ...................................................................................... 25, 26

*In re Delta & Pine Land Co. S'holders Litig.*,
  2000 WL 1010584 (Del. Ch. July 17, 2000) ................................................................... 27

*In re Oximetrix, Inc.*,
  748 F.2d 637 (Fed. Cir. 1984) ............................................................................. 21, 23, 43

*Izquierdo v. Sills*,
  2004 WL 2290811 (Del. Ch. June 29, 2004) ............................................................. 39, 41

*J.S. Alberici Constr. Co. v. Mid-West Conveyor Co.*,
  750 A.2d 518 (Del. 2000) ................................................................................................ 37

*Jones v. Sheehan, Young & Culp, P.C.*,
  82 F.3d 1334 (5th Cir. 1996) ........................................................................................... 42

*Joyce v. Cuccia*,
  1996 WL 422339 (Del. Ch. Aug. 6, 1996) ...................................................................... 30

*Liquor Exch., Inc. v. Tsaganos*,
  2004 WL 2694912 (Del. Ch. Nov. 16, 2004) .................................................................. 49

*Luckett v. Delpark, Inc.*,
  270 U.S. 496 (1926) ............................................................................................. 21, 24, 43

*McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.*,
  263 A.2d 281 (Del. 1970) ........................................................................................ *passim*

*Merchants' Nat'l Props., Inc. v. Meyerson*,
  2000 WL 1041229 (Del. Ch. July 24, 2000) .............................................................. 38, 41

*United States v. Vehicular Parking, Ltd.,*
  61 F. Supp. 656 (D. Del. 1945)............................................................................................. 49

*Univ. of Md. at Baltimore v. Peat Marwick Main & Co.,*
  923 F.2d 265 (3d Cir. 1991).................................................................................................. 42

*USX Corp. v. U.S. Denro Steels, Inc.,*
  2001 WL 1269329 (Del. Ch. June 29, 2001)........................................................................ 31

*Visual Edge Systems, Inc. v. Takefman,*
  2000 WL 193107 (Del. Ch. Jan. 31, 2000)........................................................................... 32

*Williams Natural Gas Co. v. BHP Petroleum Co.,*
  574 A.2d 264 (Del. 1990) (Order) ........................................................................................ 43

## STATUTES AND OTHER AUTHORITIES

19 U.S.C. § 1337................................................................................................................ 13, 34

28 U.S.C. § 1338....................................................................................................................... 23

28 U.S.C. § 1659................................................................................................................ 12, 32

28 U.S.C. § 1738................................................................................................................ 42, 43

Article 234 EC ..................................................................................................................... 17, 18

Chancery Court Rule 12........................................................................................................ 16, 34

French Civil Code, Art. 1156 ................................................................................................ 37, 40

French Civil Code, Art. 1160...................................................................................................... 40

A. Reinhardt, *A Scrum Over Qualcomm's Fees*, BUSINESS WEEK, Oct. 31, 2005 ........................ 10

AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000)............................ 36

D. WOLFE & M. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE
  COURT OF CHANCERY (2006)........................................................................................... 29, 44

D. Young, *No Plans for more Qualcomm suits in EU dispute - CEO*, REUTERS, Nov. 21,
  2005, Available at http://www.crn.com.au/story.aspx?CIID=25873 (last visited
  Oct. 2, 2006) ......................................................................................................................... 9

http://www.etsi.org/about_etsi/30_minutes/Sem-Chapter18.htm (last visited Oct. 2, 2006) ....... 18

J. Miller, *Standard Setting, Patents, and Access Lock-In: RAND Licensing and the
  Theory of the Firm*, forthcoming, 40 IND. L. REV. _ (2006) (Available at
  http://papers.ssrn.com/sol3/papers.cfm?abstract_id=924883 (last visited Oct. 2,
  2006))................................................................................................................................... 40

M. Lemley, Intellectual Property Rights and Standard-Setting Organizations,
  90 CAL. L. REV. 1889 (2002) ................................................................................................ 40

S. Eluvangal, *Qualcomm says it won't rock 3G boat*, REDIFF INDIA ABROAD, Nov. 11, 2005, Available at http://us.rediff.com/money/2005/nov/11qual.htm (last visited Oct. 2, 2006) ......................................................................................................... *passim*

V. Siber, *The Technical Character of Software Invention:  Why Continental and United States Patent Law Should Be Consistent in Analyzing Patentability*, 9 FED. CIR. B.J. 555 (2000) ....................................................................................... 18

Plaintiffs Nokia Corporation and Nokia Inc. (collectively, "Nokia") respectfully submit this brief in opposition to Defendant Qualcomm Inc.'s ("Qualcomm") motion to dismiss or stay.

## INTRODUCTION

Qualcomm's motion, although styled a motion to dismiss, mounts a broad attack on the accuracy of the allegations of Nokia's Complaint.  Qualcomm asks this Court to assume the allegations of the Complaint to be untrue and to dismiss the Complaint based on that assumption. Qualcomm all but admits this strategy at pages 15-16 of its brief, where it asserts, albeit in the context of the Rule 12(b)(1) and (3) branches of its motion, that "[t]he Court may freely consider matters outside the pleadings ...."  Qualcomm's strategy is equally clear from its preliminary statement (pp. 1-4), which we address in this Introduction.

Moreover, Qualcomm's analysis of the contracts at issue fails to apply French law despite the contracts' French choice-of-law provisions.  Thus, Qualcomm's motion is based on false assumptions of law and fact.  Although the motion should be denied for these defects alone, denial is particularly warranted because French law shows that Nokia's, not Qualcomm's, interpretation of the contracts is correct.  This is demonstrated by the Opinion of Laurent Aynès,[1] a Professor of Law from the Sorbonne, who analyzed the contracts under French law as required by their choice-of-law provisions and concludes that:

1.  Under French law, Qualcomm, by virtue of its FRAND declarations, licensed all ETSI members, including Nokia, to the patents it declared essential to the ETSI standards, both 2G GSM and 3G UMTS.  Contrary to Qualcomm's argument based on U.S. law, under French law the contracts are not merely agreements to negotiate a license on essential-in-fact patents, but instead are license agreements on declared-essential patents for a FRAND amount to be negotiated or determined by a national court absent an agreement.

---

[1] Opinions or Declarations cited hereinafter have been filed separately and also included as exhibits to the Affidavit of Steven J. Fineman in support of Nokia's opposition brief ("N Aff.").  Professor Aynès' Opinion may be found at N Aff., Ex. A.

2. Under French law, by the terms of those licenses, Qualcomm gave up the remedy of an injunction in the event of a dispute with Nokia over the amount of a FRAND royalty. Thus, contrary to Qualcomm's argument, it had no right to initiate baseless repetitive lawsuits around the world -- including two (in France and Italy) on the eve of this opposition brief -- seeking injunctions on declared-essential patents, and Nokia's request for injunctive relief against these breaches of contract is both proper and needed.

3. Under French law, Qualcomm's FRAND licenses can be enforced in an action on the contract unless Qualcomm had previously requested that ETSI remove the declaration **and** then proves in court as an affirmative defense that its patents are no longer essential to the standards as it had earlier admitted when filing its declarations of essentiality with ETSI. Qualcomm made no such request to ETSI before seeking an injunction and has certainly not alleged, much less proved, that any of the patents on which it has sued are no longer essential. Thus, as alleged in Nokia's Complaint and contrary to Qualcomm's argument, Qualcomm's six actions seeking injunctions around the world violate its contracts with ETSI and Nokia.

Qualcomm's second principal contractual argument -- that this Court is not a "national court" referred to in the ETSI Guide as an appropriate court to resolve this dispute -- is conclusively rebutted by the Opinion of Daniel Halberstam, Professor of Law and Director of the European Law Program at the University of Michigan (N Aff., Ex. B).

Thus, the evidence will show that French law is fully consistent with Nokia's Complaint, notwithstanding the unsupported and inaccurate assertions that underlie Qualcomm's motion.

- Contrary to Qualcomm's first argument (Q Br. 1-2),[2] Qualcomm's FRAND obligations cover all of its declared-essential patents.

- Contrary to Qualcomm's second argument (Q Br. 2), Nokia is not estopped from so asserting since Nokia continues to maintain the position that it does not (as Judge Farnan ruled) have to prove that Qualcomm's admissions of essentiality are accurate.

- Contrary to Qualcomm's third argument (Q Br. 2-3), French law does not permit it to seek an injunction on declared-essential patents.

- Contrary to Qualcomm's fourth argument (Q Br. 3), all Nokia asks is that this Court enjoin Qualcomm from breaching its contractual obligations, which does not violate the Supremacy Clause because, as Judge Farnan held, federal courts do not have original jurisdiction over contract disputes between citizens of the same state, even when the defendant wants to raise patent issues. *See Holmes Group, Inc. v. Vornado Air*

---

[2] Qualcomm's brief is cited hereinafter as "Q Br." and its appendix as "Q App."

*Circulation Sys., Inc.*, 535 U.S. 826, 834 (2002) (federal patent-law jurisdiction is absent where no "patent-law claim appears on the face of the plaintiff's well-pleaded complaint").

- Contrary to Qualcomm's fifth argument (Q Br. 3-4), an actual controversy exists unless Qualcomm is willing to stipulate to Professor Aynès' legal conclusions and admit that there is such a contract, and that its terms are enforceable under French law even in the absence of agreement on price.

- Contrary to Qualcomm's sixth argument (Q Br. 4), French and European law clearly establish that this Court is within the class of "national courts" referred to in the ETSI Guide. *See* Halberstam Opinion (N Aff., Ex. B).

- Finally, contrary to Qualcomm's seventh argument (Q Br. 4), Qualcomm fails to say in which court's favor it seeks abstention: [1] the European Commission, Directorate General of Competition ("DG Comp"), which has not yet decided whether to investigate Qualcomm's alleged violation of antitrust laws, much less to go beyond its jurisdiction by involving itself in a contractual dispute (*see* Decl. of John Temple Lang (N Aff., Ex. C)); [2] the San Diego federal court, whose proceeding on 2G GSM patents has been stayed, where no answer much less counterclaim has been filed, and where there is no jurisdiction over 3G UMTS issues; [3] the UK court, where no answer has been filed (*see* Decl. of Jane Mutimear (N Aff., Ex. D)); [4] the ITC, where no counterclaim is permitted and whose decisions have no *res judicata* or collateral estoppel effect on courts (*see, e.g.*, *Tex. Instruments Inc. v. U.S. Int'l Trade Comm'n*, 851 F.2d 342, 344 (Fed. Cir. 1988)); [5] the German court, where no answer has been filed (*see* Decl. of Wolfgang von Meibom (N Aff., Ex. E)); the [6] French court, where Qualcomm has yet to serve its complaint on all the Nokia parties and where no answer has been filed; [7] the Italian court, where Qualcomm also has yet to serve its complaint on the parties; or any other foreign jurisdictions in which Qualcomm may yet baselessly and repetitively seek an injunction. If Qualcomm wanted this issue decided in one court, it would not have filed this multiplicity of suits around the world and threatened others, since each action, absent this Court's decision, will have to decide separately whether an injunction is an available remedy for infringement of a declared-essential patent and the method by which a FRAND royalty must be calculated.

Qualcomm's unwillingness to have this matter determined in its home state in an expedited fashion is an admission of its fear that its worldwide litigation spree will be revealed as an effort to extort unfairly high royalties under threat of injunction -- in plain violation of its contractual obligations to ETSI and Nokia. Thus, Qualcomm's motion, having been based on false assumptions of law and fact, can and must be denied in favor of the expedited proceeding this Court has already scheduled. Alternatively, if this Court, despite the attached Opinions, is uncertain as to the applicable French law, Nokia respectfully requests that this Court, at its earliest convenience, order

hearings on French law -- particularly on the key issue whether Qualcomm has contracted away the remedy of an injunction on declared-essential patents. A judicial determination of Qualcomm's obligations under these French contracts will remove a major cloud of uncertainty that has prevented the parties from fully agreeing on the terms of a license agreement on Qualcomm's alleged 2G GSM patents and a post-April 2007 license agreement on Qualcomm's 3G UMTS patents.

**COUNTERSTATEMENT OF FACTS**

We will not burden the Court with a redundant discussion of undisputed facts. We focus instead on facts that Qualcomm has either omitted, mischaracterized, or declined to construe in the light most favorable to Nokia as required on a motion challenging the existence of an actual controversy, *see Ubiquitel Inc. v. Sprint Corp.*, 2006 WL 44424, at *2 n.15 (Del. Ch. Jan. 4, 2006), or seeking dismissal for failure to state a claim, *see Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 781 (Del. Ch. 2004) (Strine, V.C.).

**A.     The Parties.**

Plaintiff Nokia Corporation is organized under the laws of Finland, with its principal place of business in Espoo, Finland. Complaint ("Compl.") ¶ 6 (Q App., Ex. 2 at 3). Plaintiff Nokia Inc. is a Delaware corporation headquartered in Irving, Texas. *Id.* ¶ 7. Defendant Qualcomm, while maintaining its headquarters in San Diego, is a Delaware corporation. *Id.* ¶ 9. ETSI, the standard-setting organization ("SSO") with which Qualcomm entered the contracts at the heart of this case, is a French not-for-profit corporation based in France. *Id.* ¶ 20 (Q App., Ex. 2 at 7); Q Br. 5 n.4.

**B.      The Need for Standard-Setting in Cellular Telecommunications and the Challenge Presented by Intellectual Property Rights.**

While Qualcomm adequately describes the three generations of cellular telecommunications standards (Q Br. 5-6), it skips over the questions why standard-setting is necessary and how the industry reconciles open access to standards with patent owners' rights.

