# EXHIBIT 5

EFiled: Jul 15 2008 9:49PM EDT
Transaction ID 20659157
Case No. 2330-VCS

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NOKIA CORPORATION and NOKIA INC., | ) | |
| | ) | |
| | ) | C.A. No. 2330-VCS |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **REDACTED** |
| | ) | **PUBLIC VERSION** |
| QUALCOMM INCORPORATED, | ) | **FILED JULY 15, 2008** |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' OPENING PRE-TRIAL BRIEF

OF COUNSEL:

A. William Urquhart
Charles K. Verhoeven
Erica P. Taggart
Marshall Searcy
Patrick Shields
Ryan Goldstein
Aaron Craig
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street
Los Angeles, CA 90017
(213) 443-3000

Kathleen M. Sullivan
David Elsberg
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Thomas A. Beck (#2086)
Lisa A. Schmidt (#3019)
Jeffrey L. Moyer (#3309)
Steven J. Fineman (#4025)
Blake K. Rohrbacher (#4750)
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19899
(302) 651-7700

*Attorneys for Plaintiffs Nokia Corporation and Nokia Inc.*

Mark A. McCarty
Alston + Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309
(404) 881-7000

S. Gardner Culpepper, III
Ashe Rafuse & Hill, LLP
1355 Peachtree Street, N.E.
Suite 500, South Tower
Atlanta, Georgia 30309
(404) 253-6000


Dated:  July 8, 2008

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................. v

INDEX OF KEY INDIVIDUALS ...................................................................... vii

GLOSSARY OF KEY TERMS .............................................................................. x

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ............................................................................... 3

    A.   ETSI Standards And ETSI IPR Policy ........................................... 3

        1.   Development Of The GSM Standard ................................. 3

        2.   The ETSI IPR Policy........................................................... 4

    B.   Qualcomm's CDMAOne/IS-95 Technology ................................ 7

    C.   The Development Of 3G Technology And The ETSI UMTS Standard ......................................................................................... 8

        1.   Qualcomm's Attempt To Block UMTS ........................... 9

        2.   The Qualcomm-Ericsson Litigation ............................... 11

        3.   Qualcomm's 1999 FRAND Commitment And ETSI Declarations...................................................................... 12

    D.   The Amendment Of The SULA In 2001 ..................................... 13

        1.   Qualcomm's Changed Negotiation Position ................. 14

        2.   The Options In The 2001 SULA ...................................... 17

    E.   The Parties' Dealings Following The 2001 SULA ..................... 18

    F.   Nokia's FRAND Offers................................................................. 21

    G.   Nokia's Non-Exercise Of The SULA Options............................ 22

ARGUMENT..................................................................................................... 23

i

I.   SINCE APRIL 10, 2007, NOKIA HAS NOT HAD AND CANNOT HAVE BREACHED ANY ROYALTY OR NON-ASSERT OBLIGATIONS TO QUALCOMM OR ANY OBLIGATIONS TO ITS CUSTOMERS UNDER THE SULA ......................................................................................... 23

     A.   Nokia Cannot And Has Not "Impliedly Elected" The SULA Options ....... 24

          1.   The Text Of The SULA Precludes Implied Election Of The Options ...................................................................................... 25

          2.   Extrinsic Evidence Of The Parties' Course of Dealing Likewise Negates Any Implied Election Of The Options ............... 28

               (a)   Qualcomm's Conduct During The SULA Negotiations ........ 28

               (b)   Qualcomm's Post-SULA Conduct ........................................ 29

          3.   No Reasonable Practical Basis Exists To Impute To Nokia Acceptance of the SULA Options .................................................... 33

     B.   Nokia Has No "Interim Obligations" Under The SULA During The Option Period ............................................................................................. 35

     C.   The Provisions Relating To Offering Licenses to Qualcomm's Customers Have Expired ........................................................................... 38

     D.   Nokia Has Not Breached Its SULA Obligations And Cannot Be Made To Forfeit Its Fully Paid-Up License To Qualcomm's Early Patents ...................................................................................................... 39

II.  QUALCOMM HAS BREACHED ITS BINDING CONTRACTUAL COMMITMENTS TO ETSI, OF WHICH NOKIA IS A THIRD-PARTY BENEFICIARY, TO LICENSE ITS ESSENTIAL PATENTS ON FRAND TERMS AND TO LIMIT ANY RELIEF SOUGHT TO FRAND COMPENSATION .......................................................................................... 42

     A.   The Economics Of Standard Setting Organizations Require FRAND Undertakings To Be Binding Contractual Commitments That Limit IPR Holders' Remedies And Preclude Injunctive Relief Except In Extraordinary Circumstances ..................................................................... 43

          1.   FRAND Undertakings Prevent Using Hold-Up Power To Gain Excessive Royalties ............................................................... 43

2.    To Limit Hold-Up Power Of Essential Patent Owners, FRAND Undertakings Must Apply To All Patents *Declared* Essential ........................................................................... 47

B.    Qualcomm Has Conceded That SSO FRAND Undertakings Are Binding Contractual Commitments That Limit Essential IPR Holders' Remedies And Preclude Injunctive Relief Except In Extraordinary Circumstances ...................................................... 49

    1.    The Qualcomm-Ericsson Litigation ................................ 49

    2.    Qualcomm's Testimony In This Case ............................. 53

C.    French Contract Law Establishes That An ETSI Rule 6.1 Undertaking Creates A Binding Contractual Obligation To Grant Licenses On FRAND Terms And Precludes Resort To Injunctions .......... 55

    1.    French Contracts Must Be Read In Light Of Their Purpose And The Parties' Intent ..................................... 55

    2.    An IPR Holder's ETSI Undertaking Forms A Binding Contract Under French Law For The Benefit Of Third-Party Manufacturers .................................................... 56

    3.    Specification Of A Price Is Not Necessary To The Formation Of A Rule 6.1 Contract .................................. 58

D.    Under Principles Of Estoppel, IPR Holders Should Be Prohibited From Obtaining Injunctions On Patents Subject to FRAND Licensing Undertakings ................................................................ 60

E.    Qualcomm Has Breached Its ETSI Rule 6.1 Contractual Commitments By Failing To Propose FRAND Terms ................... 61

F.    Nokia Has Not Breached Its ETSI FRAND Obligations ............. 62

    1.    Nokia Has Evidenced Its Good-Faith Commitment To Meet Its FRAND Obligations By Escrowing $20 Million Per Quarter ........................................................................ 65

    2.    Nokia's Accounting Treatment Of Its Potential Liability Is Not Evidence Of Bad Faith ........................................... 68

III.    THE OPTIONS CLAUSE IN THE 2001 SULA DOES NOT FULFILL QUALCOMM'S FRAND OBLIGATIONS ....................................... 69

A.   Nokia Viewed The SULA Options As A Worst-Case Scenario, Not Agreed-Upon Fair Compensation .................................................. 71

B.   The Parties Could Not Have Intended The SULA Options Terms To Be FRAND .................................................................................. 72

C.   The SULA Does Not Supersede Or Discharge Qualcomm's FRAND Obligations ................................................................................... 76

D.   "Fair And Reasonable" Should Take Into Account The Contribution To The Standard And Appropriate Total Royalties For The Standard ....... 77

CONCLUSION ............................................................................................ 79

iv

### TABLE OF AUTHORITIES

#### CASES

*715 Spencer Corp. v. City Envtl. Servs., Inc.,*
80 F. Supp. 2d 755 (N.D. Ohio 1999)..................................................26

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,*
960 F.2d 1020 (Fed. Cir. 1992)..................................................60, 61

*Allen v. Smith,*
94 Cal. App. 4th 1270 (Cal. Ct. App.) ..................................................33

*Broadcom Corp. v. Qualcomm Inc.,*
501 F.3d 297 (3d Cir. 2007)..................................................*passim*

*Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.,*
2 Cal. 4th 342 (1992) ..................................................36

*Cedars-Sinai Med. Ctr. v. Shewry,*
137 Cal. App. 4th 964 (Cal. Ct. App.) ..................................................29

*Chateau Chamberay Homeowner's Ass'n v. Associated Int'l Ins. Co.,*
90 Cal. App. 4th 335 (Ca. Ct. App. 2001) ..................................................37

*Christianson v. Colt Indus. Operating Corp.,*
486 U.S. 800 (1988)..................................................69

*In re Dell Computer Corp.,*
21 F.T.C. 616 (May 20, 1996) ..................................................47

*Desny v. Wilder,*
46 Cal. 2d 715 (1953) ..................................................34

*Doryon v. Salant,*
75 Cal. App. 3d 706 (2d Dist. 1977)..................................................25

*Guz v. Bechtel Nat'l, Inc.,*
24 Cal. 4th 317 (Cal. 2000)..................................................37

*Guzman v. Visalia Cmty. Bank,*
71 Cal. App. 4th 1370 (Cal. Ct. App. 1999) ..................................................33

*Jaffe v. Paramount Commc'ns, Inc.,*
222 A.D.2d 17 (N.Y. App. Div. 1996) ..................................................26

v

*Knarston v. Manhattan Life Ins. Co.*,
140 Cal. 57 (Cal. 1903).................................................................................................25

*Masterson v. Sine*,
436 P.2d 561 (Cal. 1968)..............................................................................................77

*Nat'l Union Fire Ins. Co. v. Stauffer Chem Co.*,
558 A.2d 1091 (Del. Super. 1989)..............................................................................69

*In re Negotiated Data Solutions, LLC*,
2008 WL 258308 (F.T.C. Jan. 22, 2008) ...................................................................47

*Potter Instrument Co. v. Storage Technology Corp.*,
1980 U.S. Dist. LEXIS 14348 (E.D. Va. Mar. 25, 1980), *aff'd on other grounds*, 641 F.2d
190 (4th Cir. 1981)........................................................................................................47

*S. Cal. Edison Co. v. Superior Court*,
37 Cal. App. 4th 839 (Cal. Ct. App. 1995) ...............................................................29

*Universal Sales Corp. v. Cal. Press Mfg. Co.*,
20 Cal. 2d 751 (Cal. 1942)...........................................................................................41

*Wang Lab's, Inc. v. Mitsubishi Elecs. Am. Inc.*,
103 F.3d 1571 (Fed. Cir. 1997)....................................................................................47

*Warner Bros. Theatres v. Proffitt*,
198 A. 56 (Pa. 1938)......................................................................................................33

## STATUTES

28 U.S.C. § 1338(a) .......................................................................................................69

U.C.C. § 2-204(3) ..........................................................................................................56

## OTHER AUTHORITIES

Mark A. Lemley, *Intellectual Property Rights and Standard-Setting Organizations*, 90
Cal. L. Rev. 1889, 1925 (2002) ...................................................................................45

*Restatement (Second) of Contracts* § 33(2) ...............................................................56

Joseph Scott Miller, *Standard Setting, Patents, and Access Lock-In: RAND Licensing
and the Theory of the Firm*, 40 Indiana L. Rev. 351 (2007).....................................45

*Corbin on Contracts* § 11.16 (1996)...........................................................................34

## INDEX OF KEY INDIVIDUALS

### I.   Nokia Employees

Heikki Ahava:  Retired engineer, one of Nokia's ETSI representatives and leaders of Nokia's research into UMTS technology.  Former director of corporate strategy.  Very involved in standardization between 1992 and 2005.

Timo Ali-Vehmas:  Vice President, Standardization and Industry Relations.  One of Nokia's ETSI representatives.  Involved in research programs studying WCDMA, WTDMA and other alternatives.

Anne Eckert:  Director, IPR Communications in the IPR business unit.

Tim Frain:  Director, IPR Regulatory Affairs.  Nokia's representative to ETSI ad hoc group on IPR in 2006.

Ulla James:  Director, IPR Finance & Strategic Marketing.  Former head of Investor Relations.

Olli-Pekka Kallasuvo:  President and Chief Executive Officer, Chairman of the Group Executive Board.

Matti Kauppi:  Vice President, IPR.  Since November, 2007, co-head of IPR with Ilkka Rahnasto.  Involved in contract negotiations with Qualcomm.

Erkki Kuisma:  Technology Fellow.  Involved in negotiating the 1992 SULA with Qualcomm.

Kari J. Lang:  Director of Global Standards, Office of the Chief Technology Officer.  Board member of ETSI.

Pertti Lukander:  Nokia Networks' principal standardization representative from the mid-1990s through the mid-2000's.   Currently with Nokia Siemens Networks as Director of Industrial Environment Development.

Yrjö Neuvo:  Vice President, Technology Advisor, Office of the Chief Technology Officer.

Tero Ojanperä:  Executive Vice President, Entertainment and Communities, member of the Group Executive Board.  Former Chief Technology Officer and Head of Nokia Research Center.  Involved in renegotiation of the SULA.

Jorma Ollila:  Member, Group Executive Board, former Chief Executive Officer. President of Nokia Mobile Phones when the 1992 SULA was negotiated and executed.

Niklas Östman:  Former in-house counsel, currently an attorney in private practice. Involved in negotiating license agreements from 2005-2007 and in negotiations with Qualcomm.

Dhiren Patel:  Director of Patent Licensing.  Worked on GSM and WCDMA licensing negotiations.

Ilkka Rahnasto:  Vice President, IPR.  Head of IPR until November, 2007; currently co-head of IPR with Matti Kauppi.  Involved in most meetings with Qualcomm from 1998 until today.

Rick Simonson:  Executive Vice President and Chief Financial Officer, member of the Group Executive Board.  Heavily involved in investor relations.

James Smith:  Former Global Director of IPR Licensing.  Head of Nokia's global patent licensing from 2005-2007.

Craig Thompson:  Director, IPR Licensing.  Involved in licensing negotiations from November 2004 to January 2008.

Andrew Walker:  Patent agent and member of Nokia licensing team.  Currently Senior IPR Counsel at Nokia Siemens Networks.

Erkki Yli-Juuti:  Director, IPR.  Head of strategy and portfolio management, Wireless Modem Unit.  Previously a patent engineer involved in mobile switching.  Participant in Next Generation Mobile Networks (NGMN) discussions related to potential 4G royalty rates.

## II.     Qualcomm Employees

Derek Aberle:  Senior Vice President of Qualcomm, Inc. and general manager of Qualcomm Technology Licensing.  Participated in the negotiation of 2001 SULA and involved in post-2001 SULA negotiations.

Steve Altman:  President, Qualcomm, Inc.  Negotiated 2001 SULA and involved in post-2001 SULA negotiations.  Also involved in many lawsuits relevant to this pending case.

Marv Blecker:  Executive Vice President, Qualcomm, Inc. and President of Qualcomm Technology Licensing.

Mark Epstein:  Represented Qualcomm at various standard-setting organization meetings during the period UMTS was adopted.

Ron Foerster:  Former Managing Director of Qualcomm Europe; attended ETSI meetings.

Fabian Gonell:  Former outside counsel for Qualcomm in this case at Cravath law firm, now in-house counsel at Qualcomm.  Currently represents Qualcomm at ETSI meetings.

Michael Hartogs:  Senior Vice President, Qualcomm, Inc., division counsel of Qualcomm technology licensing.  Provided supporting legal advice during execution of 2001 SULA.  Involved in direct licensing negotiations with Nokia from 2005-present.

Irwin Jacobs:  Chairman of the Board, founder, former CEO of Qualcomm, Inc.  Father of current CEO Paul Jacobs.  Personally holds several CDMA patents.  Involved in negotiations of both the 1992 SULA and the 2001 SULA.

Paul Jacobs:  Qualcomm, Inc. Chief Executive Officer, member of Qualcomm, Inc. board of directors.  Has participated in post-2001 SULA negotiations with Nokia.

Sanjay Jha:  Chief Operating Officer, Qualcomm, Inc., President of Qualcomm CDMA Technologies.  Dr. Jha has been a high level participant in negotiations with Nokia, including the GSM arbitration, FRAND/ETSI discussions, and the BREW litigation and settlement.

Louis Lupin:  Former Executive Vice President and General Counsel, Qualcomm, Inc.  Heavily involved in nearly all negotiations with Nokia.  Corresponded with ETSI in late 1990s regarding IPR issues.  Also involved in many lawsuits relevant to this pending case.

Abasseh Samimi:  Vice President, strategic marketing analysis, Qualcomm, Inc., senior director of contract administration and finance, Qualcomm Technology Licensing.

Rich Sulpizo:  Former President and Chief Operating Officer of Qualcomm, Inc.  Involved in internal meetings to discuss progress of negotiations with Nokia.

Christine Trimble:  Senior Director of Corporate Communications.

Stephane Tronchon:  Former ETSI legal advisor.  Began working for Qualcomm in 2005.  Currently represents Qualcomm at ETSI.

## GLOSSARY OF KEY TERMS

### I.    Standard-Setting Organizations

**ANSI**
American National Standards Institute.  An non-profit United States organization that
reviews the work of standards bodies and assigns category codes and numbers, but does
not carry out standardization itself.

