SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
STEPHEN S. KORNICZKY, Cal. Bar No. 135532
MARTIN R. BADER, Cal. Bar No. 222865
MATTHEW W. HOLDER, Cal. Bar No. 217619
12275 El Camino Real, Suite 200
San Diego, California 92130
Telephone:   858.720.8900
Facsimile:   858.509.3691
E mail        skorniczky@sheppardmullin.com
              mbader@sheppardmullin.com
              mholder@sheppardmullin.com

MICHAEL W. SCARBOROUGH, Cal. Bar No. 203524
MONA SOLOUKI, Cal. Bar No. 215145
Four Embarcadero Center, 17th Floor
San Francisco, California 94111
Telephone:   415.434.9100
Facsimile:   415.434.3947
E mail        mscarborough@sheppardmullin.com
              msolouki@sheppardmullin.com

Attorneys for Plaintiff
Continental Automotive Systems, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation,<br><br>                 Plaintiff,<br><br>        v.<br><br>AVANCI, LLC, a Delaware corporation, AVANCI PLATFORM | Case No. 19-cv-2520-LHK<br><br>**FIRST AMENDED COMPLAINT FOR BREACH OF FRAND COMMITMENTS AND VIOLATIONS OF ANTITRUST AND UNFAIR COMPETITION LAWS:**<br><br>**(1) Breach of Contract;** |

1  INTERNATIONAL LIMITED, an Irish
2  company, NOKIA CORPORATION, a
   Finnish corporation, NOKIA OF
3  AMERICA CORPORATION, a
4  Delaware corporation, NOKIA
   SOLUTIONS AND NETWORKS US
5  LLC, a Delaware corporation, NOKIA
6  SOLUTIONS AND NETWORKS OY,
   a Finnish corporation, NOKIA
7  TECHNOLOGIES OY, a Finnish
8  corporation, CONVERSANT
   WIRELESS LICENSING SARL, a
9  Luxembourg corporation, OPTIS UP
10 HOLDINGS LLC, a Delaware
   corporation, OPTIS CELLULAR
11 TECHNOLOGY, LLC, a Delaware
12 corporation, OPTIS WIRELESS
   TECHNOLOGY, LLC, a Delaware
13 corporation, SHARP CORPORATION,
14 a Japanese corporation,

15         Defendants.

16

**(2) Promissory Estoppel;**

**(3) Declaratory Judgment;**

**(4) Violation of Section 1 of the Sherman Act—Concerted Action Unreasonably Restraining Trade**

**(5) Violation of Section 2 of the Sherman Act—Unlawful Monopolization;**

**(6) Violation of Section 2 of the Sherman Act—Conspiracy to Monopolize;**

**(7) Violations of the California Unfair Competition Law, Business and Professions Code Section 17200 et seq.**

Plaintiff Continental Automotive Systems, Inc. ("Continental" or "Plaintiff") alleges the following facts and claims against Defendants Avanci, LLC, Avanci Platform International Limited (collectively, "Avanci"), Nokia Corporation ("Nokia Corp."), Nokia of America Corporation ("Nokia America"), Nokia Solutions and Networks US LLC ("Nokia Solutions"), Nokia Solutions and Networks Oy ("Nokia Solutions Oy"), Nokia Technologies Oy ("Nokia Technologies Oy") (Nokia Corp., Nokia America, Nokia Solutions, Nokia Solutions Oy, and Nokia Technologies Oy collectively referred to herein as "Nokia"), Conversant Wireless Licensing SARL ("Conversant SARL"), Optis UP Holdings, LLC ("Optis UP"), Optis Cellular Technology, LLC ("Optis Cellular"), Optis Wireless Technology, LLC ("Optis Wireless") (Optis UP, Optis Cellular, and Optis Wireless collectively referred to herein as "PanOptis"), Sharp Corporation ("Sharp") (collectively, "Defendants") (Nokia, Conversant, PanOptis, and Sharp collectively referred to herein as "Defendant Licensors").

## **INTRODUCTION**

1.     Continental, a leading provider of cutting-edge automotive components, including gateway products and telematics control units ("TCUs"), brings this lawsuit because of Defendants' concerted refusal to license their alleged standard essential patents ("SEPs") relevant to the 2G, 3G, and 4G cellular standards to Continental and its suppliers on fair, reasonable, and non-discriminatory ("FRAND") terms and conditions.[1]  Continental is a willing licensee, and seeks to pay a FRAND royalty rate for a license to the SEPs owned or controlled by Defendants.  Accordingly, Continental seeks a declaration of its rights and Defendants' breaches of contract and other violations of law, as well as the determination and imposition of the FRAND terms and conditions for a license to the SEPs owned or controlled by Defendants.

---

[1] For purposes of this Complaint, FRAND will also mean and refer to reasonable and non-discriminatory ("RAND") terms and conditions.

2.      In today's society, many products in addition to mobile phones, including cars, also include cellular connectivity.  For example, cars use cellular connectivity for emergency communications, among others.  A car can provide such connectivity primarily through a telecommunications chipset, known as a baseband processor, which is the core electronic component that allows it to transmit and receive information to and from a cellular communications network.  The baseband processor is typically incorporated within a network access device ("NAD"), which is itself often a sub-system of the TCU.  The TCU includes additional functionality and components beyond cellular communication, including, by way of example, GPS, interface software, and control functions.  The car into which the TCU (and thus the NAD and baseband processor) is incorporated obviously includes many functionalities having nothing to do with cellular connectivity, which is at best tangential to the main functionality of a car.

3.      Enabling cellular connectivity requires the use of widely adopted cellular standards, such as the second generation ("2G"), third generation ("3G"), and/or fourth generation ("4G") cellular standards adopted by various standard-setting organizations ("SSOs"), such as ETSI, ATIS, TIA, ARIB, CCSA and others (addressed in more detail beginning at paragraph 64).  Continental is a Tier 1 supplier of TCUs to various automotive original equipment manufacturers ("OEMs"), *i.e.*, vehicle manufacturers.  Continental sources its NADs primarily from Tier 2 suppliers, who in turn source the necessary baseband processor chipsets that enable cellular connectivity from companies that manufacture such chipsets (*e.g.*, Qualcomm, Intel, or MediaTek, sometimes referred to as Tier 3 suppliers).

4.      Defendant Licensors claim to own patents that have been declared essential to the cellular standards that are implemented in the components and/or subsystems supplied by Tier 1, Tier 2, and Tier 3 suppliers, including Continental.  Avanci is a self-proclaimed "licensing platform" purporting to offer "one-stop" access to essential patents necessary for cellular connectivity.  On

information and belief, Avanci claims to license the majority of the total SEPs necessary for implementing the 2G, 3G, and 4G cellular standards, although Avanci does not disclose the actual percentage.  Avanci purportedly does not own any patents directly, but rather acts on behalf of Defendant Licensors and other owners of SEPs (collectively "Avanci Members") as their licensing agent for the alleged SEPs, and controls the licensing of those SEPs.

5.      On information and belief, all of the SEPs at issue are the subject of express and voluntary promises made either directly by Defendant Licensors, or their predecessors-in-interest, to the relevant SSOs pursuant to those SSOs' Intellectual Property Rights ("IPR") Policies.  Such IPR Policies all require Defendants to license the alleged SEPs to any user of the standard that requests a license, and do so on FRAND terms and conditions.  The SSOs relied on such FRAND commitments when they purportedly incorporated Defendant Licensors' proprietary technology into their standards.

6.      The relevant SSOs require FRAND commitments in recognition of the dangers inherent in collective standard-setting activities which eliminate competitive technological alternatives that otherwise would have existed in the market.  Once standardized, a technology is "locked in" and must be practiced by all who wish to produce standard-compliant products.  Such lock-in gives SEP owners the market power to exclude companies from practicing the standard, and to raise the cost of practicing the standards by charging supra-competitive royalties in excess of the *ex ante* value of such technology when it still competed with alternatives.  This phenomenon is often referred to as "hold-up."  Such market power does not derive from the original patenting of the SEPs at issue, but results directly from collective action.  In order to ameliorate the risks posed by the existence of this market power, and as a trade-off for having its proprietary technology included in the standards, which in turn enables the SEP owner to license a much greater volume of products than would be the case if the technology was not used in the standards, the SEP

1    owner is required to make the FRAND licensing commitment.

2        7.      Continental, as a supplier of TCUs implementing various cellular

3    standards, relies on such FRAND licensing promises and is a third-party beneficiary

4    of the SEP holders' FRAND promises to the relevant SSOs.  However, with respect

5    to the alleged SEPs owned or controlled by Defendants, Continental's repeated

6    attempts to obtain a license have been unsuccessful.

7        8.      Upon information and belief, Defendants have collusively agreed to

8    only offer licenses to the automotive industry at the OEM level in an attempt to

9    obtain elevated royalties that far exceed any measure of FRAND.  Indeed,

10   Continental has sought a license from each of the Defendants, including Avanci, the

11   Defendants' purported collective licensing "agent," but has been met with either

12   refusals to offer a direct license, or no response whatsoever.  For example, when

13   Continental sought a license from Avanci, Avanci informed Continental that, as part

14   of Avanci's collective agreement with its members, Avanci is only authorized to

15   license at the OEM level.  Moreover, Avanci would only seek the additional

16   authorization required to license Continental if Continental first agreed to be bound

17   by Avanci's inflated and non-FRAND royalty rates offered to the OEMs—a

18   proposal Avanci knew Continental could not agree to.

19       9.      On information and belief, Avanci demands as much as $15/vehicle for

20   a license to the Avanci Members' patents covering 4G/3G/2G and E-Call

21   capabilities.  This amount exceeds any measure of FRAND for that combination of

22   patents.  There is no economic, technical, or other valid justification for royalty rates

23   this high, and such rates are not consistent with the incremental value of

24   Defendants' SEPs, if any, to the relevant products in the supply chain.  Indeed, such

25   royalties would not be sustainable if charged to the Tier 1, Tier 2, or Tier 3 levels of

26   the supply chain.  For example, a typical baseband processor with 4G/3G/2G

27   capabilities costs around $20 or less, a typical NAD costs under $40, and a typical

28   TCU with such functionalities can cost under $100, with prices continually dropping

and subject to downward pressure within the supply chain.  If one assumes a TCU priced at $75, then a $15 royalty even at the TCU level—two tiers above the baseband processor chipset, which is the component that directly implements the cellular standards at issue—would amount to a 20% effective royalty rate.  Such a royalty rate would exceed the profit margin on the TCU, let alone that of the NAD or the baseband processor which most directly implements the standards here.  Moreover, such a royalty would not account for the cost of licensing the remaining SEPs that are not part of the Avanci "platform" and must be separately licensed, and would imply effective aggregate royalties of as much as 40% at the TCU level, assuming Avanci actually licenses at least half of the relevant SEPs.

10.    Because Defendants could not justify such exorbitant royalties to the suppliers of components and subsystems in the supply chain, they colluded to maintain their exorbitant royalty rates—and thus their monopoly—by refusing to license Tier 1, Tier 2, or Tier 3 suppliers.  Instead, they agreed to require their licensing agent, Avanci, to offer to collectively license their SEPs only at the OEM level—where the optics of their non-FRAND licensing model would appear superficially less severe given the substantially higher price and margin of a car as compared to that of a baseband processor, NAD, or TCU.

11.    However, regardless of how Defendants attempt to spin their collusive licensing model, Continental and other Tier 1 suppliers in the supply chain directly bear the artificially elevated cost of Defendants' non-FRAND royalties because the OEMs typically demand indemnity of such licensing costs as a condition of purchasing any TCUs from Tier 1 suppliers.  Accordingly, royalties charged to OEMs risk being passed through to Tier 1 suppliers like Continental.  As alleged herein, such indemnity costs are disproportionate to Tier 1 suppliers' margins and expose them, including Continental, to potentially ruinous liability.  Defendants should not be permitted to achieve indirectly what they could not do directly—*i.e.,* demand supra-FRAND royalties from suppliers within the supply chain that would

1  effectively wipe out those suppliers' margins and ability to continue in business.

2      12.    Continental, for its part, may not be able to pass on the indemnity costs

3  that would be associated with Defendants' collusive and elevated royalties.  To the

4  extent Continental must absorb such costs, it must forego investment and innovation

5  in TCUs and related products to the detriment of consumers.  Such indemnity costs

6  will substantially burden not only Continental, but also the entire Tier 1 supplier

7  industry in the form of lower investment and innovation, as other Tier 1 suppliers

8  face the same market realities as Continental.  Even if Continental theoretically

9  could pass on some of those royalty costs, it can be expected that at least a portion

10 of such costs will be passed on to American consumers in the form of higher prices

11 or lower functionality.  Either way, consumers will bear the ultimate costs as a result

12 of Defendants' refusal to license suppliers in the automotive supply chain, and also

13 their refusal to offer FRAND terms and conditions.

14     13.    None of the IPR policies established by the relevant SSOs in any way

15 restrict who is eligible and entitled to receive a FRAND license from the owners of

16 FRAND-encumbered SEPs.  Indeed, in such a consensus-oriented context involving

17 many competitors at different levels, it is doubtful that an express policy to

18 effectively exclude entire categories of implementers from access to the standards

19 would have survived the barest of antitrust scrutiny, or even gained the necessary

20 consensus among all relevant stakeholders.

21     14.    To the contrary, the IPR policies of all relevant SSOs expressly prohibit

22 owners of FRAND-encumbered SEPs from discriminating among users of the

23 standards.  For example, the ETSI IPR Policy requires SEP owners to commit to

24 provide "irrevocable licenses on fair, reasonable and nondiscriminatory ('FRAND')

25 terms and conditions."  The TIA policy requires any SEP holder that wishes to

26 monetize its essential patents to commit to license SEPs "to all applicants under

27 terms and conditions that are reasonable and non-discriminatory . . . to the extent

28 necessary for the practice of . . . the Standard."  The ATIS policy requires SEP

holders to commit that a license "will be made available to applicants desiring to utilize the license for the purpose of implementing the standard . . . under reasonable terms and conditions that are demonstrably free of any unfair discrimination." Other relevant SSOs' IPR policies are similar and consistent.