For a cellular telephone to work, it must be able to transmit radio signals to and receive them from transmitting towers, maintaining the signal as it is passed from one tower to the next. Compl. ¶ 12 (Q App., Ex. 2 at 4). A functioning network therefore requires that all components of the system interact with each other seamlessly, regardless which company manufactures them. *Id.* This need for interoperability has led carriers, telephone manufacturers, and chipset manufacturers to agree to follow a common set of industry standards. *Id.* ¶ 13. The task of studying candidate technologies and setting the standard(s) has been placed in the hands of various geographically-oriented SSOs to which the industry members belong. *Id.*

Recognizing that much of the technology being considered for inclusion in a standard is covered by patents, the SSOs seek agreements with owners of patents essential to a proposed standard to license those patents to all prospective licensees on FRAND terms. This FRAND obligation constrains the patent owners from attempting to "hold up" the industry after the standard has been adopted and implemented by alleging patent infringement, threatening an injunction, and demanding a "super-monopoly" royalty -- that is, a royalty that exploits the fact that the selection of one technology as the standard has weeded the losing technologies from the marketplace and the fact that the costs of switching to an alternate technology are high. *Id.*

The specific mechanism by which SSOs prevent patent owners from exerting such *ex post* hold-up monopoly power is (1) to require that the owners disclose *ex ante* which of their patents may be essential to the technologies under consideration for adoption as the standard (*id.* ¶¶ 13-14,

22 (Q App., Ex. 2 at 4-5, 7)); and (2) to request that the owners commit, also *ex ante*, to license such patents on FRAND terms, a benchmark that limits the owners' *ex post* licensing demands (*id.* ¶¶ 14, 24-25). If a patent owner declines to grant a FRAND license, SSOs may look to alternative technologies where patent clearance is available. *Id.* ¶¶ 15, 25. It is the patent owners' FRAND licenses that provide the SSOs with the comfort to adopt a particular technology as the standard and the industry with the comfort to make the substantial capital investment (on the order of billions of dollars) necessary to implement the standard. *Id.* ¶¶ 14, 25.

The second generation of cellular telephone technology ("2G"), still the most prevalent and the largest segment of Nokia's business, consists of three principal standards, reviewed and approved by various SSOs: GSM, U.S. Time Division Multiple Access ("U.S. TDMA"), and Code Division Multiple Access ("CDMA"). *Id.* ¶ 18 (Q App., Ex. 2 at 6). The technologies underlying these standards are based on different interface and transmission regimes and hence are not interoperable. *Id.*

ETSI took the lead in developing, reviewing, and approving 2G GSM. *Id.* ¶ 20 (Q App., Ex. 2 at 7). Qualcomm is a member of ETSI because its affiliates Qualcomm Europe S.A.R.L. and Qualcomm UK Ltd. are members, and ETSI defines "member" to include affiliates. *Id.* ¶ 21.[3] Qualcomm did not declare any of its patents essential to 2G GSM until years after the standard had been set, some as recently as this year. *Id.* ¶ 26 (Q App., Ex. 2 at 8). Qualcomm did, however, accompany its belated declarations with commitments to license the patents on FRAND terms. *Id.*

**C.     ETSI's Selection of WCDMA Technology for the Third-Generation UMTS Standard.**

ETSI also took a leading role in selecting a technology for a worldwide third-generation ("3G") standard, which would be known as Universal Mobile Telephone System ("UMTS").

---

[3] *See also* ETSI IPR Policy § 15(9) (Q App., Ex. 22 at 24). Nokia Corporation is a member of ETSI; Nokia Inc. is therefore also a member. *See* Compl. ¶¶ 10, 30 (Q App., Ex. 2 at 10).

*Id.* ¶ 27 (Q App., Ex. 2 at 9). In the late 1990s, ETSI evaluated several technologies, including WTDMA (which was based on U.S. TDMA technology that did not infringe any known Qualcomm patents) and WCDMA (which Qualcomm claimed included some of its patents). *Id.*[4]

Qualcomm initially refused to license its patents on FRAND terms for use in a 3G UMTS standard based on WCDMA. *Id.* ¶ 28. Subsequently, however, as part of the settlement of a lawsuit between Ericsson and Qualcomm, Qualcomm agreed to license its declared-essential WCDMA patents on FRAND terms to the industry. *Id.* Qualcomm submitted a letter to ETSI stating: "Qualcomm hereby commits ... to license its essential patents for each single CDMA standard or any of its modes [including UMTS based on WCDMA] on a fair and reasonable basis free from unfair discrimination." *Id.*; *see* N Aff., Ex. F. This promise gave the industry the patent clearance required to make the huge capital investment that would lock it into a 3G UMTS standard that included Qualcomm's claimed essential patents. Compl. ¶ 28 (Q App., Ex. 2 at 9).

**D.     The Parties' Existing (and Soon-To-Expire) License Agreement.**

Both Nokia and Qualcomm hold patent portfolios that they have declared essential to various standards; hence, each requires the other's permission to proceed with lawful manufacture and sale of products that comply with the standards. In 1992, Nokia and Qualcomm entered into a license agreement on Qualcomm's then-nascent CDMA technology. Although Qualcomm had obtained or was in the process of obtaining its basic patents claiming the application of decades-old CDMA technology to cellular phones, this technology had not yet been perfected, much less adopted by any carrier.                    REDACTED

---

[4] Qualcomm misleadingly asserts (Q Br. 6) that WCDMA (part of 3G UMTS) "was founded upon the CDMA technology pioneered by Qualcomm." While 3G UMTS may read on some CDMA-related patents, it reads on even more patents, held by Nokia and others, that have nothing to do with CDMA. Moreover, 3G UMTS is backwards-compatible with 2G GSM, not 2G CDMA.

By 1999, the parties had a dispute over whether REDACTED applied to CDMA technology to be used within 3G UMTS.  Qualcomm asserted that they did not apply to the 3G UMTS adopted by ETSI, and were limited only to the 2G CDMA standard employed by Verizon and other carriers. Nokia claimed that the REDACTED would apply to patents used within 3G UMTS and that REDACTED should be paid within 3G UMTS, where, as noted, Qualcomm holds a much smaller percentage of essential patents than in 2G CDMA.

In July 2001, after protracted negotiations that focused on standards other than 2G GSM, Qualcomm and Nokia

REDACTED

REDACTED

REDACTED

8



Understanding this, the parties have attempted to negotiate a replacement agreement. Those discussions have failed given the chasm between the parties' views of FRAND, including the methodology for determining a FRAND royalty. (We note that Nokia's view enjoys the support of "Next Generation Mobile Networks," an industry group founded by leading wireless carriers including Vodafone, T-Mobile, and Sprint. *Compare* Compl. ¶ 63 (Q App., Ex. 2 at 24), with NGMN Application Form 2006/07,[6] § 4.10.3 (N Aff., Ex. G at 10).) It is this disagreement that has led to Qualcomm's worldwide litigation binge: As Qualcomm has conceded, one of its motives in filing the manifold 2G GSM suits is to strengthen its hand in the 3G UMTS negotiations. *See* S. Eluvangal, *Qualcomm says it won't rock 3G boat*, REDIFF INDIA ABROAD, Nov. 11, 2005[7] (N Aff., Ex. H) (quoting Qualcomm's General Counsel: "We have followed up on Nokia and Broadcom only because we have other disagreements with the companies.").

## E.     Nokia's 2005 DG Comp Complaint Against Qualcomm.

Qualcomm's second conceded motive for its barrage of 2G GSM injunction suits is to "protect our interest"[8] after Nokia filed its DG Comp complaint in October 2005. That complaint alleges that Qualcomm has attempted to monopolize the market for the microprocessors used in 3G UMTS phones and the patents essential to their manufacture by, among other things, (1) insisting on

---

[6] Available at http://www.ngmn-cooperation.com/docs/NGMN_Participant_Application_form.pdf (last visited Oct. 2, 2006).

[7] Available at http://us.rediff.com/money/2005/nov/11qual.htm (last visited Oct. 2, 2006).

[8] D. Young, *No Plans for more Qualcomm suits in EU dispute - CEO*, REUTERS, Nov. 21, 2005, http://www.crn.com.au/story.aspx?CIID=25873 (last visited Oct. 2, 2006) (N Aff., Ex. I) (quoting Qualcomm CEO Paul Jacobs). *See also id.* (paraphrasing Jacobs as saying "his company has no immediate plans to further ratchet up the dispute by going after the other four companies that requested the investigation").

mandatory royalty-free licenses back; (2) discounting the royalties paid by customers who purchase

chips made by Qualcomm rather than its rivals in order to obtain monopoly profits on its chip sales;

and (3) charging an unreasonably high royalty (instead of the FRAND royalty to which it agreed)

for its patents, which make up but a small share (less than 25%) of the essential patents necessary to

practice 3G UMTS.  The DG Comp complaint does not ask DG Comp to interpret Qualcomm's

contractual FRAND obligations.  *See* Temple Lang Decl. ¶¶ 4-11 (N Aff., Ex. C).  Nor does the

complaint seek relief concerning whether Qualcomm has the right to seek injunctions on declared-

essential patents.  *Id.* ¶ 3.  While the complaint does seek a ruling that Qualcomm's royalties are

unreasonable under EU antitrust laws (a question related to whether Qualcomm's royalties violate

FRAND), DG Comp has power only to declare a royalty unreasonable, not actually to fix a

reasonable royalty.  *Id.* ¶¶ 8, 11.  Qualcomm filed a reply on May 19, 2006; DG Comp has not yet

decided whether to proceed with an investigation.[9]

**F.    Qualcomm's Worldwide Counterattack.**

Qualcomm has filed no fewer than *six* patent infringement suits, each seeking injunctive

relief, in fora across the world.  Three of the suits (in Germany, France, and Italy) were commenced

*after* Nokia filed its Complaint here on August 9, 2006.  Qualcomm "stopped" the French suit after

this Court expressed dismay at Qualcomm's tactics,[10] but Qualcomm has now -- incredibly --

---

[9]    Qualcomm disparages Nokia's DG Comp filing as motivated by a desire to "'bring
[QUALCOMM] back to the table' to renegotiate its existing licenses."  Q Br. 9 (quoting A.
Reinhardt, *A Scrum Over Qualcomm's Fees*, BUSINESS WEEK, Oct. 31, 2005 (Q App., Ex. 6)).  But
Nokia believes in good faith that Qualcomm has violated EU antitrust laws, and it is hardly unusual
for a party pursuing litigation to hope a settlement may yet be reached.  That such a settlement
would here take the form of a new license agreement does not establish that the DG Comp filing
was made without legal basis.  In any event, Qualcomm's criticism of litigation-in-aid-of-settlement
is more properly directed at itself.  *See* Eluvangal, *supra* (N Aff., Ex. H).

[10]    *See* Tr. of 8/11/06 Sched. Conf. before Hon. Leo E. Strine, Jr., at 14 (Q App., Ex. 11) ("If I find
out tomorrow there's an action in Belgium and an action in the Netherlands, then I'm going to set a
trial date."); Letter from Qualcomm's Counsel to the Court dated August 30, 2006, at 2 (N Aff.,
Ex. J) ("At this time, we do not know anything more than the action has been stopped.").

restarted that suit along with a new suit in Italy on the eve of this opposition brief. *See* Letter from Qualcomm's Counsel to the Court dated Oct. 4, 2006, at 2 (N Aff., Ex. K). We discuss the suits in chronological order.

      **1.**      **Qualcomm's San Diego Action.**

      Qualcomm's first lawsuit against Nokia was brought in the U.S. District Court for the Southern District of California (San Diego Division) in November 2005. This suit concerns twelve specific patents related to 2G GSM, ten of which Qualcomm had declared essential to that standard and licensed on FRAND terms. *See* San Diego Compl. ¶¶ 10-21 (Q App., Ex. 5 at 2-4) (U.S. Patent Nos. 5,257,283, 5,568,483, 5,778,338, 5,590,408, 5,655,220, 5,638,412, 6,496,543, 6,574,211, 5,742,734, 6,868,267, 6,453,182, and 6,677,894); Q Br. 9-10. Notwithstanding its FRAND obligation, Qualcomm seeks not just money damages, but an injunction barring Nokia's manufacture and sale of 2G GSM products. *See* San Diego Compl., p. 5.

      Nokia promptly responded by filing an Arbitration Demand, asking an arbitrator to determine whether, *inter alia*,

REDACTED

That same day, Nokia moved the San Diego court for a mandatory stay pending the outcome of the arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 3. The court denied Nokia's motion REDACTED the court did, however, grant a stay pending Nokia's appeal to the U.S.

---

REDACTED

Court of Appeals for the Federal Circuit on arbitrability. *Qualcomm Inc. v. Nokia Corp.*, No. 05CV2063-B(BLM), Order, at 7 (S.D. Cal. filed Mar. 16, 2006) (N Aff., Ex. N). A decision by the Federal Circuit is pending.

Though the arbitrator recently dismissed Nokia's estoppel defense, if the arbitrator had sustained the defense (as he still may if he grants Nokia's motion for reconsideration), the San Diego action would have been dismissed with prejudice *on all issues* (not just the availability of an injunction) because it concerns solely 2G GSM patents. It may yet be considerably narrowed depending upon how the arbitrator resolves Nokia's license defense on the merits. It was for this reason, and because an omission to demand arbitration and seek a stay of the San Diego action could be construed as a waiver of Nokia's arbitration rights, *see, e.g.*, *Hoffman Constr. Co. v. Active Erectors & Installers, Inc.*, 969 F.2d 796, 798 (9th Cir. 1992), that Nokia chose to lead off its defense in San Diego by seeking a stay pending arbitration rather than advancing the FRAND-bars-injunctive-relief argument that is central to Nokia's action in this Court.[12] Contrary to Qualcomm's assertion, then, Nokia's response in San Diego does *not* "beli[e] its position here that it requires urgent resolution of its FRAND defenses." Q Br. 10.