**ETSI**
European Telecommunications Standards Institute.  The European group initially
responsible for defining telecommunications fixed, mobile, radio, converged, broadcast
and internet communication technologies.  Developed the GSM and UMTS standards.

**ITU**
International Telecommunications Union.  Headquartered in Geneva, the ITU is a
specialized agency of the United Nations that issues recommendations as to
telecommunications standards and allocates portions of the wireless spectrum.

**TIA**
Telecommunications Industry Association.  United States trade association representing
approximately 600 telecommunications companies.  TIA creates networking standards
for the telephony and data networking industries.  Formerly responsible for
standardization of CDMAOne/IS-95 standard.

### II.    Technologies and Standards

**1G**
The first generation mobile phone technologies.  1G systems were analog systems.

**2G**
The second generation of mobile phone technologies including GSM, CDMAOne/IS-95
and D-AMPS IS-136.  2G systems are digital systems.

**2.5G**
The enhancement of GSM which includes technologies such as GPRS and EDGE.

**3G**
The third generation of mobile phone technologies covered by the ITU IMT-2000 family,
such as UMTS (which uses a WCDMA air interface) and CDMA2000.

x

**4G**
The fourth generation of mobile phone technologies currently under development including LTE and WiMAX.

**CDMA**
Code Division Multiple Access, a general technology invented in the 1940's; also known as spread spectrum, CDMA cellular systems permit multiple users to utilize a single frequency band at the same time, differentiating the individual transmissions by assigning them unique codes before transmission.

**CDMAOne**
The first commercial CDMA cellular system; deployed mainly in North America and Korea; subsequently standardized and known as IS-95. Began as proprietary Qualcomm system.

**CDMA2000**
A member of the IMT-2000 3G family; backwardly compatible with CDMAOne/IS-95.

**EDGE**
Enhanced Data rates for GSM Evolution; allows higher data speeds within the existing GSM spectrum. Also known as Enhanced GPRS ("E-GPRS").

**GPRS**
General Packet Radio Service; allows packet switching within GSM; essential precursor for 3G as it introduces the packet switched core required for UMTS.

**GPS**
Global Positioning System; a location system based on a constellation of United States Department of Defense satellites; incorporated as a feature in an increasing number of handsets.

**GSM**
Global System for Mobile communications, the 2G digital technology originally developed by ETSI for Europe, but which now has over 71 per cent of the world market.

**IMT-2000**
The family of 3G technologies approved by the ITU. There are five members of the family: IMT-DS, a direct sequence WCDMA FDD solution; IMT-TC, a WCDMA TDD solution; IMT-MC, a multicarrier solution developed from cdma2000; IMT-SC, a single carrier solution developed from IS-136/UWC-136; and IMT-FT, a TDMA/TDD solution derived from DECT.

**IS-95**
2G Cellular standard earlier known as CDMAOne.  Began as proprietary Qualcomm system.

**IS-136**
Cellular standard also known as US TDMA or D-AMPS.

**TD-CDMA**
Time Division CDMA.

**TD-SCDMA**
Time Division-Synchronous CDMA; a CDMA variant developed primarily by Siemens and Chinese vendors.

**TDMA**
Time Division Multiple Access; a technique for allowing multiple users on a single channel on a single carrier by splitting the carrier into time slots and allocating these on an as-needed basis.  Used in GSM standard in part of UMTS standard.

**UMTS**
Universal Mobile Telecommunications System; the 3G standard initially developed by ETSI, 3GPP using WCDMA as its air interface; now subsumed into the IMT-2000 family as the WCDMA technology.  Backward compatible with GSM.

**WCDMA**
Wideband CDMA; the air interface concept selected for the UMTS 3G standard.

## PRELIMINARY STATEMENT

The issues in Phase 1 of this case revolve around the interpretation of two contracts: first, the Subscriber Unit License Agreement ("SULA") agreed to by Nokia and Qualcomm in 1992 and amended and restated in 2001, and, second, the contractual undertakings IPR holders including Qualcomm and Nokia made to ETSI committing to license patents declared as essential to ETSI standards on FRAND terms.

In particular, Nokia will demonstrate that it has not exercised either of the options provided for in the 2001 SULA broaden the scope of its license from one set of patents to another set of patents. Those options can be exercised only by express written agreement; they are not exercised simply by Nokia's continued manufacture of certain products. Since Nokia has not exercised the options in writing, the options' terms are not binding on the parties, and Nokia has not breached any obligation it has under the SULA.

As to ETSI, Nokia will demonstrate that the purpose of the ETSI Intellectual Property Rights ("IPR") policy is to ensure that standards can be implemented by the industry notwithstanding IPR claims on that standard. To accomplish this, when ETSI becomes aware of essential IPRs, ETSI asks IPR holders if they will commit to license their essential IPRs on FRAND terms and conditions. Manufacturers like Nokia are the third-party beneficiaries of such commitments, and are entitled to implement the standard subject to the obligation to pay FRAND compensation for any valid patents that are infringed by doing so. An IPR holder who has declared patents to be essential to an ETSI standard and voluntarily submitted a FRAND undertaking for such a patent is limited, in the case of infringement of a valid patent, to FRAND compensation for such patent and is

1

not entitled to an injunction or exclusion order that could prevent implementation of the standard — except in extraordinary circumstances, such as where the manufacturer refuses to pay judicially determined FRAND compensation for the actual infringement of a valid essential patent. Qualcomm should not be heard to say otherwise, for this is exactly the position Qualcomm itself took in litigation against Ericsson, shortly before giving its first commitment to ETSI to license its UMTS-essential patents on FRAND terms.

In violation of its ETSI undertakings and statements in the Ericsson litigation, Qualcomm has sought injunctions against Nokia throughout the world trying to shut down Nokia's implementation of ETSI standards, has failed to propose FRAND-compliant unbundled terms and conditions for its supposed essential patents, and has failed to show any intention of abiding by its obligation to compensate Nokia on FRAND terms for Nokia's essential patents. Nokia, by contrast, has refrained from seeking to shut down Qualcomm's use of ETSI standards, has provided unbundled terms and conditions for its own essential patents, and has attempted to provide FRAND compensation to Qualcomm for the possibility of any infringement of valid, essential patents in implementing ETSI standards.

It is no answer for Qualcomm to claim that the mere inclusion of options to license the ███████████████ in the 2001 SULA satisfied its ETSI FRAND commitments. Any issues of valuation or damages are beyond the scope of Phase 1 and the jurisdiction of this Court, so the objective or economic determination of what would constitute FRAND compensation is not at issue here. But both the text and course of conduct

2

surrounding the signing of the SULA demonstrate that the options provided to Nokia under the SULA were not intended to be FRAND compensation for Qualcomm's ████████ ███████████ The SULA options, thus, cannot either supersede or satisfy Qualcomm's ETSI-imposed FRAND obligations.

<div align="center">

**FACTUAL BACKGROUND**

</div>

**A.    ETSI Standards And ETSI IPR Policy**

In the 1980s, cell phones were in their infancy.  First-generation (1G) analog cellular technology had slow transmission speeds and limited call capacity.  Because cellular "standards" were developed largely by government-owned telephone companies, cell phone communication across international borders was difficult.  In the late 1980s, the cellular telephone industry began to develop second-generation (2G) technologies based on digital data transmission, and saw that national wireless standards were inadequate.[1]  In response, international standard-setting organizations (SSOs) were created, including, in 1988, the European Telecommunication Standards Institute (ETSI) to develop common standards that would allow cellular communication across national borders.

**1.    Development Of The GSM Standard**

One of ETSI's successes has been the promulgation of the GSM standard, which was developed in the late 1980s and early 1990s and adopted as a standard in 1992. GSM uses a Time Division Multiple Access (TDMA) air interface, which was primarily

---

[1] *See* Wolfgang Groenen, "GSM and Beyond — Digital Cellular Mobile Technology on its way to Global Services," Nokia Appendix Exhibit ("NAE") 1.

<div align="center">

3

</div>

created by various European companies.   Although initially intended as a European

standard, GSM has expanded worldwide.

Qualcomm did not contribute in any way to GSM until eight years after it was first

adopted, and then only assisting with certain minor GSM refinements.   Yet, Qualcomm

now claims to have 390 GSM-essential patents[2] (representing far fewer patent families),

but has repeatedly failed to prove in court that it holds any valid patents that would

actually have to be practiced to implement the GSM standard.[3]

### 2.    The ETSI IPR Policy

ETSI's Intellectual Property Rights ("IPR") Policy aims to ensure that the

standards it creates, and the IPRs that could be infringed through implementing those

standards, are available to potential users.[4]   One of the express objectives of the ETSI

IPR Policy is:

---

[2] All data herein as to ownership of ETSI essential patents are from searches run on www.etsi.org on or about July 3, 2008.
[3] As this Court is aware, Qualcomm has filed eleven patent infringement actions against Nokia's GSM products since November 2005 based on its allegedly essential GSM patents, presumably based on the strongest of its purported GSM essential patents.  The first of those actions to reach trial, in the International Trade Commission, involved three patents that Qualcomm had declared essential to GSM.  The Commission found that Nokia's GSM handsets did not infringe any of the patents-in-suit, and that the asserted claims of one patent were invalid.  NAE 2 (Notice to the Parties in ITC Investigation 337-TA-578 dated 12/12/07); NAE 3 (Notice of Commission Decision not to Review Initial Determination in 337-TA-578 dated 2/27/08).  The second action, in the United Kingdom, involved two additional patents Qualcomm had declared essential to GSM.  The court ruled that both patents were invalid.  NAE 4 (2008-03-03 UK Judgment in Case No. HC 2006 C 02034 between Qualcomm Incorporated and Nokia Corporation, 2008 EWHC 329 (Pat)).  The remaining infringement actions have been stayed pending the conclusion of Phase 1 in this case, though Qualcomm has already withdrawn several such patents from litigation.
[4] NAE 5 (ETSI Rules of Procedure, Annex 6: ETSI Intellectual Property Rights Policy ("ETSI Rules")), Clause 3.1 at 33; NAE 127 (Tronchon Dep.) at 54:4-55:9.

> to reduce the risk to ETSI, MEMBERS, and others applying
> ETSI STANDARDS and TECHNICAL SPECIFICATIONS,
> that investment in the preparation, adoption and application of
> STANDARDS could be wasted as a result of an ESSENTIAL
> IPR for a STANDARD or TECHNICAL SPECIFICATION
> being unavailable.[5]

The ETSI IPR Policy requires that members timely disclose to ETSI any patents essential to the implementation of a standard and shortly commit to granting licenses to those patents on "fair, reasonable and non-discriminatory" ("FRAND") terms. ETSI IPR Rule 4.1 requires each ETSI member "to inform ETSI of ESSENTIAL IPRs in a timely fashion."[6] ETSI IPR Rule 6.1, in turn, requires the Director-General of ETSI to request that each IPR holder disclosing an essential patent voluntarily give "an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable, and non-discriminatory terms."[7] If an IPR holder declines to give such a FRAND undertaking, as it is entitled to do, ETSI IPR Rule 8.1 bars ETSI from going forward with the standard unless the unavailable patent can be designed around through "a viable alternative technology."[8]

When the ETSI IPR Policy was first proposed in early 1993, it also appended a 12-page detailed written undertaking, to be signed by all ETSI members, to commit to the

---

[5] NAE 5 (ETSI Rules), Clause 3.3 at 33; *see also id.* ¶ 1.1 at 43 ("The Policy is intended to ensure that IPRs are identified in sufficient time to avoid wasting effort on the elaboration of a Deliverable which could subsequently be blocked by an Essential IPR.").
[6] NAE 5 (ETSI Rules), Rule 4.1 at 33.
[7] *Id.*, Clause 6.1 at 33.
[8] *Id.*, Clause 8.1.1 at 34; *see* NAE 127 (Tronchon Dep.) at 66:10-69:10; NAE 111 ███████
████████████████████████ NAE 104 (Ali-Vehmas Dep.) at 143:24-145:16. ████

(footnote continued)

practical effects of the IPR Policy.[9]  Notably, that undertaking included prohibitions

against infringement actions during the pendency of good-faith negotiations (Clause 12),

and particularly against seeking an injunction as to patents that had been declared

essential (Clause 13).[10]  Although many objected to parts of this detailed undertaking,

such as the default of licensing IPR rather than voluntary FRAND licensing undertakings

for declared essential IPRs, there were no objections to Clause 12's prohibition against

infringement suits during negotiations, and very few objections to Clause 13 regarding

injunctions (and then to its extraterritorial effect),[11] and neither clause was changed in the

interim IPR Policy adopted with ETSI members' overwhelming approval in March

1993.[12]  After eighteen months of negotiations during which a vocal minority objected to

points of the detailed undertaking unrelated to injunctive relief,[13] ETSI eliminated the 12-

page written undertaking altogether.  As even Qualcomm's experts acknowledge that the

objections to the undertaking had nothing to do with these two sections,[14] however, they

are relevant in understanding what the industry believed followed from the ETSI IPR

policy.

---

████████████████████████████████ NAE 111 ███████████████████████
████████████████████

[9] NAE 6 (ETSI Intellectual Property Rights Policy and Undertaking dated 1/5/93).
[10] *Id.*
[11] NAE 7 (letter from Computer Business Equipment Manufacturers Association to ETSI dated 2/11/93).
[12] NAE 8 (Intellectual Property Rights Policy and Undertaking, approved 3/18/93; NAE 9 (Revised Minutes of the 15th ETSI General Assembly dated 6/21/93) at 23.
[13] NAE 10 (Proposed Alternative Course of Action on IPR dated 3/25/94).
[14] NAE 113 (Holleman Dep.) at 258:21-261:1; NAE 125 (Smoot Dep.) at 43:23-44:10.

### B.    Qualcomm's CDMAOne/IS-95 Technology

While ETSI was developing the GSM standard in the early 1990s, Qualcomm was focused on developing a separate, proprietary 2G standard, known as CDMAOne/IS-95, that used a variant of the Code Division Multiple Access (CDMA) air interface, which had been invented decades earlier and used by the military and in satellite technology.[15] The CDMAOne/IS-95 standard was commercialized in parts of North America in the early 1990s, with Qualcomm owning the vast majority of the patents.

In order to enable Nokia to gain access to the specifications of Qualcomm's closed and proprietary CDMAOne technology and to sell handsets to those United States carriers who used the CDMAOne/IS-95 standard, Nokia and Qualcomm agreed to the Subscriber Unit License Agreement ("1992 SULA") signed April 9, 1992.[16]  This agreement gave Nokia access to know-how involving Qualcomm's closed and proprietary CDMAOne technology as well as a license to make CDMA Subscriber Units under what would later be known as Qualcomm's ███████████ ─── ████████████ ████████████████████████  It provided that this license "shall be fully paid" in fifteen years upon payment of royalties ██████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

---

[15] NAE 114████████████████
[16] NAE 11 ("1992 SULA") ████████████████
[17] NAE 11 ("1992 SULA") ████████████████

**C.    The Development Of 3G Technology And The ETSI UMTS Standard**

Later in the 1990s, the industry began moving to a third generation (3G) of wireless technology that would improve transmission of data and media such as photographs, video, and music.  Nokia and others at ETSI (not including Qualcomm, who was not then a member of ETSI) began working in earnest on the 3G Universal Mobile Telecommunications System (UMTS) standard.[18]

From 1996 through 1998, ETSI evaluated air interfaces that could send data to cell phones and also be compatible with a GSM backbone.  At a June 1997 working group meeting, ETSI considered five options for UMTS's terrestrial radio access ("UTRA"): WTDMA, WCDMA, OFDMA, TD-CDMA and ODMA.[19]  Although WCDMA used the Code Division Multiple Access method of frequency-sharing that was also used in CDMAOne/IS-95, WCDMA was developed completely independently from CDMAOne/IS-95 and had very little in common with the air interface used in CDMAOne/IS-95.[20]

The ETSI working group concluded that each of these candidates for the air interface concept was technically viable and that none was technically superior to the others.[21]  In particular, Nokia researched WTDMA and determined it was a completely

---

[18] NAE 103 (Ahava Dep.) at 19:25-21:4.
[19] NAE 12 (Executive Summary, ETSI SMG #22 dated 6/9/97); NAE 103 (Ahava Dep.) at 23:13-24:22.
[20] NAE 35 (Rebuttal Report of J. Stevenson Kenney ("Kenney Rep.") at 6-8.
[21] Nokia shared this opinion.  NAE 121 (Ojanperä Dep.) at 242:1-244:3; NAE 116 (Lukander Dep.) at 145:8-17; NAE 103 (Ahava Dep.) at 34:22-35:13.