15.     Thus, Defendants' collusive agreement to discriminate against suppliers, like Continental, by refusing to license the relevant 2G, 3G, and 4G SEPs to Continental and other suppliers on FRAND terms and conditions not only breaches Defendants' FRAND commitments, but constitutes anticompetitive conduct in violation of the antitrust laws resulting in reduced competition and innovation in both the upstream technology licensing markets and the downstream TCU market, and higher prices to ultimate consumers as further alleged herein.  As a result, Continental has brought this lawsuit in order to address the above breaches of contract and other violations of law, and obtain a license to the SEPs owned or controlled by Defendants on FRAND terms and conditions.

## THE PARTIES

### A.     Continental

16.     Plaintiff Continental Automotive Systems, Inc. ("Continental") is a corporation organized under the laws of the State of Delaware, with its principal place of business at One Continental Drive, Auburn Hills, Michigan 48326.

17.     Continental is an indirect subsidiary of Continental AG, a corporation organized and existing under the laws of Germany.  Continental AG was originally founded in 1871 as a rubber manufacturer, focusing its business on automotive tires. Since then, Continental AG has expanded into new automotive business areas, becoming one of the leading suppliers to automotive OEMs worldwide.  Today, Continental AG's business is organized into five divisions:  the Interior Division, the Chassis & Safety Division, the Powertrain Division (collectively forming the Automotive Group), the Tire Division, and the ContiTech Division (collectively forming the Rubber Group).

18.     The Interior Division develops, *inter alia*, highly innovative telematics devices, including TCUs that merge telecommunications, infotainment, and safety features.  The TCUs produced by Continental rely on telecommunications standards, such as 2G, 3G, and/or 4G cellular standards, to transmit and receive data used by these features.  Indeed, Continental was an early innovator in the design and production of TCUs.  Continental and/or Continental AG also spend millions of dollars in research and development in an effort to engineer solutions that are separate from or in addition to the cellular connections made by connected vehicles.

19.     In April 2017, a nearly 65,000 square foot research and development center was opened in Silicon Valley, with activity that includes a focus on connectivity and mobility services.  Through this research and development center in Silicon Valley, all areas of Continental cooperate in an interdisciplinary and collaborative manner to engineer Continental's next innovative contributions to the automotive market.

**B.     Avanci**

20.     Upon information and belief, defendant Avanci, LLC is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business at 1717 McKinney Avenue, Suite 1050, Dallas, Texas 75202.

21.     Upon information and belief, defendant Avanci Platform International Limited (collectively with Avanci, LLC, "Avanci") is a company organized and existing under the laws of Ireland, having its principal place of business at Unit 40, The Hyde Building, The Park, Carrickmines, Dublin 18, Ireland D18 PX40.

22.     Upon information and belief, Avanci regularly conducts business in California which supports its patent licensing business.

23.     Upon information and belief, Avanci derives revenues primarily from patent licensing and aggressively seeks to monetize the alleged SEPs for which it acts as licensing agent by targeting automotive OEMs that sell automobiles

incorporating components that operate in compliance with these standards, both in California and all around the world.

24.     Upon information and belief, Avanci claims to have the right to license a majority of the world's cellular SEPs spanning multiple jurisdictions and telecommunications technologies.

25.     Upon information and belief, Avanci has engaged in licensing and related business negotiations within this judicial district, including with at least defendant Conversant SARL (Conversant SARL's Chief Executive Officer, who announced Conversant SARL's relationship with Avanci, is based in Conversant's office within this judicial district), InterDigital, Inc. ("InterDigital") (InterDigital has offices and high level officers in this judicial district), and defendant Nokia (Nokia has multiple offices in this judicial district and high level licensing negotiation personnel in this judicial district).

26.     Upon information and belief, Avanci has entered into license agreements with entities located within this judicial district that require continuing obligations with this judicial district, and/or choice of law and forum selection clauses in this judicial district.  For example, at least Avanci Members BlackBerry, Conversant SARL, and Nokia all have a substantial presence in this judicial district and current or former principal places of business in this judicial district.

**C.     Nokia**

27.     Upon information and belief, defendant Nokia Corporation ("Nokia Corp.") is a corporation organized and existing under the laws of Finland, having its principal place of business at Karaportti 3, 02610 Espoo, Finland.

28.     Upon information and belief, defendant Nokia of America Corporation ("Nokia America") is a corporation organized under the laws of Delaware, having its principal place of business at 600 Mountain Avenue, Murray Hill, New Jersey 07974.  Upon information and belief, Nokia of America Corporation is a wholly owned subsidiary of Nokia Corporation.

29.     Upon information and belief, defendant Nokia Solutions and Networks US LLC ("Nokia Solutions") is a corporation organized under the laws of Delaware, having its principal place of business at 6000 Connection Drive, Irving, Texas 75039.  Upon information and belief, Nokia Solutions and Networks US LLC is a wholly owned subsidiary of Nokia Corp.

30.     Upon information and belief, defendant Nokia Solutions and Networks Oy ("Nokia Solutions Oy") is a corporation organized and existing under the laws of Finland, having its principal place of business at Karaportti 3, 02610 Espoo, Finland.  Upon information and belief, Nokia Solutions Oy is a wholly owned subsidiary of Nokia Corp.

31.     Upon information and belief, defendant Nokia Technologies Oy is a corporation organized and existing under the laws of Finland, having its principal place of business at Karaportti 3, 02610 Espoo, Finland.  Upon information and belief, Nokia Technologies Oy is a wholly owned subsidiary of Nokia Corp.

32.     Upon information and belief, Nokia America, Nokia Solutions, Nokia Solutions Oy, and Nokia Technologies Oy are all wholly-owned direct or indirect subsidiaries of Nokia Corp.  Nokia Corp., Nokia America, Nokia Solutions, Nokia Solutions Oy, and Nokia Technologies Oy (collectively "Nokia") act as a common, unified economic enterprise.

33.     Upon information and belief, Nokia conducts business within the United States as a whole, including having employees located at multiple offices and campuses within this judicial district with locations including Mountain View, San Jose, Sunnyvale, and Petaluma.  Upon information and belief, Nokia supports its patent licensing business through its operations within this judicial district, and has sent licensing correspondence to Continental's affiliate from its offices in this judicial district.

34.     Upon information and belief, Nokia joined the Avanci platform on or about October 25, 2018.

### D.   Conversant

35.   Upon information and belief, defendant Conversant Wireless Licensing SARL ("Conversant SARL") is a corporation organized and existing under the laws of Luxembourg, having its principal place of business at 12, rue Jean Engling, L-1466 Luxembourg, Luxembourg.

36.   Upon information and believe, Conversant SARL conducts business within the United States as a whole, which supports its patent licensing business.

37.   Upon information and belief, Conversant SARL derives revenues primarily from patent licensing and aggressively seeks to monetize its patents, which includes patents declared essential to the 2G, 3G, and 4G standards—at least through its agent Avanci.

38.   Upon information and belief, Conversant SARL is a wholly-owned direct or indirect subsidiary of Conversant Intellectual Property Management Inc. ("Conversant IP Inc."), a corporation organized under the laws of Canada, having its principal place of business at 515 Legget Drive, Suite 704, Ottawa, Ontario, Canada K2K 3G4.

39.   Upon information and belief, Conversant Intellectual Property Management Corporation ("Conversant IP Corp."), is a corporation organized under the laws of Texas, having its principal place of business at 5601 Granite Parkway Suite 1300, Plano, TX 75024, and its principal business office in California at 2441 Park Blvd. Suite 104, Palo Alto, CA 94036.  Conversant Wireless Licensing Ltd. ("Conversant Wireless"), is a corporation organized under the laws of Texas, having its principal place of business at 5601 Granite Parkway Suite 1300, Plano, TX 75024.

40.   Upon information and belief, Conversant SARL, Conversant IP Corp., and Conversant Wireless are all wholly-owned direct or indirect subsidiaries of Conversant IP Inc.  Conversant IP Inc., Conversant SARL, Conversant IP Corp., and Conversant Wireless (collectively "Conversant") act as a common, unified

1   economic enterprise.

2       41.     Upon information and belief, Conversant has offices and employees in

3   the United States, including California, and/or regularly conducts business in

4   California and in this district, including via its office at 2441 Park Blvd, Suite 104,

5   Palo Alto, CA 94036, as well as the presence of the Chief Executive Officer of

6   Conversant IP Inc., Boris Teksler, in this district.  For example, Continental's

7   correspondence with Conversant relevant to this matter was directed to Conversant's

8   office in this judicial district.

9       42.     According to publicly available information, Conversant's patents are

10  held by Conversant SARL and are managed by Conversant by and through business

11  activity in this judicial district.

12      43.      Upon information and belief, Conversant SARL joined the Avanci

13  platform on or about October 10, 2018, by and through activities taking place in this

14  judicial district.

15      **E.      PanOptis/Unwired Planet**

16      44.     Upon information and belief, defendant Optis Wireless Technology,

17  LLC ("Optis Wireless") is a corporation organized and existing under the laws of

18  Delaware, having its principal place of business at 7160 Dallas Parkway, Suite 250,

19  Plano, TX 75024.

20      45.     Upon information and belief, defendant Optis Cellular Technology,

21  LLC ("Optis Cellular") is a corporation organized and existing under the laws of

22  Delaware, having its principal place of business at 7160 Dallas Parkway, Suite 250,

23  Plano, TX 75024.

24      46.     Upon information and belief, defendant Optis UP Holdings, LLC

25  ("Optis UP") is a corporation organized under the laws of Delaware, having its

26  principal place of business at 7160 Dallas Parkway, Suite 250, Plano, TX 75024.

27      47.     Optis UP, Optis Cellular, and Optis Wireless are collectively referred to

28  herein as "PanOptis."  Upon information and belief, PanOptis conducts business

1    within the United States as a whole, which supports its patent licensing business.

2         48.    Upon information and belief, PanOptis derives revenues primarily from

3    patent licensing and aggressively seeks to monetize its patents, which includes

4    patents declared essential to the 2G, 3G, and 4G standards—at least through its

5    agent Avanci.

6         49.    Upon information and belief, Optis Wireless, Optis Cellular, and Optis

7    UP are wholly-owned direct or indirect subsidiaries of PanOptis Patent

8    Management, LLC, a corporation organized and existing under the laws of

9    Delaware, having its principal place of business at 7160 Dallas Parkway, Suite 250,

10   Plano, TX 75024.

11        50.    Upon information and belief, PanOptis Patent Management, LLC

12   obtained all patents formerly owned by Unwired Planet, Inc., which patents are now

13   owned by Optis UP, which also operates under the name "Unwired Planet."

14        51.    Upon information and belief, PanOptis joined the Avanci platform on

15   or about March 6, 2017.

16        **F.    Sharp**

17        52.    Upon information and belief, defendant Sharp Corporation ("Sharp") is

18   a corporation organized and existing under the laws of Japan, having its principal

19   place of business at 1 Takumi-cho, Sakai-ku, Sakai-City, Osaka, 590-8522, Japan.

20   Upon information and belief, Sharp is also known as "Sharp Kabushiki Kaisha."

21        53.    Upon information and believe, Sharp conducts business within the

22   United States as a whole, which supports its patent licensing business.  Upon

23   information and belief, Sharp derives revenues from patent licensing and

24   aggressively seeks to monetize its patents, which includes patents declared essential

25   to the 2G, 3G, and 4G standards—at least through its agent Avanci.

26        54.    Upon information and belief, Sharp Electronics Corporation ("SEC") is

27   a wholly-owned direct or indirect subsidiary of Sharp.  Upon information and belief,

28   Sharp Business Systems, Inc. ("Sharp Business Systems") is a wholly-owned direct

1   or indirect subsidiary of SEC.

2       55.     Upon information and belief, Sharp, SEC, and Sharp Business Systems

3   act as a common, unified economic enterprise.  Upon information and belief, Sharp

4   Business Systems is a sales division of SEC, which is the United States sales and

5   marketing subsidiary of Sharp.  Upon information and belief, Sharp has employees

6   located at offices within and conducts business within this judicial district, including

7   in Pleasanton, California.

8       56.     Upon information and belief, Sharp joined the Avanci platform on or

9   about July 12, 2017.

10                      **JURISDICTION AND VENUE**

11      57.     Continental brings this action for specific performance, declaratory

12  relief, injunctive relief, costs of suit, and reasonable attorneys' fees arising under,

13  *inter alia*, Sections 1 and 2 of the Sherman Act and Section 16 of the Clayton Act,

14  15 U.S.C. §§ 1, 2, 26, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and

15  2202.  Accordingly, this Court has jurisdiction to hear this case pursuant to 28

16  U.S.C. §§ 1331 and 1337.

17      58.     To the extent any of Continental's claims are deemed to arise under

18  state law, this Court has subject matter jurisdiction over those claims pursuant to 28

19  U.S.C. § 1367, because such claims arise from the same factual nucleus as

20  Continental's federal law claims.

21      59.     This Court has personal jurisdiction over each defendant based on their

22  national contacts with the United States as a whole pursuant to 15 U.S.C. § 22, as

23  well as Defendants' relevant contacts with this judicial district.  Upon information

24  and belief, each Defendant has conducted and continues to conduct business in this

25  judicial district and/or has engaged in continuous and systematic activities in this

26  judicial district, including licensing activities, demands, and negotiations in

27  California—at least through their agent Avanci.

28      60.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)

and (c) and/or 15 U.S.C. § 22.