## 2. Qualcomm's United Kingdom Action.

Qualcomm filed suit against Nokia in the UK on May 22, 2006, alleging infringement of two GSM-related patents. *See* Case No. HC 06 C 02034 (High Court of Justice, Chancery Div., Patents Court), at ¶ 1 (Ex. A to Mutimear Decl. (N Aff., Ex. D)) (European Patents (UK) Nos. 0 695

---

[12] In a recent oral ruling, the San Diego court granted an alternative stay, pending completion of Qualcomm's ITC proceeding (discussed *infra*, at 13), as to the part of the San Diego action that concerns three patents also before the ITC. The court based this stay on its inherent authority, rather than on 28 U.S.C. § 1659(a) (providing for a mandatory stay as to patents in common between district court action and ITC proceeding), which the court erroneously held inapposite because Qualcomm filed in San Diego before the ITC. An evident purpose of Section 1659(a) is to relieve defendants of the burden of simultaneously defending against infringement actions in two fora.

482 and 0 629 324). Again, despite having declared both patents essential and licensed them on FRAND terms, Qualcomm seeks injunctive relief. *See id.*, Claim ¶ 4. Nokia applied for a stay pending arbitration for the same reasons discussed above. The application will be heard on or about October 11, 2006, unless the court grants a slight adjournment to permit the result of the motion for reconsideration in the arbitration, *see* n.11, *supra*, to be taken into account. The case has been stayed in the interim. Mutimear Decl. ¶ 3 (N Aff., Ex. D). A trial will likely not be held before early 2008. *Id.* ¶ 5.

### 3. Qualcomm's ITC action.

Third, Qualcomm filed a complaint with the U.S. International Trade Commission ("ITC"), asserting infringement of six GSM-related patents -- three of which are common to the San Diego suit and five of which Qualcomm declared essential and licensed on FRAND terms -- and seeking an order barring importation of Nokia's 2G GSM phones into the U.S. *See* Q App., Ex. 10 at ¶ 1.2 (U.S. Patent Nos. 5,452,473, 5,590,408, 5,655,220, 5,576,767, 5,452,104, and 6,453,182 B1); ¶ 12.1.

Nokia asked the ITC to stay the proceeding pending the arbitration.

REDACTED

Discovery is ongoing, and Nokia filed its Answer on August 10, 2006. *See* Q App., Ex. 8. Nokia did not assert any counterclaims because the ITC lacks jurisdiction over counterclaims. *See* 19 U.S.C. § 1337(c). Although Nokia included FRAND-based defenses, the ITC's potential resolution of those defenses in Nokia's favor, even if prompt, will not aid Nokia elsewhere because the ITC's decisions lack preclusive effect. *See, e.g.*, *Tex. Instruments*, 851 F.2d at 344 ("the ITC's determinations regarding patent issues should be given no res judicata or collateral estoppel effect").

### 4. **Qualcomm's German Action.**

Qualcomm commenced its fourth suit, in Germany, against Nokia's German subsidiary, after Nokia filed this case; Qualcomm informed Nokia of the suit only the day before this Court's August 11, 2006 Scheduling Conference. The suit involves the German equivalents of the two patents involved in the UK action, and it also seeks an injunction. *See* von Meibom Decl. ¶ 3 (N Aff., Ex. E); Annex to von Miebom Decl. (translation of writs of complaint). In contrast with U.S. litigation, the German system does not typically allow for discovery or presentations by parties' expert witnesses. von Meibom Decl. ¶ 4. A trial will likely not be held before August-October 2007. *Id.* ¶ 8.

### 5. **Qualcomm's French Action.**

Qualcomm's fifth suit, commenced in France, was brought to this Court's and Nokia's attention only *after* the August 11 scheduling conference. In response to this Court's admonition that "[i]f I find out tomorrow there's an action in Belgium and an action in the Netherlands, then I'm going to set a trial date" (Tr. of 8/11/06 Sched. Conf. before Hon. Leo E. Strine, Jr., at 14 (Q App., Ex. 11)), Qualcomm "stopped" the French suit. *See* n.10, *supra.* But now, to our astonishment, Qualcomm has restarted the litigation, *see* Letter from Qualcomm's Counsel to the Court dated Oct. 4, 2006, at 2 (N Aff., Ex. K), exposing Nokia to the threat of injunction in yet another foreign country.

### 6. **Qualcomm's Italian Action.**

Qualcomm's litigation barrage continues in Italy, where Qualcomm has commenced its sixth action and "will shortly serve process" on Nokia. *Id.* Like the restarted French action, this action comes well after this Court expressed concern that Qualcomm's multiple injunction actions posed the dual risks of irreparable harm and inconsistent judgments.

14

### G.   The Instant Action.

Faced with this multiplicity of injunction actions and the irreparable harm they may cause, Nokia filed this action on August 9, 2006 to procure a prompt and fair resolution of the parties' fundamental contractual dispute, a dispute that transcends Qualcomm's various infringement actions -- which focus on specific subsets of 2G GSM patents. This action offers (1) a universal resolution to whether Qualcomm may seek injunctive relief in those lawsuits or any future lawsuits involving declared-essential patents, and (2) a framework for determining a FRAND royalty, whether in the context of the 2G GSM patents-in-suit in Qualcomm's actions or the parties' as-yet fruitless negotiations for a license agreement covering 3G UMTS patents.

Qualcomm filed a Notice of Removal on the theory that Nokia's claims require a determination whether Qualcomm's declared-essential patents are *actually essential*, a question that turns on whether a standard-compliant product would necessarily infringe the patents and thus arguably touches upon federal patent law. Nokia filed a motion to remand, which the federal court granted on August 29, 2006, rejecting Qualcomm's argument: "It is not necessary, as Defendant contends, to determine whether the patents at issue are in fact 'essential' because Defendant has already voluntarily declared them essential. Rather, Plaintiff[s] merely see[k] an interpretation of Defendant's obligations arising after declaring certain patents essential." *Nokia Corp. v. Qualcomm, Inc.*, No. 06-509-JJF, Mem. Op., at 3 (D. Del.) (Farnan, J.) (Q App., Ex. 15 at 3). By its motion to dismiss, Qualcomm asks this Court to ignore Judge Farnan's ruling and re-decide this issue *de novo*.

### ARGUMENT

This action is based on breach of contract. Plaintiffs are a Delaware corporation and its Finnish parent. Defendant is a Delaware corporation. This Court has jurisdiction over all the parties and is uniquely positioned to resolve their worldwide dispute quickly and comprehensively.

15

Qualcomm's motion to dismiss or stay should be denied, and the case should proceed on the expedited schedule already ordered by this Court.

In leading with Rule 12(b)(6) merits arguments and deferring jurisdictional (Rule 12(b)(1)) and venue (Rule 12(b)(3)) contentions to the end of its brief, Qualcomm signals that it is perfectly content to have this Court decide the merits so long as that decision favors Qualcomm -- but if this Court is inclined to sustain Nokia's claims as legally sufficient, the Court should get rid of the case on procedural grounds. Qualcomm has it backwards. Logic and judicial economy dictate that the Court first "determine where the merits may, may not, or must be resolved." *Simon v. Navellier Series Fund*, 2000 WL 1597890, at *5 (Del. Ch. Oct. 19, 2000) (Strine, V.C.). Qualcomm's misguided stratagem aside, its arguments on both the threshold issues and the merits are wrong.

## I.   THIS COURT CLEARLY QUALIFIES AS AN APPROPRIATE FORUM UNDER THE APPLICABLE FORUM-SELECTION CLAUSE.

Section 4.2 of the ETSI Guide provides that "in the absence of an agreement between the parties involved, the national courts of law have the sole authority to resolve IPR disputes." Q App., Ex. 22 at 15. Settled judicial interpretations of a similar term in European law, as well as the drafting history of Section 4.2, make clear that "national courts of law" encompasses any court of competent jurisdiction located within any country in which a signatory of a FRAND contract, or its affiliates, resides. Qualcomm is such a signatory and resides in the U.S.; and this Court, unlike the Delaware federal court (which found jurisdiction lacking), is a court of competent jurisdiction within the U.S. Thus, this Court is plainly within the scope of ETSI's forum-selection clause.

### A.   Judicial Interpretations of a Similar Term in EU Law Confirm That "National Courts of Law" Does Not Distinguish Between Federal and State Courts.

The settled European understanding of "national courts of law" refutes Qualcomm's suggestion that "national courts," when applied to countries like the U.S. that have a dual federal-state court system, includes only federal courts. *See* Halberstam Opinion, at 2, 4-8 (N Aff., Ex. B).

16

authorities to which Article 234(2) EC applies, such as the Landgericht Hamburg"); Halberstam Opinion, at 6 (citing similar cases).[15]

The distinction ETSI *was* trying to draw in employing the phrase "national courts of law," and the distinction the EU was trying to draw with the phrase "court or tribunal of a Member State," is one between national courts and *supra-national* courts such as the European Court of Justice. (As noted below, ETSI was also distinguishing between courts and arbitrators.)  This, again, is evident from the Article 234 EC analogy, where "Court of Justice" is used in clear contrast with "court or tribunal of a Member State."  *See* Halberstam Opinion, at 4-5 (N Aff., Ex. B).  It also accords with the structure of the European patent system and the phrase at the beginning of the ETSI forum-selection clause -- "[O]nce an IPR (patent) has been granted, ...."  (ETSI Guide § 4.2 (Q App., Ex. 22 at 15)) -- because in Europe, the supra-national "European Patent Office (EPO) is authorized to grant patents, [but] all infringement cases are dealt with by the national courts."  V. Siber, *The Technical Character of Software Invention: Why Continental and United States Patent Law Should Be Consistent in Analyzing Patentability*, 9 FED. CIR. B.J. 555, 564 (2000).  Indeed, ETSI has explicitly used "national court" in contradistinction to supra-national court.  *See* http://www.etsi.org/about_etsi/30_minutes/Sem-Chapter18.htm (last visited Oct. 2, 2006) (N Aff., Ex. P at 2) ("This emphasis on national law is significant:  it means, for instance, that a case concerning infringement of a Directive will be heard by a national court, not some European federal court.") (cited in Halberstam Opinion, at 7 (N Aff., Ex. B)).

---

[15] To be sure, U.S. courts sometimes use "national courts" to refer to federal courts.  *See, e.g.*, *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 104, 150 (1996) (Souter, J., dissenting).  But the European understanding is clearly more instructive as to the intent of the drafters of the ETSI Guide.

Rather, it extends to any court of otherwise competent jurisdiction within the state of a FRAND signatory,[13] and hence to this Court because it (a) has jurisdiction to resolve contractual disputes between Delaware corporations requiring equitable relief and (b) sits within the U.S., where Qualcomm resides.

As Professor Halberstam explains, Qualcomm's equation of "national courts" with "federal courts" is plainly incorrect:

> In European parlance, the term "national court of law" is generally used to distinguish "national" courts from "supranational" or "international" courts. In a European context, the term "national court" predominantly refers to any court of a country regardless of whether that court is part of the federal, state, or local level of governance.

*Id.* at 4. Professor Halberstam bases his Opinion on European interpretations -- of which ETSI's drafters were undoubtedly aware -- of "a court or tribunal of a Member State" in Article 234 EC,[14] a term similar to, and often paraphrased as, "national courts of law." Professor Halberstam discusses how this term has been applied to Germany, which, like the U.S., has a federal-state judicial structure. He reports that the European Court of Justice and its Advocates General have routinely considered the German state courts (the *Landgerichte*) to qualify as "court[s] or tribunal[s] of a Member State." *See* Halberstam Opinion, at 6. In one recent case, for example, the Advocate General, paraphrasing Article 234 EC in a way that drives home its similarity to ETSI Guide § 4.2, unflinchingly referred to the Landgericht Hamburg as a "national" court. Case C-206/04 P, *Muehlens GmbH & Co. KG v. Office for Harmonisation in the Internal Market*, Nov. 10, 2005 (attached to Halberstam Opinion as Ex. F), ¶ 74; *see also id.* ¶ 76 (discussing "the national judicial

---

[13] Qualcomm is the signatory of relevant FRAND contracts here. *See, e.g.*, Qualcomm's ETSI Declaration dated October 14, 2005 (Q App., Ex. 23).

[14] Article 234 EC sets forth when the European Court of Justice has jurisdiction to give preliminary rulings in cases pending before "any court or tribunal of a Member State." N Aff., Ex. O.

**B.      The Drafting History of ETSI Guide § 4.2 Shows that "National Court of Law" Is Synonymous with "Competent Court of the State of the Signatory."**

The drafting history of Section 4.2 also powerfully demonstrates that ETSI intended the phrase to encompass any court of competent jurisdiction within the State of a signatory of a FRAND contract.  The 1993 version of the ETSI policy contains the following provision expressing a now-abandoned requirement (with one limited exception) of mandatory arbitration of IPR disputes:

> 19.2  All disputes which cannot be settled as provided for in clause 19.1 above [*i.e.*, amicably] shall be finally settled by ad hoc arbitration by three arbitrators ….