8

sufficient alternative to WCDMA.[22]  Nokia and others ultimately supported WCDMA, which had gained momentum in Asia, in particular due to the research done by the Japanese operators, as a way of furthering the goal of achieving a single global 3G standard.[23]  Many other companies favored TD-CDMA.[24]  At a plenary meeting in January 1998, ETSI members agreed on a compromise:  WCDMA would be used for paired UMTS frequency bands that were designed to be used together, and TD-CDMA would be used for unpaired frequency bands.[25]

### 1.    Qualcomm's Attempt To Block UMTS

During this evaluation process, ETSI asked all members whether they claimed to hold patents essential to proposals under consideration for UMTS and if so, whether they would commit to grant licenses to any such patents on FRAND terms.  Many companies, including Nokia, responded that they had patents that would be essential to the contemplated technologies and committed to license such patents on FRAND terms.[26]

Qualcomm, in contrast, informed ETSI that although it believed it had patents essential to both the WCDMA and the TD-CDMA air interfaces, it was still preparing an

---

[22] NAE 103 (Ahava Dep.) at 31:10-34:13.

[23] *Id.* at 30:11-31:23, 35:14-17, 46:4-47:14.

[24] NAE 13 (e-mail from Serge Willenegger to Ron Foerster et al. dated 12/5/97).

[25] NAE 14 (Executive Summary, ETSI SMG #24 dated 1/28/98) ("SMG 24 Exec. Summary") at NOKIA-DEL 0089681, 0089757.

[26] In particular, in December 1997, Nokia responded to ETSI's request by stating that, with respect to WCDMA, it was "prepared to grant under its respective essential IPRs licenses/cross licenses (subject to reciprocity) on a fair, reasonable and non discriminatory basis (in accordance with ETSI's IPR Policy, Clause 6.1)."  NAE 15 (Nokia Letter to ETSI on WCDMA IPR dated 12/3/97).

IPR position.[27]  After WCDMA as a concept was initially selected, Qualcomm informed ETSI that it would *not* make license its supposedly essential patents on FRAND terms unless ETSI agreed to change the WCDMA air interface to be compatible with Qualcomm's effectively proprietary CDMA2000 standard.[28]

Qualcomm's proposal was not well received:  ETSI members complained that Qualcomm was improperly blocking the standard.[29]  ETSI itself wrote to Qualcomm and said that Qualcomm's response was improper because "Article 6.1 of the ETSI Rules of Procedure does not provide for the possibility to give an undertaking to grant licenses on [FRAND] terms subject to fulfillment of other conditions than the ones specified."[30] ETSI met to determine if the standard could be implemented without any Qualcomm IPR,[31] and industry members held a meeting in conjunction with the ITU in Kuala

---

[27] NAE 16 (letter from Steve Altman to K.H. Rosenbrock dated 12/29/97); NAE 14 (SMG 24 Exec. Summary).

[28] *See, e.g.*, NAE 17 (status report on IPR Position of Qualcomm presented at ETSI SMG #25 dated 3/16/98); NAE 18 (letter from Harvey White to K.H. Rosenbrock dated 4/20/98, notifying ETSI that it will not license its essential patents under Article 6.1 if WCDMA is not "compatible with existing GSM and TIA/EI-41 networks, including CDMAOne"); NAE 19 (letter from Steve Altman to K.H. Rosenbrock dated 6/2/98).

[29] NAE 21 (letter from Presidents of Nokia, Ericsson, and Siemens to K.H. Rosenbrock objecting to Qualcomm's attempt to leverage its refusal to give a FRAND commitment into CDMAOne/IS-95 convergence with WCDMA dated 4/27/98); NAE 112 (Foerster Dep.) at 103:20-106:24, 145:23-146:10; NAE 114 (I. Jacobs Dep.) at 140:24-141:5; NAE 119 (Lupin 6/13/08 Dep.) at 24:20-25:7; NAE 103 (Ahava Dep.) at 91:7-92:2, 93:4-94:15, 96:5-20.

[30] NAE 20 (letter from K.H. Rosenbrock to Harvey White dated 5/7/98).

[31] NAE 22 (ETSI Board No. 16, Temp. Doc. 30 dated 12/11/98).

Lumpur to consider possible courses of action.[32]  Qualcomm was well aware of ETSI's concerns.[33]

### 2.     The Qualcomm-Ericsson Litigation

During this same time, Ericsson sued Qualcomm for infringement of patents it claimed were essential to the CDMAOne/IS-95 and CDMA2000 standards.  In response to Ericsson's claims, Qualcomm argued a position virtually identical to the one Nokia's claims in this case.  Specifically, Qualcomm argued that it had relied upon Ericsson's 1995 undertaking to the Telecommunications Industry Association ("TIA," a US-based SSO) to license patents essential to the IS-95 standard on reasonable and non-discriminatory ("RAND") terms,[34] that such commitments "ensures that all industry participants will be able to develop, manufacture and sell products compliant with the relevant standard without incurring the risk that patent holders will be able to shut down those operations,"[35] by making committing to RAND licensing, Ericsson had granted to Qualcomm and other manufacturers an "implied license" to practice the patents Ericsson claimed were essential to the standard,[36] that Ericsson's remedies were limited to recovering RAND compensation, and that Ericsson was estopped from obtaining any

---

[32] NAE 141 (ITU Addendum 5 to Circular Letter dated 1/13/99) at 2.

[33] NAE 119 (Lupin 6/13/08 Dep.) at 102:15-103:15, NAE 111 (Epstein Dep.) at 40:6-19, 41:3-17.

[34] *See* NAE 23 (Qualcomm's Motion for Partial Summary Judgment To Limit Ericsson's Requested Relief for the Alleged Infringement of the Patents-in-Suit, *Ericsson Inc. et al. v. Qualcomm Inc.*, Civil Action No. 2-06-CV183 (E.D. Tex.) filed 10/6/98) ("Qualcomm/Ericsson MSJ").

[35] *Id.* at 4.

[36] *Id.* at 17.

injunctive relief.[37]   Moreover, Qualcomm argued it was entitled to rely on this RAND commitment even though Qualcomm continued to challenge essentiality, infringement and validity of those patents.[38]

### 3.   Qualcomm's 1999 FRAND Commitment And ETSI Declarations

In March 1999, weeks after claiming that Ericsson's RAND commitments limited Ericsson to royalties and precluded injunctions, Qualcomm and Ericsson reached a settlement whereby both parties agreed to license their standard-essential patents on FRAND terms.[39]   Shortly thereafter, Qualcomm provided ETSI with a letter stating that:

> As a result of these [settlement] agreements, Qualcomm and Ericsson have agreed to jointly support approval by ETSI of a single CDMA third generation that encompasses three optional modes of operation.   Qualcomm hereby commits to the European Telecommunications Standards Institute to license its essential patents for such single CDMA standard or any of its modes on a fair and reasonable basis free from unfair discrimination.[40]

Based on Qualcomm's representation, ETSI finalized the UMTS standard with WCDMA as the air interface technology.[41]

---

[37] *Id.* at 11-16; *see id.* at 14 (arguing that Ericsson's undertaking "led Qualcomm to reasonably infer that it could practice the IS-95 standard without fear that Ericsson would seek to enjoin its activities").

[38] *Id.* at 4, 20.

[39] NAE 24 (Qualcomm Press Release dated 3/25/99); NAE 119 (Lupin 6/13/08 Dep.) at 97:16-98:8, 102:15-103:15, NAE 114 (I. Jacobs Dep.) at 180:20-181:2; 184:23-185:7.

[40] NAE 25 (letter from Louis Lupin to K.H. Rosenbrock dated 6/25/99); *see also* NAE 117 (Lupin 12/22/2006 Dep.) at 34-23:36:9, 40:22-41:2.

[41] NAE 26 (e-mail from Edward Tiedemann to Colin Chandler et al. dated 5/5/99); NAE 103 (Ahava Dep.) at 144:21-145:5 ("[T]his [Qualcomm's licensing commitment] will open the blockage in the ITU and the standardization of CDMA and WCDMA can continue").

Over the next few years, IPR holders declared individual patents essential to that standard under ETSI Rule 4.1 and voluntarily undertook to license on FRAND terms pursuant to ETSI Rule 6.1. Qualcomm first declared a patent as essential to the UMTS standard in September 2001,[42] and between 2004 and today has made 907 written patent-specific undertakings to ETSI committing to license UMTS patents on FRAND terms. At least 50 other companies also have submitted to ETSI declarations of essentiality and FRAND undertakings as to the UMTS standard.[43] Nokia has identified approximately 1,500 patents as essential to the UMTS standard and has provided FRAND undertakings with respect to each.

**D.    The Amendment Of The SULA In 2001**

Also during the late 1990s, both Nokia and Qualcomm obtained patents with priority dates after ██████████ Qualcomm told Nokia that Nokia needed to agree to license terms for these newer patents to make or sell handsets that functioned in any CDMA- or WCDMA-based system. In May 1998, at the same time Qualcomm was opposing the UMTS standard under development, Qualcomm proposed an amendment to the 1992 SULA that would expand the agreement to include Qualcomm's ██████████ ███████████████████████

---

[42] NAE 27 (ETSI IPR Information Statement and Licensing Declaration Forms).
[43] NAE 28 (Fairfield Resources International, Analysis of Patents Declared Essential to WCDMA study dated 11/21/07) at NOKIA-DEL 0943662; *see also* NAE 29 (PA Consulting Report: Essential Intellectual Property in 3GPP-FDD).
[44] NAE 30 ███████████████████████

13

In November 1998, after further negotiation,[45] Qualcomm sent a revised draft of

the amended and restated 1992 SULA to Nokia. This draft, ███████████████████



██████████████ In that draft, ████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ This agreement

was to apply to all patents for UMTS products, including ███████████████████

The deal was so close to being executed that the parties began negotiating the details of a

joint press release about the conclusion of an amended and restated SULA.

### 1.   Qualcomm's Changed Negotiation Position

But soon after making this offer, Qualcomm unexpectedly withdrew from the

already negotiated precise terms, ██████████████████████ Nokia later learned

---

[46] NAE 32 ██████████████████████████████

that such unexpected change of heart likely coincided with a breakthrough in the negotiations between Ericsson and Qualcomm. After the March 1999 Qualcomm - Ericsson settlement, Qualcomm demanded ███████████████████████████ ████████████████████████████████████ despite the fact that, in the meantime, it had publicly committed to FRAND in relation to UMTS. After ETSI and the International Telecommunications Union ("ITU") formally adopted UMTS in November 1999, Qualcomm further hardened its negotiating position after having offered somewhat lower rates in late 1999 ███████████████ Leveraging the hold-up value of its purported UMTS essential patents, Qualcomm insisted that the old rate originally set for its proprietary CDMAOne/IS-95 standard should apply to UMTS too.

The Subscriber Unit and Infrastructure Equipment License Agreement ultimately signed by the parties on July 2, 2001 ("2001 SULA"), constituted an "amended and restated" 1992 SULA and █████████████████████████████████████ ███████████████████████████████████████████████ 1992 SULA's requirement that Nokia pay ████████ royalties until April 2007, at which time Nokia would have a paid-up and royalty-free license to the ████████ .[49] The 2001 SULA contained no agreement, however, on any handset royalty that Nokia should pay for Qualcomm's ██████████████ or on the appropriate royalty that

---

[47] *Id.* at 12-13.
[48] NAE 123 █████████████████████████
[49] NAE 36 ("2001 SULA") § 4.2.1.

███████████████████████████████████████████████████

██████████████████████████

     Instead, the parties agreed only to a temporary truce until April 10, 2007 whereby

███████████████████████████████████████████████████

████████████████████████████████ were intended to maintain peace for the

remaining term of the 1992 SULA, by which time the parties' disagreement as to the

applicability of each party's portfolio to the other's 3G products — and the consequent

disagreement over the value of their portfolios — might be resolved.[52]  The 2001 SULA

---

[50] NAE 119█████████████████████ NAE 106███████████████
NAE 123 Rahnasto 6/5/08 Dep.) at 264:7-266:9.
[51] NAE 36 (2001 SULA) §§ 6.1.1, 6.2.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████ NAE 42 █████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

*See* NAE 106█████████████████

16

also allowed Nokia to collect royalties for its patents used in Qualcomm chipsets from Qualcomm's chipset customers.[53]

### 2. The Options In The 2001 SULA

The 2001 SULA also contains a clause, ▮▮▮▮▮▮▮ providing that, between April 10, 2007 and December 31, 2008, Nokia could exercise an option, *in writing*, to obtain a license to Qualcomm's ▮▮▮▮▮ through 2022, and/or to Qualcomm's ▮▮▮ ▮▮▮ through 2013, at the same royalty rates that Nokia had paid for Qualcomm's ▮▮▮ under the 1992 and 2001 SULAs:



If Nokia elected either option, then Nokia's covenant not to assert its patents against Qualcomm and any obligations concerning customers would also be extended.[55] Nokia has never elected either option.

---

[53] *See* NAE 36 (2001 SULA) § 6.2.
[54] *Id.* § 4.4.6 (emphasis added).

### E.   The Parties' Dealings Following The 2001 SULA

In the years after execution of the 2001 SULA, Qualcomm continually tried to limit Nokia's rights under the SULA and expand its own. ███████████

███████████████████████████████████████████████

███████████████████████████████████████ Beginning in the fall of 2004, ███████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

Facing those onerous terms, Nokia sought to transfer its CDMA2000 manufacturing business to a joint venture with Sanyo, which would have had the right to purchase chipsets already by virtue of Sanyo's agreements with Qualcomm. ████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

───────────────

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

[56] NAE 129 (Kauppi Dep.) at 130:17-131:17.
[57] *Id.* at 138:25-140:3
[58] NAE 44 ███████████████████████████ BREW is a technology enhancement used in many CDMA2000 handsets. Some operators will not support CDMA2000 handsets unless they include BREW capability.

Nokia then explored purchasing CDMA2000 handsets from an ODM (original device manufacturer) for sale under Nokia's brand.  Rather than accede to Qualcomm's demands, Nokia chose to greatly limit its sales of CDMA and CDMA2000 phones at the loss of considerable investment.[60]

In addition to Qualcomm's interference with Nokia's CDMA2000 business that ultimately succeeded in driving out Nokia as a significant player in the CDMA2000 handset business, Qualcomm has also prevented Nokia from collecting royalties from Qualcomm's chipset customers.

---

[59] NAE 45 █████████
[60] NAE 46 (Nokia press release dated 6/22/06).  *See* NAE 47 (Bank of America analyst report "Nokia/Sanyo Cancel JV" dated 6/22/2006) at 2 ("the company expects a restructuring charge of EUR 150M in 3Q06")).  Nokia's reduced sales of CDMA2000 handsets also had the collateral effect of increasing the effective royalty rate that Nokia paid on UMTS handsets under the 2001 SULA.  According to the terms of the 2001 SULA, ███████████████ NAE 36 (2001 SULA) § 1. Because Nokia's CDMA phones have historically been cheaper on average than its UMTS phones, reduced sales of CDMA phones increased Nokia's royalty base for UMTS phones.
[61] Altman Ex. 1 (2001 SULA)

19

As April 9, 2007 approached, ███████████████████████
███████████ the parties once again entered negotiations for royalties to Nokia and Qualcomm's patents, except those subject to Nokia's paid-up handset license. Qualcomm has never indicated which of its UMTS-essential patents it believes Nokia infringes (despite repeated requests from Nokia),[62] nor proposed FRAND terms or conditions of any specific essential patent or even its specified essential patents for any ETSI standard.  Moreover, Qualcomm's proposals ██████████████████████



███████

One should note that even if Nokia were to exercise either of the options (which it has not done),███████████████████████████████████

███████ Moreover, the 2001 SULA█████████████████████████

_____

[62] At this Court's insistence, Qualcomm provided a list of 17 patents it claimed were truly essential.   Although without claim charts and analysis of products (not to mention claim construction) a final conclusion is impossible, it is worth noting that Professors Goodman and Myers examined eight of these 17 (looking only at essentiality, and not validity) and found that six of the eight were not truly essential to any part of the UMTS standard.  Goodman and Myers did not review the validity of the patents.  NAE 53 (Fairfield Resources International Center 3GPP Spreadsheet attached to Goodman & Myers Essentiality study).
[63] NAE 54 █████████████████████████████████████ NAE 106
NAE 109███████████████ NAE 55████████████████

20

[REDACTED]

**F.   Nokia's FRAND Offers**

In contrast to Qualcomm's refusal to provide FRAND terms for its essential patents, Nokia has proposed unbundled terms for Nokia's essential UMTS, GSM and CDMA2000 patents as well as identified the patents covered by its offer with precise patent identification data.[64]   On June 20, 2007, Nokia proposed [REDACTED]

[REDACTED]   As to Nokia's CDMA patents, [REDACTED]

[REDACTED]

Nokia later provided Qualcomm with yet another, even lower proposal for Nokia's CDMA and GSM/UMTS essential patents [REDACTED]

[REDACTED]

---

[64] NAE 61 [REDACTED]

[65] *Id.* at [REDACTED]

[66] *Id.* at [REDACTED]   Nokia calculated these royalty rates by estimating the proportion of essential patents owned by Nokia out of the total number of patents that IPR holders have claimed to be essential to the standard, factoring in what Nokia believes to be a sustainable cumulative royalty cost for all the patents in those standards.