61.    Upon information and belief, this Court has personal jurisdiction over defendant Avanci LLC at least pursuant to 15 U.S.C. § 22, as Avanci is incorporated within the United States and therefore has national contacts with the United States. Further, venue is proper over Avanci in this judicial district at least pursuant to 15 U.S.C. § 22, as Avanci transacts business within this judicial district.

62.    Upon information and belief, this Court has personal jurisdiction over defendant Avanci Platform International Limited at least pursuant to 15 U.S.C. § 22, as Avanci Platform International Limited has acted within any district of the United States at least by and through licensing with companies within the United States and therefore has national contacts with the United States.  Further, venue is proper over Avanci Platform International Limited in this judicial district at least pursuant to 28 U.S.C. § 1391(c)(3).

63.    Upon information and belief, this Court has personal jurisdiction over defendants Nokia Corporation, Nokia Solutions and Networks Oy, and Nokia Technologies Oy at least pursuant to 15 U.S.C. § 22, as Nokia Corporation, Nokia Solutions and Networks Oy, and Nokia Technologies Oy each have acted within any district of the United States at least by and through their license and preceding negotiations with Avanci, and therefore each has national contacts with the United States.  Further, venue is proper over Nokia Corporation, Nokia Solutions and Networks Oy, and Nokia Technologies Oy in this judicial district at least pursuant to 28 U.S.C. § 1391(c)(3).

64.    Upon information and belief, this Court has personal jurisdiction over defendants Nokia of America Corporation and Nokia Solutions and Networks US LLC at least pursuant to 15 U.S.C. § 22, as Nokia of America Corporation and Nokia Solutions and Networks US LLC are incorporated within the United States and therefore have national contacts with the United States.  Additionally, personal jurisdiction over defendants Nokia of America Corporation and Nokia Solutions and

1  Networks US LLC is proper in this judicial district due to Nokia of America

2  Corporation and Nokia Solutions and Networks US LLC having substantial and

3  continuous contacts with this judicial district.  Further, venue is proper over Nokia

4  of America Corporation and Nokia Solutions and Networks US LLC in this judicial

5  district at least pursuant to 15 U.S.C. § 22, as Nokia of America Corporation and

6  Nokia Solutions and Networks US LLC each transact business within this judicial

7  district.

8        65.    Upon information and belief, this Court has personal jurisdiction over

9  defendant Conversant SARL at least pursuant to 15 U.S.C. § 22, as Conversant

10  SARL has acted within any district of the United States at least by and through its

11  license and preceding negotiations with Avanci, and therefore has national contacts

12  with the United States.  Additionally, this Court has personal jurisdiction over

13  Conversant SARL at least through its substantial and continuous contacts with this

14  judicial district.  Finally, venue is proper over Conversant SARL in this judicial

15  district at least pursuant to 28 U.S.C. § 1391(c)(3).

16        66.    Upon information and belief, this Court has personal jurisdiction over

17  defendants Optis Wireless, Optis Cellular, and Optis UP in this judicial district at

18  least pursuant to 15 U.S.C. § 22, as Optis Wireless, Optis Cellular, and Optis UP are

19  incorporated within the United States and therefore have national contacts with the

20  United States.  Further, venue is proper over Optis Wireless, Optis Cellular, and

21  Optis UP in this judicial district at least pursuant to 15 U.S.C. § 22, as Optis

22  Wireless, Optis Cellular, and Optis UP all transact business within this judicial

23  district.

24        67.    Upon information and belief, this Court has personal jurisdiction over

25  defendant Sharp in this judicial district at least pursuant to 15 U.S.C. § 22, as Sharp

26  has acted within any district of the United States at least by and through its license

27  and preceding negotiations with Avanci, and therefore has national contacts with the

28  United States.  Additionally, this Court has personal jurisdiction over Sharp at least

through its substantial and continuous contacts with this judicial district.  Further, venue is proper over defendant Sharp in this judicial district at least pursuant to 28 U.S.C. § 1391(c)(3).

**INTRADISTRICT ASSIGNMENT**

68.     Assignment to the San Jose Division is proper.  This action arises in Santa Clara County because a substantial part of the events or omissions which give rise to the claim occurred in Santa Clara County.  Continental has a large research and development facility in Santa Clara, with activity that includes a focus on connectivity and mobility services.  Defendant Nokia has offices in Sunnyvale, San Jose, and Mountain View.  Defendant Conversant has offices and high-level officers located in Palo Alto.  Third parties that have information relevant to this action, including other Avanci Members, also have offices in Santa Clara County.

**FACTUAL ALLEGATIONS**

69.     As explained below, Continental brings this action because of Defendants' unlawful refusal to license Continental and other suppliers within the automotive supply chain with respect to their patents asserted to be essential to the 2G, 3G, and 4G cellular standards, as well as their failure and refusal to offer FRAND terms and conditions for such a license.

**I.     Overview of Standard Setting Organizations and Relevant Standards**

70.     Cellular communications depend on widely distributed networks that implement cellular communications standards.  These standards promote availability and interoperability of standardized products regardless of geographic boundary. Cellular standards have evolved over generations, beginning with the "first generation"—or "1G"—standards developed in the 1980s. *See In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948, 955 (N.D. Cal. 2017).  Second, third, and fourth generation standards followed.

71.     Industry groups called standard-setting organizations, or SSOs, have emerged to develop and manage the relevant cellular standards.  SSOs are voluntary

membership organizations whose participants engage in the selection and development of industry technical standards, such as cellular communication standards, which provide important benefits by resolving interoperability problems. Common SSOs in the cellular communications field are the European Telecommunications Standards Institute ("ETSI"), the Telecommunications Industry Association ("TIA"), the Alliance for Telecommunications Industry Solutions ("ATIS"), T1P1, the Association of Radio Industries and Businesses ("ARIB"), the Telecommunications Technology Committee ("TTC"), and the China Communications Standards Association ("CCSA").

72.     As work began on third generation—or "3G"—cellular communication standards, collaborations of SSOs formed to ensure global standardization. One such collaboration is the Third Generation Partnership Project ("3GPP"). As 4G technology emerged, 3GPP also developed the 4G LTE family of standards. Another collaboration, the Third Generation Partnership Project 2 ("3GPP2"), focused its 3G standardization efforts on the CDMA2000 standard.

73.     Individual member SSOs of 3GPP and 3GPP2 are known as Organizational Partners. An Organizational Partner approves and maintains the 3GPP or 3GPP2 scope and transposes 3GPP or 3GPP2 technical specifications into the Organizational Partner's own standards. ETSI, ATIS, ARIB, TTC, and CCSA are all organizational partners of 3GPP. TIA, ARIB, and TTC are all organizational partners of 3GPP2.

74.     Prior to the adoption of 2G standards, 1G cellular connectivity offered relatively basic functionality, supporting just a few analog signals (as opposed to the digital signals used today). In the late 1980s, the cellular industry began moving towards 2G and considered a number of different standards, including the Global System for Mobile communications ("GSM"), the Generalized Packet Radio System ("GPRS"), Enhanced GPRS ("EDGE"), and Code Division Multiple Access ("CDMA"). Ultimately GSM and CDMA became the primary standards in 2G

1 cellular communications.  The two 2G standards were not interoperable; thus a

2 device configured for one network would not operate on the other.

3      75.    In the late 1990s, the cellular industry pushed towards 3G, which

4 offered higher transmission speeds, ability to support more users, and improved

5 reliability.  The leading 3G standards families were CDMA2000 and the Universal

6 Terrestrial Radio Access ("UTRA"), which operated in various modes around the

7 world, including Wideband CDMA ("WCDMA") and Time Division Synchronous

8 Code Division Multiple Access ("TD-SCDMA").  The WCDMA standard was also

9 known as Universal Mobile Telecommunications System ("UMTS"), with High

10 Speed Packet Access ("HSPA") which utilized at least two protocols:  High Speed

11 Downlink Packet Access ("HSDPA") and High Speed Uplink Packet Access

12 ("HSUPA").  Once again, the two main 3G standards were not interoperable, and

13 thus a device configured for a CDMA2000 network would not function on a UMTS

14 network.

15      76.    In the late 2000s, the cellular industry came together for 4G to develop

16 a single standard:  Evolved UTRA ("E-UTRA"), more commonly referred to as

17 Long Term Evolution ("LTE").  LTE was adopted almost universally as the 4G

18 cellular communication standard.

19 **II.**    **The Importance of FRAND Commitments in the Context of Voluntary**

20     **Standard Setting**

21      77.    Although standards deliver economic benefits, they can also present

22 anticompetitive risks that potentially impose excessive and unfair costs on users of

23 the standards, and even hinder broad implementation of the standards.  SSO

24 members often own or hold patents covering the technologies adopted into the

25 standards, creating a potential for market-distorting behavior whereby the owners of

26 essential technology attempt to capture not only the value of the patented

27 technology, but also the value of standardization itself.  Such behavior could involve

28 refusing to license certain users of the standards, or demanding supra-FRAND

1  royalties that are disproportionate to the value of the essential technology at issue.

2       78.    In order to prevent the owner of a patent essential to complying with

3  the standard—the "SEP holder"—from blocking or otherwise inhibiting

4  implementation of a given standard, the relevant cellular SSOs maintain IPR

5  policies which impose certain duties on SEP holders.  Such policies require and/or

6  strongly encourage each party that participates in the standard-development process

7  to disclose on a timely, bona fide basis, all intellectual property rights they are aware

8  of and believe may be essential to a proposed standard.  *See, e.g.*, ETSI IPR Policy,

9  § 4.1; TIA IPR Policy, § 3.1.2; ATIS Operating Procedure, § 10.4.2 at 10.

10      79.    The relevant SSO IPR policies additionally require members who wish

11 to voluntarily contribute essential IPR to the standards to commit to license their

12 asserted SEPs to firms implementing the standard on FRAND terms and conditions.

13 *See, e.g.*, ETSI IPR Policy, § 6.1; TIA IPR Policy, § 3.1.1; ATIS Operating

14 Procedure, § 10.4.2 at 10, 11.  These FRAND commitments are recognized as

15 encumbrances that bind all successors-in-interest to such asserted SEPs.  *See, e.g.*,

16 ETSI IPR Policy, § 6.1bis; TIA IPR Policy, § 3.1.1; ATIS Operating Procedure, §

17 10.4.2 at 11.

18      80.    Moreover, it has been judicially determined that, *as a matter of law*, the

19 TIA and ATIS IPR policies require a SEP holder to license its alleged SEPs on

20 FRAND terms and conditions to any implementer within a given supply chain that

21 uses the standards, and not merely to the manufacturers of "end-products."  There is

22 no material difference between the TIA and ATIS IPR policies and those of ETSI

23 and other SSOs that have adopted the same cellular standards.  Accordingly,

24 Defendants have a duty to license users of relevant cellular standards within the

25 automotive supply chain, including component suppliers like Continental, regardless

26 of their position within that supply chain.

27      81.    By voluntarily undertaking FRAND licensing commitments, SEP

28 holders benefit from the broad implementation of their patented technologies as a

result of standardization, which significantly expands the pool of licensees who must practice any essential patents to all those who produce and sell standard-compliant products.  In exchange, the SEP holders agree not to abuse the market power resulting from the patent's incorporation into the standard to the exclusion of other alternatives.

82.     These FRAND commitments provide firms that implement the standard—such as Continental— the assurance that they will always have access to the essential technology and will not be denied access to the standardized technology or disadvantaged relative to others if they invest in implementing the standard or developing innovative products that may operate with the standard.

83.     When SEPs are not available for FRAND licensing, the relevant SSOs have an obligation to reassess, and then revise or even abandon the portions of their standards that rely on such essential proprietary technologies.  For example, under the ETSI IPR Policy, "[w]here prior to the publication of a STANDARD or a TECHNICAL SPECIFICATION, an IPR owner informs ETSI that it is not prepared to license an IPR" on FRAND terms pursuant to the policy, ETSI is required to select another "viable alternative technology" solution "which is not blocked by that IPR and satisfies ETSI's requirements." *Id.*, § 8.1.1.  If no such viable solution exists, then work on the standard "shall cease[.]"  The TIA IPR Policy similarly provides that in the absence of the required FRAND commitment, the standard is to be "referred back to the Formulating Group for further consideration[,]" TIA IPR Policy § 4 at 11-12, and may be withdrawn by TIA, *id.* § 3.1.3 at 9-10.  Other relevant SSOs have policies similar to the policies at ETSI and TIA.

84.     Thus, by making an affirmative and voluntary FRAND commitment, an SEP holder intentionally displaces the process within the SSOs whereby SSO members are duty-bound to re-evaluate their technical specifications when the unavailability of an essential technology under consideration is timely brought to their attention.

85.     Accordingly, to the extent that SSO participants may not have had the opportunity to consider alternatives that were available for FRAND licensing, or to withdraw the portions of the standards where no such alternative was available, such failure was directly due to Defendant Licensors' affirmative FRAND licensing representations that induced the SSO participants to forego such opportunity.

### III.   Defendants' FRAND Commitments to SSOs

86.     Upon information and belief, certain Defendants are directly obligated to license their SEPs on FRAND terms and conditions by virtue of the declarations they made with regard to their own patents.  Moreover, upon information and belief, certain defendants are either successors-in-interest to or otherwise the authorized licensing agents for certain alleged SEPs that were originally declared to be essential to standards by other SEP holders who gave irrevocable FRAND licensing commitments and are obligated to license any SEPs they own or control on FRAND terms and conditions.

87.     Defendant Nokia has participated in the cellular standard setting process through membership in various SSOs, including ETSI, TIA, and ATIS.  On information and belief, Nokia has declared that certain of its patents or patent applications may be or may become essential to cellular standards under consideration by such SSOs, and committed to grant licenses to the disclosed patents on FRAND terms and conditions.