> 19.10  If the SIGNATORY is not permitted by its national law to be a party to an arbitration and a dispute arises out of the UNDERTAKING which involves the SIGNATORY, then such dispute shall be submitted to the jurisdiction of *a competent court of the State of the SIGNATORY.*

IPR Policy and Undertaking (version approved March 16-18, 1993) ("1993 Policy"), App. A, p. U12 (N Aff., Ex. Q) (emphasis added).  (The terms "SIGNATORY" and "UNDERTAKING" refer, respectively, to the entity signing the FRAND contract and the contract, and are still in use today.[16])

The emphasized phrase "a competent court of the State of the SIGNATORY," as the antecedent of "national courts of law," is instructive.  It plainly encompasses any court of competent jurisdiction in any State in which the signatory (or the signatory's affiliates, *see* 1993 Policy, Annex I, p. D2 (N Aff., Ex. Q)) of the FRAND contract resides.  Under the 1993 Policy, then, this Court is an appropriate forum because, as explained above, this Court sits within the U.S. and is otherwise competent to adjudicate this case.

That conclusion necessarily carries forward to the present forum-selection clause's "national courts of law" phraseology, since the evolution of the policy was away from arbitration and toward

---

[16] *See* ETSI Guide, Annex B (Q App., Ex. 22 at 25) ("The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy [*i.e.*, FRAND terms], in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.").

court adjudication.  Specifically, the requirement of mandatory arbitration (subject to the exception

discussed above) was criticized by IBM and others.  IBM proposed an alternative approach: "first

to provide for dispute resolution on the basis of negotiation and second, if contentious proceedings

are unavoidable, to resort to the ordinary courts of law rather than arbitration."  Letter from ETSI

Director to ETSI Members, dated January 25, 1993, attaching IBM Comments, at 18 (N Aff.,

Ex. R); *see also* Revised Minutes of the 15th ETSI General Assembly, at 17-18 (June 21, 1993) (N

Aff., Ex. S).   IBM's view eventually prevailed:   The current ETSI IPR Policy discards the

mandatory arbitration requirement, and the current ETSI Guide provides that "once an IPR (patent)

has been granted, in the absence of an agreement between the parties involved, the national courts

of law have the sole authority to resolve IPR disputes."  ETSI Guide § 4.2 (Q App., Ex. 22 at 15).

Given this movement away from arbitration and toward court resolution, there is no reason to think

that the change from "competent court of the State of the SIGNATORY" to "national courts of law"

was meant to be restrictive.  The earlier phrase is therefore compelling evidence of the scope of

current Section 4.2, a scope that in the case of a U.S.-based signatory such as Qualcomm reaches all

courts of competent jurisdiction within the U.S.[17]

---

[17] The 1993 Policy also confirms that the *types* of disputes subject to the forum-selection clause are
not limited to patent-law questions of validity or infringement, but also include disputes concerning
how to construe the contract/license.   In addition to the exception (19.10) from mandatory
arbitration discussed in text, the policy provided that "[i]ssues of IPR infringement and validity
shall not be decided by the arbitrators."  1993 Policy App. A § 19.9, at U12 (N Aff., Ex. Q).  This
necessarily implies there existed other sorts of disputes that arbitrators *were* able to decide.

   To the extent the phrase "IPR disputes" in current ETSI Guide § 4.2 does not cover disputes
over the terms of a license, *see* Q Br. 43 n.57, it would be inapplicable here even if Qualcomm were
correct in equating "national courts" with "federal courts."   Qualcomm errs in suggesting (*id.*) that
the dispute would be submitted to the exclusive jurisdiction of the ETSI General Assembly under
ETSI IPR Policy § 14.  *See* Q App., Ex. 22 at 23.  That clause, which incorporates the ETSI Statutes
(particularly ETSI Rule of Procedure 1.4 (N Aff., Ex. T at 18-19)), does not purport to be a forum-
selection clause or to resolve licensing disputes between members, since the only remedy available
to ETSI is expulsion of the offending member.

**C.    If "National Courts of Law" Is Somehow Ambiguous, The Ambiguity Must Be Resolved in Favor of this Court as an Appropriate Venue.**

Even if the drafting history and the settled European understanding of "national courts of law" leave ambiguity as to ETSI Guide § 4.2, that ambiguity must be resolved in favor of this Court as an appropriate venue.  First, interpreting "national courts" to mean only federal courts would have the perverse effect of denying *any* U.S. judicial forum where a U.S.-based ETSI signatory has violated its contractual obligations and where no peripherally related federal patent infringement cases are pending.  Many disputes concern only the terms of a patent license, arise between non-diverse parties, and therefore do not come within federal jurisdiction.  *See, e.g.*, Judge Farnan's Remand Opinion (Q App., Ex. 15 at 4); *Luckett v. Delpark, Inc.*, 270 U.S. 496, 510 (1926) (where a "complainant makes his suit one for recovery of royalties under a contract of license or assignment, or for damages for a breach of its covenants, or for a specific performance thereof, ... he does not give the Federal district court jurisdiction of the cause as one arising under the patent laws"); *In re Oximetrix, Inc.*, 748 F.2d 637, 642 (Fed. Cir. 1984) (contrary approach would "improperly alte[r] the fundamental division of jurisdiction between the state and federal courts").  There is no basis to infer that ETSI's drafters intended such an inequitable result.

Second, Delaware courts hold that a forum-selection clause must use clear language before it will be construed to oust venue.  *See Prestancia Mgmt. Group, Inc. v. Va. Heritage Found., II LLC*, 2005 WL 1364616, at *7 (Del. Ch. May 27, 2005) ("'[A]bsent clear language, a court will not interpret a forum selection clause to indicate the parties intended to make jurisdiction exclusive.'") (quoting *Eisenbud v. Omnitech*, 1996 WL 162245, at *1 (Del. Ch. Mar. 21, 1996)) (alteration in original).[18]  Whatever may be said of the phrase "national courts of law," it is not "clear" in favor of

---

[18] Our citation of these Delaware cases requires explanation given the contractual choice-of-law clause selecting French law.  *See* Q App., Ex. 23; ETSI IPR Policy § 12 (Q App., Ex. 22 at 22-23).  To our knowledge, French law is silent on whether an ambiguous forum-selection clause should be

Qualcomm's position that "national courts" means "federal courts." Accordingly, the forum-selection clause does not make this Court an improper venue.

## II.   THE *MCWANE* PREFERENCE IS EITHER INAPPOSITE OR TRUMPED.

Qualcomm's *McWane* argument proceeds as if that doctrine's paradigm of *two actions* (*i.e.*, a first-filed action and a second-filed action) is present here. It is not. Qualcomm filed in San Diego, then in the UK, then in the ITC, then in Germany, then in France, and finally in Italy. Thus, Qualcomm is effectively arguing that instead of seven fora there should be six -- hardly much of an efficiency gain, particularly when Qualcomm's six actions will not proceed promptly enough to provide a universal resolution that spares the parties of litigation expenses and risks around the world. Because Nokia's action in this Court, with a scheduled March 2007 trial date, will do so, "the necessities of an orderly and efficient administration of justice" (*McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.*, 263 A.2d 281, 283 (Del. 1970)) are served by proceeding here.[19]

Acknowledging this problem (albeit in a footnote, Q Br. 49 n.67), Qualcomm defends its foreign filings (but not its ITC filing) as necessary to enforce its patents "in each applicable foreign jurisdictions [*sic*]." But Qualcomm cannot explain why this motive (even if truly held[20]) for filing multiple actions warrants excluding them from the efficiency analysis under *McWane*. The fact

---

construed to encompass (a) U.S. federal courts; or (b) U.S. federal and state courts. In the absence of French law, it is appropriate to consult forum (Delaware) law. *See* Q Br. 21 n.26 (citing *Republic of Panama v. Am. Tobacco Co.*, 2006 WL 1933740, at \*4 (Del. Super. July 13, 2006)).

[19] As this Court recognized, Qualcomm's launching of multiple actions means that "[i]f you took Delaware out, there would still be that risk [of inconsistent judgments]." Tr. of 9/1/06 Sched. Conf., at 51 (Q App., Ex. 17). *See also* Tr. of 8/11/06 Sched. Conf., at 11 (Q App., Ex. 11) ("[I]f QUALCOMM says, 'No, what we really do want is some sort of international infection of lawsuits to afflict Nokia, we want the possibility of inconsistent adjudications . . . [,] that really cuts very strongly against worrying about first-filed doctrine.").

[20] In fact, Qualcomm's suits were filed not to protect its 2G GSM patent rights for their own sake, but to gain leverage with Nokia in the 3G UMTS negotiations. This is evident from Qualcomm's filing of suits against only Nokia and Broadcom, and not other companies, even though none has licensed Qualcomm's supposed 2G GSM-related patents. As discussed in n.9, *supra*, Qualcomm conceded that "[w]e have followed up on Nokia and Broadcom only because we have other disagreements with the companies." Eluvangal, *supra* (N Aff., Ex. H).

remains that, under Qualcomm's proposal, Nokia's FRAND-based arguments will be considered -- if at all -- seriatim at various points in the proceedings *in each of six jurisdictions*, wasting judicial resources and giving rise to possibly inconsistent judgments, especially given that most of the jurisdictions involved do not have a system of discovery that permits relevant evidence to be adduced.    Given this clash between Qualcomm's requested dismissal/stay and *McWane*'s underlying rationale, it is not surprising that Qualcomm's *McWane* argument is also flawed on numerous doctrinal levels, as we now show.

### A.    *McWane* Is Inapposite Because its Doctrinal Elements Are Not Satisfied.

*McWane* applies only if (1) the later-filed Delaware action and the earlier-filed action(s) involve a "substantial identity" of issues (*Teachers' Retirement Sys. of La. v. Scrushy*, 2004 WL 423122, at *10 n.15 (Del. Ch. Mar. 2, 2004) (Strine, V.C.)); and (2) the earlier-filed action(s) warrants deference (*see, e.g., Fort James Corp. v. Beck*, 2005 WL 2000761, at *4 (Del. Ch. Aug. 16, 2005)).    Qualcomm fails to establish either prerequisite.[21]

> ### 1.    Whereas Qualcomm's actions involve highly technical issues relating to discrete 2G GSM patents, Nokia's action presents overarching contractual issues concerning the meaning of FRAND.

As noted, *supra*, at 21, U.S. courts have "consistently held for over 130 years that contract disputes involving patents do not arise 'under any Act of Congress relating to patents ... [,]'"[22] and hence are matters within the *exclusive jurisdiction of state courts* unless a non-patent law basis for federal jurisdiction is present.  *See, e.g., Luckett*, 270 U.S. at 510; *Excelsior Wooden Pipe Co. v.*

---

[21] Qualcomm also is unable, once the entirety of its filings is considered, to establish a third *McWane* prerequisite, that the supposedly earlier-filed action was indeed earlier-filed.  *See, e.g., United Phosphorus, Ltd. v. Micro-Flo, LLC*, 808 A.2d 761, 764 (Del. 2002).  As noted *supra*, at 14, Qualcomm commenced its German, French, and Italian actions *after* Nokia's Delaware filing. Accordingly, at best for Qualcomm, its filings as a whole should be deemed contemporaneous with Nokia's Delaware filing.  *See Rapoport v. Litig. Trust of MDIP Inc.*, 2005 WL 3277911, at *4 (Del. Ch. Nov. 23, 2005).

[22] *Therien v. Trs. of the Univ. of Pa.*, 2006 WL 83448, at *4 (E.D. Pa. Jan. 10, 2006) (quoting *Beghin-Say Int'l v. Ole-Bendt Rasmussen*, 733 F.2d 1568, 1571 (Fed. Cir. 1984)).

*Pac. Bridge Co.*, 185 U.S. 282, 286 (1902); *Clausen Co. v. Dynatron/Bondo Corp.*, 889 F.2d 459, 465 (3d Cir. 1989); *In re Oximetrix, Inc.*, 748 F.2d at 642; *see also Holmes*, 535 U.S. at 834 (federal jurisdiction under 28 U.S.C. § 1338 exists only when "a patent-law claim appears on the face of the plaintiff's well-pleaded complaint"). By contrast, suits that do allege patent infringement fall within the exclusive jurisdiction of federal courts. *See, e.g.*, *Holmes*, 535 U.S. at 829. These starkly different jurisdictional assignments reveal a considered congressional determination that licensing disputes and infringement actions do not typically present a "substantial identity" of issues. *Scrushy*, 2004 WL 423122, at *10 n.15.