21



### G.   Nokia's Non-Exercise Of The SULA Options

Nokia wrote Qualcomm before and after April 9, 2007, that it was *not* electing at that time to exercise either of the ████████████ options under SULA §4.4.6.[68] Qualcomm responded on April 11, 2007, stating its view that Nokia had elected the options by conduct[69] — a view that Nokia stated was precluded by the SULA's plain text.



---

[67] NAE 62 ████████████████████████

[68] NAE 63 ████████████████████

[69] NAE 64 ████████████████████

[70] NAE  65 ████████████████████████

████████████████████████

NAE 129 ████████

22

## **ARGUMENT**

**I.     SINCE APRIL 10, 2007, NOKIA HAS NOT HAD AND CANNOT HAVE BREACHED ANY ROYALTY** ███████████ **OBLIGATIONS TO QUALCOMM** ███████████████████████████
███████

From 1992 to 2007, Nokia paid Qualcomm ████████████████████
███████████████████████under the terms of the 1992 and 2001 SULAs.

By the SULA's express language, Nokia's license to these ███████ became fully

paid-up and royalty-free on April 10, 2007.[71]  In contrast, Nokia has *never* had an

obligation under the SULA to pay handset royalties on Qualcomm's ███████████

███████

Unlike the ███████ Qualcomm's ██████████████████

█████████████████████████████████████████

█████████████████████████████ Since that date, Nokia has not

owed Qualcomm any SULA handset royalties on the ████████████ and will not

owe Qualcomm any SULA handset royalties unless and until it expressly elects one of

the options ██████████████████ Nokia also does not have any remaining

---

[71] NAE 102 ██████████████████████████ *see* NAE 11 ██████████
███████████████████████████████████ NAE 36 █████████
██████████████████████

[72] *See* NAE 36 (2001 SULA) ██████████
█████████████████████████████████████████████
█████████████████████████████████████████████

[73] ██████████████████████████████████████████
████████████ NAE 36. ████████████████████████████
█████████████████████████████████████████████

(footnote continued)

23

███████████████████████████████████████████

Qualcomm contends nonetheless that Nokia has somehow elected the SULA options by conduct, or in the alternative that Nokia has interim obligations under the SULA to make royalty payments to Qualcomm during the period the options remain open between April 9, 2007 and December 31, 2008. Qualcomm contends further that it is entitled to terminate the SULA for nonpayment and that Nokia should forfeit even its paid-up license to the ███████ as a result and that Nokia has likewise ██████ ████████████████████████████ As the evidence will show, each of these assertions is meritless.[75]

### A.   Nokia Cannot And Has Not "Impliedly Elected" The SULA Options

It is undisputed that Nokia has never provided Qualcomm with any *written* notice that it was electing either of the options set forth in SULA ████████ Instead, Nokia has repeatedly stated to Qualcomm, both before and after April 9, 2007, that it is not exercising the option. Qualcomm nonetheless claims that Nokia "impliedly elected" one of the options by supposedly "using" some unidentified Qualcomm ██████████

---

[74] ████████████████████████████████████████
████████████████████████

[75] Accordingly, the Court should grant Nokia the relief requested in Nokia Claims 6, 7 and 11, and should deny Qualcomm the relief sought in Qualcomm Counterclaims 7-12 (to the extent that those claims are within the scope of Phase 1).

[76] *See* NAE 102 ████████████████████

██████after April 9, 2007.   But Nokia's continued manufacture and sale of those handsets after April 9, 2007 cannot be deemed an "implied election" of either option, for numerous independent reasons.

### 1.   The Text Of The SULA Precludes Implied Election Of The Options

The SULA options provision states that Nokia may elect either option only "by providing written notice to Qualcomm."[77]  ██████ of the SULA, moreover, requires that *all* notices between the parties be in writing.[78]  Qualcomm may not unilaterally waive either writing requirement.  The SULA is governed by California law, which holds that a party may waive only those "provisions placed in a contract *solely* for his benefit." *Doryon v. Salant*, 75 Cal. App. 3d 706, 712 (2d Dist. 1977) (collecting cases) (emphasis added).  Neither of the SULA in-writing requirements fits this exception.

To determine which party was meant to benefit from a contractual provision, California law asks which party logically would have had an interest in the provision when the contract was entered into. [79]  Under this approach, it is clear that the writing requirements were *not* for Qualcomm's sole benefit.  Rather, Nokia naturally had a strong interest in the ██████ writing requirement, which gave clarity to the parties and

---

[77] NAE 36 (2001 SULA) § 4.4.6; NAE 106█████████████████████
[78] NAE 36 § 20 ("All notices, requests, demands and other communications required or permitted to be given under this Agreement shall be in writing.").
[79] *See, e.g., Doryon*, 75 Cal. App. 3d at 711-12 (reasoning that a contract provision conditioning real estate sale on purchasers' ability to obtain financing was for purchasers' sole benefit, because sellers "would have had no complaint if [purchasers] had elected to forgo financing altogether and to pay the purchase price with their own cash"); *Knarston v. Manhattan Life Ins. Co.*, 140 Cal. 57, 62-63 (Cal. 1903) (reasoning that a contract provision requiring timely (footnote continued)

would foreclose disputes over whether and when Nokia had exercised one of its options. At a minimum, ███████ benefits *both* parties by preventing confusion and uncertainty over when the options may be elected.[80] Moreover, the ██████ writing requirement, by its very terms, imposes equal conditions on Nokia and Qualcomm, and therefore is waivable by neither.

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████   ████████████████████
███████████████████████████████████████
████████

---

payment of insurance premiums was for sole benefit of insurance company, because "they alone were interested" in ensuring timely payment).

[80] *See Jaffe v. Paramount Commc'ns, Inc.*, 222 A.D.2d 17, 22 (N.Y. App. Div. 1996) (writing requirement was intended for the benefit of both parties because it "promoted clarity of rights and avoided litigation by limiting occasions for disputes based upon misunderstandings"); *715 Spencer Corp. v. City Envtl. Servs., Inc.*, 80 F. Supp. 2d 755, 762 (N.D. Ohio 1999) (writing requirement was intended for the benefit of option-holder and option-grantor because it protected both parties against unsupported allegations that the option was exercised).

[81] NAE 102████████████████████ *see* NAE 106████████████████

[82] *See* NAE 106█████████████████████████████████
██████████████ NAE 102 ██████████████████████

26

An additional textual basis that negates the possibility of implied election is the portion of ███████████ that grants Nokia a twenty-month period, from April 9, 2007 to December 31, 2008, to decide whether to elect either option.[83] It would render this provision meaningless if Nokia's only choice during this period —— as Qualcomm suggests — was to suspend all of its UMTS manufacturing and sales operations on April 10, 2007 and resume them if, and only if, Nokia elected to exercise the option in writing. Under Qualcomm's theory, Nokia could not use this twenty-month period, for which it had expressly negotiated, to evaluate its options or to elect not to exercise.

By contrast, Qualcomm cannot derive any textual support for its implied election theory from the 2001 SULA provisions ████████████████████████ ███████████████     It is far-fetched to read this ████████████████████ consideration for Nokia's implied assent to pay the same high rates on the █████████ ████████     Qualcomm received other benefits in the 2001 SULA ████████████

████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

███████████████████████     The importance of this ████████████████████████
████████████████████████████████     ████████████████████████████

---

[83] NAE 36 (2001 SULA)
[84] NAE 36 (2001 SULA)███████
[85] NAE 118████████████████████

27



[86] In sum, the plain text of ▮▮▮▮▮▮

negates any implied election of the options, and no other provision of the SULA's text

provides any basis for Qualcomm's new interpretation.

> **2.  Extrinsic Evidence Of The Parties' Course Of Dealing Likewise Negates Any Implied Election Of The Options**

> **(a)  Qualcomm's Conduct During The SULA Negotiations**

Like the plain text of the SULA, the parol evidence surrounding the SULA

negotiations negates any inference that the parties intended or understood that the SULA

options could be exercised by conduct as opposed to written expression.  During the 2001

SULA negotiations, Qualcomm never informed Nokia that it would consider Nokia's

manufacture of handsets after April 9, 2007 to be an implied exercise of either of the

options.[87] ▮▮▮▮▮▮▮▮▮▮

---

[86] *See* NAE 114 ▮▮▮▮▮▮

[87] NAE 106 ▮▮▮▮▮▮



**(b)** **Qualcomm's Post-SULA Conduct**

Qualcomm's dealings with Nokia after the SULA was executed likewise contradict any intent of the parties to consider the SULA license options capable of implied exercise. "A party's conduct subsequent to the formation of a contract may be looked upon to determine the meaning of disputed contractual terms." *Cedars-Sinai Med. Ctr. v. Shewry*, 137 Cal. App. 4th 964, 983 (Cal. Ct. App.). More specifically, "the practical interpretation of the contract by one party, evidenced by his words or acts, can be used against him on behalf of the other party." *S. Cal. Edison Co. v. Superior Court*, 37 Cal. App. 4th 839, 851 (Cal. Ct. App. 1995). Here, the practical construction of the SULA, as evinced by Qualcomm principals' repeated statements between July 2001 and April 2007, was that any accused practice by Nokia of Qualcomm's Later and Other patents after April 9, 2007, would be treated as unlicensed and would give rise to patent

---



[88] NAE 110

[89] NAE 114
[90] NAE 106                              ] NAE 119

infringement litigation, not that such accused practice would impliedly exercise either of the SULA options.

For example, 

Mr. Altman did not say that Nokia had a third choice to decline to exercise the options but nonetheless to acquire a license by mere conduct.[92]  To the contrary, he told the investor community a year later that, if Nokia did not exercise the options but continued manufacturing handsets without paying royalties to Qualcomm, Qualcomm would sue Nokia for patent infringement,[93] not treat it as licensed through implied exercise of the options.

Similarly, a 2005 proposed term sheet



---

[91] NAE 66

[92] NAE 106                     at 142:11-143:13

                                                *See, e.g., id.*

NAE 102                         NAE 119

[93] NAE 67 (Final Transcript of Qualcomm Investor Day dated 11/13/06) ("London Investor Day")                    NAE 106



made it

clear that both sides anticipated the possibility of infringement litigation,[97] which is

fundamentally inconsistent with Qualcomm's implied exercise by conduct theory.

Numerous public statements by Qualcomm likewise contradict any implied

election theory. Qualcomm CEO Paul Jacobs stated in an investor call on November 13,

2006, that: "The 2008 date is the date is the date by which *they have to elect* whether or

not to exercise the extension."[98]   And in the months and years leading up to April 9,

2007, Qualcomm executives routinely stated that Nokia would be "*unlicensed*" and

"*infringing*" Qualcomm's patents after that date — *not* that they would be licensed

through some automatic exercise of the options.   For example, in Qualcomm's Q3

earnings conference call on July 19, 2006, Qualcomm President Steve Altman stated that:

---

[94] NAE 68
[95] NAE 69
[96] NAE 102
[97] *Id.*; NAE 106                                         NAE 42
                        NAE 115                           NAE 105
[98] NAE 67 (London Investor Day)

"I think that once we get past April 9, if there's no agreement, they will be infringing our patents."[99]

Indeed, Qualcomm executives *never* mentioned the "implied election" theory, to Nokia or the general public, at any point before it filed its arbitration demand on April 7, 2007.



[101]

Nor did Qualcomm disclose this newly minted "exercise by use" theory to Nokia even then. To the contrary, Qualcomm continued to make public statements threatening to sue Nokia for patent infringement, contradicting any theory that Nokia was licensed by implied exercise of the options. Not until the eve of its Los Angeles arbitration demand

---

[99] NAE 70 (Qualcomm's 3rd Quarter 2006 Earnings Call Final Transcript dated 7/19/06) at 12. Similarly, in Qualcomm's Q1 Earnings Conference Call, Steve Altman stated that: "If Nokia does not exercise its Option by the April deadline, then we will have 140 companies licensed under our intellectual property and paying us royalties and we will have one company, Nokia, that [is] *unlicensed and infringing*." NAE 71 (Earnings Call Final Transcript) at NOKIA-OA000007239 (emphasis added). And in Qualcomm's January 24, 2007 press release, the company stated: "We intend to pursue and obtain injunctions against Nokia's sales as well as damages (which will include interest from the date of infringement) for Nokia's *unlicensed* sales after April 9, 2007." NAE 72 at 3 (emphasis added); NAE 73.

[100] NAE 106

[101] *Id.* at

[102] NAE 102

32

against Nokia did Qualcomm first disclose the "exercise by use" theory that it had invented in late 2006.[103] In short, Qualcomm's late creation and continued concealment of its exercise by conduct theory undercuts any effort to ascribe such a theory to the parties' intentions in entering into the 2001 SULA.

### 3. No Reasonable Practical Basis Exists To Impute To Nokia Acceptance Of The SULA Options

Even beyond the text of the SULA options provision and the extrinsic evidence of the parties' interpretation of that provision, which plainly preclude any finding that Nokia could exercise the SULA options by conduct, there is also no reasonable basis to attribute any such implied exercise here. To be sure, under some circumstances, "a reasonable . . . mode of acceptance may be implied." *Allen v. Smith*, 94 Cal. App. 4th 1270, 1281 (Cal. Ct. App.). But a party's actions may constitute acceptance only if a "reasonable person" would have thought they signified acceptance. *See Guzman v. Visalia Cmty. Bank*, 71 Cal. App. 4th 1370, 1376-77 (Cal. Ct. App. 1999). And it would be unreasonable to infer that Nokia "impliedly elected" the options merely by continuing to manufacture and sell handsets after April 9, 2007, for at least two reasons.

First, when a party has a separate, non-option right to use offered property, using that property does not constitute implied election of the option. *See Warner Bros. Theatres v. Proffitt*, 198 A. 56 (Pa. 1938) (holding that, when a defendant had the right to purchase property through an option and a separate right to take the property through

---

[103] *See id.* ██████████████████████████████
████████ NAE 115 ██████████████████████

foreclosure, the defendant's taking of the property through foreclosure did not constitute implied acceptance of the option price); *accord* CORBIN ON CONTRACTS §11.16 n.3 (1996).

Nokia enjoys such a separate, non-option right here. Independent of the SULA options, by virtue of Qualcomm's FRAND undertakings to ETSI, Nokia is entitled to implement ETSI UMTS and GSM standards so long as it compensates Qualcomm on FRAND terms if it infringes any of Qualcomm's actually valid and essential patents. *See* Part II, *infra.* Nokia thus has a lawful basis to continue to manufacture its standard-compliant handsets without electing the SULA options. Given Nokia's independent right to use the patents, Professor Williston's "shopkeeper" hypothetical, quoted in *Desny v. Wilder*, 46 Cal. 2d 715 (Cal. 1953), is inapposite. The Williston hypothetical states that a buyer who goes into a shop, takes an item, and leaves only a fraction of the shopkeeper's stated price may be held to have impliedly accepted the stated price for that item. But this hypothetical naturally assumes a buyer who has no independent right to the item.[104] By contrast, Nokia has an independent, non-SULA basis to manufacture handsets that implement ETSI standards, notwithstanding patents that IPR holders may contend read onto that standard. In any event, even the Williston hypothetical would not entail that, if a shopkeeper holds a "going out of business" sale and offers his entire inventory for one

---

[104] *Desny*, 46 Cal. 2d at 736 (quoting Professor Williston) ("The parties may be bound by the terms of an offer even though the offeree expressly indicated dissent, *provided his action could only lawfully mean assent*. A buyer who goes into a shop and asks and is [told] the price of an article, cannot take it and say 'I decline to pay the price you ask, but will take it at its fair value.' (footnote continued)

fixed price, one who takes a single item implicitly agrees to pay for the entire store inventory, as Qualcomm's "SULA is FRAND" theory suggests.

Qualcomm's interpretation should also be rejected as unreasonable because such a theory would leave Nokia with no choice (or option) at all. If Qualcomm's claims to essential patents are to be believed, Nokia would literally have had to *shut down its business* through December 31, 2008 to avoid the risk of "impliedly electing" the options.

### B. Nokia Has No "Interim Obligations" Under The SULA During The Option Period

As an alternative to its "implied election" claim, Qualcomm claims that Nokia must pay SULA handset royalties on the ███████████ ███████████. But, like Qualcomm's "implied election" theory, this "interim obligations" theory is foreclosed by the SULA's plain language. As discussed above, the SULA requires handset royalty payments only for ███████████ a category to which the ███████ ███████ do not belong *unless and until Nokia elects an option* under ███████ Because Nokia has *not* elected either option, it has no present handset royalty obligations on the ███████████ irrespective of Nokia's right to elect either option in the future.