88.     Nokia made these declarations to ensure that the cellular standards incorporated Nokia's technologies to the exclusion of alternatives, such that manufacturers of standard-compliant devices would require a license to Nokia's alleged SEPs.  While making such declarations to the relevant SSOs, Nokia concealed its intent to, among other things, refuse to license certain users of the standards in a given supply chain, charge supra-competitive royalty rates, and demand discriminatory terms and conditions for a license to its alleged SEPs.  The intent of this concealment was to deceive and induce the relevant SSOs to adopt

1   technologies Nokia declared to be essential to the standards.

2   89.   Defendant Conversant has participated in the cellular standard setting

3   process through its membership in at least ETSI.  Conversant has declared that

4   certain of its patents or patent applications may be or may become essential to

5   cellular standards adopted by ETSI, and committed to grant licenses to the disclosed

6   patents on FRAND terms and conditions.

7   90.   Conversant made these declarations to ensure that the cellular standards

8   incorporated Conversant's technologies to the exclusion of alternatives, such that

9   manufacturers of standard-compliant devices would require a license to

10   Conversant's alleged SEPs.  While making such declarations to the relevant SSOs,

11   Conversant concealed its intent to, among other things, refuse to license certain

12   users of the standards in a given supply chain, charge supra-competitive royalty

13   rates, and demand discriminatory terms and conditions for a license to its alleged

14   SEPs.  The intent of this concealment was to deceive and induce the relevant SSOs

15   to adopt technologies Conversant declared to be essential to the standards.

16   91.   Upon information and belief, Conversant is either an assignee or the

17   licensing agent of certain original alleged SEP holders for certain cellular SEPs that

18   are the subject of FRAND commitments, including, on information and belief, many

19   patents declared by Nokia to be essential to various cellular standards and subject to

20   irrevocable FRAND commitments.  Conversant acknowledges that its portfolio

21   includes many declared SEPs that it seeks to license on FRAND terms.  (*See*

22   http://www.conversantip.com/news-article/conversant-wireless-files-uk-patent-

23   infringement-and-frand-case-against-huawei-and-zte/.)

24   92.   Defendant PanOptis has participated in the cellular standard setting

25   process through ETSI, TIA, and ATIS.  Indeed, PanOptis has declared, to at least

26   ETSI, that certain of its patents or patent applications may be or may become

27   essential to cellular standards under consideration, with such declarations

28   committing PanOptis to grant licenses to the disclosed patents on FRAND terms and

1 | conditions.

2 |     93.    PanOptis made these declarations to ensure that the cellular standards

3 | incorporated PanOptis's technologies to the exclusion of alternative technologies,

4 | and also so that manufacturers of standard-implementing devices would require a

5 | license to PanOptis's alleged SEPs.  While making the above declarations to at least

6 | ETSI, PanOptis concealed its intent to, among other things, charge supra-

7 | competitive royalty rates and demand discriminatory terms and conditions for a

8 | license to its alleged SEPs.  The intent of this concealment was to deceive at least

9 | ETSI members so that technologies PanOptis claims to have patented were included

10 | in the standards.

11 |     94.    Upon information and belief, PanOptis is at a minimum an assignee or

12 | the licensing agent of original alleged SEP holders for certain cellular SEPs that are

13 | subject to FRAND commitments to various SSOs, including patents declared by at

14 | least LG, Ericsson, and Panasonic to be essential to various cellular standards and

15 | subject to irrevocable FRAND commitments.  PanOptis recognizes its duty to

16 | license those SEPs on FRAND terms.  (*See* http://www.panoptis.com/.)

17 |     95.    Upon information and belief, defendant Optis UP is at a minimum an

18 | assignee or the licensing agent of original alleged SEP holders for certain cellular

19 | SEPs that are subject to FRAND commitments to various SSOs, including patents

20 | declared essential to various cellular standards and subject to irrevocable FRAND

21 | commitments made to at least ETSI by Ericsson.  Indeed, Optis UP obtained its

22 | patent portfolio from Unwired Planet who was similarly subject to the irrevocable

23 | FRAND commitments made by Ericsson and other assignees.  Such FRAND

24 | commitments were made by SEP holders, including Ericsson, without disclosing

25 | their intent to, among other things, charge supra-competitive royalty rates and

26 | demand discriminatory terms and conditions for a license to their alleged SEPs.

27 | SSO members relied on such unqualified FRAND commitments when they adopted

28 | such patented technologies into standards.

96.     Defendant Sharp has participated in the cellular standard setting process through membership in various SSOs, including ETSI.  On information and belief, Sharp has declared that certain of its patents or patent applications may be or may become essential to cellular standards under consideration by such SSOs, and committed to grant licenses to the disclosed patents on FRAND terms and conditions.

97.     Sharp made these declarations to ensure that the cellular standards incorporated Sharp's technologies to the exclusion of alternatives, such that manufacturers of standard-compliant devices would require a license to Sharp's alleged SEPs.  While making such declarations to the relevant SSOs, Sharp concealed its intent to, among other things, refuse to license certain users of the standards in a given supply chain, charge supra-competitive royalty rates, and demand discriminatory terms and conditions for a license to its alleged SEPs.  The intent of this concealment was to deceive and induce the relevant SSOs to adopt technologies Sharp declared to be essential to the standards.

98.     Upon information and belief, Avanci members have all committed to license their alleged SEPs that are part of the Avanci licensing platform on FRAND terms pursuant to the IPR policies of various SSOs either directly, or indirectly through their predecessors-in-interest and/or principals.  Such FRAND commitments were made without disclosing an intent to, among other things, refuse to license certain users, charge supra-competitive royalty rates and demand discriminatory terms and/or conditions for a license to any relevant SEPs.  SSO members relied on such unqualified FRAND commitments when they adopted such patented technologies into standards.

99.     As described above, all of the alleged SEPs for which Avanci acts as licensing agent are encumbered by FRAND obligations, thus similarly obligating Avanci to also license them on FRAND terms and conditions.  Indeed, Avanci also has made public statements that it will, and is obligated to, license the patents which

have been committed to collective licensing by Avanci pursuant to the agency agreement with its members, on FRAND terms and conditions.  For example, on its website, Avanci asks itself whether "Avanci licensing [is] on FRAND terms?", and answers that question by saying "Absolutely.  Avanci shares a commitment with the IoT ecosystem to make the latest technology available in a way that is fair, reasonable and non-discriminatory (FRAND)."  (*See* www.avanci.com/faq/.)

100.   Avanci has also publicly acknowledged its obligation to offer licenses to any willing licensee, claiming, "We're serious about our responsibility to being fair and equitable. . . . Our transparent, open marketplace is *accessible to everyone*—ensuring those companies . . . using the technologies get a fair price, enabling them to continue developing the future of connected products."  (*See* www.avanci.com/vision) (emphasis added).)  Unfortunately, Avanci has not behaved consistent with this statement, because it will *not* license all companies who make standard-compliant products, its pricing methodology is *not* transparent, and the cost of an Avanci license is *not* at "a fair price."

101.   Because SSOs and users of the standards alike reasonably relied on FRAND promises made by the original SEP holders in adopting and implementing the standards at issue, such FRAND commitments have been recognized as encumbrances that bind subsequent licensors and transferees of such patents.  *See, e.g.*, ETSI IPR Policy, § 6.1bis.  This interpretation of FRAND is consistent with the IPR policies of all relevant SSOs which are intended to ensure the availability of the standardized technologies to any standards implementer.  Otherwise, SEP holders could subvert those policies by simply transferring those SEPs to other entities or delegating their licensing to others who did not make the original FRAND promises.

102.   Accordingly, to the extent certain Defendants, including Avanci, PanOptis, and Conversant, are either the licensing agents for or successors-in-interest of relevant FRAND-encumbered SEPs, they have the same irrevocable FRAND licensing obligations as the original declarants, and either knew or should

have known of the original transferees' FRAND promises and the resulting reliance by the SSOs and users of the standards alike.

## IV.   The Automotive Industry Supply Chain

103.   In the automotive industry, there is a well-established "division of labor" at least between the OEMs (*e.g.*, automobile manufacturers) and their Tier 1 suppliers (*e.g.*, Continental).  Tier 1 suppliers like Continental are much more than manufacturing companies.  Rather, they have the in-depth know-how and expertise to manufacture and constantly research and develop (and re-develop) a large number of complex automotive components that must be implemented in different vehicles manufactured by different OEMs.  Automotive OEMs then assemble the various components obtained from their various Tier 1 suppliers and combine them into the final vehicle.  In this sense, Tier 1 suppliers are one of the driving forces in the technological development of the automotive industry.  For example, in the TCU context, Tier 1 suppliers must determine the sub-components necessary for cellular connectivity and have the expertise to design a product (the TCU) that not only fits into the OEM's vehicle, but also seamlessly integrates with the vehicle's existing user interface.

104.   Tier 1 suppliers source components and subsystems, such as NADs, necessary for the products they manufacture from Tier 2 suppliers.  In turn, Tier 2 suppliers source the components necessary for their products from Tier 3 suppliers (manufacturers of the baseband processor, in the case of the TCU).  The manufacturers of the baseband processor chipsets provide their reference design to the Tier 2 suppliers in order to facilitate the making of a tested and functional modem for later use in the TCU.

105.   Automotive OEMs are highly sophisticated purchasers with the ability to exercise significant buyer power.  Automotive OEMs often initiate fierce bidding competitions in so-called "Request for Quotes" ("RFQs").  Often, the winning bid is the supplier with the ability to provide a product meeting the OEM's specifications

at the lowest price.  Additionally, this significant buyer power allows OEMs to traditionally require their suppliers to deliver components "free of (third party) rights."  Specifically, such requirements typically include assurances that the products supplied to the OEM do not violate patents or other intellectual property rights, as well as indemnification clauses obliging the Tier 1 supplier to indemnify the respective OEM for any royalties the OEM might pay for using and/or selling the product as part of a vehicle.

106.   Accordingly, Continental has a strong interest in obtaining adequate licensing to patents that may cover cellular standards implemented by the products it supplies to automotive OEMs.  However, Continental cannot do so because Defendants collectively have agreed to refuse to directly license Continental and its suppliers as part of a concerted scheme to charge elevated royalties to OEMs.  Even though Defendants refuse to license Continental directly, Continental bears the cost of Defendants' supra-competitive and non-FRAND royalties as alleged herein. Accordingly, Continental is a direct victim of Defendants' anticompetitive scheme (and arguably the most direct victim) and is best positioned to bring this action to seek to enforce the antitrust laws and Defendants' FRAND licensing commitments.

## V.     The Formation of Avanci as a Collusive Vehicle to Raise the Price of Utilizing Cellular Standards for IoT Applications

107.   Avanci is a purported "licensing platform" claiming to offer "one-stop" access to essential patented technology for wireless connected devices that are part of the Internet of Things, or "IoT."  To do so, Avanci acts as a licensing agent for a large group of patent owners and traditional patent licensors.  Presently, Avanci claims to act as a licensing agent for at least BlackBerry, BT Group, China Mobile, KPN, NTT Docomo, Ericsson, Fujitsu Ltd., Innovative Sonic, InterDigital, IP Bridge, NEC, Nippon Telegraph and Telephone Corporation ("NTT"), Panasonic, Qualcomm, Siemens, Sony, TNO, Vodafone, and ZTE (collectively, the "Non-Party Licensors"), as well as the Defendant Licensors.

108.   Upon information and belief, Avanci was formed in or around September 2016, primarily by Ericsson and Qualcomm, two of the largest cellular SEP licensors in the handset (*e.g.*, smartphone) industry.  Ericsson and Qualcomm have long exploited the handset industry through their lucrative licensing business model, whereby both refuse to license suppliers of baseband processors in order to preserve their ability to collect supra-FRAND royalties from downstream handset manufacturers.

109.   In recent years, this practice has come under increasing scrutiny by regulators worldwide, as well as the courts.  For example, in an enforcement action brought by the United States Federal Trade Commission against Qualcomm for, among other things, refusing to license baseband processor suppliers, the district court "conclude[d] that the TIA and ATIS IPR policies require Qualcomm to license its SEPs to modem chip suppliers." *Federal Trade Comm'n v. Qualcomm, Inc.*, Case No. 5:17-cv-00220-LHK, ECF 931 at 25 (N.D. Cal. Nov. 6, 2018).  After extensive investigation, the Korea Fair Trade Commission ("KFTC") similarly ordered that Qualcomm "shall negotiate licensing terms with the modem chipset manufacturer that is willing to enter into licensing in good faith . . . ."

110.   Ericsson, for its part, has also come under scrutiny for its excessive demands from handset manufacturers, with a court recently concluding that Ericsson's licensing offers to TCL, a handset manufacturer, were not FRAND, and setting FRAND rates that were far below Ericsson's demands. *See TCL Commc'n Tech. Holdings v. Telefonaktiebolaget LM Ericsson*, No: SACV 14-341 JVS(DFMx), 2018 WL 4488286 (C.D. Cal. Sep. 14, 2018).

111.   The emergence of the IoT, with various connected products like cars and smart meters, presented large SEP holders with an opportunity to tap into a new and enormous growing market for the licensing of their asserted SEPs.  At the same time, these SEP holders also wanted to preserve their ability to continue to extract supra-FRAND licensing revenues.  Thus, they colluded to create Avanci, which

1   would act as the "agent" for the licensing of their asserted cellular SEPs and those of

2   others who would join them in the scheme.  The Avanci Members, including

3   Defendant Licensors, knew that, collectively through Avanci, they would have

4   much greater bargaining power to extract elevated, supra-FRAND royalties than

5   each would have individually.  The larger the number of alleged SEPs included in

6   the "platform" (*i.e.*, pool), the greater pressure they could collectively exert on

7   companies who need a license to practice the standards, and the higher royalties they

8   could demand by collectively boycotting certain implementers in the supply chain.

9   Thus, the agreement to collectively license their asserted SEPs on non-FRAND

10  terms was a mechanism by which Defendant Licensors and other Avanci Members

11  could enhance and maintain the monopoly power they obtained through

12  standardization by enhancing their collective ability to exploit that power.