This determination is clearly correct here, as shown by a comparison of Nokia's Delaware contract action with Qualcomm's San Diego 2G GSM patent infringement suit. It is telling that the San Diego court itself recently observed that Nokia's Delaware action "doesn't sound like anything at all that's involved in this court." Transcript of 8/15/06 Telephonic Status Conference before Hon. Rudi M. Brewster, at 26 (N Aff., Ex. U). The San Diego court was right. There is simply no "common nucleus of operative facts" (*Dura Pharms., Inc. v. Scandipharm, Inc.*, 713 A.2d 925, 930 (Del. Ch. 1998)) between Nokia's contract action and Qualcomm's case-in-chief in the San Diego action (or its manifold other patent infringement actions). The former, governed by French substantive law, addresses the meaning of the FRAND provisions in ETSI contracts, as revealed by the parties' intentions and policy considerations, and applies to all standards (not just 2G GSM). The latter involves extremely technical questions concerning the scope of Qualcomm's discrete 2G GSM patents and their validity, exemplified by the claim construction orders issued in the

*Qualcomm v. Broadcom* case that Qualcomm curiously trumpets (Q Br. 49) as giving the San Diego court a leg up on the FRAND contractual issues.[23]

Contrary to Qualcomm's suggestion (Q Br. 48), Nokia's ability to interpose its FRAND arguments as affirmative defenses or permissive counterclaims does not resolve the "substantial identity" inquiry in Qualcomm's favor. Rather, Delaware courts inquire whether the plaintiff's claims in the Delaware case would be ***compulsory counterclaims*** in the foreign case, *see, e.g.*, *Dura Pharms.*, 713 A.2d at 930 (looking to Alabama law to determine whether the Delaware claims would be compulsory counterclaims in the Alabama action); *Gen. Video Corp. v. Kertesz*, 2006 WL 2051023, at *4 (Del. Ch. July 19, 2006) (similar), a more stringent inquiry that asks "whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Hydranautics v. Filmtec Corp.*, 70 F.3d 533, 536 (9th Cir. 1995) (internal quotation marks omitted).[24]

*Hydranautics* establishes that Nokia's FRAND contractual claims are not compulsory counterclaims in San Diego. In *Hydranautics*, FilmTec sued Hydranautics for patent infringement. Hydranautics later sued FilmTec for violating the antitrust laws by filing predatory patent litigation against it. The Ninth Circuit held that Hydranautics' antitrust claim was not a compulsory counterclaim in FilmTec's patent infringement action, reasoning, *inter alia*, that (1) "[t]he evidence for patent infringement and antitrust damages may differ considerably" (70 F.3d at 536), and

---

[23] Consider, for example, the San Diego court's construction of claim 2 of U.S. Patent No. 5,655,220 in its May 1, 2006 Order: "A method for limiting **transmit power of a radio** [*level of power transmitted by the radio*] operating in a radio communications system, the radio communications system **comprising** [*including but not limited to*] a **plurality** [*two or more*] of **base stations** [*in a wireless communications system, any fixed station that communicates with mobile stations*] that transmit **power control commands** [*commands from the base station instructing the radio to turn up or turn down power*] to the **radio** [*a transmitter, receiver, or transceiver used for communication via electromagnetic waves*] . . . ." N Aff., Ex. V at 3 (emphasis in original).

[24] The Ninth Circuit's test is appropriate because the San Diego court sits within that circuit.

(2) "[i]n many cases even if the antitrust [claim] were asserted by counterclaim, the court would sever the issues and resolve the infringement case first" (*id.* at 536).

Both circumstances are present here.  First, unlike Qualcomm's patent infringement action, which involves highly technical questions concerning discrete 2G GSM patents, Nokia's contract action turns on an application of French law to discern what ETSI's drafters intended regarding the meaning of FRAND.  Second, as Qualcomm itself concedes,[25] and Nokia's counsel in the UK and German actions similarly report,[26] the courts in Qualcomm's patent infringement actions will consider questions of infringement and (with the exception of Germany) validity *before* turning to the FRAND contract questions whether injunctive relief is barred and how to determine a FRAND royalty.  And because those cases -- unlike this action -- are limited to specific patents, there may ultimately be no reason to reach the FRAND issues in those cases, leaving the core dispute between the parties unresolved.

Non-compulsory counterclaim status is especially clear as to Nokia's FRAND-bars-injunctive-relief claim.  In *Hydranautics*, the Ninth Circuit observed that Hydranautics' "antitrust claim attacks the patent infringement lawsuit itself as the wrong which furnishes the basis for antitrust damages.  This is somewhat analogous to a civil claim for malicious prosecution[,] ... [which] *cannot* be asserted as a counterclaim to the original suit which furnishes its predicate."  70 F.3d at 536-37 (emphasis added); *see also Tex. Instruments, Inc. v. Tandy Corp.*, 1992 WL 103772, at *7 (Del. Ch. May 12, 1992) (staying portions of Delaware case in deference to first-filed California federal action, but declining to stay claim that Tandy had breached a license agreement by filing the federal action because "[t]he question can be adjudicated now [and] appears to be

---

[25] *See* Q Br. 35 ("[I]f Nokia took the position that patents asserted against it were invalid or not infringed (positions it has taken in the U.K. and the ITC), this Court's holding would be of no consequence unless and until some other court rules on these patent-law questions.").

[26] *See* Mutimear Decl. ¶ 4 (N Aff., Ex. D); von Meibom Decl. ¶ 9 (N Aff., Ex. E).

unrelated to the merits of the California suit ..."). Similarly here, Nokia's FRAND-bars-injunctive-relief claim asserts that Qualcomm's mere filing of an injunction suit concerning a declared-essential patent breaches Qualcomm's FRAND contract.[27]

### 2.    Qualcomm's lawsuits do not warrant deference.

Even if Nokia's Delaware action and Qualcomm's six lawsuits could somehow be said to present the "same issues," Qualcomm's invocation of *McWane* nonetheless fails because its lawsuits are not deserving of deference. What Qualcomm describes as garden-variety first-filed suits were in fact filed (a) in reaction to an even-earlier-filed complaint by Nokia; and (b) in violation of Qualcomm's FRAND commitment forfeiting the right to seek injunctive relief as to declared-essential patents. Each of these defects, and certainly both of them together, undermines the deference Qualcomm's actions might otherwise be due.

a. Consider first the "reactive" character of Qualcomm's numerous actions. As described, *supra*, at 9-10, in October 2005 Nokia filed a complaint before DG Comp alleging that Qualcomm was engaging in anticompetitive practices. Qualcomm conceded that its San Diego action was a response to the DG Comp complaint, to "protect our interest." Thus, if Qualcomm's actions can even be granted the "first-filed" label, *but see* n.21, *supra*, they reflect the sort of tactical maneuvering that has caused Delaware courts to withhold deference. *See, e.g.*, *Dura Pharms.*, 713 A.2d at 929 (competing lawsuits would not be considered under the "race to the courthouse"/contemporaneous filing rubric because the second suit was filed "in reaction to, rather

---

[27] Nokia's action here is also not the "mirror image" of Qualcomm's San Diego patent infringement action -- another gloss on *McWane*'s "same issues" element. *See, e.g.*, *In re Delta & Pine Land Co. S'holders Litig.*, 2000 WL 1010584, at *4 (Del. Ch. July 17, 2000). Courts have found "mirror-image" claims where a claim for patent infringement is filed in one forum and a claim for a declaratory judgment of non-infringement or invalidity is filed in another. *See, e.g.*, *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 938 (Fed. Cir. 1993), *abrogated on other grounds by Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995). Here, Judge Farnan has already determined that the Delaware action does not involve any question of validity or infringement of the patents-in-suit in Qualcomm's actions. *See* Judge Farnan's Remand Opinion (Q App., Ex. 15 at 2).

than independently of, news of [the first] filing"). *See generally Rapoport v. Litig. Trust of MDIP Inc.*, 2005 WL 3277911, at *4 (Del. Ch. Nov. 23, 2005) ("It is ... well known that this Court takes a rather dim view of 'tactical maneuvers and improper manipulation of the litigation process by parties who seek to invoke the principles of comity and efficiency underlying the *McWane* doctrine.'" (quoting 1 D. WOLFE & M. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY ("WOLFE & PITTENGER") § 5-1[a], at 5-11 (2005))).

b. Fundamental to Qualcomm's "protect our interest" counterattack is its pursuit of injunctive relief against Nokia's manufacture and sale of 2G GSM phones, which, despite 3G UMTS' ascendancy, remain the most prevalent on the market. Such relief, if granted, would effectively shut down Nokia's business; even the threat of such an injunction strongly bolsters Qualcomm's hand in its dealings with Nokia. Nokia's position is that such saber-rattling by patent owners to extract a unilaterally determined royalty is inconsistent with a commitment to *license* declared-essential patents on FRAND terms. If Nokia is correct, then each of Qualcomm's actions was filed in breach of Qualcomm's FRAND commitments, and those actions deserve no deference. *See Ft. James Corp.*, 2005 WL 2000761, at *4 (but for bankruptcy-law considerations, "the California Preliminary Injunction Action should not be given deference as a first-filed action because it would appear to have been filed in breach of the settlement agreement between [the parties]").

### 3. Qualcomm cannot sustain its burden under ordinary *forum non conveniens* analysis.

Because *McWane* is inapposite, ordinary *forum non conveniens* analysis applies, *see Cornerstone Techs., LLC v. Conrad*, 2003 WL 21003402, at *2 (Del. Ch. Apr. 22, 2003) (Strine, V.C.), and Nokia "should not be denied [its] choice of an appropriate forum absent significant countervailing circumstances related to judicial economy, efficiency and fairness."

28

*Asten v. Wangner*, 1997 WL 634330, at *1 (Del. Ch. Oct. 3, 1997). Qualcomm, a Delaware corporation, cannot sustain that heavy burden here.

Of the six *Cryo-Maid* factors[28] that comprise ordinary *forum non conveniens* analysis, the sixth -- "practical considerations that would make trial easy, *expeditious*, and inexpensive" (WOLFE & PITTENGER § 5-2, at 5-29 (emphasis added)) -- is dispositive here. This Court, which is the only forum so far to have reviewed Nokia's allegations and heard argument (albeit preliminary) concerning Qualcomm's obligations under contracts with ETSI, has made clear its willingness to order expedited discovery and to hold a trial in March 2007 -- before Qualcomm's agreement not to assert its 3G UMTS patents expires on April 9, 2007. The San Diego court to which Qualcomm (explicitly) urges deference, by contrast, has suggested that it is not equipped to conduct such an expedited trial, describing that action as "cranking forward with perhaps not alacrity" and the ITC's 14-month trial calendar as "an amazing calendar." N Aff., Ex. U at 21-22. (We discuss the inadequacy of Qualcomm's fora at greater length *infra*, at 30-34, in connection with our argument that, even if *McWane* applies, Nokia's Delaware action should nonetheless proceed.)

Qualcomm's "practicality" arguments (Q Br. 51 n.69) are easily dismissed. First, that Delaware substantive law will not govern "typically has less significance tha[n] the other relevant factors." WOLFE & PITTENGER § 5-2[a], at 5-32. Second, because the action turns on French law and European contracts, Qualcomm's San Diego-based personnel and documents will be minimally relevant. Finally, Qualcomm does not dispute that Delaware has an "interest in opening its courts to Delaware citizens in order to provide a forum in which they may seek justice." *Id.* § 5-2[f], at 5-42.

---

[28] The factors set forth in *General Foods Corp. v. Cryo-Maid, Inc.*, 198 A.2d 681 (Del. 1964), *overruled on other grounds, Pepsico, Inc. v. Pepsi-Cola Bottling Co.*, 261 A.2d 520 (Del. 1969), and its progeny are: (1) applicability of Delaware law; (2) relative ease of access to proof; (3) availability of compulsory process for witnesses; (4) possibility of a view of the premises at issue; (5) pendency of similar litigation elsewhere; and (6) all other practical considerations that would make trial easy, expeditious, and inexpensive. *See* WOLFE & PITTENGER § 5-2, at 5-29.

**B.      Even if the *McWane* Preference Applies, It Is Trumped by the Need for the Expedited Treatment that this Court Is Uniquely Positioned To Provide.**

Under *McWane*, deference to a first-filed action is not "a matter of right," but a "strong preference."  WOLFE & PITTENGER § 5-1, at 5-2.  Thus, where the foreign first-filed action offers a less prompt resolution than the Delaware action or is otherwise inadequate, Delaware courts have not hesitated to allow the Delaware case to proceed.  *See, e.g.*, *Collins & Aikman Corp. v. Compo Indus., Inc.*, 1981 WL 15116, at *2 (Del. Ch. May 14, 1981) (declining to defer to first-filed patent infringement action because a "date for a trial ... [was] not yet predictable" and a "pending motion for summary judgment" was delaying that action); *Crusader Enters., Inc. v. Del. Comm'n on Massage Establishments & Adult Bookstores*, 1978 WL 22000, at *1 (Del. Ch. Sept. 1, 1978) (approving *Piasecki Aircraft Corp. v. Int'l Union*, 129 A.2d 663 (Del. Ch. 1957), as a decision declining to defer to first-filed federal action "because the overriding issues in the two actions were not identical and more importantly because plaintiff sought injunctive relief and was therefore entitled to a prompt ruling on its application"); *Joyce v. Cuccia*, 1996 WL 422339, at *5 (Del. Ch. Aug. 6, 1996) (declining to defer to first-filed Louisiana action in which trial awaited a judicial election and "there is presently no way to predict when the Louisiana case would go to trial"); *Harbor Ins. Co. v. Newmont Mining Corp.*, 564 A.2d 352, 355 (Del. Super. 1989) ("It seems obvious that the [foreign action] is not capable of resolving the issues presented here, either promptly or completely."); *Tuff Torq Corp. v. Hydro-Gear Ltd. P'ship*, 882 F. Supp. 359, 364 (D. Del. 1994) ("The case here in Delaware has been scheduled for trial and discovery is underway .... The situation in Iowa seems quite different.  While a trial date has been set, neither party at oral

argument seemed to suggest that that was a dependable date.").[29]  This Court should do the same here.

To borrow from *Box v. Box*, 697 A.2d 395, 398 (Del. 1997), "[t]his case presents a classic opportunity for the Court of Chancery to exercise the type of expedited decisionmaking for which it is renowned."  Specifically, this Court has already crafted a schedule under which the parties would conclude fact discovery in December 2006, expert discovery in January 2007, and try the case in March 2007.  This case also presents the parties' overarching contractual dispute in its purest form, unfettered by fact-intensive questions of validity and infringement of discrete subsets of patents related to a single standard (2G GSM) -- questions that Judge Farnan confirmed are irrelevant here. This Court's resolution of the dispute will definitively determine (a) whether Qualcomm can seek an injunction as to patents it has declared essential to *any* standard; and (b) whether a FRAND royalty must be based on the factors set forth in Nokia's Complaint.  *See* Compl. ¶¶ 2-5 (Q App., Ex. 2 at 2).