Qualcomm's own pre-litigation statements again confirm what the SULA's plain language says: unless and until Nokia elects either option, Nokia has no SULA royalty or

---

He will be liable, if the seller elects to hold him so liable, not simply as a converter for the fair value of the property, but as a buyer for the stated price." (emphasis added)).

non-assert obligations after April 9th, 2007.  For instance, Qualcomm's 10-Q for the period ending March 26, 2006 stated:  "[A]fter April 9, 2007, unless and until the existing agreement is extended or a new agreement is concluded, Nokia's right to sell subscriber products under most of our patents (including many that we have declared as essential to CDMA, WCDMA and other standards) and therefore Nokia's obligation to pay royalties to us will both cease under terms of the current agreement."[105]  Similarly, at Qualcomm's November 13, 2006 London Investor Day, Qualcomm General Counsel Louis Lupin stated that, after April 9, 2007, "Nokia's obligations to pay royalties would cease unless or until they exercised the option."[106]  Asked by an analyst, "if you guys engaged in litigation post-April 2007, would the option survive that?" Mr. Lupin responded that, "as long as Nokia continues to comply with the terms and conditions that survive this partial expiration in April 2007, *then yes, the option continues and is exercisable by Nokia through the end of 2008.*"[107]

Nor is Qualcomm's "interim obligations" claim supported by the SULA's implied covenant of good faith and fair dealing.  Under California law, this implied covenant cannot bar actions that are authorized by express contract provisions.[108]  Since the SULA expressly authorizes Nokia to cease handset royalty payments on the █████████████

---

[105] NAE 73 (Qualcomm 10-Q for period ending 3/26/2006 filed with SEC 4/19/2006) at 34; *see also* NAE 115█
[106] NAE 67 (London Investor Day) at QSUL00048157.
[107] *See id.*█████████████
[108] *See Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (Cal. 1992) ("[a]s to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct") (quoting *Wal-Noon Corp. v. Hill*, 45 Cal. App. 3d 605, 613 (3d Dist. 1975)).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ and imposes no handset royalty obligations for the ▮▮▮▮▮▮▮▮▮▮ unless and until Nokia elects either option ▮▮▮▮▮▮▮▮ by December 31, 2008,[109] the implied covenant cannot bar Nokia from taking all these actions. Nor can the implied covenant forbid actions within the parties' reasonable expectations,[110] as these actions were, even according to Qualcomm's own statements.

Nor is Nokia obliged to make SULA handset royalty payments throughout the *entire* interim period merely because the SULA options contain no express provision for Qualcomm to collect back payments from April 9, 2007. Should Nokia elect the options, it will then simply pay Qualcomm SULA royalties on its handset sales subsequent to April 9, 2007. Such an implied obligation would not contradict the SULA's plain language: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ Such a result would also conform with the parties' expectations when they signed the SULA. Nokia's SULA negotiator Ilkka Rahnasto testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[109] NAE 36 (2001 SULA) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
(emphasis added)).
[110] *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 351-52 (Cal. 2000); *Chateau Chamberay Homeowner's Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 346 (Cal. Ct. App. 2001).



**C.    The Provisions Relating To** ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇ **Have Expired**

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ This
provision was expressly coterminous with ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇ This is unsurprising, as these provisions were intended to ▇▇▇▇▇▇▇

---

[111] NAE 36 ▇▇▇▇▇
[112] NAE 123 ▇▇▇▇▇▇▇▇▇▇▇▇
[113] NAE 36 ▇▇▇
[114] *See id.* ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

(footnote continued)



**D.   Nokia Has Not Breached Its SULA Obligations And Cannot Be Made To Forfeit Its Fully Paid-Up License To Qualcomm's Early Patents**

Qualcomm's pleadings allege that Nokia has breached the SULA by (1) withholding royalty payments after April 9, 2007; ████████████████████

████████████████████████████████████████

████████████████████████████ and (5) relying on its rights to implement ETSI standards to which Qualcomm has declared essential patents.[115]   The first three allegations fail because, as explained above, Nokia's royalty obligations for Qualcomm's ████████ ended on April 9, 2007,[116] ████████

████████████████████████████████████████

████████████████████████████ The fourth allegation is outside the scope of Phase 1 pursuant to agreement between the parties (and anyway is

████████████████████████████████████

[115] *See* NAE 142 (Qualcomm's Answer, Affirmative Defenses and Second Amended Counterclaims dated March 19, 2008) at ¶ 224.
[116] Qualcomm understood as much; in its 10-Q for the period ending March 26, 2006, Qualcomm stated that "Nokia's rights to sell subscriber products under *most* of our patents," would expire in the event the SULA was not extended, thereby carving out Nokia's right to sell under the paid-up license as a right that would not expire on April 9, 2007.  NAE 115 ████████████
████████ (Qualcomm 10-Q for period ending 3/26/06) at 34 (emphasis added).

foreclosed by the facts and the law).[117] And the fifth is in error for the reasons set forth below in Part II.

Because Nokia has not breached its SULA obligations, much less materially breached them, it cannot be made to forfeit the fully paid-up ███████ license ███ ██████████████████████████████████ Nor does Qualcomm have any right to terminate the SULA.[119] And Nokia is fully entitled to rely on its ETSI rights to implement ETSI standards. Far from using this right to "avoid its SULA obligations," as Qualcomm wrongly asserts, Nokia faithfully fulfilled its SULA obligations until those obligations expired on their own terms, ██████████████████████

████████████████████████████████████████

---

[117] Contrary to Qualcomm's intimations, Nokia has not engaged in a "bad faith campaign" to disparage Qualcomm's licensing practices and depress its stock price. ██████████████████████████████████ *See* NAE 124 ██

[118] *See* NAE 36 (2001 SULA) ████████████████

Qualcomm does not dispute that the license for ███████ is fully paid-up as to certain products, including as to WCDMA products. NAE 117 ████

[119] Even if Nokia's post-April 9, 2007 actions were deemed to be a breach of the SULA, Qualcomm could not terminate the SULA, for in light of the SULA's plain language, Nokia at least had a good faith basis to believe that the SULA authorized it to cease royalty payments, ██████████████████████ "A party is not entitled to terminate a contract under a termination provision which gives such party termination rights if the second party refuses to comply with its terms, where the second party's failure to comply is not in bad faith but is based on a good faith dispute as to the amount due." 17B C.J.S. CONTRACTS § 437.

40

Finally, even if Qualcomm could somehow prove its allegations of breach of the SULA and right to termination as a result, which it cannot, Nokia still would not forfeit its paid-up license to the ██████████.[120] ██████████████████████████████████ ████████████████████████████████ in the event of contract termination, but this refers to licenses for which royalties were still being paid, not to forfeiture of a paid-up license. When the parties wished to say that a paid-up license could be forfeited, they specifically did so.[121] By negative implication, therefore, the lack of any paid-up license forfeiture provision ██████████ bars such a result. Any possible ambiguity on this score would have to be resolved against forfeiture under well-settled California contract principles.[122] California's presumption against forfeiture is at its strongest in a case such as this one, where ██████████████████████████ ██████ for the ██████████ before finally achieving a paid-up handset license in April 2007. In light of this presumption, and the language in the SULA, it is unreasonable to suggest that Qualcomm could work a forfeiture of Nokia's paid-up ██████████ handset license simply by terminating the SULA.

---

[120] NAE 102██████████████████████████
[121] *See, e.g.,* NAE 36 (2001 SULA) § 12.3 at██████████████ ) ██████████████████████████████████████████████

[122] *See Universal Sales Corp. v. Cal. Press Mfg. Co.,* 20 Cal. 2d 751, 771 (Cal. 1942) ("Forfeitures are not favored by the courts, and if an agreement can be reasonably interpreted so as to avoid a forfeiture, it is the duty of the court to avoid it . . . a contract is not to be construed to provide a forfeiture unless no other interpretation is reasonably possible" (internal citations omitted)).

**II.    QUALCOMM HAS BREACHED ITS BINDING CONTRACTUAL COMMITMENTS TO ETSI, OF WHICH NOKIA IS A THIRD-PARTY BENEFICIARY, TO LICENSE ITS ESSENTIAL PATENTS ON FRAND TERMS AND TO LIMIT ANY RELIEF SOUGHT TO FRAND COMPENSATION**

As shown in Part I, Nokia has not exercised its SULA options. To the extent the parties have any rights and obligations concerning Qualcomm's ███████████ and Nokia's patents beyond the default patent rules in effect in the applicable countries, therefore, they arise from essentiality declarations and FRAND undertakings made pursuant to the ETSI IPR policy that govern a subset of those patents. Both Qualcomm and Nokia have made binding contractual commitments under this ETSI IPR policy.[123]

These FRAND undertakings under Rule 6.1 are binding, enforceable commitments that entitle manufacturers to implement the ETSI standards subject only to the obligation to pay FRAND compensation for any valid patents that are actually infringed by implementing the standard, and free from the possibility of injunctions. This interpretation of the meaning of Qualcomm's contractual commitment follows from the intent of the IPR policy and economics of SSOs, as Qualcomm itself strenuously urged in litigation against Ericsson in 1998-99 and should not be heard to repudiate now. This interpretation is also dictated by the French law of contracts that governs ETSI and its relationship with its members. Contrary to the allegations of Qualcomm's current experts (although consistent with Qualcomm's position in the Ericsson litigation), an ETSI

---

[123] NAE 97 (Qualcomm's Undertakings, Exhibit A to Nokia's First Amended Complaint filed 2/29/08); NAE 100 (Nokia's Undertakings, Exhibit B to Nokia's First Amended Complaint filed 2/29/08).

FRAND undertaking is *neither* a simple agreement in principle nor a mere expression of willingness to entertain future bilateral negotiations concerning possible licenses for essential patents which can still be withheld. It is rather an irrevocable, binding and enforceable commitment made to ETSI for the benefit of third parties to grant licenses to those patents on FRAND terms.[124]

### A.    The Economics Of Standard Setting Organizations Require FRAND Undertakings To Be Binding Contractual Commitments That Limit IPR Holders' Remedies And Preclude Injunctive Relief Except In Extraordinary Circumstances

Open and accessible technology standards have obvious benefits:  they enable industries to promote the best interoperable technologies with input from private manufacturers in the industry.  At the same time, the overlap between standards and patents causes obvious problems.  Without restrictions, every holder of a valid and truly essential patent would have the power to hold up manufacturers implementing the standard and potentially block the standard altogether.  *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 310 (3d Cir. 2007).  Policies like ETSI's are meant to solve this hold-up problem.

### 1.    FRAND Undertakings Prevent Using Hold-Up Power To Gain Excessive Royalties

Specifically, if unrestrained, a holder of a patent essential to a standard could use its leverage to extract supra-competitive royalties from any manufacturer wanting to implement the standard, especially those who are locked in to the standard through their

---

[124] For these reasons, this Court should grant the relief requested in Nokia's Claims 1-5 and 8-10, and deny the relief requested in Qualcomm's counterclaims 2-4 and 6.

43

capital investments.[125]   In contrast to a rate negotiated before standardization, when manufacturers could easily switch to other competing technologies, a holder of an essential patent after standardization can capture not only the incremental value its patents add to the standard, but also the value contributed by other inventions plus the costs to switch away from the standard.[126]   Such royalties could far exceed the value of the invention, approaching the threshold that would drive the industry to abandon the standard and switch to an unpatented technology.[127]

To constrain such hold-up power, SSOs like ETSI employ IPR policies that typically impose the dual requirements of disclosure of essential patents and commitment to license those patents on FRAND terms.[128]   They also provide that the SSO will decline to adopt standards when faced with a refusal from an owner of an essential IPR to abide by such FRAND commitments.[129]   Such SSO IPR policies limit the power of owners of standard-essential patents to extract excessive royalties, and prevent them from using the

---

[125] NAE 75 (Expert Report of Carl Shapiro dated 5/23/08) ("Shapiro Rep.") at 4; NAE 128 (Shapiro Dep.) at 14:7-16:3.

[126] NAE 75 (Shapiro Rep.) at 8-12.

[127] *Id.* at 11-14.

[128] *Id.* at 5; *see* NAE 130 (*Antitrust Enforcement and Intellectual Property Rights Guide*, Dep't of Justice & Fed. Trade Comm'n Report, April 2007) at 36, 42, 46.

[129] *See* NAE 5 (ETSI Rules) Clause 8.1 at 34 (providing that, if an owner of and essential IPR refuses to make a FRAND undertaking, ETSI must either replace the technology with an available substitute, or if no such substitute exists, immediately stop work on the standard). *See* NAE 127 (Tronchon Dep.) at 66:10-69:10.  This provision underscores the importance to ETSI of securing FRAND commitments from essential IPR holders. For example, when ETSI was drafting the UMTS standard, Qualcomm claimed it had essential WCDMA (and TD-CDMA) patents as to which it would not agree to give FRAND undertakings.  ETSI tried to determine if Qualcomm's essentiality claims were true, considered stopping development on the WCDMA air interface, and pressured Qualcomm to change its decision.

threat of injunction to hold up standard implementation.[130]   At the same time, such policies provide essential IPR holders with the benefit of FRAND compensation from a far larger market than they would enjoy were their patents not included in the standard.[131] By thus preventing hold-ups, the IPR policies of ETSI and other SSOs enable standards and the patented technologies they incorporate to become more widely available.

These economic principles were well understood by the founders of ETSI.  As Friedrich Hillebrand, the Chairman of ETSI's Technical Committee Special Mobile Group from 1996 to 2000 has stated, "The intention in ETSI was that once the undertaking is given, the owner would have no possibility to use his blocking rights as long as the licensee is prepared to accept FRAND terms and conditions. . . .  This was commonly understood, and is very much at the heart of the IPR Policy."[132]  Furthermore, European Commission letters to SSOs during the time the ETSI IPR Policy was being drafted emphasized the need to enable manufacturers to implement the standards, and made clear that patent holders were giving up monopoly rights when participating in the standard setting process.[133]

---

[130] *See* Joseph Scott Miller, *Standard Setting, Patents, and Access Lock-In:  RAND Licensing and the Theory of the Firm*, 40 Indiana L. Rev. 351 (2007) (arguing that injunctions are at cross-purposes with FRAND); Mark A. Lemley, *Intellectual Property Rights and Standard-Setting Organizations*, 90 Cal. L. Rev. 1889, 1925 (2002) (arguing that a FRAND commitment should be viewed as a grant of an implied license, thus precluding injunctive relief).

[131] NAE 128 (Shapiro Dep.) at 71:16-73:5; NAE 75 (Shapiro Rep.) at 18-19.

[132] NAE 84 (Expert Report of Friedhelm Hillebrand dated 5/22/08) ¶ 19 at 9.

[133] NAE 79 (October 27, 1992 Communication from the Commission of European Communities re Intellectual Property Rights and Standardization ("EC Communication") states that:  "It has to be recognized at the same time that the standard-making process entails an acceptance by the rightholder of the fact that he is no longer acting in a totally free and geographically limited market once he has agreed to give licenses as of right on fair and reasonable conditions." *Id.* § (footnote continued)

45

Judicial decisions in this area agree with these IPR limitations and the economic need for them. In *Siemens v. AMOI*, Düsseldorf Regional Court Case No. 4a O 124/05, dated February 13, 2007, for example, the Civil Division of the Duesseldorf Regional Court held that plaintiff had forgone its right to enjoin the use of its patent by declaring such patent to be essential to ETSI's GSM/GPRS standard, and that anyone seeking to implement the standard had a contractual right to do so. Ruling on a request for injunction on a standard-essential patent, the Court held: "Because the [patent] holder — as in this case — is in principle willing to grant the license and has also contractually agreed to do so, the only question arises, since he has already submitted an offer for closing of a license agreement, as to whether inappropriate license fees are demanded (so called exploitation abuse) or whether his licensing practice is discriminating and/or inappropriate."[134] Because the plaintiff had thus far offered only a portfolio rate for all its patents, and at a rate that would be excessive if applied by similar patent holders, the case was dismissed and no injunction issued.[135] Furthermore, the Court considered the required grant-back of all essential and implementation patents to be unreasonable in scope and not justified by the reciprocity language in the ETSI IPR Policy.[136]

Similarly, in *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297 (3d Cir. 2007), the Third Circuit held that Qualcomm could be liable for antitrust violations for reneging on

---

4.7.3 at 20. *See also* NAE 125 (Smoot Dep.) at 203:16-206:25 (agreeing that ETSI Article 6.1 is tantamount to a rewording of this provision).
[134] NAE 83 (*Siemens v. Amoi*, Dusseldorf Regional Court, 4a O 124/05, February 13, 2007 (certified English translation)) at 18.
[135] *Id* at 19-21.

its FRAND promise, holding that: "Deception in a consensus-driven private standard-setting environment harms the competitive process by obscuring the costs of including proprietary technology in a standard and increasing the likelihood that patent rights will confer monopoly power on the patent holder." *Id.* at 314.