13          112.   Avanci was then authorized through a multilateral agreement with and

14  among its members to offer a collective license to its members' SEPs only to

15  manufacturers at the very end of a supply chain, like car OEMs.  To give the scheme

16  the superficial appearance of reasonableness, Avanci would charge a "flat" royalty

17  which varied with the type and price of the end-product implementing the cellular

18  standards.  Thus, the royalty for a car (a significantly more expensive end-product)

19  would be set higher than the royalty for a smart meter (a less expense product), even

20  though both products implement the particular standards by using a baseband

21  processor.  Further, Avanci would only target car OEMs even though there are

22  several intermediate (and vastly less expensive) components between the baseband

23  processor and the car which likewise implement the standards (namely, NADs and

24  TCUs), and are more analogous to a handset than a car is.  This scheme allowed

25  Defendants and other Avanci Members to maintain and, indeed, further extend their

26  end-product level licensing model in a way that is even further removed from the

27  core components which practice the standards, but would ensure the most revenue

28  possible for the licensors.

113.   At the heart of Defendants' scheme was the collective agreement among Avanci Members to not directly license upstream suppliers, such as suppliers of baseband processors, NADs, and TCUs within the automotive supply chain. Avanci has admitted to Continental that it lacks the authority, pursuant to its multilateral agreement with its members, to offer a license to Continental.  As alleged herein, this concerted refusal to license was a necessary mechanism for achieving Avanci's collective supra-FRAND royalties which could not be sustained if charged directly to suppliers in the supply chain with much smaller prices and margins.  Moreover, Defendants knew that a FRAND license to Tier 1, Tier 2, or Tier 3 suppliers would exhaust Avanci's ability to license car OEMs at much higher royalties.

114.   In keeping with this collective agreement, Avanci notified Continental that it would only seek authorization from its members to license Continental if Continental agreed in advance to pay the same inflated rates Avanci demands from the car OEMs, knowing fully well that Continental could not agree to such an unreasonable demand.  The result is that Defendants are able to collectively maintain cellular SEP licensing costs at higher levels than their FRAND obligations permit.

115.   Patent pools may be efficient by reducing the transactional costs of negotiating separate licenses with individual licensors.  However, any efficiency benefits quickly evaporate when a pool fails to incorporate structural protections to avoid illegal coordination among a large number of licensors in the pool.  Such structural protections include, *at a minimum*, a pool's commitment to FRAND licensing of *any* willing licensee regardless of its level within the supply chain; the availability of FRAND licenses from individual licensors; and ensuring the validity and essentiality of all of the patents within the pool to minimize the risk of anticompetitive coordination, such as price fixing or tying of non-essential technologies.  As alleged herein, Avanci falls far short of offering such

protections.  Not only does Avanci expressly refuse to license willing suppliers within the chain based on its multilateral agreement with its members, but also some of its assertedly largest SEP holder members have publicly indicated they do not license their SEPs to any implementers other than the end-product manufacturers (here, purportedly car manufacturers).  Moreover, Avanci fails to offer transparency as to what patents are included for licensing within the Avanci "marketplace," and the steps taken to ensure that each and every patent being licensed as purportedly "essential" is in fact valid and essential to a relevant standard.

116.   On information and belief, and despite Avanci's claim to the contrary, not all patents offered by Avanci for collective licensing are essential to cellular standards.  Many are non-essential patents that are not necessary to practice the standards and have alternatives in or outside of the "platform," thus resulting in price fixing and/or illegal tying of non-essential and competing technologies which are not necessary to practice the standards.

117.   Indeed, other than the initial over-declarations of potential essentiality, which are unchecked by SSOs, there is no disclosure by Avanci or Defendant Licensors whatsoever identifying the precise patents, or even the number of those patents, that Avanci claims have been determined to be essential and thus offered for licensing by Avanci.  Moreover, Avanci has made no disclosure of the actual process by which its supposed experts have made essentiality determinations, nor has it identified a process by which potential licensees can challenge the essentiality determinations of any supposed SEP.

118.   Avanci's lack of transparency has thus made it impossible for Continental or other users of the standards to evaluate Avanci's claims as to the essentiality of the patents it purports to license.  For example, there is no information as to the number of patents submitted by each licensor member, or the number or proportion of those submissions that were rejected as non-essential. Indeed, Avanci and its members have every incentive to artificially inflate the

1  number of the patents in the pool to justify their elevated and non-FRAND royalty

2  demands.

## VI.    Defendants' and Their Co-Conspirators' Extensive and Ongoing Anticompetitive Conduct

5          119.   Prior to adoption of a standard, there are generally multiple alternative

technology solutions competing to perform any given functionality.  During the

standard setting process, SSO participants evaluate and then select the appropriate

technology, among alternatives, to fulfill each individual function required to

practice the relevant standard.  This process includes considering the technical

merits of any alternative, and also whether any alternative is based on proprietary

technology and if such proprietary technology is available for licensing on FRAND

terms and conditions.  If an alternative is not available for FRAND licensing, the

relevant SSOs are required to reassess their options or even withdraw the portion of

the standard that relies on such proprietary technology.

15          120.   Thus, before a standard is adopted, all of the potential alternative

technologies capable of performing each particular function within a 2G, 3G, or 4G

standard compete in a relevant product market.  These product markets are

collectively referred to for a particular standard as "technology markets."  For

example, with respect to much of the functionality within the 3G UMTS and LTE

standards, alternative technologies prior to standardization (*e.g.*, tDocs or technical

submissions) were regularly proposed to the SSOs by companies that are not

members of Avanci.  These technologies all competed in a relevant technology

market for the stated functionality.  Thus, ETSI could have adopted any of these

alternatives (in whole or in part) as part of the 3G UMTS and 4G LTE standards.

To the extent Defendant Licensors claim that their purported technology is essential

to the stated functionality and thus adopted into the standard, ETSI relied on

Defendant Licensor's FRAND licensing commitments in adopting their proprietary

technology.

121.   Subsequent to standardization, however, other technological alternatives no longer compete with the standardized technology, which by definition was adopted over the alternatives.  Thus, for as long as the standard remains in use, no viable substitutes exist post-standardization for the technology embodied in a relevant SEP.  As a result, the incorporation of a patent into a standard makes the scope of the relevant technology market for each specific functionality of a standard congruent with that of the patent asserted to be essential to that particular functionality of the standard.  Examples of technology markets and/or submarkets post-standardization include the specific patents and/or patent applications that each Defendant Licensor claims are essential to the 2G, 3G, or 4G cellular standards that were identified in their respective licensing declarations to ETSI, TIA, ATIS and/or other relevant SSOs.  Thus, after standardization, each Defendant Licensor became the only commercially viable technology supplier in each of the relevant technology markets for which its patented technology became standardized.  Accordingly, standards implementers, including Continental, could no longer substitute the adopted technologies with any other alternatives.  As a result, each Defendant Licensor possesses monopoly power in a relevant technology market for its standardized patented technology, and a dominant share of that market, allowing it to extract supra-FRAND royalties and exclude companies in the downstream markets that utilize the standards.

122.   The relevant SSOs require FRAND commitments from SEP holders precisely to impose a limit on such exercise of otherwise unchecked monopoly power that results from collective standard setting.  When, as alleged herein, SEP holders intentionally renege on their voluntary FRAND bargain with the SSOs, they subvert the very safeguards that shield collective standard-setting activity from violating the antitrust laws.

123.   Despite SSOs adopting IPR policies incorporating FRAND commitments, some SEP owners, including Defendant Licensors, have attempted to

abuse their monopoly power arising from the standardization process to exclude certain implementers from practicing the standards and extract supra-competitive royalty rates after companies are locked into the standardized technology. Such exploitation of SEPs in an effort to extract unreasonable or discriminatory royalties is referred to as patent "hold-up." The cumulative royalty burden that would be required to satisfy all SEP holders' royalty demands is referred to as royalty stacking.

124.    Hold-up harms competition and impedes broad implementation of standards, diminishing any benefits that flow from widespread adoption of the standard. The anticompetitive effects of hold-up are magnified when the total aggregate royalty stack would be unreasonable relative to prices and margins of the product that implements the standards. The total royalty stack must be reasonable when viewed in the aggregate. The demands of individual SEP owners must be assessed in light of the total number of SEPs included in the standard and their relative technical contributions. It has been recognized that patent hold-up is a widespread problem, given that royalty demands by many SEP holders significantly exceed adjudicated FRAND rates.

125.    Legal precedent and economic analysis have made clear that FRAND principles are only effective when, at least, (a) royalties for essential technology are limited to the *ex ante* value of the alleged SEP(s) when the SEP still competed with other alternatives for inclusion in the standard; (b) such royalties exclude the additional value the technology gains solely from being broadly adopted into standards; and (c) licenses are offered to any user of the standards on nondiscriminatory terms such that an end-product manufacturer is not forced to pay a higher royalty for implementing a given SEP technology than could be justified relative to the royalty payable by a component manufacturer that implements the same SEP for the same functionality.

126.    By refusing to adhere to such basic FRAND principles in violation of

their express and voluntary FRAND commitments, Defendant Licensors have been illegally maintaining the monopoly power they initially obtained when their patented technologies became standardized as a direct result of their FRAND commitments.  Defendant Licensors' illegal exploitation of their monopoly power in their standardized proprietary technologies has raised SEP royalty costs to levels that are unsustainable for implementers like Continental and other TCU suppliers. Despite Defendant Licensors' refusal to license them, TCU suppliers nonetheless directly bear the burden of such supra-FRAND royalties in the form of indemnity obligations and costs.  Such costs often exceed the available margins on TCUs.  As a result of this supplier boycott, if left unchecked, Defendant Licensors could force many TCU suppliers out of the market, or cause them to reduce investing in new and better TCU functionalities to the detriment of competition and consumers.

127.   In addition to the technology markets described above, there exists a market for the licensing of SEPs relevant to 2G, 3G, and 4G cellular standards. Such a market is relevant to the conspiracy claims alleged herein and is a market directly restrained by the conspiratorial conduct alleged herein.  In a competitive SEP licensing market, untarnished by illegal coordination among large SEP holders, the terms, including the price, on which one large SEP holder would offer to license its cellular SEPs would competitively discipline the terms that could be offered by other SEP holders.  Absent collusion, SEP holders would compete in setting the licensing terms for a SEP license due to the fact that all of the SEPs at issue are subject to common FRAND commitments.  For example, if one large SEP licensor were to offer to license its cellular SEPs exhaustively to component suppliers at a FRAND rate, such a license would establish a precedent that would effectively limit the ability of other SEP holders to discriminate against component suppliers.  In addition, those FRAND obligations impose a reasonable aggregate limit on all SEP holders and so the royalty charged by one large SEP holder competitively disciplines the royalties that others may charge.  The fact that different FRAND-

encumbered SEPs relevant to particular cellular standards do not directly compete with each other does not affect this competitive dynamic related to the licensing of those SEPs.

128.   Thus, there exists a great degree of incentive for illegal coordination in particular among large SEP holders to collusively set the terms of an SEP license in order to establish a floor for licensing terms, and minimize or eliminate competition in setting terms for SEP licenses.  That is precisely what has happened here.  Rather than competing to establish FRAND licensing terms, Defendants have colluded with other Avanci Members to restrain and eliminate such competition.  Avanci Members include some of the largest purported SEP holders, including Qualcomm, Nokia, Ericsson, and InterDigital, among others, who together claim to own the bulk of the SEPs related to 2G, 3G, and/or 4G cellular standards.  After Nokia joined Avanci as a member in late 2018, Avanci's Chief Executive Officer, Kasim Alfalahi, issued a statement claiming that the platform "now offers a licence [sic] covering a vast majority of the world's cellular standard essential patents," although he stopped short of disclosing the actual percentage of SEPs Avanci purports to license.  While any of these SEP holders could have licensed its SEPs individually outside of the platform on competitive FRAND terms, including to component suppliers, they instead collusively agreed amongst themselves and with other Avanci Members, including Defendants, to collectively refuse to license component suppliers within the automotive supply chain and to otherwise fix the terms of an SEP license, including supra-competitive royalties on end-products that bear no relationship to the actual value of the alleged SEPs at issue.

129.   An example of such a collusive agreement is expressly memorialized in a multilateral agreement among Avanci Members and Avanci.  That multilateral agreement restrains each Avanci Member from offering a license in competition with an Avanci licensing program in any manner that would hinder Avanci's ability to collect its full stated supra-FRAND royalty at the end-user device level—here,

the automobile.  While Avanci indicates that each Avanci Member may offer an individual license to its SEPs outside of the "platform," the Avanci Members' multilateral agreement nonetheless requires each Avanci Member to ensure that its individual licenses do not adversely affect Avanci's ability to collect its full stated price.  The multilateral agreement thus expressly provides that the existence of an individual license by any Avanci Member would not affect the terms and conditions for any Avanci licensing program, including any royalty terms offered by Avanci for such a licensing program that would include the individually-licensed patents.  Because fully exhaustive individual licenses would subject Avanci to double-dipping and exhaustion claims with respect to an Avanci Member's separately-licensed SEPs, it is practically impossible for members to offer individual licenses to suppliers that are fully exhaustive and yet avoid any effect on Avanci's ability to collect its full stated price from car OEMs.  As a result, Avanci Members have no incentive to compete—and thus effectively do not compete—with each other or with Avanci in offering competitive SEP license terms, including fully exhaustive licenses, to component suppliers.