In Qualcomm's San Diego action, by contrast, the contract claims framed by Nokia's Delaware action have not yet been presented in any form.  Assuming that Nokia's claims could be inserted into that action as affirmative defenses or permissive counterclaims, there is simply no prospect that they will be resolved promptly.  The San Diego action is currently stayed pending the Federal Circuit's decision on arbitrability; if the Federal Circuit holds the dispute arbitrable, the San Diego action will be further stayed pending completion of the arbitration.  Regardless of the Federal Circuit's decision, the San Diego action will remain stayed as to the three patents common to the

---

[29] The importance of promptness is underscored by the fact that Delaware courts *granting* stays under *McWane* often do so only after finding that the foreign action is likely to proceed with dispatch. *See, e.g.*, *USX Corp. v. U.S. Denro Steels, Inc.*, 2001 WL 1269329, at *2 (Del. Ch. June 29, 2001) ("My thoughts about the motion to stay are significantly influenced by the expectation that the Texas proceeding will be concluded in accordance with the anticipated schedule.").

San Diego and ITC actions pending completion of the ITC action. *See* n.12, *supra* (discussing San Diego court's ruling granting this alternative stay, albeit not in reliance upon 28 U.S.C. § 1659(a), which provides for a mandatory stay pending completion of a parallel ITC proceeding as to common patents-in-suit).

That Nokia initiated these stays, *see* Q Br. 50, is irrelevant. In *Visual Edge Systems, Inc. v. Takefman*, 2000 WL 193107, at *4 n.13 (Del. Ch. Jan. 31, 2000), upon which Qualcomm relies (Q Br. 48), Chancellor Chandler, in granting a stay of Visual Edge's second-filed Delaware action, "note[d] that Visual Edge made no effort to stay the Florida Action and is now proceeding to the merits there."[30]  The clear implication is that when the second-filing Delaware plaintiff *does* seek to stay the first-filed action (as Nokia did here), the Delaware court should be less willing to stay the second-filed Delaware action. That approach is unquestionably fair in the present circumstances. As noted, *supra*, at 12, Nokia could not be expected to forfeit its arbitrable estoppel defense to Qualcomm's San Diego suit in its entirety (as opposed to just the injunction piece) in order to present its overarching FRAND contractual arguments in a San Diego court that is focused upon a discrete set of 2G GSM patents.[31]  As for the stay pending ITC proceedings, Nokia cannot be faulted for availing itself of a mechanism granted by Congress to avoid imposing upon defendants the burden of simultaneously defending against a patent infringement suit and an ITC action.

---

[30] *Visual Edge* does not support Qualcomm for several additional reasons. First, it presented the classic *McWane* situation of two suits, whereas at least seven suits are pending between Nokia and Qualcomm. Second, the two suits were cross-suits (*i.e.*, mirror images), whereas Qualcomm's infringement claims will not be presented as affirmative defenses in Delaware. Third, practical convenience favored the first-filed foreign forum because it was the situs of the contract and the parties' residence, whereas here the relevant witnesses and evidence are closer to Delaware.



Even were it possible for the San Diego court to lift the stay without prejudicing Nokia's rights under the SULA's arbitration clause and 28 U.S.C. § 1659(a), the prospect of a swift resolution is still remote. First, the San Diego action is in its procedural infancy (Nokia has not answered the complaint and discovery has not begun), and as noted, *supra*, at 24-25 & n.23, any work the San Diego judge has done on claim construction in a related case has nothing to do with the FRAND contract issues here. Second, the San Diego court will likely begin with the questions of validity and infringement of the specific patents-in-suit. *See* Q Br. 35 ("[I]f Nokia took the position that patents asserted against it were invalid or not infringed ..., this Court's holding [on the FRAND contract claims] would be of no consequence unless and until some other court rules on these patent-law questions."). Finally, the San Diego court has cast doubt on its ability to hold a trial within fourteen months, much less the seven months within which a trial would occur here. *See* N Aff., Ex. U at 22 (discussing ITC's decision-within-fourteen-months mandate: "I don't know how they do it, but at least they don't have damages. They just have the injunction. But, still, even that is an amazing calendar.").[32]

Promptness aside, the San Diego action will not necessarily *ever* resolve the second of Nokia's FRAND contract claims, which concerns the methodology for determining a FRAND royalty rate. *See, e.g.*, Compl. ¶ 5 (Q App., Ex. 2 at 2). In the San Diego action, Qualcomm has demanded a jury trial (Q App., Ex. 5 at 8), as is the norm in patent infringement actions. Accordingly, if and when it comes time to determine damages based upon a FRAND royalty, that determination will take place within the black box of the jury room. Although the judge might

---

[32] Qualcomm mischaracterizes (Q Br. 50) our argument as relying upon "Judge Brewster's impending retirement." Judge Brewster did not refer to his retirement in describing a 14-month calendar as "amazing," and his statement can thus be taken as a comment on the pace of cases in the San Diego court generally.

provide some guidance through his jury instructions, those instructions will focus upon 2G GSM and may not lay down a generalizable method to determine a FRAND royalty rate.

Qualcomm, in keeping with its tactic of sweeping its other five pending proceedings (ITC, UK, Germany, France, and Italy) under the rug to facilitate its *McWane* argument, does not address the prospects for prompt and adequate resolution of the FRAND issues in those fora. We note briefly that those fora, like San Diego, are not nearly as suitable for the task as is this Court. The ITC, despite its scheduling of a trial for late March 2007, does not allow counterclaims, *see* 19 U.S.C. § 1337, and renders decisions to which courts do not accord "res judicata or collateral estoppel effect." *Tex. Instruments*, 851 F.2d at 344. The UK action will likely not go to trial before early 2008, and even then the court will decide questions of validity and infringement before turning to Nokia's FRAND contract claims. Mutimear Decl. ¶¶ 4-5 (N Aff., Ex. D at 2-3). The German action will likely not be tried until August 2007 at the earliest, and again the Court will decide infringement (a separate court will decide validity) of the patents-in-suit before turning to Nokia's FRAND contract claims. von Meibom Decl. ¶¶ 6-9 (N Aff., Ex. E at 2-4). Even more troubling, on the adequacy front, is that the German action does not allow expert witnesses or discovery. *Id.* ¶¶ 4-5. Finally, the recently commenced French and Italian actions will "take at least a year to get to trial." Letter from Qualcomm's Counsel to the Court dated Oct. 4, 2006, at 2 (N Aff., Ex. K).

In short, it is clear that this Court is uniquely positioned -- among the seven jurisdictions in which actions are currently pending -- to provide the expeditious consideration that the parties' overarching contractual dispute demands. Accordingly, even if *McWane* can be stretched from its two-suits paradigm to fit the instant situation, the *McWane* preference is trumped.

### III.   NOKIA'S FRAND-BARS-INJUNCTIVE-RELIEF CLAIM IS SUFFICIENT.

Having established that Nokia's FRAND-bars-injunctive-relief claim belongs in this Court (Point I, *supra*) and should proceed without delay (Point II, *supra*), we turn to Qualcomm's Rule 12(b)(6) argument that this claim is legally insufficient.[33]   Qualcomm fails to establish "with reasonable certainty that [Nokia] would not be entitled to the relief sought under any set of facts which could be proven to support the action." *Prod. Res. Group*, 863 A.2d at 781 (Strine, V.C.). Rather, Qualcomm's arguments at most reveal factual issues that are not properly resolved on a motion to dismiss.

### A.   The FRAND Obligation Unambiguously Covers Qualcomm's Declared-Essential Patents that Are Listed in its FRAND Contracts and Does Not Require that Nokia Prove Such Patents To Be Essential in Fact.

Contrary to Qualcomm's claim (Q Br. 17), the "plain language" of its FRAND contracts and the ETSI IPR Policy does not "unambiguously sho[w]" that Qualcomm's FRAND obligation extends only to patents that are proven to be essential in fact.   Indeed, it shows the opposite:   that the FRAND obligation applies to all patents that the holder has voluntarily *declared* essential and listed in its FRAND contract.   Qualcomm's argument rests on an incorrect reading of the relevant language and a disregard of the French contract principles that govern here.

The FRAND contracting process consists of two steps:

(1)     an ETSI member's mandatory disclosure of "that MEMBER's IPR which might be ESSENTIAL if that propos[ed] [standard] is adopted" and of "ESSENTIAL IPRs" held by others (ETSI IPR Policy § 4.1 (Q App., Ex. 22 at 20)); and

(2)     an IPR holder's voluntary, signed undertaking that

---

[33] Qualcomm's ripeness and adequacy-of-legal-remedy challenges (Q Br. 32-42) to Nokia's second and third claims for relief are appropriately viewed as jurisdictional challenges. *See Ackerman v. Stemerman*, 201 A.2d 173, 175 (Del. 1964) ("The existence of an actual controversy between the parties is a jurisdictional fact in actions for declaratory judgments . . . ."). Because Qualcomm does not advance these challenges against Nokia's first (FRAND-bars-injunctive-relief) claim, it is appropriate to address Qualcomm's Rule 12(b)(6) merits challenge to that claim before turning to its jurisdictional challenges to Nokia's other claims.

(a) lists those IPRs that the IPR holder "belie[ves] ... are, or are likely to become, ESSENTIAL IPRs in relation to [the] Standard" (ETSI IPR Information Statement and Licensing Declaration Form (Q App., Ex. 23 at 1)); and

(b) "declares that [the SIGNATORY and/or its AFFILIATES] are prepared to grant irrevocable licenses under *the IPRs* on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy [*i.e.*, FRAND terms], in respect of the STANDARD, *to the extent that the IPRs remain ESSENTIAL*." (*Id.* (emphasis added)).

As Nokia has clearly alleged, it is both of these steps, particularly the second, that give rise to the IPR holder's FRAND obligations. *See, e.g.*, Compl. ¶ 31 (Q App., Ex. 2 at 10).[34]  The emphasized text of the second-step licensing declaration form plainly defeats Qualcomm's suggestion that FRAND licensing obligations extend only to patents that are eventually shown to be essential in fact. Those obligations cover "*the IPRs*" -- a universal reference to those IPRs that the IPR holder believes "are, or are likely to become, ESSENTIAL." That the licensing obligation covers all of these IPRs is confirmed by the forward-looking caveat -- "to the extent [they] *remain* ESSENTIAL" -- that Qualcomm curiously views (Q Br. 20-21) as favoring its position. "Remain" means "[t]o continue in the same state or condition" (AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1475 (4th ed. 2000) (cited at Q Br. 43-44 n.58)), and therefore connotes that all of the listed patents *are* deemed essential when the form is signed.

Other provisions in the ETSI Guide and IPR Policy are consistent with this interpretation, and, conversely, inconsistent with Qualcomm's notion that declared-essential status is meaningless. For example, ETSI Guide § 3.2.2 provides for "[r]emoval of IPR disclosures at the request of the IPR holder" in connection with "[a] license undertaking/licensing declaration for these IPRs." Q App., Ex. 22 at 14. This clearly implies that all of the IPRs the holder believes "are, or are likely to become, ESSENTIAL" are covered by the FRAND obligation, unless and until the IPR holder

---

[34] Qualcomm mischaracterizes (Q Br. 18-20) our argument as turning on only step one.

36

asks ETSI to withdraw some or all of them from the list -- which Qualcomm has not done as to any of its declared-essential patents.  The importance of an IPR holder's self-reporting declaration is again made clear by ETSI Guide § 3.2, which states that "IPR information reflected by ETSI is based on the information received" and that ETSI does not independently "confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential."  Q App., Ex. 22 at 14.[35]

Qualcomm's "plain language" argument is flawed on an even more fundamental level. French substantive law, which indisputably governs here,[36] provides that "[o]ne must in agreements seek what the common intention of the contracting parties was, *rather than pay attention to the literal meaning of the terms*."  French Civil Code, Art. 1156 (G. Rouhette, transl.) (N Aff., Ex. W at 1) (emphasis added).[37]  Here, the "common intention of the contracting parties" requires consideration of the purpose of the FRAND contract -- a fact that Qualcomm ignores and that shows that Qualcomm's argument is not appropriate for consideration on a motion to dismiss.  As alleged in Nokia's Complaint, the FRAND contract constrains a patent owner from attempting to "hold up" the industry after the standard has been implemented by alleging patent infringement, threatening an injunction, and demanding a "super-monopoly" royalty; the industry, knowing that the FRAND protection is in place, is in turn willing to undertake the enormous investment necessary to implement the standard.  Under Qualcomm's regime, however, a patent holder could

---

[35] This refutes Qualcomm's assertion that, after first-step disclosure, "ETSI seeks an undertaking to license under FRAND terms only patents that actually <u>are</u> 'ESSENTIAL.'"  Q Br. 19.  Since ETSI does not examine actual essentiality, it makes the request as to *all* patents disclosed during step one.

[36] *See* Q App., Ex. 23 ("The construction, validity and performance of this DECLARATION shall be governed by the laws of France."); ETSI IPR Policy § 12 (Q App., Ex. 22 at 22-23) ("The POLICY shall be governed by the laws of France.").  Since ETSI is based in France, there is clearly a "material relationship" between the transaction and the law selected; the choice must therefore be honored.  *See J.S. Alberici Constr. Co. v. Mid-West Conveyor Co.*, 750 A.2d 518, 520 (Del. 2000).