These decisions support the view that IPR holders that undertake FRAND commitments pursuant to ETSI's IPR Policy effectively relinquish their right to exclude others from practicing their patents to implement the standard and estop themselves from pursuing unlimited licensing fees or injunctions.[137]

**2. To Limit Hold-Up Power Of Essential Patent Owners, FRAND Undertakings Must Apply To All Patents *Declared* Essential**

Contrary to Qualcomm's allegations, an IPR holder's ETSI obligations apply to all patents it has claimed is essential and committed to make available on FRAND terms and conditions, not simply those that later prove to be "actually essential." Nothing in the language of Rule 4.1 permits a conditional declaration of essentiality, and FRAND undertakings under Rule 6.1 are similarly unconditional: the Director-General must seek

---

[136] *Id.*

[137] *See also Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571 (Fed. Cir. 1997) (royalty-free implied license granted as the patentee informed the body it would not seek patent rights in order to encourage adoption by the industry); *Potter Instrument Co. v. Storage Technology Corp.*, 1980 U.S. Dist. LEXIS 14348 (E.D. Va. Mar. 25, 1980), *aff'd on other grounds*, 641 F.2d 190 (4th Cir. 1981) (action dismissed and patentee was equitably estopped from enforcing its patent because the patent owner failed to inform the standard body of the patent's existence); *In re Negotiated Data Solutions, LLC*, 2008 WL 258308 (F.T.C. Jan. 22, 2008) (current owner of patents could not alter the licensing commitment made to the standard settings body by previous owner as the commitment to license and rate promised were a large factor in the adoption of the standard); *In re Dell Computer Corp.*, 21 F.T.C. 616 (May 20, 1996) (consent order prohibiting Dell's enforcement of patent rights as it was a member of a standard (footnote continued)

an undertaking for *all* IPRs that are declared essential and that are brought to the attention of ETSI.[138]   Apart from declaring patents essential to a technical proposal on the basis that these patents may become essential if the technical proposal is adopted, nothing in such an undertaking is conditioned on the patent turning out to be essential.[139] Furthermore, even Qualcomm's IPR expert conceded that IPR holders declaring patents to ETSI are representing that they are actually essential to standards.[140]

Qualcomm's interpretation would gut the FRAND declaration of meaning and defeat the purpose of the FRAND undertaking, namely, to avoid uncertainty by guaranteeing the widespread availability of standards.  It would allow a patentee to claim unilaterally that its declared-essential patent is non-essential, and seek an injunction, giving the implementer only an affirmative defense of actual essentiality.   Thus, the implementer who relied on the declaration to build products implementing the standard would face the risk of total exclusion from the market — the very risk ETSI was trying to avoid in drafting its IPR Policy.

By contrast, Nokia's interpretation fits the text of the ETSI IPR policy and furthers the public policy goals of minimizing hold-up, discouraging excessive declarations of essentiality, and promoting the implementation of new technology into standards in reliance on those rights being available on FRAND terms.  The IPR holder is far better

---

setting organization in the midst of setting a standard, without disclosing the existence of its patent rights prior to joining the organization).
[138] NAE 5 (ETSI Rules) Clause 6.1 at 33-34.
[139] *Id.*
[140] NAE 125 (Smoot Dep.) at 215:20-216:11.

situated to know whether its invention is actually necessary for the standard, and should thus bear the risk of an over-inclusive declaration, a position also supported by the governing French law.[141]

    **B.**    **Qualcomm Has Conceded That SSO FRAND Undertakings Are Binding Contractual Commitments That Limit Essential IPR Holders' Remedies And Preclude Injunctive Relief Except In Extraordinary Circumstances**

        **1.**    **The Qualcomm-Ericsson Litigation**

In a patent infringement case brought by Ericsson in 1997, Qualcomm advocated the very same interpretation of SSO undertakings that Nokia urges here, based on the same economic reasoning. In that case, Qualcomm claimed that Ericsson could not get an injunction as a matter of law on patents that Ericsson had declared essential to TIA, a United States-based SSO similar to ETSI, because Ericsson had committed to license those patents on reasonable and non-discriminatory ("RAND") terms.[142] As Qualcomm argued in its pleadings in that case, IPR policies are intended to ensure that "all industry participants will be able to develop, manufacture and sell products compliant with the relevant standard without incurring the risk that patent holders will be able to shut down those operations."[143] Accordingly, Qualcomm asserted an affirmative defense of

---

[141] NAE 85 (Aynès Rebuttal Report dated 6/5/08) ("Aynès Rebuttal Rep.") § 3.3 at 7-8.

[142] For present purposes there is no material difference between RAND and FRAND requirements; both serve the same purposes of avoiding hold-ups described above.

[143] NAE 80 (Defendants' Answer to Ericsson's "Corrected" Third Amended Complaint and Amended Counterclaims, *Ericsson Inc. v. Qualcomm Inc.*, No. 2:96-CV183 (E.D. Tex) filed 3/5/99) ("Qualcomm/Ericsson Answer") Twelfth Affirmative Defense at 20.

equitable estoppel,[144] and implied license.[145]  As the litigation progressed, Qualcomm's pleadings expanded to include theories of express license[146] and breach of contract alleging that Ericsson had "entered into a contract with Qualcomm and other participants in the [standard setting] process," and had thus "bound itself to Qualcomm to license, under [RAND terms] any patents that would be required for implementing the IS-95 standard."[147]  As a result of the contract with TIA and its members, Qualcomm claimed that Ericsson was "barred from asserting a contrary position including a claim seeking injunctive relief or other compensatory damages other than a reasonable and non-discriminatory royalty,"[148] having "contracted away" its other rights.[149]

In addition to its pleadings, Qualcomm argued in a motion for partial summary judgment that Ericsson was equitably estopped by its RAND commitments from obtaining an injunction against Qualcomm, that Qualcomm had an implied license based on Ericsson's RAND commitments, and that Ericsson's damages should be limited to RAND damages in the event that infringement and validity were proven (which Qualcomm contested).  In this motion, Qualcomm stated:

---

[144] NAE 139 Qualcomm's Second Amended Answer and Amended Counterclaims (from the Ericsson litigation) Case No. 2:96-CV183, filed May 22, 1997), Tenth Affirmative Defense at 13-14.
[145] *Id.*, Eleventh Affirmative Defense at 14.
[146] NAE (Qualcomm/Ericsson Answer), Eighteenth Affirmative Defense at 23-24.
[147] *Id.*, Fourteenth Affirmative Defense at 21; *Id.*, Eleventh Counterclaim at 33-34.
[148] *Id.*, Fourteenth Affirmative Defense at 21.
[149] *Id.*, Eleventh Counterclaim at 34.

[B]y participating in the TIA process and by repeatedly promising Qualcomm and others, Ericsson has lost its ability to enjoin Qualcomm and others from practicing patents that are essential to IS-95.[150]

[T]his motion merely seeks a limitation of the relief sought to the recovery of license royalties, "under reasonable terms and conditions that are demonstrably free of any unfair discrimination," if Qualcomm is found to have infringed those patents.  That is, Qualcomm merely seeks to hold Ericsson to the repeated promises it made to Qualcomm and others who participated in the IS-95 standard setting process.[151]

Ericsson's conduct and its many promises led Qualcomm to reasonably infer that it could practice the IS-95 standard without fear that Ericsson would seek to enjoin its activities; Qualcomm relied on Ericsson's conduct and promises; and, as a result of that reliance, Qualcomm would be materially prejudiced if Ericsson were allowed to proceed with its claims for injunctive relief and for lost profits.  Accordingly, Ericsson should be estopped from seeking any relief other than royalties "under reasonable terms and conditions free from any unfair discrimination."[152]

[T]he TIA's Intellectual Property Rights Policy and Ericsson's course of conduct during the standard setting process mandate that Qualcomm be granted an implied license to any of the Alleged TIA Patents that are deemed necessary to the IS-95 standards "under reasonable terms and conditions that are demonstrably free from any unfair discrimination."  In light of the TIA Intellectual Property Rights Policy, such a license is the only remuneration Ericsson should expect to recover for such patents.[153]

Also attached to the summary judgment brief is a declaration from Qualcomm's then-Chairman and Chief Executive Officer (currently Chairman) Irwin Jacobs stating that Qualcomm relied on Ericsson's statements to the SSO to license any essential patents on RAND terms.[154]

---

[150] NAE 23 (Qualcomm/Ericsson MSJ).

[151] *Id.*

[152] *Id.*

[153] *Id.*

[154] NAE 81 (Declaration of Irwin M. Jacobs in Support of Qualcomm/Ericsson MSJ) ("Jacobs Decl.") at ¶ 9.

Qualcomm's reply brief went further in explaining how "Ericsson Has Relinquished Its Right to Exclude Others from Practicing the IS-95 Standard" even though Qualcomm had rejected Ericsson's proposed terms and maintained patent law defenses to individual patents:

> If an industry participant must accept without challenge all patent claims of others or risk being blocked from building to a specific industry standard, unscrupulous competitors could easily claim broader patent rights in an effort to gain unfair advantages. For example, a corporation with a single, valid essential patent could claim it held ten patents essential to a particular standard to great advantage. Others wishing to practice the standard would either have to accept the claims without challenge or risk being barred from practicing the standard. Or, more likely, the holder of essential patents, after identifying its patents to the TIA, could stand idly by after the adoption of the standard as others invested huge sums of money in the development of products compliant with the standard. Once those others began to enjoy some commercial success, the patent holder could then demand the payment of royalties for its allegedly essential patents. Those who had invested in the standard would either have to accept the patent holder's claims and terms without challenge or risk having their investment destroyed. . . . And that is, of course, precisely what open standards are meant to prevent.[155]

These arguments, made just months before Qualcomm first committed to license its UMTS-essential patents on FRAND terms, are important not just in confirming Nokia's understanding of the law, but also in proving Qualcomm's own state of mind with respect to its own FRAND commitment to ETSI and its own interpretation of the

---

[155] NAE 138 (Qualcomm's Reply in Support of its Motion for Partial Summary Judgment to Limit Ericsson's Requested Relief for the Alleged Infringement of the Patents-in-Suit dated 12/3/98) at 8-9 (footnotes omitted).

effect of its FRAND commitments around the time they were made, and demonstrating the common intent of the parties, pursuant to French law.[156]

### 2.      Qualcomm's Testimony In This Case

Qualcomm does not dispute here that FRAND commitments (where they exist) constitute binding obligations; it has stated that "Fair Reasonable and Non-Discriminatory ('FRAND') obligations are part of a private agreement, a binding contract that is enforceable against each patent owner."[157]

_____



[156] *See infra* Part II.C.
[157] NAE 140 Qualcomm's Opening Brief in Support of its Motion to Dismiss or Stay, *Nokia Corp. v. Qualcomm Inc.*, C.A. No. 2330-VCS, filed 9/8/06 Del. Ch. at 33 (Trans. ID 12316603).
[158] Qualcomm acknowledges that ETSI's IPR policy, and specifically an Article 6.1 declaration, creates binding contractual obligations on its members.  NAE 127 (Tronchon Dep.) at 91:8-93:13, 96:8-97:23, 104:24-105:13.
[159] NAE 102                                  NAE 81 (Jacobs Decl.) ¶ 9; NAE 131

[160] NAE 101                              NAE 102

[161] NAE 102

*see also id.*

By contrast, and in a stark turnabout from Qualcomm's pleadings in the Ericsson case, Qualcomm's *expert* witnesses have testified that a FRAND undertaking does not limit in any way the IPR holder's ability to get an injunction,[162] or the financial terms an IPR holder can charge.[163] Oliver Smoot and Richard Holleman, neither of whom serve any role in ETSI and whose combined ETSI meeting attendance totals fewer than five, have acknowledged that, under their interpretation of FRAND undertakings:

- An essential IPR holder can seek injunctions against manufacturers implementing a standard the same day as it gives a FRAND undertaking that it is prepared to grant licenses on FRAND terms.[164]

- A manufacturer should stop implementing a standard each time a new patent is declared essential until it has agreed with the IPR holder on all the terms and conditions.[165]

- There is no limitation whatsoever on the availability of injunctions.[166]

- The concepts of fair and reasonable impose no financial limits whatsoever.[167]

- It is perfectly permissible for an IPR holder to use the extra leverage resulting from its FRAND declaration and lock-in to get higher royalty rates.[168]

---

[162] NAE 125 (Smoot Dep.) at 173:8-16 ("The submission of an Article 6.1 undertaking committing to be prepared to grant licenses on FRAND terms imposes no limitation whatsoever on an IPR holder's right to seek an injunction to stop implementers of the standard from using that patent in implementing the standard.") *See also id.* at 76:18-22, 77:9-25, 93:16-20, 171:10-16.

[163] NAE 113 (Holleman Dep.) at 150:25-152:19, 154:6-17, 155:22-156:20.

[164] NAE 125 (Smoot Dep.) at 76:5-17

[165] *Id.* at 71:15-25.

[166] *Id.* 173:8-16, 76:18-22, 77:9-25, 93:16-20, 171:10-16; NAE 113 (Holleman Dep.) at 146:8-16, 47:11.

[167] NAE 113 (Holleman Dep.) at 150:25-152:19, 154:11-17, 155:22-156:20.

[168] NAE 125 (Smoot Dep.) at 93:16-94:13, 171:10-23, 172:3-4.

Such an interpretation cannot be correct, as it would render a FRAND undertaking meaningless and impose no check on the hold-up power of essential IPR holders, ensuring that IPR holders could block the implementation of standards and get excessive prices due to that power. Furthermore, this interpretation is directly contrary to what Qualcomm itself argued in the Ericsson case. It is thus no surprise that Qualcomm's fact witnesses and own principals in the Ericsson litigation took just the opposite position.

**C.     French Contract Law Establishes That An ETSI Rule 6.1 Undertaking Creates A Binding Contractual Obligation To Grant Licenses On FRAND Terms and Precludes Resort to Injunctions**

**1.     French Contracts Must Be Read In Light Of Their Purpose And The Parties' Intent**

Under the French law that explicitly governs interpretation of the relevant ETSI contracts, the main objective (as in American law) is to discover the genuine "common intent" of the parties. "In agreements, one must seek the common intention of the contracting parties and look beyond the literal meaning of the terms."[169] Even Qualcomm's French civil law expert, Professor Alain Bénabent, agrees this is normally so in French contract interpretation.[170] Thus, ETSI Rule 6.1 undertakings are to be read in light of the purpose of ETSI's IPR Policy, which is to make standards immediately and widely available; the Policy itself states that it "seeks to reduce the risk to ETSI, MEMBERS, and others applying ETSI STANDARDS . . . that investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an

---

[169] NAE 78 (Aynès Report dated 5/21/08) ("Aynès Rep.") § 1.5 at 9.
[170] NAE 108 (Bénabent Dep.) at 18:14-19:3, 19:11-21, 21:16-22:3.