130.   Continental is informed and believes, and thereupon alleges, that in addition to the collusive express multilateral agreement among Avanci and Avanci Members, alleged above, there exist other agreements and/or understandings–tacit or express—between and among Defendants and their co-conspirators to fix the terms and conditions of an SEP license, including agreements or understandings to individually boycott certain implementers, and/or offer terms with the same practical effect of a refusal to deal with such implementers.  The purpose of such agreements is to raise and/or maintain SEP royalties and other SEP licensing terms at supra-competitive and non-FRAND levels, by collectively forcing potential licensees to obtain a joint license from Avanci instead.  For example, while Avanci indicated that Continental could attempt to seek individual licenses from its members at the component level, Defendant Licensors have refused to directly

license Continental and its suppliers on FRAND terms as alleged herein, including
in Section VII, below.  Through such collusive agreements or understandings,
Defendants and other Avanci Members have thus agreed to eliminate competition in
offering FRAND terms and conditions for an SEP license, thus harming competition
in the market for the licensing of 2G, 3G, and 4G cellular SEPs, and raising royalty
costs to implementers, including TCU manufacturers, and ultimately consumers
who must bear those higher costs either in higher prices, or reduced innovation and
functionality in TCUs and cars that incorporate them.

131.   Defendants' collusive conduct also threatens to unreasonably restrain
competition, innovation and investment in the markets for the baseband processors
that implement the 2G, 3G, 4G, and/or eCall functionalities and standards.  As
alleged herein, baseband processors are the components that most directly
implement and substantially, if not fully, practice the cellular standards.  Such
components are essential inputs for purposes of manufacturing TCUs with cellular
functionality.  Baseband processor suppliers—sometimes referred to as Tier 3
suppliers—supply basebands to Tier 2 NAD suppliers for incorporation into NADs,
which are then supplied to Tier 1 TCU suppliers, like Continental, as subsystems
that are incorporated into their TCUs.  Baseband processor suppliers include
Qualcomm (a key Avanci Member), and to a lesser extent MediaTek, Intel, and
Samsung System LSI.  However, Qualcomm remains by far the largest supplier of
baseband processors and has always held a significant lead—due to its historically
dominant position—in baseband processors with new and premium functionalities.
Qualcomm is also by far the largest supplier of CDMA-compliant baseband
processors in the world, as well as multimode baseband processors which are
capable of operating on all major cellular networks, including all 2G (*e.g.*, CDMA,
GSM), 3G (*e.g.*, CDMA, UMTS, TDSCDMA, etc.), and 4G LTE networks.
According to a leading industry analyst company, Strategy Analytics, as of Q1
2018, Qualcomm's revenue share of the overall baseband processor market was

roughly 52%, with its second largest competitor, MediaTek, having only a 13%

share, followed by Samsung System LSI at 14%.  The remaining competitors,

including Intel, had a combined share of roughly 21%.  Thus, Qualcomm has a

significant lead over its competitors both in market share and technology.

132.   Continental is informed and believes, and thereupon alleges, that in

addition to the collusive agreements alleged above, there exist agreements or

understandings—tacit or express—among Defendants and their unnamed co-

conspirators that they would collectively offer royalty discounts, rebates, marketing

support and/or other incentives (collectively "inducements") to any car OEM whose

products utilize Qualcomm baseband processors for cellular connectivity.  Such

inducements would not be available to OEMs who use a TCU or NAD that utilizes a

baseband processor chipset from other chipset competitors.  As a result, OEMs

would have no incentive to purchase TCUs or NADs that would utilize a competing

baseband processor chip because they would have to forego these inducements.

133.   Continental is informed and believes, and thereupon alleges, that one

reason, among others, that other Avanci Members have agreed to offer such

inducements is that, in return for other considerations, Qualcomm previously

obtained long term component-level licenses, still in effect, from many Avanci

Members—including those who are major SEP holders—that grant exhaustive (*i.e.*,

pass-through) rights for the use of its baseband processors, or cap royalties those

SEP holders can collect from potential licensees.  Because such rights, including

exhaustive licenses, would not be available to any other baseband processor

supplier, competing baseband processor suppliers would face the stigma that their

chips are inferior because competing chips would be sold with no exhaustive pass-

through rights, or other royalty capping rights.  Such perceived deficiency of

competing chips would thus dissuade potential customers from purchasing

competing chipsets.  Accordingly, these exclusionary agreements or understandings

threaten to unreasonably restrain competition in the markets for baseband processors

by reducing rival baseband processor suppliers' sales and margins, and thus
hindering and reducing their ability to invest and innovate in better and new
functionalities to compete.

134.   The geographic scope of the relevant technology markets, the market
for the licensing of 2G, 3G, and 4G cellular SEPs, and the baseband processor
markets alleged herein is worldwide.  The 2G, 3G, and 4G standards at issue have
been adopted globally and are subject to common FRAND obligations governing all
SEPs incorporated into those standards, irrespective of the region or country in
which a particular patent incorporated into a standard may have been issued.  In
addition, SEP licenses are typically granted on a worldwide basis in light of the
global scope of the standards at issue.  For example, Avanci does not grant licenses
by region or country, but instead purports to license "all the essential patents owned
by the licensors who have joined our marketplace" which assertedly "covers the
entire essential 2G, 3G and 4G patent portfolio these innovators own today as well
as any such patents they develop or acquire during the term of your license."
Finally, there are no material geographic barriers to competition for baseband
processor sales.

135.   Defendants' anticompetitive conduct in the markets alleged above have
injured, and/or threaten to injure TCU suppliers, including Continental.  Continental
and other TCU suppliers directly face the burden of Defendants' excessive royalty
demands from car OEMs in the form of indemnity obligations that are
disproportionate to the prices and margins of TCUs.  Such indemnity obligations
often exceed the available margins on TCUs, putting Continental and other TCU
suppliers at risk of having to exit the market, or reducing investment and innovation
in new and better functionalities to the detriment of competition and consumers.
Indeed, the TCU market as a whole faces the risk of general stagnation in
investment and innovation if TCU suppliers must bear the brunt of Defendants'
excessive and non-FRAND royalty demands.  These collusive agreements also

unreasonably lead to the exclusion of other baseband processor suppliers and ultimately to a key Avanci Member's further and continued dominance in the markets for baseband processors.  Faced essentially with a monopoly (sole-source) supplier of baseband processors, Continental and other TCU suppliers would be subjected to higher costs as such Avanci Member would have little incentive to offer competitive prices.

### VII.   Continental's Attempts to Obtain a License from Defendants

136.   Continental's own attempts to obtain licenses to the alleged SEPs owned or controlled by Defendants confirms the above-described anticompetitive and unlawful agreements.

137.   Upon information and belief, Defendants first began targeting certain Continental customers (automobile OEMs) in early 2017, asserting that their connected cars practice the cellular standards purportedly covered by Defendants' alleged SEPs, and offering a license to the alleged SEPs.  The rates offered to Continental's customers are non-FRAND and in violation of Defendants' obligations to the various SSOs.

138.   Continental became aware that its customers were being targeted by Defendants when informed by its customers.  Understanding that the automobiles sold by its customers connect to the various cellular networks through the TCUs provided by Continental (the actual practice of the cellular standards occurs at the level of the baseband processor), Continental knew it would be in a better position than its customers to negotiate a license to the alleged cellular SEPs.  Indeed, patents declared as essential to cellular standards are often highly technical.  Understanding such patents in a way that promotes productive licensing negotiations requires knowledge beyond the scope required by car OEMs, who often simply assemble cars with the components or subsystems that include cellular functionality.  While baseband processor and/or NAD suppliers are best situated to engage in such negotiations, Continental has a better understanding of the cellular technology

1    standards implemented by its products than do its car OEM customers.

2          139.   Continental contacted each of the Defendants individually in an attempt

3    to negotiate a FRAND license to the alleged SEPs asserted against its customers.

4    However, all of Continental's attempts have failed, in that the Defendants have

5    failed and refused to offer a direct license on FRAND terms.

6          140.   Continental first contacted defendant Avanci on or about early 2018,

7    seeking a license to the alleged SEPs for which it acts as licensing agent.  However,

8    at every turn, Avanci refused Continental's simple requests customary to any

9    FRAND licensing negotiation.  For example, from the outset, Continental requested

10   claim charts detailing how the alleged SEPs practice the relevant standards and/or

11   how Continental's products practice the alleged SEPs.  Avanci continually rebuffed

12   these requests, stating that it does not engage in technical discussions regarding the

13   patents it is authorized to license.  Rather, Avanci directed Continental to contact the

14   owners of the alleged SEPs (*i.e.*, the Avanci Members) if Continental wished to

15   engage in technical negotiations.  However, as described in further detail below,

16   Continental's attempt to open lines of communication with the Avanci Members

17   was also fruitless.

18         141.   In addition to requesting claim charts, Continental also requested

19   Avanci's terms for a license to the alleged SEPs under its control.  Avanci refused to

20   provide terms for a license to Continental.  According to Avanci, it is only

21   authorized to license the alleged SEPs under its control to the automotive OEMs, *not*

22   to Tier 1 suppliers such as Continental.  Further, Avanci would only seek

23   authorization from the Avanci Members to enter into a license with Continental (a

24   prerequisite to providing Continental terms of a license) if, prior to doing so,

25   Continental agreed to be bound by the royalty rates posted on Avanci's website.

26   Continental cannot be forced to agree to the clearly non-FRAND royalty rates

27   published by Avanci as a prerequisite to negotiations of other terms.  Instead, willing

28   Continental has continually informed Avanci that it is a willing licensee, and willing

1   to engage in good faith negotiations for a license to the alleged SEPs under Avanci's

2   control on FRAND terms.  However, Avanci has refused to come off of its

3   unreasonable demands in violation of its FRAND obligations.

4        142.   Continental also contacted defendant Nokia about an individual license

5   to its portfolio of alleged cellular SEPs.  At various times, Continental and its

6   affiliates have sought a direct license from Nokia, without regard to the ultimate end

7   use of the product (*e.g.*, whether it will be sold directly to an OEM in the automotive

8   industry), or the identity of any end user.  However, Nokia has failed and refused to

9   provide Continental with a direct license, whereby Continental itself would be fully

10  licensed to Nokia's SEPs.  In addition, the royalty rates demanded by Nokia are not

11  FRAND, and are grossly disproportionate to the value of Nokia's purported

12  essential technologies to the actual components—*i.e.*, baseband processors—that

13  directly implement the cellular standards.

14       143.   On or about January 11, 2019, Continental also contacted defendant

15  Conversant about obtaining an individual license to its portfolio of alleged cellular

16  SEPs.  When Conversant responded, it stated that it was "offering a FRAND license

17  to its SEP portfolio to manufacturers of vehicles with cellular functionality," and

18  only expressed a willingness to "make the same offer" to Continental that

19  Conversant had made to one of Continental's OEM customers, at the same rate

20  offered to that OEM customer.  Conversant did not offer Continental a license for all

21  standard-compliant devices sold by Continental, despite Continental's follow-up

22  request for just such a license.  In the meantime, Conversant continues to assert its

23  patents against Continental's OEM customers, all while demanding non-FRAND

24  rates from them.

25       144.   Continental also contacted defendant PanOptis about an individual

26  license to its portfolio of alleged cellular SEPs.  However, much like the other

27  Defendants, PanOptis has refused to provide an offer for such a license to

28  Continental.

145.   On or about June 3, 2019, Continental became aware that defendant Sharp filed a lawsuit against one of Continental's automotive OEM customers in Germany alleging patent infringement in connection with standardized cellular devices provided by Continental.  On information and belief, prior to filing its complaint defendant Sharp never contacted Continental's OEM customer or Continental regarding a direct license to Sharp's alleged SEPs.  Rather, Sharp threatened Continental's OEM customer that the only way to resolve the lawsuit is to take a license from Avanci.  Continental regards Sharp's conduct as a refusal to directly license Continental, as well as a refusal to individually license its alleged SEPs separate from Avanci.  In a letter sent to Sharp shortly before the filing of this First Amended Complaint, Continental indicated that it is willing to negotiate a direct license to any applicable SEPs and asked Sharp to send Continental an offer for a license on FRAND terms.

146.   Additionally, upon information and belief, Non-Party Licensor Ericsson has indicated that it has a policy of licensing its alleged cellular SEPs only at the end-user device level—here, the automotive OEM.  For example, Christina Petersson, Ericsson's Chief IP Officer, recently publicly testified in a government trial that Ericsson licenses only to companies that make "a fully compliant product that can be used by the user."  (*FTC v. Qualcomm* Trial testimony, Jan. 25, 2019, 21:20-22:6.)  In the *FTC* case, the relevant companies that Ericsson offers to license were handset manufacturers, such as Samsung or Huawei.  Here, such companies would be the car OEMs, such as BMW.  Particularly, for Ericsson's cellular SEP portfolio, it "would be licensing to the company putting its name on the fully compliant equipment and selling that on the market," which Ms. Petersson identified as the OEMs.  (*FTC v. Qualcomm* Trial testimony, Jan. 25, 2019, 25:5-14.)

147.   Qualcomm, another Avanci Member, also has publicly indicated that it does not license component suppliers, such as suppliers of baseband processors that directly implement the cellular standards at issue even though Qualcomm requires a

1  cross-license from its licensees covering the manufacture, sale and use of its own

2  baseband processors and components.

3      148.   Meanwhile, as Continental remains unable to obtain a FRAND license

4  from Defendants, Avanci and the Avanci Members' (including Defendants)

5  continue to put pressure on Continental's customers (the automotive OEMs) to

6  accept a license to the alleged cellular SEPs on non-FRAND terms, often impliedly

7  or explicitly threatening litigation and the possibility of an injunction.

8      149.   Based on the above, Continental is informed and believes, and

9  thereupon alleges, that Avanci and Avanci Members have collusively agreed only to

10  directly license their alleged SEPs at the automotive OEM level (effectively

11  agreeing to a boycott of all other implementers in the supply chain) in direct

12  contravention of their commitments to make licenses available to *all* users of the

13  standards.  This collusive agreement is designed to subvert the FRAND promises

14  each Avanci Member made to obtain its market power in the relevant market for its

15  standardized technology to the exclusion of alternatives, which ultimately drives up

16  the cost of licensing 2G, 3G, and 4G cellular SEPs to companies like Continental

17  which implement the standards.  Defendants know they could not collect the same

18  level of royalties from Tier 1 suppliers like Continental, Tier 2 suppliers, or

19  baseband processor suppliers because the demanded rates are disproportionately

20  high as compared to product prices and profit margins of suppliers at these levels.