[37] Available at http://www.legifrance.gouv.fr/html/codes_traduits/code_civil_textA.htm (last visited Oct. 2, 2006).

evade its FRAND contract by the simple expedient of claiming that its declared-essential patents are not and never were actually essential.

Professor Aynès of the Sorbonne explains this conclusion in comprehensive detail in his Opinion (N Aff., Ex. A). After considering the French Civil Code, analogous areas of French law, and the purpose of the FRAND regime to "remov[e] any obstacle to the Essential IPR being incorporated in a Standard" (*id.* at 6), Professor Aynès states: "When the owner of an IPR gives the undertaking in writing on the basis of [ETSI IPR Policy] art. 6.1, it agrees that this IPR is essential." *Id.* at 8. According to Professor Aynès, only "in the event that the licensed IPR is *no longer* considered 'essential' due to evolutions in the technology" (*id.* (emphasis added)) may an IPR owner (1) request that ETSI remove that IPR from the declared list pursuant to ETSI Guide § 3.2.2; and (2) after procuring such removal, attempt to sustain its burden of proof, as an affirmative defense to the licensee's contract action, that the patent is no longer essential. Aynès Opinion, at 8 (N Aff., Ex. A).[38] As noted, Qualcomm has not availed itself of the ETSI removal procedure.

We anticipate that Qualcomm will, on reply, attempt to adduce evidence showing that French contract principles, the parties' intentions, and policy considerations point in a different direction. Such a conflict in the evidence will only underscore why even summary judgment (and, *a fortiori*, a motion to dismiss) would be an inappropriate procedural mechanism to resolve this dispute. *See, e.g., Merchants' Nat'l Props., Inc. v. Meyerson*, 2000 WL 1041229, at \*8 (Del. Ch. July 24, 2000) (where contract interpretation "necessarily will require extrinsic evidence for its resolution[,] ... the defendants' motion for summary judgment must be denied"); *Izquierdo v. Sills*,

---

[38] As Judge Farnan correctly held (Remand Opinion, at 1-2 (Q App., Ex. 15)), such an affirmative defense does not bring this case within federal jurisdiction because of the well-settled rule that "whether a case arises under federal patent law 'cannot depend upon the answer.'" *Holmes*, 535 U.S. at 831 (quoting *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22 (1913)).

38

2004 WL 2290811, at *9 & nn.72-73 (Del. Ch. June 29, 2004) (similar) (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232-33 (Del. 1997)).

**B.      FRAND Precludes the IPR Owner from Seeking Injunctive Relief.**

Qualcomm's alternative argument, that the FRAND obligation unambiguously does not prohibit seeking injunctive relief, is equally without merit.  Again, Qualcomm overlooks French contract-interpretation principles that undermine its conclusion, support Nokia's interpretation, and thus make a Rule 12(b)(6) dismissal improper.

As Professor Aynès explains, what results from the two-step process described above is a license -- not merely a promise into enter a license.  Aynès Opinion, at  7 (N Aff., Ex. A).  French law interprets such a license as forfeiting the licensor's otherwise available right to seek injunctive relief and restricting the licensor to seeking money damages based upon a court's determination of FRAND terms for that license.  *See id.* at 9 ("[A]fter a written undertaking has been given in conformity with art. 6.1, the only issue between the parties is whether the terms and conditions proposed by the signatory of the undertaking are '*fair, reasonable and non-discriminatory*'.  But the right to use the IPR, i.e. the license itself, is granted and cannot be revoked.").

Policy considerations firmly support this view.  Numerous scholars have concluded that it is the sword of an injunction threat that allows a patent owner to extract a royalty that is limited not by FRAND, but by the exorbitant expense that would be required for the licensee to switch to an alternative standard or technology:

> Such a holdup cannot occur, however, if the court confronted with a license dispute interprets the [F]RAND promise, consistent with its core function, as an irrevocable waiver of the patentee's right to extraordinary relief for infringement, i.e., an injunction (preliminary or permanent) or enhanced damages for willful or bad faith infringement.

J. Miller, *Standard Setting, Patents, and Access Lock-In: RAND Licensing and the Theory of the Firm*, forthcoming, 40 IND. L. REV. __ (2006)[39] (N Aff., Ex. X at 21) (footnote omitted); *see also* M. Lemley, *Intellectual Property Rights and Standard-Setting Organizations*, 90 CAL. L. REV. 1889, 1902 (2002) (SSOs "permit their members to own IP rights, but require those members to commit in advance to licensing those rights on specified terms and to forgo injunctive relief altogether").

Qualcomm's objection (Q Br. 26-28) that ETSI's policies do not specifically state, "A FRAND declarant may not seek injunctions," again betrays Qualcomm's misplaced focus on the literal terms of the contract rather than their legal effect under French law. *See* Civil Code Art. 1156, *supra*; *id.*, Art. 1160 (N Aff., Ex. W at 1) ("Terms which are customary shall be supplemented in the contract, even though they are not expressed there."). Under these and other principles of French contract law, as explained in Professor Aynès' Opinion (at 9-10), Qualcomm's FRAND licenses clearly and effectively waive the right to seek injunctive relief, which disposes of Qualcomm's argument (Q Br. 26) that waiver of a federal statutory right (here, 35 U.S.C. § 283[40]) must be express. Moreover, Qualcomm is wrong that the text of ETSI's policies is silent on the injunction question. ETSI Guide § 4.4 provides that developers of standard-compliant products may protect themselves against the emergence of as-yet unknown essential IPR holders by "put[ting] in place [a] financial contingency, based on their assessment of 'reasonable', against the possibility that further/additional license fees might become payable." Q App., Ex. 22 at 15. This provision is obviously premised upon the IPR holders' restriction to seeking money damages.

---

[39] Available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=924883 (last visited Oct. 2, 2006).

[40] Qualcomm incorrectly cites this statute as "15 U.S.C. § 283." Q Br. 26.

Otherwise, the financial contingency would furnish no protection at all -- the IPR holder would simply disagree with the licensee's assessment of "reasonable" and seek an injunction.[41]

In short, application of French contract principles to Qualcomm's FRAND contracts establishes that Qualcomm has forgone the right to seek injunctive relief. Certainly, Qualcomm has not unequivocally shown as a matter of French law that it retains that right, and any conflict in extrinsic evidence of a contract's meaning may not be resolved on a motion to dismiss. *See Merchants' Nat'l Props.*, 2000 WL 1041229, at *8; *Izquierdo*, 2004 WL 2290811, at *9.

### C.      This Court Has Ample Authority To Grant Nokia's Requested Relief.

As its final ground for Rule 12(b)(6) dismissal, Qualcomm argues that this Court (1) *may not* issue an injunction or declaratory judgment that affects Qualcomm's U.S. federal (San Diego and ITC) proceedings; and (2) *should not* issue an injunction preventing Qualcomm from pursuing its foreign actions. These arguments are wholly without merit.

Beginning with the U.S. federal proceedings, Qualcomm gives undue attention to whether this Court may *enjoin* Qualcomm's prosecution of them. Whether or not this Court has power to enter such an injunction consistent with the Supremacy Clause, it is clear that this Court has power to grant Nokia's requested *declaratory relief* (that the FRAND contract bars Qualcomm from seeking injunctions), and that such a declaratory judgment would -- entirely permissibly -- impact

---

[41] Qualcomm's argument that waiver must be explicit is wrong for several additional reasons. First, neither the cases it cites (Q Br. 26-27) nor any of which we are aware involved waiver of the right to seek injunctive relief against a patent infringer -- a meaningful distinction since such waiver is the raison d'être of the license here. *See* Miller, 40 IND. L. REV. at (N Aff., Ex. X at 9) (that injunctive relief is "out of bounds ... goes to the heart of what the [F]RAND promise means"). Second, not all federal statutory rights may be waived only explicitly: In an analogous situation, the U.S. Supreme Court "found that a contract provision establishing that a dispute shall be settled exclusively and finally by compulsory arbitration makes clear that the union may not strike over such a dispute." *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 708 n.12 (1983) (discussing *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 105 (1962)). Finally, even if Qualcomm is correct, its argument impacts only whether it has waived its right to seek injunctions for infringement of *U.S. patents*; Qualcomm also seeks injunctions for infringement of UK, German, French, and Italian patents, and Qualcomm does not suggest any explicit waiver requirement as to those patent rights.

the U.S. federal proceedings to the extent those tribunals accord it preclusive effect, as the Full Faith and Credit Statute (28 U.S.C. § 1738) requires them to do. Contrary to Qualcomm's unsupported submission "that the same reasoning [on this Court's ability to enjoin Qualcomm] applies to the declaration Nokia seeks" (Q Br. 29), a uniform line of case law, including *Donovan v. City of Dallas*, 377 U.S. 408 (1964), makes abundantly clear that "'both the state court and the federal court, having concurrent jurisdiction, may proceed with the litigation at least until judgment is obtained in one of them which may be set up as res judicata in the other.'" *Id.* at 412 (quoting *Princess Lida v. Thompson*, 305 U.S. 456, 466 (1939)); *see also, e.g.*, *Univ. of Md. at Baltimore v. Peat Marwick Main & Co.*, 923 F.2d 265 (3d Cir. 1991) (same); *Epstein v. Chatham Park, Inc.*, 153 A.2d 180, 184-85 (Del. Super. 1959) (citing RESTATEMENT OF JUDGMENTS § 43 (1942)). This rule applies regardless whether the first case to reach judgment was also the first-filed case, *see, e.g.*, *Epstein*, 153 A.2d at 184-85; *Penobscot Nation v. Georgia-Pacific Corp.*, 254 F.3d 317, 323 (1st Cir. 2001); *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 n.3 (5th Cir. 1996), or whether the underlying dispute involves federal or state law, *Penobscot Nation*, 254 F.3d at 323.

Moreover, Qualcomm's (basically irrelevant) conclusion that this Court may not enter an injunction vis-à-vis the U.S. federal proceedings is far from certain. While the Supremacy Clause may prohibit a state court from "enter[ing] an injunction preventing a litigant from pursuing *an action* in federal court," Q Br. 28 (emphasis added); *see also* Q Br. 29 & n.37 (citing cases extending rule to federal agencies), Nokia does not seek to enjoin Qualcomm's San Diego or ITC "actions." Rather, Nokia asks that Qualcomm be enjoined from seeking a specific form of relief -- an injunction -- within those actions, and then only insofar as declared-essential patents are concerned. *See* Compl. ¶ 55 (Q App., Ex. 2 at 19). Qualcomm has not cited a single case holding that the Supremacy Clause bars such a limited injunction, which is far less offensive to federal policy than the broader injunctions addressed in *Donovan* and *General Atomic Co. v. Felter*, 434

42

U.S. 12 (1977) *(per curiam)* -- especially given the longstanding and well-settled rule that disputes over patent licenses do not trigger original federal jurisdiction and hence are customarily adjudicated exclusively in state court. *See supra*, at 21, 23-24; *Luckett*, 270 U.S. at 510 (where a "complainant makes his suit one for recovery of royalties under a contract of license or assignment, or for damages for a breach of its covenants, or for a specific performance thereof, ... he does not give the Federal district court jurisdiction of the cause as one arising under the patent laws"); *Excelsior Wooden Pipe Co.*, 185 U.S. at 286 (same); *Clausen Co.*, 889 F.2d at 465 (same); *In re Oximetrix, Inc.*, 748 F.2d at 642 (contrary approach would "improperly alte[r] the fundamental division of jurisdiction between the state and federal courts").

Turning to the foreign actions, Qualcomm concedes this Court has power to enjoin it from pursuing injunctive relief in those actions, and it argues only that this Court should not exercise its discretion to do so. *See* Q Br. 30.[42] And Qualcomm correctly notes that one of the situations in which this Court should exercise its discretion to issue such an injunction is "'to protect its jurisdiction over a controversy in order to do complete justice.'" *Id.* But Qualcomm's cursory discussion (Q Br. 30-31) of this category is incorrect. The Delaware Supreme Court has recognized on several occasions that an injunction of a foreign suit even in its *entirety* (which, again, Nokia does not request here) is warranted to avoid a "collision course" between two actions involving the "same parties and issues" with "potential[ly] conflict[ing]" results. *Williams Natural Gas Co. v. BHP Petroleum Co.*, 574 A.2d 264, 1990 WL 38329, at *1 (Del. 1990) (Order); *see also ANR Pipeline Co v. Shell Oil Co.*, 526 A.2d 930 (Del. 1987) (Order). Irreparable harm is clearly present in such circumstances because "money damages would be difficult, if not impossible, to calculate in

---

[42] As with the U.S. federal actions, even if an injunction would be inappropriate regarding the foreign actions, a declaratory judgment would not. We note, however, that seeking preclusive effect in foreign courts is more complex than in federal court, where 28 U.S.C. § 1738 requires recognition. Accordingly, the injunction remedy is especially important as to the foreign actions.

a manner that could adequately compensate a party for the unfairness, inefficiency, and risk of inconsistent judgments that might inhere in the simultaneous prosecution of duplicate actions in multiple jurisdictions." WOLFE & PITTENGER § 5-3, at 5-51.[43]   Nokia is faced with just such irreparable harm here, plus the risk that its business in the UK or Germany or France or Italy will be suddenly shut down by an injunction.   It is therefore clear that, if this Court ultimately rules that Qualcomm's FRAND commitment bars it from seeking injunctive relief, it would be an appropriate exercise of discretion to enjoin Qualcomm from seeking such relief in those foreign suits.   At the very least, this Court cannot reach the contrary conclusion on a motion to dismiss.