ESSENTIAL IPR for a STANDARD . . . being unavailable."[171]   Furthermore, the

European Commission highlighted this goal in directing ETSI and other SSOs to write

sufficiently protective IPR policies.[172]

> **2.   An IPR Holder's ETSI Undertaking Forms A Binding Contract Under French Law For The Benefit Of Third-Party Manufacturers**

Nokia's expert witness Professor Laurent Aynès, a leading contract law scholar

from the Sorbonne University in Paris, will testify that under French law,[173] a contract is

validly formed when the parties agree on its essential elements, even if the parties

contemplate further negotiation on secondary elements.[174]   Under French law, the

essential elements of a patent license agreement are the usage of a thing and the principle

that *some* price will be paid for it, but agreement on the amount of the price is not a

condition for the valid formation of the license.[175]   Professor Aynès will testify that all

the essential elements of a license agreement are present when an IPR holder provides

ETSI with a FRAND undertaking pursuant to ETSI IPR Policy Rule 6.1.   Once there is

---

[171] NAE 5 (ETSI Rules) Clause 3.1 at 33.
[172] NAE 79 (EC Communication) states "European standard-making bodies should ensure that: . . . standards are available for use on fair, reasonable and non-discriminatory terms . . . ."
[173] ETSI's IPR Policy Article 12 provides that it is to be interpreted under French law.  NAE 5 (ETSI Rules) Clause 12 at 37.
[174] NAE 78 (Aynès Rep.) § 1.1.1 at 4, *citing* Cass. Civ., 27 November 1984, Bull. Civ. III, n. 200.  United States law is similar:  The fact that it is uncertain which Qualcomm patents are valid and practiced by Nokia, or what royalty will be charged, does not make the contract indefinite.  U.C.C. § 2-204(3) ("Even though one or more terms are left open, a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy"); *Restatement (Second) of Contracts* § 33(2).
[175] NAE 78 (Aynès Rep.) § 1.2.1 at 6.  There is no legal provision in French law specifically covering patent license agreements.  The closest applicable civil code section (Article 1709) (footnote continued)

agreement as to these elements, a binding and enforceable commitment is formed, even as the price and other secondary elements (such as confidentiality and royalty rate) remain to be negotiated.   In the event that an IPR holder and a manufacturer implementing the standard fail to reach agreement on the price (royalty rate) or other terms for the IPR used in implementing the standard, the IPR holder has the right to set a FRAND price for the IPR, subject to court review of whether the IPR holder has abused its pricing power and whether the proposed price was FRAND — but the existence of the underlying contract is not thereby drawn into question.[176]

An IPR holder's commitment to ETSI to make its patents available on FRAND terms and conditions in turn creates a type of contract between the IPR holder and ETSI for the benefit of manufacturers called a "*stipulation de contrat pour autrui,*" which can lead to the formation of separate binding contracts with implementers of the standard. The elements of such a contract are set forth in Article 1121 of the French Civil Code.   A *stipulation de contrat pour autrui* is formed where a promisor (in this case, an IPR holder) commits to a stipulator (here, ETSI) to grant a right to one or more beneficiaries (would-be manufacturers of a standard-compliant product).   The beneficiaries have the option, but not the obligation, to accept the grant of right.   The promisor becomes bound

---

pertains to leases of things, and is viewed by both parties' experts as applicable here notwithstanding their dispute over its interpretation.   NAE 108 (Bénabent Dep.) at 93:12-94:16.
[176] NAE 132 (Aynès Dep.) at 70:3-12, 70:21-72:3; NAE 78 (Aynès Rep.) §§ 4.2, 4.4 and 4.5 at 16-17.

to all willing third party beneficiaries once it has exchanged consent with the stipulator. Such a commitment is irrevocable once consent has been given.[177]

Qualcomm agrees with this method of contract formation. Qualcomm's French law expert Alain Bénabent filed an expert report in an ITC proceeding between Qualcomm and Nokia that stated that the ETSI declaration mechanism could be considered a *"stipulation pour autrui"*[178] and that other ETSI documents indicated that Rule 6.1 FRAND declarations were tantamount to a license.[179] Moreover, Qualcomm itself argued in the Ericsson litigation that similar RAND undertakings give rise to an implied license allowing implementation of the standard.[180] Professor Bénabent reiterated his agreement with Professor Aynès on the characterization of the *"stipulation pour autrui"* in testimony here.[181]

### 3. Specification Of A Price Is Not Necessary To The Formation Of A Rule 6.1 Contract

Professor Bénabent will confirm almost all of these settled principles; the only area where he and Professor Aynès differ is on the question whether French contract law requires the price to be determined or determinable at the time of formation of the contract.[182] Professor Bénabent claims that, absent specification of the amount of the

---

[177] NAE 78 (Aynès Rep.) § 1.3 at 7-8.
[178] NAE 77 (Witness Statement of Alain Bénabent dated 1/23/07), French language Answer to Question 60 at 13 in *In the Matter of Certain Mobile Telephone Handsets, Wireless Communications Devices and Components Thereof*, 337-TA-578.
[179] *Id.*, French language Question and Answer 61 at 13.
[180] NAE 23 (Qualcomm/Ericsson MSJ) at 17.
[181] NAE 108 (Bénabent Dep.) at 107:2-16.
[182] NAE 108 (Bénabent Dep.) at 60:5-61:7, 66:5-23, 68:7-16, 70:12-72:8.

58

price, a Rule 6.1 undertaking is not sufficiently precise to form a contract.[183]  In his view, such an undertaking is merely an *"accorde de principe,"* committing the IPR holder merely to negotiate in good faith toward future licenses, while retaining monopoly and potential hold-up power until FRAND terms and conditions are agreed upon.[184]  In Professor Bénabent's view, the absence of the single formal prerequisite of the price term is fatal even if the purposes of ETSI and the intent of the parties are to permit contract formation to proceed without it.[185]

Even as a formal matter, however, Professor Bénabent is wrong.  Professor Aynès will explain how, in 1995, France's highest court (the *Cour de Cassation*) ruled in four major cases, whose importance was underscored by the Court sitting *en banc*, that a contract can be validly formed *without* the price being determined or determinable.[186] These cases have been reaffirmed consistently over the past thirteen years.[187]  Thus, an agreement on the amount of the price is not a prerequisite to the valid formation of a binding contract.[188]  This follows the general rule under French law that price need not be determined or determinable to create a valid contract — all that is required is an agreement that a price will be paid.[189]  Although there are a few exceptions to this general

---

[183] *Id.* 68:7-14.
[184] *Id.* 60:5-62:4, 62:19-64:1, 66:5-67:8, 67:17-22.
[185] *Id.* 66:5-23, 68:7-14, 72:1-8.
[186] NAE 78 (Aynès Rep.) § 1.1.2 at 5, *citing* Bull. civ. Ass. Plen. nos. 7, 8 and 9.
[187] *jId. citing* Cass. com. 9 July 1996, Bull. Civ. III no. 205;  Cass. civ. 1, 20 Feb. 1996, B. Civ. I, no. 91;  Cass. civ. 1, 12 May 2004; RDC 2004, p.925 note D. Mazeaud.
[188] *Id.* § 1.2 2 at 6-7.
[189] *Id. citing* Bull civ. Ass. Plen. no. 7 (interpreting French Civil Code Article 1709 governing leases of things); Cass. civ. 1, 6 March 2001, Bull. civ. I, no. 54 (interpreting French Civil Code Article 1129 governing determination of the subject matter of the obligation).

rule (such as in sales of goods), a license for the use of intellectual property (as in other leases of things under French Civil Code § 1709) is not one of them.[190]

### D. Under Principles Of Estoppel, IPR Holders Should Be Prohibited From Obtaining Injunctions On Patents Subject To FRAND Licensing Undertakings

This same conclusion is supported generally by the principle of estoppel, which in the patent context provides that patent holders cannot induce infringement through a false promise that it would not enforce its patent rights.[191]   Indeed, this is exactly what Qualcomm argued in its case against Ericsson, where Qualcomm claimed Ericsson was estopped as a matter of law against seeking injunctions on patents subject to RAND licensing commitments.[192]

An estoppel defense requires a manufacturer to prove:   (1) that a patentee's conduct and statements led a manufacturer to infer that the patentee would not seek to prevent it from using the patent; (2) that a manufacturer relied on the patentee's conduct or statements; and (3) the manufacturer suffered material prejudice from that reliance.[193]

Each of these elements is present in a situation like here where an essential patent holder seeks injunctions on the same patents subject to FRAND undertakings. Nokia and the industry have relied on Qualcomm's patent-specific FRAND undertakings promising to grant irrevocable licenses to essential patents on FRAND terms in implementing ETSI's GSM and UMTS standards, despite Qualcomm's and others' claims over time to

---

[190] *Id.* § 1.2.2 at 7.
[191] *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1042 (Fed. Cir. 1992) (en banc) (setting forth elements of equitable estoppel).
[192] NAE 80 (Qualcomm/Ericsson Answer) Twelfth Affirmative Defense at 20.

have essential patents, in the belief that those FRAND undertakings would make the standards available and prevent patent blocking or hold up.  As part of this reliance, Nokia has invested billions of dollars into GSM and UMTS business and research.[194]

Additionally, Nokia and the industry have relied on Qualcomm's commitment to ETSI in 1999 that it would license any UMTS-essential patents on FRAND terms.  ETSI went forward with the UMTS standard that included a WCDMA air interface, notwithstanding Qualcomm's unsupported claims of essentiality, specifically because Qualcomm finally agreed to license any such patents on FRAND terms.  For all these reasons, IPR holders of essential patents subject to FRAND undertakings, and specifically Qualcomm here, should be estopped from seeking any injunctions against practice of patents declared as essential to ETSI standards.

### E.     Qualcomm Has Breached Its ETSI Rule 6.1 Contractual Commitments By Failing To Propose FRAND Terms

Even though any issue of economic valuation is beyond the scope of Phase 1, and indeed the jurisdiction of this Court, this Court may find Qualcomm now in breach of its ETSI FRAND obligations to grant licenses on FRAND terms.  Qualcomm has never offered any proposed terms for any of its allegedly essential patents that could be viewed, subjectively, as fulfilling its ETSI FRAND obligations.  Qualcomm relies primarily on

---

[193] *A.C. Aukerman Co. v. R.I. Chaides Constr. Co.*, 960 F.2d 1020, 1042 (Fed. Cir. 1992).
[194] Between 1992 and 2007, Nokia directly invested over $4.3 billion into the adopted 3G UMTS standard.  NAE 133 (Plaintiffs' Supplemented Response to Defendant's Interrogatory No. 22 dated March 14, 2008) at 8-9.

the SULA options as a basis to claim it has made a FRAND offer.[195] ██████████

███████████████████████████████████████████████████████████████

█████████ they cannot be viewed as satisfying Qualcomm's obligation under French law

to propose FRAND terms for its essential patents.[196]    Indeed, even under Qualcomm's

own theory, whereby an ETSI FRAND commitment requires at least an offer to negotiate

to license on FRAND terms,[197] Qualcomm's efforts have been notably deficient.

**F.    Nokia Has Not Breached Its ETSI FRAND Obligations**

Qualcomm's counterclaims include a fallback argument that Nokia has materially

breached its obligations to pay Qualcomm, supposedly giving Qualcomm the right to

terminate any binding ETSI FRAND contracts and seek injunctive relief.[198]  Specifically,

Qualcomm contends that Nokia is obligated to pay Qualcomm the rate that was set forth

in the SULA in the event Nokia elected to extend the duration and scope of the SULA by

---

[195]  Aside from certain offers predating the 2001 SULA, Qualcomm has identified only a



█████████████████████████ NAE 134 (Qualcomm's Response to Interrogatory No. 7 as to its
Denial of Requests for Admission Nos. 43-47, dated June 6, 2008) at 20-22.

NAE 90

[196] NAE 78 (Aynès Rep.) § 4.3 at 16-17.
[197] NAE 102 ███████████████████████ NAE 106 ██████████

adding the ████████████ [199]  On the contrary, Nokia's refusal to pay an amount it contends in good faith is not FRAND, and on unspecified patents where Nokia contests patent infringement and validity is not a breach of any ETSI FRAND contracts, and Qualcomm may not terminate its commitment or seek injunctive relief based on that refusal.

In fact, this was exactly Qualcomm's argument when Ericsson made a similar claim.  When explaining why Qualcomm was entitled to the benefit of Ericsson's RAND promises even though it had rejected Ericsson's licensing proposal and still challenged the patents, Qualcomm explained:

> First, the TIA's Policy does not provide that an open standard may be closed if two companies have a bona fide dispute as to the ownership of intellectual property. . . [T]he resolution of such disputes would presumably occur in some other forum, most likely a federal court.  . . . Under Ericsson's view, an industry member such as Qualcomm must either accept, without challenge, Ericsson's patent claims and pay a license fee based on those claims or risk having the standard closed to it.  Further, the industry member also would have to accept, without challenge, the license terms and conditions demanded by Ericsson.  Ericsson's demand of 'accept our claims and our terms or risk an injunction barring you from practicing the standard' flies in the face of the TIA's goal of open standards. [200]

Consistent with what Qualcomm advocated in the Ericsson case, Professor Aynès will testify that a beneficiary of a *stipulation pour autrui* does not breach the contract by contesting the price or applicability (i.e., whether the patent is valid or infringed), and

---

[198] Qualcomm's Answer, Affirmative Defenses and Second Amended Counterclaims ¶ 170.
[199] *Id.* ¶¶ 175, 179.

63

that such contracts cannot be unilaterally terminated by the promisor on the ground that its proposal for FRAND terms has been rejected by the manufacturer.[201]  That is because the dispute is about agreement on the secondary elements of the contract, which can later be resolved by various means of contract interpretation to fill in those terms if needed.  If FRAND terms are agreed upon or decided by a court and there is no longer a good-faith dispute about an obligation to pay, then non-payment would amount to a breach.  But merely failing to pay a demanded rate for patents in dispute is not such a breach.[202]

Here too, Qualcomm cannot be entitled to obtain injunctions solely because Nokia has not paid its demanded price on a whole portfolio of patents where there has been no specific accusation, not to mention finding in a national patent court, of infringement and validity of any claim or any patent.  Nothing in the ETSI IPR policy, patent rules, or understanding of the IPR disclosure and commitment arrangement allows an IPR holder to impose a royalty on a portfolio of patents without proving infringement, validity, and value of individual patents, just as it has to do in every patent case.  This is particularly the case here where Qualcomm has not even told Nokia of any specific claim of a ███ ███████ that are actually infringed by any specific UMTS product (not to mention proven in court), and where Qualcomm's has been unable to prove up any of its claims against Nokia's GSM products after two trials in separate patent law courts.

---

[200] NAE 138 (Qualcomm's Reply in Support of its Motion for Partial Summary Judgment dated 12/3/97) at 7-8.
[201] NAE 78 (Aynès Rep.) § 4.5, 4.6 at 17-18.
[202] *Id.*

### 1. Nokia Has Evidenced Its Good-Faith Commitment To Meet Its FRAND Obligations By Escrowing $20 million Per Quarter

In any event, Qualcomm's contractual commitments to Nokia in particular cannot be terminated for non-payment because Nokia has demonstrated its commitment to abide by its obligation to compensate on FRAND terms by proffering $20 million per quarter to Qualcomm.  This payment was not necessary as it is Qualcomm's responsibility as the IPR holder to propose FRAND licensing terms,[203] and Qualcomm has yet to make any specific infringement claims (outside the GSM lawsuits, where Nokia has so far uniformly prevailed).  Nevertheless, such a payment on account prevents any claim of termination by Qualcomm.

Although the payment is not a precise calculation of FRAND based on patent determinations of infringement, validity and valuations, it was a good-faith proposal that, if anything, overestimates Nokia's obligations.  Nokia performed internal rough calculations based on independent studies estimating the number of essential patents in ETSI standards owned by Qualcomm in comparison to the total number of essential patents; the countries in which Qualcomm's essential patents issued or applications therefore remain pending; Nokia's understanding of a fair and reasonable aggregate royalty ceiling for all essential patents; and Nokia's projected sales of UMTS products in those countries.[204]  This analysis indicated that any FRAND royalties would be

---

[203] *Id.* § 4.2 at 16.
[204] NAE 86 (e-mail from Niklas Östman to Carl Belding et al. dated 3/28/07).

substantially below $20 million per quarter — and in any event ████████ ████████████████████████████████████████[205]

Furthermore, $20 million per quarter over a 15-year period — the same period as the 1992 SULA with its 2001 amendment, and also the same period as the option for the Later Patents — would total over $1 billion, ███████████████████ ████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████ According to *ex ante* economic analysis,[207] ███████████████████████████████ ██████████████████ would have been closer to the true value of Qualcomm's patents, before Qualcomm had hold-up power from incorporation into the standard and industry lock-in.[208]

Also influencing Nokia's decision to offer Qualcomm $20 million per quarter was the fact that ████████████████████████████████████████ ████████████████████████████████████

---

[205] *Id.* In April 2007, a euro cost approximately $1.35. At this rate of exchange, €8 million equals $10.8 million.
[206] NAE 32 ██████████████
[207] NAE 75 (Shapiro Rep.) § VI.
[208] NAE 119 ████████████████████████████████

Nokia faced an imminent trial requesting an exclusion order against Nokia's GSM handsets.[209]

Professor Aynès will testify that Nokia's attempt to provide Qualcomm with a $20 million *paiment sur acompte*, or payment on account, followed by its deposit of such payment into a third-party escrow account, is an appropriate mechanism to preserve Nokia's rights under the ETSI FRAND contracts pending the resolution of the dispute over whether specific patents are valid, practiced and essential, and what FRAND compensation should be.[210]   Nokia's payment on account is further proof of the conclusive formation of an agreement that neither party has the right to revoke.[211]   It precludes Qualcomm from contending that Nokia has breached its obligations to compensate Qualcomm for use of its essential IPRs on FRAND terms, even if a Court ultimately finds Nokia's obligation to Qualcomm to be greater than the amount Nokia has placed in escrow.[212]   Notably, Qualcomm has never employed a similar mechanism, or shown any indication that it will abide by its ETSI obligations with regards to Nokia's patents.

---

[209] NAE 90█████

[210] *See* French Civil Code Article 1257 ("When the creditor refuses to receive his payment, the debtor can make offers in kind and in case of refusal to accept them, deposit the sum or the thing offered", which has the same legal effect as payment).

[211] Malaurie, Aynès and Stoffel-Munck, Obligations, Defrenois, 2d ed., 2005, No. 1080; Court of Appeal of Toulouse, 21 February 1984 (R., 84.706, note J. Mestre); Mestre, Fages and Doireau, "Lamy Droit du Contrat", par. 138-40.