21      150.   Given this dynamic and the above-stated facts, individual licenses are

22  not practically available to Continental, and any further licensing requests would be

23  futile, in part because individual licensing of Continental and other suppliers would

24  result in the exhaustion of Avanci and the Avanci Members' patent rights against

25  automobile OEMs, which would up-end Defendants' collusive licensing model.

26  Defendants' licensing tactics demonstrate that Defendants are collaborating in an

27  anticompetitive fashion in an attempt to extract non-FRAND royalty rates.  In light

28  of Defendants' continued unfair, discriminatory, and unreasonable conduct,

Continental has no choice but to bring this action in order to confirm its right to a license, and seek a judicial determination of the FRAND terms and conditions for such a license.

## FIRST CAUSE OF ACTION

### Breach of Contract

### (Against All Defendants)

151.   Continental re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

152.   Defendants entered into, or are bound by, contractual commitments they made to the relevant SSOs, such as ETSI, TIA, and/or ATIS, and their respective members, participants, and implementers relating to the 2G, 3G, and 4G standards.  To comply with the IPR Policies of the relevant SSOs, Defendants either made or are encumbered by a binding commitment to those SSOs, their members, and third-party implementers to grant irrevocable licenses to any such user of cellular standards purportedly covered by Defendants' alleged SEPs on FRAND terms and conditions.

153.   The declarations made pursuant to such IPR Policies created an express and/or implied contract with those SSOs and their members, including an agreement that Defendants would license those patents on FRAND terms and conditions.  The IPR Policies of ETSI, TIA, and ATIS, among other relevant SSOs, do not limit the right to obtain a license on FRAND terms and conditions to their members; third parties that are not members also have the right to be granted licenses under those patents on FRAND terms and conditions.  Each and every party with products that implement the 2G, 3G, and 4G standards promulgated by such SSOs is an intended third-party beneficiary of Defendants' contractual commitments, including Continental, its suppliers, and its customers.

154.   Despite Continental's good faith efforts to negotiate a license to Defendants alleged SEPs, Defendants are refusing to license Continental, opting

1    instead to pursue licenses solely with automotive OEMs.

2        155.   Therefore, Defendants have breached their obligations to relevant SSOs

3    such as ETSI, TIA, and/or ATIS by refusing to license to all users of cellular

4    standards allegedly covered by Defendants' declared patents, namely Continental.

5        156.   Moreover, Defendants have also failed and refused to offer a license to

6    their alleged SEPs on FRAND terms and conditions.  This constitutes an additional

7    breach of Defendants' FRAND obligations, of which Continental is an intended

8    third-party beneficiary.

9        157.   As a result of Defendants' contractual breaches, Continental has been

10   injured in its business or property and is threatened by imminent loss of profits, loss

11   of customers and potential customers, the imposition of non-FRAND terms and

12   conditions (including via Continental's contractual indemnity obligations to its

13   OEM customers, should Defendants succeed in procuring a non-FRAND license

14   from those OEM customers), and loss of goodwill and product image.

15       158.   Continental has suffered and will continue to suffer irreparable injury

16   by reason of the acts, practices, and conduct of Defendants alleged above until and

17   unless the Court enjoins such acts, practices, and conduct.  Namely, Continental

18   requests (1) that this Court order Defendants to offer a license on FRAND terms and

19   conditions to Continental, and (2) an adjudication of the FRAND terms and

20   conditions for such a license.

## SECOND CAUSE OF ACTION

### Promissory Estoppel

### (Against All Defendants)

24       159.   Continental re-alleges and incorporates by reference the allegations set

25   forth in the foregoing paragraphs.

26       160.   Defendants made a clear and definite promise to potential users of the

27   2G, 3G, and 4G standards through their commitments to relevant SSOs, including

28   ETSI, TIA, and/or ATIS, and also their public statements, that they had granted, or

1   would grant, licenses to any essential patents on FRAND terms and conditions.

2       161.   The intended purpose of Defendants' promises was to induce reliance

3   upon these promises so that companies like Continental would invest substantial

4   resources to design, develop, and produce products compatible with the relevant

5   standards.  Defendants knew or should have reasonably expected to know that they

6   would induce reliance on these promises by companies such as Continental.

7       162.   Continental developed and marketed its products and services in

8   reliance on Defendants' promises, including making its products and services

9   compliant with cellular standards adopted by the relevant SSOs, including the 2G,

10  3G, and 4G standards, in various Continental product offerings.

11      163.   Defendants are estopped from reneging on these promises under the

12  doctrine of promissory estoppel.

13      164.   Continental has been harmed as a result of its reasonable reliance on

14  Defendants' promises and is threatened by the imminent loss of profits, loss of

15  customers and potential customers, imposition of non-FRAND terms and

16  conditions, and loss of goodwill and product image.

17      165.   Continental has suffered and will continue to suffer irreparable injury

18  by reason of the acts and conduct of Defendants alleged above until and unless the

19  court enjoins such acts, practices, and conduct.

20      166.   Moreover, Defendants' breach of their FRAND obligations further

21  constitutes waiver and/or estoppel of Defendants' rights to enforce any declared

22  essential patents against any entity allegedly practicing the standard.

23                   **THIRD CAUSE OF ACTION**

24                      **Declaratory Judgment**

25                  **(Against All Defendants)**

26      167.   Continental re-alleges and incorporates by reference the allegations set

27  forth in the foregoing paragraphs.

28      168.   Defendants are contractually obligated to license their 2G, 3G, and 4G

1  alleged SEPs on FRAND terms and conditions.  As a result of the acts described in

2  the foregoing paragraphs, there exists a definite and concrete, real and substantial,

3  justiciable controversy between Continental and Defendants regarding (1) whether

4  Continental and other suppliers in the automotive supply chain are entitled to a

5  direct license to Defendants' 2G, 3G, and 4G SEPs on FRAND terms and conditions

6  consistent with Defendants' irrevocable commitments in their obligations,

7  membership, and or declarations with relevant SSOs, including ETSI, TIA, and/or

8  ATIS, and (2) what constitutes FRAND terms and conditions for a license to

9  Defendants' 2G, 3G, and 4G SEPs.  This dispute is of sufficient immediacy and

10  reality to warrant the issuance of a declaratory judgment.

11       169.   Continental is entitled to a declaratory judgment with respect to (1)

12  Continental and other suppliers' entitlement to a direct license to Defendants' 2G,

13  3G, and 4G SEPs on FRAND terms and conditions; (2) a determination that

14  Defendants have not offered Continental a direct license to their alleged 2G, 3G, and

15  4G SEPs on FRAND terms and conditions; (3) a determination of what constitutes

16  FRAND terms and conditions for a license to Defendants' 2G, 3G, and 4G SEPs,

17  with those terms and conditions being imposed on the parties; and (4) a

18  determination that the FRAND terms and conditions must be consistent with well-

19  established apportionment principles under federal patent law (*i.e.*, the smallest

20  salable patent practicing unit rule).

## FOURTH CAUSE OF ACTION

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 – Concerted Action

### Unreasonably Restraining Trade

### (Against All Defendants)

25       170.   Continental re-alleges and incorporates by reference the allegations set

26  forth in the foregoing paragraphs, as though fully set forth herein.

27       171.   Continental is informed and believes, and on that basis alleges, that

28  there exists a contract, combination, or conspiracy between or among Defendants

and their co-conspirators.  As alleged herein, such contract, combination or

conspiracy includes, among other anticompetitive agreements or mutual

understandings, agreements or understandings to (a) collectively boycott

intermediate suppliers of components and subsystems within the automotive

chain—including suppliers of TCUs such as Continental, NADs, and the baseband

processors that directly implement the standards at issue—by refusing to directly

license them, let alone on FRAND terms and conditions, as all Defendants are

required to do; (b) fix and otherwise collectively set a minimum floor for basic SEP

licensing terms; (c) steer potential licensees to Avanci by refusing to offer individual

fully exhaustive direct FRAND licenses to suppliers in the automotive supply chain

in order to preserve Avanci's ability to extract supra-competitive prices at the OEM

level; (d) combine (*i.e.*, pool) their patents for collective licensing on non-FRAND

terms by Avanci as a mechanism to enhance and maintain their ability to exploit the

market power each Defendant Licensor gained from standardization by exerting

additional bargaining power as a collective; (e) illegally tie the licensing of their

alleged SEPs to potential licensees taking licenses to their collective non-essential

and thus unwanted technologies, and packing the purported collective license with

non-SEPs in order to inflate the number of patents for collective licensing to justify

their non-FRAND royalties; (f) bundle alleged SEPs and non-SEPs for a joint

license resulting in the collective price fixing of non-essential and competing

technologies; and (g) fix the minimum price of licensing their alleged SEPs through

Avanci by collectively refusing to discount Avanci's stated royalty for the value of

any individual or existing licenses, thus further raising the cost of implementing the

standards through double dipping in violation of exhaustion rules.

172.   Continental is informed and believes, and on that basis alleges, that the

contract, combination, or conspiracy between or among Defendants and their co-

conspirators, as alleged herein, has and will unreasonably restrain and/or eliminate

trade in violation of Section 1 of the Sherman Act in multiple markets as alleged in

1  Section VI by, among other things, (a) excluding alternative technologies that

2  otherwise would have been included in the relevant technology markets had

3  Defendants, their co-conspirators, and predecessors-in-interest been transparent

4  about not honoring their relevant FRAND commitments; (b) raising the costs of

5  implementing standardized technologies and prices to consumers; (c) reducing or

6  eliminating investments by the suppliers in the automotive supply chain, including

7  by TCU suppliers, who directly bear the cost of Defendants' supra-FRAND

8  royalties in the form of disproportionable indemnity costs, which would leave little

9  to negative margins for investment in new and better TCU functionalities; (d)

10 reducing or eliminating competition in the baseband processor markets within the

11 automotive supply chain by dissuading OEMs from purchasing TCUs and NADs

12 that use baseband processors that compete with those supplied by a key Avanci

13 Member; and (e) eliminating or reducing competition in the licensing of non-

14 essential and competing technologies included in the "platform" for collective

15 licensing.

16        173.   Continental is informed and believes, and on that basis alleges, that

17 Defendants are engaged in interstate commerce in the United States, and the

18 activities alleged herein involve products in the flow of interstate commerce and will

19 substantially impact interstate commerce as the alleged licensing activities are

20 directed to car OEMs throughout the United States and directly affect the products

21 sold throughout the United States, the cellular standards are implemented

22 throughout the United States, and SSOs such as ATIS and TIA adopt such standards

23 for implementation throughout the United States with IPR Policies governing

24 FRAND licensing of SEPs they adopt into standards for the entire United States.

25        174.   Continental is informed and believes, and on that basis alleges, that the

26 unreasonable restraints and elimination of trade, as alleged herein, have resulted in

27 substantial harm to competition in both the upstream technology markets and the

28 downstream markets that implement and practice the standards, as alleged in Section

VI.

175.   Continental is informed and believes, and on that basis alleges, that Defendants and their co-conspirators have used the cover of Avanci as a patent pool or "licensing platform" to collusively engage in all of the anticompetitive conduct alleged herein, including in Section VI, that unreasonably restrains trade in violation of Section 1 of the Sherman Act.

176.   Continental is informed and believes, and on that basis alleges, that there is no procompetitive justification for the anticompetitive agreements and conduct alleged herein, including Defendants' refusal to offer Continental a direct FRAND license in breach of their affirmative and voluntary commitments to do so. To the extent Defendants assert that any procompetitive justifications exist, such purported justifications are outweighed by the anticompetitive effects in markets alleged in Section VI.

177.   As a result of the collusive conduct alleged herein, including the collective refusal to directly license Continental and its NAD and baseband processor suppliers, Continental has suffered and will continue to suffer injury to its business and property and will suffer substantial and irreparable harm if such conduct remains unredressed.  In particular, because Continental cannot obtain the necessary FRAND licenses to the alleged SEPs, its ability to secure customers is threatened because its customers typically demand that Continental indemnify them or discount its prices to account for Defendants' exorbitant royalties.  Such indemnity costs exceed Continental's margins on its products that implement the standards primarily through the use of a baseband processor.  Continental, as with other TCU suppliers, is also faced with the prospect of a sole supplier of baseband processors for its TCUs as a result of Defendants' and their co-conspirators' agreements to offer royalty rebates, discounts or other incentives for the use of a key Avanci Member's chipsets, which would effectively eliminate Continental's ability to switch to competing chips to reduce costs.

178.   Continental thus seeks an order declaring as unlawful the collusive agreements, alleged herein, and to enjoin and otherwise remedy such conduct, including ordering Defendants to offer a FRAND license to Continental and other suppliers in the automotive supply chain, and setting the terms of a FRAND license, including a FRAND rate, for their asserted SEPs being collectively licensed by Avanci.

## FIFTH CAUSE OF ACTION

### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 – Unlawful Monopolization

### (Against Defendant Licensors)

179.   Continental re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs, as though fully set forth herein.

180.   Continental is informed and believes, and on that basis alleges, that the relevant technology markets, as defined in Section VI above, are valid antitrust markets.

181.   Continental is informed and believes, and on that basis alleges, that Defendant Licensors have willfully acquired and maintained monopoly power in the relevant technology markets, as described in Section VI above.