## IV.   AN ACTUAL CONTROVERSY EXISTS CONCERNING NOKIA'S SECOND CLAIM FOR RELIEF.

Qualcomm's ripeness challenge rests largely on its misunderstanding of Nokia's allegations concerning the absence of a definitive FRAND methodology and the risks of irreparable harm under which Nokia consequently labors.   Once those allegations are taken into account, Qualcomm's contentions at most show a factual dispute that may not be resolved on a motion to dismiss.[44]

We begin, however, with Qualcomm's challenge (Q Br. 33) to the first part of Nokia's second claim, which seeks a declaration that Qualcomm's FRAND obligations are binding. Qualcomm's agreement on this point, *see id.*; *but cf.* Q Br. 39-42 (arguing that FRAND obligation is not specifically enforceable), is a welcome development.   It paves the way for a stipulation,

---

[43] To be sure, in these cases the foreign action (such as Qualcomm's German, French, and Italian actions) was commenced after the Delaware action.   They nonetheless are instructive as to whether this Court should enter an injunction vis-à-vis an earlier-filed foreign action (such as Qualcomm's UK action) where *McWane* is inapposite or trumped.   *Cf.* WOLFE & PITTENGER § 5-3, at 5-44 ("many of the principles discussed herein are no doubt equally applicable with respect to similar injunctions in the other instances described").

[44] Qualcomm does not dispute that Nokia's claim for declaration of a FRAND methodology meets the other elements of actual controversy.   *See* Q Br. 35-39 (arguing only ripeness).

allowing the parties and this Court to focus on what remains in dispute -- the proper methodology for calculating a FRAND royalty rate.

Turning to that dispute, Qualcomm argues (Q Br. 35-36) that it is unripe because (a) if Nokia prevails on liability, there may be no need in Qualcomm's infringement suits to apply such methodology, which bears on only the amount of damages; and (b) Nokia does not "identify any harm that it is presently suffering because of any alleged dispute over such principles." These arguments betray Qualcomm's misunderstanding of the FRAND methodology question as tied up with Qualcomm's 2G GSM suits. In fact, it is the interplay between those suits and the 3G UMTS negotiations upon which Nokia's allegations of actual controversy rest. Specifically, Nokia's Complaint supports at least three reasons why the FRAND methodology question is ripe.

*First*, the absence of a FRAND methodology is one of two problems plaguing the parties' negotiations over a 3G UMTS replacement license; the other is Qualcomm's wielding of the injunction threat through its 2G GSM suits, a tactic Qualcomm has publicly conceded is an attempt to strengthen its hand in the 3G UMTS negotiations. *See* Eluvangal, *supra* (N Aff., Ex. H) (Qualcomm's General Counsel: "We have followed up on Nokia and Broadcom only because we have other disagreements with the companies."). These dual problems, if they do not lead to an injunction against Nokia, may coerce Nokia into agreeing to a 3G UMTS replacement license on non-FRAND terms. Having entered into such a license, Nokia might be barred from obtaining judicial consideration whether the terms comply with FRAND. *See* Q Br. 38 n.48 (arguing that there is no actual controversy over whether ⬚⬚⬚⬚ complies with FRAND because "Nokia is presently paying royalty rates *to which it freely agreed* -- and which it presumably believed at the time were 'fair, reasonable, and non-discriminatory'") (emphasis added). This risk of irreparable harm would be removed were this Court to announce a well-specified FRAND methodology because the room for negotiation between the parties' 3G UMTS positions would narrow

considerably, diminishing the effectiveness of Qualcomm's injunction threats and likely causing it to drop its current suits or at least refrain from pursuing new ones.[45]

*Second*, Qualcomm may succeed in obtaining injunctive relief in one or more of its 2G GSM suits, strengthening its hand even further in the 3G UMTS negotiations.  Qualcomm does not contest that such an injunction would irreparably harm Nokia.  *See* Q Br. 16-31 (challenging Nokia's first claim for relief on different grounds); Compl. ¶ 50 (Q App., Ex. 2 at 18) ("if ... some court in some jurisdiction ... enjoin[s] Nokia's manufacture of cell phones, Nokia's business will be substantially harmed"); *id.* ¶ 51 (the "multiplicity of actions poses a substantial risk that Nokia could be subject to inconsistent adjudications to the extent that some courts rule that Qualcomm's FRAND obligation precludes it from seeking injunctive relief, while other courts rule that Qualcomm is entitled to seek injunctive relief").

*Third*, even accepting Qualcomm's focus on whether its infringement actions will progress to the damages phase (hence requiring a FRAND methodology to determine damages), an actual controversy is present and poses the same risks of irreparable harm just catalogued.  Qualcomm errs in examining only the 2G GSM suits, not the avalanche of 3G UMTS suits that Qualcomm has *explicitly promised*, absent a replacement agreement, after April 9, 2007.  *See* Transcript of Q3 2006 Qualcomm Inc. Earnings Conference Call, at 11 (July 19, 2006) (N Aff., Ex. Y) (Qualcomm's President Steve Altman: "I think that once we get past April 9, if there's no agreement, they will be infringing our patents, so we will take all appropriate measures ....  In addition to damages, we would look and seek injunctions in a variety of markets where there [*sic*] are shipping certainly WCDMA [*i.e.*, UMTS] at that time.").  In 3G UMTS, unlike in 2G GSM, Qualcomm has a

---

[45] Qualcomm protests that the task of defining a FRAND methodology is hopeless because Nokia and Qualcomm "would still have a dispute over a specific royalty rate if their applications of those principles differed."  Q Br. 36 n.47.  The obvious answer is that if the FRAND methodology is sufficiently well-defined, disputes over its application will be rare.

colorable claim that at least some of its patents are valid and essential, such that they would be infringed by producers of 3G UMTS-compliant products. Accordingly, unlike in 2G GSM, it is more likely that some of Qualcomm's threatened suits will progress to the damages phase. That the 3G UMTS suits will not commence until April 10, 2007 does not defeat ripeness, a flexible doctrine that turns on "a practical evaluation" (*Ubiquitel*, 2006 WL 44424, at *2) of the circumstances. Here, as noted, Nokia labors under the risk of several types of irreparable harm stemming from the lack of a judicially endorsed FRAND methodology, and this Court's plan to hold a trial in March 2007 will provide a resolution just as the crucial April 10 date is reached. *Cf. id.* (defendant had no capability to engage in activities violating plaintiff's exclusivity rights "for several years").

*Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235 (Del. Ch. 1987) (cited at Q Br. 36-38), is not to the contrary. *Schick* arose from a corporation's attempt to obtain a declaration that a particular minority stockholder would be an inadequate representative in an as-yet un-filed derivative suit against the majority stockholder for breach of fiduciary duty. *Id.* at 1236-37. Because such a declaration would merely pass the baton to an untainted minority stockholder, resulting in the same litigation of the "substantive claim relating to the alleged breaches of fiduciary duty" (*id.* at 1242), the Court found that declaratory-judgment jurisdiction could not be justified on efficiency grounds. That is not the case here, for Nokia's claim does go to an underlying dispute between the parties -- how to determine a FRAND royalty, whether in the damages phase of an infringement suit or in license negotiations. Thus, *Schick* turned not on Qualcomm's notion of a suit that "resolve[s] only part of a dispute" (Q Br. 37), but on whether the part that is resolved is a "substantive claim" (533 A.2d at 1242) rather than a determination who may bring such claim.

Qualcomm is equally incorrect in relying upon *Schick*'s finding that the plaintiff was "suffering 'no current adverse economic or other impact.'" Q Br. 38 (quoting 533 A.2d at 1242).

As set forth above, the absence of a FRAND methodology has created a risk that Nokia will be coerced into a non-FRAND license that it may later be precluded from challenging, and it has spawned injunction suits against Nokia, which threaten disruption of Nokia's core business. Nokia has clearly alleged adverse economic impact and, as *Schick* reiterates, this Court must take those "well-pleaded allegations to be true" (533 A.2d at 1236) on a motion to dismiss for lack of actual controversy, just as with a Rule 12(b)(6) motion. *See also Ubiquitel*, 2006 WL 44424, at *2 n.15 (cited *supra*, at 4) (similar). Qualcomm's ripeness challenge must therefore be denied.

## V.   QUALCOMM'S DUTY TO NEGOTIATE UNDER THE FRAND METHODOLOGY ANNOUNCED BY THIS COURT IS SPECIFICALLY ENFORCEABLE.

Nokia's third claim for relief seeks specific performance of Qualcomm's contractual obligation to participate in a good-faith negotiation for license of Qualcomm's essential 3G UMTS patents for the period after April 2007, in light of this Court's resolution of the parties' dispute as to the methodology for determining a FRAND royalty. *See* Compl. ¶ 73 (Q App., Ex. 2 at 23). Just pages after conceding that the obligation is binding (Q Br. 33), Qualcomm asserts (*id.* at 39-42) that it may not be specifically enforced because it is insufficiently "clear and definite" and because Nokia has an adequate remedy at law.

Having addressed the irreparable harm/adequate legal remedy question in Point IV, *supra*, we focus here on Qualcomm's contention that FRAND is not sufficiently "clear and definite." Professor Aynès concludes just the opposite under French law, stating that "the absence of a definition of FRAND does not affect the enforceability of the obligations created by the declaration." Aynès Opinion, at 10 (N Aff., Ex. A). Professor Aynès explains that "[w]hile FRAND terms and conditions are not contractually defined, it is a concept which can be objectively specified, especially by referring to the market." *Id.*

U.S. courts agree.  In *ESS Technology, Inc. v. PC-TEL, Inc.*, 1999 WL 33520483 (N.D. Cal. Nov. 4, 1999), for example, a licensee sued an owner of patents essential to modem standards adopted by the ITU, seeking, *inter alia*, "specific performance of defendant's agreement with the ITU" (*id.* at *2) -- namely, the defendant's obligation to license the patents on FRAND terms.  The defendant moved to dismiss on the same rationale Qualcomm advances, that FRAND "is too vague to support a claim for specific performance, since it does not provide any express terms of the contract."  *Id.* at *3.  Applying California law, the court denied the motion, recognizing the early "stage of the proceedings" (*id.* at *4) and the principle that "a court can enforce a contract even if some of the terms are not provided" (*id.* at *3).[46]

*ESS* is no anomaly.  Courts in antitrust/patent cases have often explicitly imposed a FRAND-type licensing requirement to regulate the defendant's conduct going forward, thus revealing their belief that such a requirement is enforceable.  *See, e.g.*, *United States v. Glaxo Group Ltd.*, 410 U.S. 52, 62 (1973) (defendants required to sell product "on *reasonable and nondiscriminatory terms* and to grant patent licenses at *reasonable-royalty rates*") (emphasis added); *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 94 (1950) (similar); *United States v. Vehicular Parking, Ltd.*, 61 F. Supp. 656, 658 (D. Del. 1945) ("*jurisdiction is specifically reserved to determine what are reasonable royalties or terms on present patents ...*") (citing *Hartford-Empire Co. v. United States*, 323 U.S. 386 (1945)) (emphasis added).  This Court should not conclude otherwise on a motion to dismiss.

Qualcomm's remaining contention -- that Nokia's unsuccessful efforts to obtain guidance *from ETSI* on a FRAND methodology demonstrate that FRAND is not sufficiently "clear and

---

[46] Qualcomm's lone case citation (Q Br. 39 n.49, 42 n.54) is easily distinguished because the contract provided only that the parties would "*agree upon all terms*," with no constraints upon those terms. *Liquor Exch., Inc. v. Tsaganos*, 2004 WL 2694912, at *3 (Del. Ch. Nov. 16, 2004) .

definite" to be specifically enforced *by a court* (Q Br. 40-41) -- is easily dismissed.  Qualcomm omits to mention that ETSI's principal rationale for declining to issue such a clarification is that courts are the more appropriate fora: "[T]he concepts of fair, reasonable, and non-discriminatory license obligations reflect legal mechanisms *well established in the courts of many countries to settle patent disputes.*"  ETSI, *Implementation of the ETSI IPR Policy*, at 6-7 (Q App., Ex. 19) (emphasis added); *see also* Q App., Ex. 21 at 7 (Nokia's recent statement that its ETSI proposal "does not alter the facts that a commitment to license on FRAND terms ... is precise enough so that it can if necessary be interpreted by a court ....").  Nokia cannot be criticized for seeking relief from the forum to which ETSI has directed it.

## CONCLUSION

The motion to dismiss or stay should be denied.


OF COUNSEL:
A. William Urquhart
Frederick Lorig
Patrick Shields
Erica Taggart
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street
Los Angeles, CA 90017
(213) 443-3000

Richard I. Werder, Jr.
Sanford I. Weisburst
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Dated:  October 6, 2006

Thomas A. Beck (#2086)
beck@rlf.com
Lisa A. Schmidt (#3019)
schmidt@rlf.com
Jeffrey L. Moyer (#3309)
moyer@rlf.com
Steven J. Fineman (#4025)
fineman@rlf.com
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19899
(302) 651-7700
Attorneys for Plaintiffs Nokia Corporation
and Nokia, Inc.

50

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of October 2006, true and correct copies of the foregoing Brief Of Plaintiffs Nokia Inc. And Nokia Corporation In Opposition To Defendant's Motion To Dismiss Or Stay were caused to be served on counsel of record at the following address as indicated:

**BY E-FILE AND HAND DELIVERY**
Matthew E. Fischer, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899

Steven J. Fineman (#4025)