[212] The sum deposited into escrow need not be the precise amount owed, where it is impossible for the debtor to determine the exact amount to be paid, so long as the debtor agrees to adjust the payment once it is determined, as Nokia has here.  Cass. Civ., 6 Feb. 1901, DH 1902 1, p. 73; Cass. Civ., 22 Nov. 1869, DP 1870, 1, p. 206.

### 2. Nokia's Accounting Treatment Of Its Potential Liability Is Not Evidence Of Bad Faith

The fact that ███████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████ does not mean that Nokia's proffer was made in bad faith.

███████████████████████████████████████████████████████████

███████████████████████████████████████ because that was the most Nokia

believed it would be the amount Qualcomm would voluntarily agree and which would

put an end to all such disputes when the reserve was made (before Nokia prevailed in

patent litigation against Qualcomm in the United States International Trade Commission

and the United Kingdom).

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████ The compromise figure was

also based on an evaluation that this figure was likely to be acceptable to Qualcomm in a

voluntary negotiated global resolution of the parties' dispute.[214]

The fact that a company creates such accounting entries is not an admission that

any sum would be owed or that the underlying claims are valid.  Rather, it reflects a

---

[213] NAE 88 ████████████████████████████████████████
[214] *Id.*

conservative acknowledgement of the possibility that litigation could be resolved against the company. Nokia's provisioning for a potential liability is akin to a reserve, which under Delaware law is of "limited relevance and little probability of leading to admissible evidence." *Nat'l Union Fire Ins. Co. v. Stauffer Chem Co.*, 558 A.2d 1091, 1097 (Del. Super. 1989).

If anything, the fact that Nokia's conservative worst-case scenario calls for a reserve of ███████████████████████ demonstrates that Nokia did not believe that it had exercised the SULA options or that it would continue to be liable to Qualcomm on SULA terms.

## III. THE OPTIONS CLAUSE IN THE 2001 SULA DOES NOT FULFILL QUALCOMM'S FRAND OBLIGATIONS

Although Qualcomm has continued to claim in this litigation that the options in the SULA discharge Qualcomm's FRAND obligations, determination of whether the SULA options are economically and objectively fair, reasonable and non-discriminatory is outside the purview of Phase 1, and the jurisdiction of this Court.[215]  Phase 1 is meant to address contractual questions related to interpretation of the SULA and ETSI IPR policy.[216]  Moreover, the adjudication of whether the SULA options are economically and objectively FRAND will require evidence specifically excluded from Phase 1, including "general industry practice with respect to the terms of licenses covering patents subject to

---

[215] Qualcomm's claim requires evaluation of patent law issues inappropriate for this court, or indeed any single national court. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988); *see also* 28 U.S.C. § 1338(a). Determining whether Nokia must pay any such rate would require the Court to construe the claims of each Qualcomm patent and compare each of Nokia's products to the claims of each of these patents, and assess Nokia's patent law defenses.

undertakings to ETSI or other SSOs" and "evidence of the specific contents and terms of licenses granted by Qualcomm to handset manufacturers other than Nokia."[217]  Indeed, Qualcomm's entire claim that the rates are FRAND is based on these supposed other licenses.[218]  It is Nokia's belief that full discovery would show that all or almost all licenses at the supposed "standard rate" are actually with Qualcomm chipset customers who receive offsetting discounts, rebates, credits and benefits that have the practical effect of significantly lowering or even neutralizing the royalty burden.  Moreover, such licensees do not have a paid-up license to much of Qualcomm's portfolio, as Nokia does.[219]

Thus, for Phase 1 purposes, the only remaining question is whether the inclusion of the options clause in the 2001 SULA supersedes or satisfies Qualcomm's FRAND obligations as a matter of law.  It does not.  Qualcomm has never proposed terms and conditions for the IPR subject to its FRAND undertakings that could ever be FRAND regardless of their economic valuation, and Qualcomm has failed to negotiate in good faith.  The parties did not intend to acknowledge the SULA option as a FRAND offer as to any of the ██████████████████

---

[216] NAE 87 (February 13, 2008 Hearing Tr.) at 30:24-31:4.
[217] NAE 135 (February 22, 2008 Order) at § V.A.3-4.
[218] *See* Qualcomm's Answer, Affirmative Defenses and Second Amended Counterclaims ¶ 92 ("*Over 140 other QC licensees*, including all major manufacturers of handsets and other cellular telephone network equipment, have agreed to terms and conditions similar to Nokia's.  Indeed, almost all of these Qualcomm licensees are obligated to pay royalties as high or higher than Nokia." (emphasis added)).
[219] *See, e.g.,* NAE 117 ███████████████████████████████████████████

70

**A.    Nokia Viewed The SULA Options As A Worst-Case Scenario, Not Agreed-Upon Fair Compensation**

Qualcomm contends that the SULA options rates are FRAND merely because Nokia agreed to allow their inclusion in the SULA. ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ More important, Qualcomm's view does not comport with practical reality.

The SULA options simply represent a ceiling or "hedge" that Nokia could exercise if, six years after executing the SULA, Nokia proved to be wrong about the value of Qualcomm's UMTS portfolio and the value of Nokia's UMTS portfolio.[221] As a hedge, Nokia agreed to an option giving it a unilateral right to extend its license in writing from Qualcomm beyond April 2007 — albeit at a price that was so high that circumstances would have had to change dramatically for Nokia to voluntarily exercise it, for example, in the unlikely event that in 2007 or 2008, Qualcomm would own all or most of the IPR needed to implement ETSI 3G (or, conceivably, some new 4G) wireless standards. An option is not the same as a futures contract, where a buyer and seller lock in a "futures price" for the sale of a commodity or a security on a certain day. In a futures contract, the transaction *must* go forward. In contrast, a party with an option right can choose

---

[220] NAE 105▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[221] The mobile phone industry can be difficult to predict, and the idea that Nokia would agree to a FRAND rate 6 years prior to its implementation is not credible. *See* NAE 91 ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

whether or not to proceed with the transaction, depending on whether it deems it advantageous to do so. From Nokia's perspective, the SULA option provided an upper limit to Nokia's theoretical royalty exposure.

Indeed Qualcomm's claim that the options set the agreed upon rate for continuing to sell Nokia standard-compliant handsets would make the option equivalent to a license — where the only way to stop paying the rate is to stop selling the products.

**B.   The Parties Could Not Have Intended The SULA Options Terms To Be FRAND**

As noted above, a determination of whether the SULA options are economically FRAND compensation for any truly essential, valid and used patents is outside this phase, the jurisdiction of this Court, or indeed any court in any one country. Nevertheless, it is worth considering a few simple reasons that make it clear that the Qualcomm and Nokia did not and could not have believed that a "true" FRAND amount for the essential patents included in the ███████████ would be anywhere near the SULA options rate.

First, it is undisputed that Qualcomm's contribution to the UMTS standard is smaller than its contribution to the CDMAOne/IS-95 standard,[223] although the extent of the difference is in dispute. What is FRAND for all the patents in a standard is almost certainly not also FRAND for a small fraction of the patents in another standard. This is especially true here where Qualcomm made no official contributions to the GSM or UMTS standards before adoption.[224]

Second, unlike in 1992 █████████████████████████ ████████████████████████████ Qualcomm is now one of the top users worldwide of Nokia's patented technologies. Since 1992, Nokia has invested over €25 billion in research and development and has contributed significantly to the development of the entire industry, and especially 3G technologies.[225] It is common knowledge that Nokia inventions can be found throughout the 3G UMTS standard.[226] Moreover, all UMTS phones will require 2G GSM functionality for several years (for network transitional purposes), which will also require use of Nokia's patented technology. ██████████████████████████████

██████████████████████████████

---

[222] NAE 102█████████████████

[223] *Compare* NAE 94 (Essential Intellectual Property in cdma2000, PA Consulting Group (May 2005)) (essential patents "dominated by Qualcomm") at NOKIA-DEL 0943416 *with* NAE 29 (Essential Intellectual Property in 3GPP-FDD, PA Consulting Group (March 2007)) at NOKIA-DEL 0944556 (describing Nokia and Ericsson's portfolios of essential 3G patents as "very strong" while noting that "Qualcomm holds fewer Essential patents than is often assumed").

[224] NAE 103 (Ahava Dep.) at 111:17-21, 112:8-17.

[225] NAE 98 (Nokia Corp., Form 6K dated 7/3/06) at Enclosure 13.

[226] NAE 29 (Essential Intellectual Property in 3GPP-FDD, PA Consulting Group).



[227] ████

████

████ [228] If Nokia

elected to exercise the SULA options in writing, ████

████

████ ████

████ [229] A truly FRAND offer

from Qualcomm would necessarily take this changed circumstance into account; the

SULA options do not.

Additionally, the SULA options terms and conditions are more than Nokia charges

for its own essential patent portfolio in commercial negotiations for portfolio

convenience licenses. Nokia's standard terms for all essential patents for both GSM and

UMTS, not counting any credit for cross-licenses, is ████

████ And by all accounts, Nokia holds far more patents essential to



[227] NAE 114 ████ *see also* NAE 115 ████

[228] NAE 106 ████ NAE 115 ████
98:14-102:6; *see also* NAE 40 (Notes from September 2000 NMP Management Board Meeting).
[229] NAE 102 ████

████

████ '); NAE 119

[230] NAE 122 ████

████

these standards than Qualcomm, in part because Nokia was a major contributor to these standards in ETSI.[231]

Moreover, the cellular communications functionality to which Qualcomm's patents relate represents a much smaller percentage of the overall functionality and value of handsets in 2008 than in 1992 or 2001. Today's cellular devices have evolved to include numerous non-voice features, such as cameras, music players, hard drives, touch screens, games, WLAN connectivity, and other so-called convergence features. These non-voice functions represent the large majority of the value of today's handsets.[232] Accordingly, Qualcomm cannot claim that it believes its inventions continue to represent ███████████████ of the value of the entire handset, simply because that rate was agreed to for far simpler devices that bear little resemblance to today's handsets.

In short, because the wireless world, and the contributions and needs of Qualcomm and Nokia, have changed so significantly since the SULA was negotiated in 1992 and amended and restated in 2001, and because the drafters of the agreements were well aware of these rapid changes, there is no basis to suppose that the parties subjectively believed that the terms and conditions that were fair and reasonable in the

---

[231] The parties are further aware that Qualcomm's demand is not FRAND because it far exceeds Qualcomm's royalty demands to Nokia for the same standard essential patents before adoption of the standard and before Nokia and others were locked in. ██████████████████ ████████████████████████████ Before Nokia and the rest of the industry became locked in, a fair and reasonable royalty rate after 2007 was well below Qualcomm's current demands.

[232] ██████████████ NAE 114 ███████████████████ *see also* NAE 115█

past for Qualcomm's early patents would also be FRAND today for Qualcomm's Later or Other Patents.

### C.   The SULA Does Not Supersede Or Discharge Qualcomm's FRAND Obligations

Qualcomm contends that Nokia 

First of all, it is undisputed that every one of Qualcomm's patent-specific Rule 6.1 FRAND undertakings occurred after the 2001 SULA, and therefore

These patent-specific FRAND undertakings give rise to obligations regardless of Qualcomm's pre-SULA general letter.[234]   Moreover,

Furthermore, there is no evidence that an ETSI FRAND undertaking

Intent of the parties is of paramount importance in determining the effect and scope of integration clauses.

---

[233] NAE 97 (Qualcomm's Undertakings).
[234] NAE 85 (Aynès Rebuttal Rep.) ¶ 6 at 9.

*Masterson v. Sine*, 436 P.2d 561 (Cal. 1968). Here, the FRAND undertakings are commitments that limit the IPR holder's default monopoly rights as to those patents. Qualcomm's undertaking *to ETSI* was a binding commitment made for the benefit of third parties that limited Qualcomm's rights in relation to its UMTS patents for so long as they were in force. ████████████████████

████████████████████████████████████████████
████████████████████████████████████████████

### D.   "Fair and Reasonable" Should Take Into Account The Contribution To The Standard And Appropriate Total Royalties For The Standard

Qualcomm argues finally, that FRAND does not require reference to the percentage of essential patents held by an IPR holder, nor consideration of the total royalty burden for all patents needed to implement that standard. As an initial matter, Nokia believes any decisions about what is fair and reasonable should not be in Phase 1 because they should be informed, among other things, by evidence of licensing practices that are excluded from Phase 1. Qualcomm's entire argument rests on the fact that Nokia's proposal to explicitly incorporate the concepts of proportionality and cumulative royalty into the ETSI IPR Policy was not adopted.[236]

But the fact that Nokia's proposal to ETSI was not adopted does not mean that the determination of what it means to be fair and reasonable should not reflect the contribution to the standard, and take into account the total royalty burden if everyone

---

[235] NAE 36 ████████████

charged similar rates. In fact, Qualcomm's own standards expert testified that the ETSI's failure to adopt a proposal alone neither affects the interpretation of the policy nor indicates that the concept is not already embodied in the policy.[237] Nokia has long understood the determination of FRAND should reflect consideration of both the cumulative royalty and proportionality.[238] The effort to codify this understanding in the ETSI IPR Policy gained significant support, and was blocked in large part by Qualcomm itself.[239]

Finally, to the extent Qualcomm's purported standards experts claim that cumulative royalties and proportionality are not part of being fair and reasonable, it is worth noting that neither Mr. Holleman nor Mr. Smoot have ever participated in a single patent license negotiation.[240] In fact, Mr. Holleman admitted that he doesn't know one way or the other whether anyone ever has used these concepts to determine royalty rates for essential patents.[241] Contrary to their contentions, concepts of proportionality and cumulative reasonable royalty terms are fundamentally part of being fair and reasonable.

---

[236] Qualcomm's Answer, Affirmative Defenses and Second Amended Counterclaims dated March 19, 2008, Count IV ¶¶ 149-156.
[237] NAE 125 (Smoot Dep.) at 163:4-20.
[238] NAE 104 (Ali-Vehmas Dep.) at 101:16-102:15; NAE 103 (Ahava Dep.) at 164:6-165:1; NAE 136 (Yli-Juuti Dep.) at 51:17-52:4, 52:9-12; NAE 137 (Östman Dep.) at 168:1-9; NAE 126 (Thompson Dep.) at 52:8-15.
[239] NAE 99 (Response to Qualcomm's Contributions Opposing the Minimum Change Optimum Impact (MCOI) Approach) at 3-8.
[240] NAE 125 (Smoot Dep.) at 33:20-34:5; NAE 113 (Holleman Dep.) at 49:8-14, 50:6-14, 143:7-23.
[241] NAE 113 (Holleman Dep.) at 70:7-17.

## CONCLUSION

For the foregoing reasons, and based on the evidence to be submitted at trial, judgment should be entered in favor of plaintiffs on the following counts: Nokia Counts I-XI and Qualcomm Counts I-III, and Qualcomm's Counts VII-X, to the extent they do not rely on patent issues including infringement, validity or valuation. Additionally, should the Court adjudicate any of the other counts within Phase 1 notwithstanding the limitations on evidence and Nokia's motion to dismiss, judgment should be entered in favor of plaintiffs for the foregoing reasons and based on the evidence to be submitted at trial.

OF COUNSEL:

A. William Urquhart
Charles K. Verhoeven
Erica P. Taggart
Marshall Searcy
Patrick Shields
Ryan Goldstein
Aaron Craig
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street
Los Angeles, CA 90017
(213) 443-3000

Kathleen M. Sullivan
David Elsberg
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

/s/ Thomas A. Beck
Thomas A. Beck (#2086)
Lisa A. Schmidt (#3019)
Jeffrey L. Moyer (#3309)
Steven J. Fineman (#4025)
Blake K. Rohrbacher (#4750)
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19899
(302) 651-7700

*Attorneys for Plaintiffs Nokia Corporation and Nokia Inc.*

Mark A. McCarty
Alston + Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309
(404) 881-7000

S. Gardner Culpepper, III
Ashe Rafuse & Hill, LLP
1355 Peachtree Street, N.E.
Suite 500, South Tower
Atlanta, Georgia 30309
(404) 253-6000

Dated:  July 8, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of July 2008, true and correct copies of the foregoing

document were caused to be served on counsel of record at the following address as indicated:

**BY E-FILE**
Brian C. Ralston, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899

                                        /s/ Steven J. Fineman
                                   Steven J. Fineman (#4025)

## CERTIFICATE OF SERVICE

I hereby certify that, on the 15th day of July 2008, true and correct copies of the foregoing document were caused to be served on counsel of record at the following address as indicated:

> **BY E-FILE**
> Brian C. Ralston, Esquire
> Potter Anderson & Corroon LLP
> 1313 North Market Street
> P.O. Box 951
> Wilmington, DE  19899

Blake K. Rohrbacher (#4750)

RLF1-3302888-1