182.   Continental is informed and believes, and on that basis alleges, that Defendant Licensors intentionally and falsely represented to the relevant SSOs, such as ETSI, ATIS and/or TIA that if elements of their proprietary technology were included in the cellular standards adopted into standards, they would license such patents to any applicant desiring a license to utilize the standards to produce standard-complaint products on FRAND terms and conditions.  To the extent, Defendant Licensors are successors-in-interest to an original SEP holder that made such FRAND promises, they obtained their rights subject to such commitments and either knew or should have known of the nature of the FRAND commitments that encumbered the disclosed asserted SEPs.

183.   Continental is informed and believes, and on that basis alleges, that the relevant SSOs relied on such FRAND licensing promises in adopting the asserted SEPs into standards, and that, absent such affirmative promises, the SSOs otherwise would not have agreed to adopt a cellular standard that would have given Defendant Licensors the power to effectively block companies from practicing the standards. Indeed, the anticompetitive effects of Defendant Licensors' breaches of their FRAND promises are the same whether Defendant Licensors intentionally deceived the SSOs at the time they made FRAND promises, or later opportunistically breached their FRAND promises once their technologies became locked into the standards.  Either way, Defendant Licensors' technologies became locked into the standards because their FRAND licensing representations directly caused SSO participants to, at a minimum, forego the process by which they were required to evaluate and select alternatives to any essential technology known to be unavailable for FRAND licensing, or to abandon those portions of the standards for which no such alternative was available.

184.   After their technologies were locked into the standards, giving Defendant Licensors monopoly power in their standardized technologies, Defendant Licensors have refused to negotiate in good faith to license their asserted SEPs on FRAND terms, including by refusing to directly license Continental and its suppliers within the automotive supply chain, so that they could extract higher royalties from car OEMs.

185.   Continental is informed and believes, and on that basis alleges, that there is no procompetitive justification for Defendant Licensors' exclusionary conduct as alleged herein, including their refusal to offer Continental a FRAND license in breach of their affirmative and voluntary commitments to do so.  Even if any procompetitive justification is asserted to exist, it is far outweighed by the anticompetitive effects asserted herein, especially in light of Defendant Licensors' voluntary FRAND licensing commitments.

186.   As a result of Defendant Licensors' anticompetitive breaches of their FRAND obligations, including their refusal to directly license Continental and its NAD and baseband processor suppliers, Continental has suffered and will continue to suffer injury to its business and property and will suffer substantial and irreparable harm if the anticompetitive conduct alleged herein remains unredressed.

187.   Continental thus seeks an order declaring Defendant Licensors' exclusionary conduct to be unlawful, and to enjoin and otherwise remedy such conduct, including ordering Defendant Licensors to offer a FRAND license to Continental and other suppliers in the automotive supply chain, and setting the terms and conditions of a FRAND license, including a FRAND rate, for their asserted SEPs.

## SIXTH CAUSE OF ACTION

### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 – Conspiracy to Monopolize

### (Against all Defendants)

188.   Continental re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs, as though fully set forth herein.

189.   Continental is informed and believes, and on that basis alleges, that the relevant markets, as defined in Section VI above, are valid antitrust markets.

190.   Continental is informed and believes, and on that basis alleges, that Defendant Licensors and their unnamed co-conspirators each willfully acquired and then maintained monopoly power in the relevant technology markets as a result of the standardization of their proprietary technologies, as described in Section VI above.

191.   Although each Defendant Licensor and unnamed co-conspirator obtained monopoly power in its own standardized technology, each licensor's ability to license those SEPs nonetheless was subject to competitive discipline by licensing terms offered by other large SEP holders, as described in Section VI,

above.  Upon information and belief, to avoid competition in setting the basic terms and conditions of a FRAND license, including the levels of the supply chain to be licensed, Defendants and their co-conspirators colluded to set up Avanci as a front through which they would jointly license their alleged SEPs on a single set of common non-FRAND terms only to car OEMs, thus establishing a floor for cellular SEP licensing of the automotive industry.

192.   Continental is informed and believes, and on that basis alleges, that Defendants entered into a multilateral agreement between and among themselves and with their co-conspirators, or otherwise reached mutual understandings to use Avanci as a tool to exert additional pressure and bargaining power in licensing negotiations with users of the standards, particularly due to unavailability of individual FRAND licenses as agreed by and among themselves.  Accordingly, the multilateral agreement between/among Defendants and their co-conspirators, to pool or otherwise combine and collectively license their patents through Avanci on non-FRAND terms was a mechanism to maintain and further enhance their ability to exploit the monopoly power that each co- conspirator SEP holder initially obtained from standardization of its proprietary technologies as a result of its FRAND representations, as alleged herein.

193.   Continental is informed and believes, and on that basis alleges, that Defendants and their co-conspirators thus agreed for Avanci to carry out their collusive scheme by, among other things, offering a joint license at supra-FRAND royalties only to car OEMs, which are overvalued in comparison to the technical contributions of the patents being licensed.

194.   Continental is informed and believes, and on that basis alleges, that Defendants' and their co-conspirators' exclusionary conduct harms competition in multiple levels of the automotive supply chain, including by threatening the suppliers' ability to continue to invest in innovative products to the detriment of consumers.

195.   As a result of the conspiratorial and anticompetitive breaches of FRAND obligations and other anticompetitive agreements alleged herein, including in Section VI above, Continental has suffered and will continue to suffer injury to its business and property and will suffer substantial and irreparable harm if such conduct remains unredressed.

196.   Continental is informed and believes, and on that basis alleges, that there is no procompetitive justification for the exclusionary conduct as alleged herein, including Defendants' refusal to offer Continental a FRAND license in breach of their affirmative and voluntary commitments to do so.  Even if any procompetitive justification is asserted to exist, it is far outweighed by the anticompetitive effects asserted herein, especially in light of Defendants' and their co-conspirators' voluntary FRAND licensing commitments.

197.   Continental thus seeks an order declaring the exclusionary and collusive agreements alleged herein to be unlawful, and to enjoin and otherwise remedy such illegal conduct, including ordering Defendants to offer a FRAND license to Continental and other suppliers in the automotive supply chain, and setting the terms of a FRAND license, including a FRAND rate, for their asserted SEPs.

## SEVENTH CAUSE OF ACTION

### Violation of California Unfair Competition Law – Cal. Bus. & Prof. Code Section 17200 et seq.

### (Against All Defendants)

198.   Continental re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs, as though fully set forth herein.

199.   By the acts alleged herein, Defendants have engaged in unfair competition within the meaning of the California Business and Professions Code Section 17200 et seq. (the "UCL"), in that the conduct alleged herein, and each of them, constitute unlawful, unfair or fraudulent business acts or practices as

1   proscribed by the UCL.

2       200.   The anticompetitive business acts or practices that are alleged herein

3   and above violate, *inter alia*, Sections 1 and 2 of the Sherman Act, Section 5 of the

4   Federal Trade Commission Act and common law, and as such also constitute

5   unlawful conduct within the meaning of the UCL.  Such unlawful conduct includes,

6   among others, (a) unilateral as well as concerted refusals to license Continental and

7   other component suppliers within the automotive supply chain in an effort to extract

8   excessive, non-FRAND royalties from car OEMs through Avanci at supra-

9   competitive levels in violation of Defendants' express and voluntary FRAND

10  commitments; (b) agreements to fix and otherwise set a floor for cellular SEP

11  license terms—including supra-FRAND royalties and other discriminatory terms—

12  through Avanci in an effort to eliminate competition in establishing basic FRAND

13  terms and conditions for SEP licensing; (c) Defendant Licensors' breaches of their

14  express and voluntary FRAND contracts with SSO's as alleged herein; (d) Avanci's

15  knowing aiding and abetting of Defendant Licensors' breaches of their FRAND

16  contracts with SSOs; and (e) Defendant Licensors' illegal agreements and

17  understandings with Avanci and other co-conspirators to combine their asserted

18  SEPs for non-FRAND joint licensing by Avanci in an effort to further enhance and

19  maintain the monopoly power each Defendant Licensor obtained from

20  standardization of its proprietary technology.

21      201.   Defendants' business acts or practices complained of herein are unfair

22  within the meaning of the UCL.  Such acts (and each of them as alleged herein) at a

23  minimum threaten an incipient violation of an antitrust law, or violate the policy or

24  spirit of one of those laws such that their effects are comparable to or the same as a

25  violation of the law, or otherwise significantly threaten or harm competition.

26  Defendants' complained-of conduct is immoral, unethical, oppressive, unscrupulous

27  or substantially injurious to TCU, NAD and baseband processors manufacturers,

28  including Continental, and to consumers who ultimately bear higher costs resulting

1  from Defendants' anticompetitive and unfair business acts or practices alleged

2  herein.

3      202.  Defendant Licensors' alleged acts or practices are also deceptive within

4  the meaning of the UCL.  When Defendant Licensors made their express FRAND

5  commitments to SSOs, they omitted disclosing that they may, in their own

6  discretion, withhold licenses from certain implementers, including TCU, NAD and

7  baseband processor suppliers whose products utilize the standards in order to extract

8  supra-FRAND royalties from more downstream implementers, like car OEMs.

9  Standards participants and implementers alike had no reason to believe that

10 Defendant Licensors would withhold licenses to their FRAND-encumbered SEPs so

11 as to disadvantage certain implementers within a given supply chain when they

12 agreed to adopt Defendant Licensors' proprietary technologies into standards.  Such

13 omissions were material to the standardization of their technologies by the relevant

14 SSOs because the omissions, at a minimum, displaced the process within the SSOs

15 that required those SSOs to revise or abandon portions of their standards that relied

16 on proprietary technology known to be unavailable for FRAND licensing.

17 Accordingly, each SSO adopted Defendant Licensors' asserted SEPs into standards

18 in reliance upon their express and unqualified FRAND commitments, reasonably

19 believing that such essential technology would be available for FRAND licensing to

20 any implementer who seeks to utilize the standards.  Avanci, as Defendant

21 Licensors' agent for the licensing of their SEPs, knew of these omissions and later

22 aided and abetted the breaches of FRAND commitments alleged herein.  Indeed,

23 Avanci's Chief Executive Officer, Kasim Alfalahi, was previously a licensing

24 executive at Ericsson, one of Avanci's initial members.

25     203.  As a direct, proximate, and foreseeable result of Defendants' wrongful

26 conduct in violation of the UCL, alleged above, Continental has suffered—and

27 continues to suffer—harm, including lost TCU sales, an inability to effectively

28 compete in the relevant TCU market, and higher costs and reduced profitability, as

alleged above.

204.    Pursuant to Section 17203 of the California Business and Professions Code, Continental seeks (1) an injunction prohibiting Defendants from engaging in the above-alleged unlawful, unfair, and fraudulent business acts or practices; (2) an order setting the terms of a FRAND license for Defendants' asserted SEPs, including a FRAND rate; and (3) all other equitable remedies as the Court may deem appropriate.

## PRAYER

WHEREFORE, Continental prays for judgment as follows:

A.      Adjudge and decree that Defendants are liable for breach of their contractual commitments to the relevant SSOs, including ETSI, TIA, and/or ATIS, by refusing to license their alleged 2G, 3G, and/or 4G SEPs to Continental;

B.      Adjudge and decree that Defendants are liable for breach of their contractual commitments to the relevant SSOs, including ETSI, TIA, and/or ATIS, by failing to offer FRAND terms and conditions for a license to their alleged 2G, 3G, and/or 4G SEPs to Continental;

C.      Adjudge and decree that Defendants are liable for promissory estoppel;

D.      Adjudge and decree that Continental and other suppliers in the automotive supply chain are entitled to a license from Defendants for any and all patents Defendants deem "essential" and/or which Defendant Licensors have declared as "essential" to the 2G, 3G, and 4G standards under FRAND terms and conditions pursuant to Defendants' obligations to the relevant SSOs, including ETSI, TIA, and/or ATIS;

E.      Adjudge, decree, and set the FRAND terms and conditions that Continental is entitled to under Defendants' obligations to the relevant SSOs, including ETSI, TIA, and/or ATIS, for a license to Defendants' 2G, 3G, and 4G SEPs;

F.      Adjudge and decree that a license on FRAND terms and conditions in

accordance with Defendants' obligations to the relevant SSOs, including ETSI, TIA, and/or ATIS, must be consistent with apportionment principles under federal patent law, *i.e.*, the smallest salable patent practicing unit rule;

G.      Adjudge and decree that Defendants have not offered a license to their alleged 2G, 3G, and 4G SEPs to Continental on FRAND terms and conditions;

H.      Enjoin defendants from demanding excessive royalties from Continental and its customers that are not consistent with Defendants' FRAND obligations to the relevant SSOs, including ETSI, TIA, and/or ATIS;

I.      Enjoin Defendants from enforcing their alleged 2G, 3G, and/or 4G SEPs against Continental and its customers via patent infringement lawsuits or other proceedings in other jurisdictions, while Continental remains a willing licensee and seeks an adjudication of the FRAND terms and conditions from this Court;

J.      Adjudge and decree that Defendants have violated Section 1 of the Sherman Act and enjoin Defendants from further violations of that statute;

K.      Adjudge and decree that Defendants have violated Section 2 of the Sherman Act and enjoin Defendants from further violations of that statute;

L.      Adjudge and decree that Defendants have violated the California Business and Professions Code Section 17200 et seq., and enjoin Defendants from further violations of the statute;

M.      Enter judgment awarding Continental its expenses, costs, and attorneys' fees under applicable laws;

N.      Award Continental pre-judgment and post-judgment interest to the full extent allowed under the law, as well as its costs; and

O.      For such other and further relief as the Court deems just and proper.

Dated:  June 20, 2019

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By        _____
                /s/ Stephen S. Korniczky
STEPHEN S. KORNICZKY
MARTIN R. BADER
MATTHEW W. HOLDER
MICHAEL W. SCARBOROUGH
MONA SOLOUKI

Attorneys for Plaintiff
Continental Automotive Systems, Inc.

Case No. 19-cv-2520-LHK
FIRST AMENDED COMPLAINT