SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
STEPHEN S. KORNICZKY, Cal. Bar No. 135532
MARTIN R. BADER, Cal. Bar No. 222865
MATTHEW W. HOLDER, Cal. Bar No. 217619
12275 El Camino Real, Suite 200
San Diego, California 92130
Telephone:    858.720.8900
Facsimile:    858.509.3691
Email      skorniczky@sheppardmullin.com
           mbader@sheppardmullin.com
           mholder@sheppardmullin.com

MICHAEL W. SCARBOROUGH, Cal. Bar No. 203524
MONA SOLOUKI, Cal. Bar No. 215145
LAI L. YIP, Cal. Bar No. 258029
Four Embarcadero Center
Seventeenth Floor
San Francisco, California 94111
Telephone:    415.434.9100
Facsimile:    415.434.3947
Email      mscarborough@sheppardmullin.com
           msolouki@sheppardmullin.com
           lyip@sheppardmullin.com

Attorneys for Plaintiff Continental
Automotive Systems, Inc.

<span style="color:red">REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED PARTIALY UNDER SEAL</span>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> AVANCI, LLC, et al., <br><br> Defendants. | Case No. 5:19-cv-02520-LHK <br><br> **CONTINENTAL'S OPPOSITION TO MOTION TO TRANSFER VENUE TO NORTHERN DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1404(a)** <br><br> Hearing Date:  November 14, 2019 <br> Time:  1:30 p.m. <br> Place:  Courtroom 8 <br> Judge:  Hon. Lucy H. Koh |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................ 2

    A.   Continental Has Significant Operations, and Develops and Sells Products Relying on the Cellular Standards, in This District. ....................... 2

    B.   Avanci Travels Regularly to This District in Pursuit of Business. ................. 4

    C.   Conversant's Key Representative, Boris Teksler, Is Located in This District. ................................................................................................. 5

    D.   Nokia Has Major Facilities and Operations in This District. ......................... 6

    E.   Other Avanci Members Are Located in or Near This District. ...................... 7

III.  LEGAL STANDARD .......................................................................... 9

IV.   TRANSFERRING THIS CASE WOULD BE UNWARRANTED AND INAPPROPRIATE. ........................................................................... 10

    A.   The Interests of Justice Favor This District. ................................................. 10

        1.   The antitrust "special venue provision" gives Continental's choice of forum greater deference. .................................................... 10

        2.   This District has great local interest in this dispute. .......................... 11

        3.   Judicial economy favors this District. ................................................ 13

        4.   This District is better able to monitor compliance with an injunction than the Northern District of Texas. .................................. 14

        5.   Relative court congestion does not weigh in favor of transfer. .......... 15

    B.   Convenience Considerations Do Not Weigh in Favor of Transfer. .............. 16

        1.   This District is more convenient for Continental. .............................. 16

        2.   This is a national and global dispute, with party and nonparty witnesses located all around the country and the world. .................... 17

    C.   The *Jones* Factors Favor This District. ........................................................ 19

        1.   Relevant agreements were negotiated in this District. ....................... 19

        2.   This District is more familiar with the UCL. ..................................... 19

        3.   Continental's choice of forum is entitled to deference. ..................... 20

        4.   The parties have copious amounts of contact with this District. ........ 21

5.    There are numerous contacts relating to Continental's causes of action in this District. .......................................................... 21

6.    Litigating in this District is less costly due to location of counsel. .................................................................................. 22

7.    Key nonparty witnesses would be immune from compulsory process if this case is transferred to Texas. ........................................ 22

8.    This District has as much ease of access to proof as the Northern District of Texas. ............................................................... 23

9.    Public policy favors maintaining this action in this District. ............. 23

D.    To the Extent the Court Is Inclined to Transfer, It Should Permit Venue Discovery Instead. ............................................................ 24

V.    CONCLUSION ............................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Alere Med., Inc. v. Health Hero Network, Inc.*
    No. 07-cv-05054 CRB, 2007 WL 4351019 (N.D. Cal. Dec. 12, 2007) .......................... 9

*Apple Inc. v. Telefonaktiebolaget LM Ericsson, Inc.*
    15-cv-154 (N.D. Cal. filed Jan. 12, 2015) ...................................................... 7, 14

*Apple, Inc. v. Samsung Elec. Co.*
    11-cv-1846-LHK (N.D. Cal. filed Apr. 15, 2011) ............................................... 13

*Apple, Inc. v. Samsung Elec. Co.*
    No. 12-cv-630-LHK (N.D. Cal. filed Feb. 8, 2012) ............................................ 13

*Arreola v. Finish Line*
    No. 14-cv-03339-LHK, 2014 WL 6982571 (N.D. Cal. Dec. 9, 2014) ......................... 22

*ASUS Computer Int'l v. InterDigital, Inc.*
    No. 15-cv-01716 (N.D. Cal. filed Apr. 15, 2015) ............................................... 14

*California v. U.S. Bureau of Land Mgmt.*
    No. 17-cv-03804, 2017 WL 8294171 (N.D. Cal. Sept. 7, 2017) .......................... 12, 13

*CES Grp., LLC v. DMG Corp.*
    No. 14-cv-02919-BLF, 2015 WL 457405 (N.D. Cal. Feb. 3, 2015) ...................... 17, 21

*CFA N. Cal., Inc. v. CRT Partners LLP*
    378 F. Supp. 2d 1177 (N.D. Cal. 2005) ......................................................... 18

*Chrimar Systems v. Cisco Systems*
    No. 13-cv-1300 (N.D. Cal. filed Mar. 22, 2013) ................................................ 14

*Clipper Carloading Co. v. Rocky Mountain Motor Tariff Bureau*
    No. 72-cv-863, 1972 U.S. Dist. LEXIS 11373 (N.D. Cal. Oct. 30, 1972) ................... 10

*Commodity Futures Trading Com. v. Savage*
    611 F.2d 270 (9th Cir. 1979) ...................................................................... 9

*Consumer Fin. Prot. Bureau v. Nationwide Biweekly Admin., Inc.*
    No. 15-cv-02106, 2015 WL 4463790 (N.D. Cal. July 21, 2015) ........................ 11, 20

*Conversant Wireless Licensing S.A.R.L. v. Apple Inc.*
    No. 15-cv-05008 (N.D. Cal. filed Nov. 3, 2015) ............................................... 14

*Conversant Wireless Licensing SARL v. Apple Inc.*
    No. 5:15-cv-05008-NC, Dkt. Nos. 112, 121 (N.D. Cal.) ................................................... 6

*Ctr. for Biological Diversity v. Export-Import Bank of the United States*
    No. 12-cv-6325-SBA, 2013 WL 5273088 (N.D. Cal. Sep. 17, 2013) .......................... 21

*Decker Coal Co. v. Commonwealth Edison Co.*
    805 F.2d 834 (9th Cir. 1986) .............................................................................................. 9

*Diva Limousine, Ltd. v. Uber Technologies, Inc.*
    No. 18-cv-5546-EMC, 2019 WL 2548459 (N.D. Cal. Jun. 20, 2019) ......................... 20

*Eggers v. Campagnolo North America, Inc.*
    No. 08-cv-0198, 2009 WL 311124 (S.D. Cal. Feb. 9, 2009) ......................................... 18

*Ellis v. Costco Wholesale Corp.*
    372 F. Supp. 2d 530 (N.D. Cal. 2005) ............................................................................ 10

*Ergos Software, Inc. v. Benflah*
    No. 08-cv-908-AG, 2009 WL 10674043 (C.D. Cal. Sep. 15, 2009) ............................ 14

*FTC v. Qualcomm, Inc.*
    No. 17-cv-00220-LHK (N.D. Cal. filed Jan. 17, 2017) ........................................... 7, 13

*Funai Electric v. LSI Corp.*
    No. 16-cv-01210 (N.D. Cal. filed Mar. 11, 2016) ........................................................ 14

*In re Funeral Consumers Antitrust Litig.*
    No. 05-cv-03305, 2005 U.S. Dist. LEXIS 48243 (N.D. Cal. Sept. 23,
    2005) ...................................................................................................................................... 11

*Gem Acquisitionco, LLC v. Sorenson Grp. Holdings, LLC*
    No. 09-cv-1484-SI, 2009 WL 1621456 (N.D. Cal. June 6, 2009) .................... 15, 16, 20

*Getz v. Boeing Co.*
    547 F. Supp. 2d 1080 (N.D. Cal. 2008) ................................................................... 15, 17

*GPNE Corp. v. Apple, Inc.*
    No. 12-cv-02885-LHK (N.D. Cal. filed June 8, 2012) ................................................. 13

*Heartland Payment Sys., Inc. v. Mercury Payment Sys., LLC*
    No. 14-cv-0437 CW, 2014 WL 5695051 (N.D. Cal. Nov. 4, 2014) ................. 17, 19, 23

*Huawei Tech. v. Samsung Elec. Co.*
    No. 16-cv-02787 (N.D. Cal. filed May 24, 2016) ........................................................ 14

*Jones v. GNC Franchising, Inc.*
    211 F.3d 495 (9th Cir. 2000) ........................................................... 1, 2, 9, 10, 18, 19, 22

*Kaia Foods, Inc. v. Bellafiore*
    70 F.Supp.3d 1178 (N.D. Cal. 2014) .............................................................. 24

*Kremen v. Cohen*
    No. 5:11-cv-05411-LHK, 2012 U.S. Dist. LEXIS 1988 (N.D. Cal. Jan. 7,
    2012) ................................................................................................... 13, 17

*Mays v. Wal-Mart Stores, Inc.*
    No. 17-cv-07174-LHK, 2018 WL 1400468 (N.D. Cal. Mar. 19, 2018) ...................... 22

*Mycone Dental Supply Co. v. Creative Nail Design, Inc.*
    No. 12-cv-00747, 2012 WL 12920620 (N.D. Cal. Apr. 20, 2012) ................................. 9

*Nat. Wellness Centers of Am., Inc. v. J.R. Andorin Inc.*
    No. 11-cv-04642 EDL, 2012 WL 216578 (N.D. Cal. Jan. 24, 2012) ...................... 10, 20

*Nokia Corp. v. AU Optronics Corp.*
    No. 09-cv-05609 (N.D. Cal. filed Nov. 25, 2009) ........................................................ 7

*Orange Cty. IBEW-NECA Labor Mgmt. Cooperation Comm. v. Pro Tech
    Eng'g Corp.*
    No. 14-cv-04225-LHK, 2015 U.S. Dist. LEXIS 127915 (N.D. Cal. Sep.
    23, 2015) ............................................................................................. 9, 16, 23

*Powerteq, LLC v. Moton*
    No. 15-cv-2626, 2016 WL 80558 (N.D. Cal. Jan. 7, 2016) .................................... 16, 24

*In re Qualcomm Antitrust Litigation*
    No. 17-md-2773 (N.D. Cal. filed Apr. 6, 2017) ........................................................ 14

*Rafton v. Rydex Series Funds*
    No. 10-cv-1171, 2010 WL 2629579 (N.D. Cal. June 29, 2010) ............................ 11, 15

*Realtek Semiconductor Corp. v. LSI Corp.*
    No. 12-cv-03451 (N.D. Cal. filed June 29, 2012) ...................................................... 13

*Reese v. Malone*
    No. 07-cv-7511, 2008 WL 11342462 (C.D. Cal. June 19, 2008) .................................... 9

*Ryan v. Microsoft Corp.*
    No. 14-CV-04634-LHK, 2015 WL 1738352 (N.D. Cal. Apr. 10, 2015) ...................... 21

*Sharma v. Globalfoundries U.S., Inc.*
    No. 15-cv-03631, 2016 WL 2742399 (N.D. Cal. May 11, 2016) ............................ 16, 18

*Shultz v. Hyatt Vacation Mktg. Corp.*
  No. 10-cv-04568-LHK, 2011 U.S. Dist. LEXIS 24692 (N.D. Cal. Feb.
  28, 2011) ......................................................................................... 12, 19, 23

*Sillah v. Command Int'l Sec. Servs.*
  No. 14-cv-01960-LHK, 2014 U.S. Dist. LEXIS 145948 (N.D. Cal. Oct.
  13, 2014) ........................................................................................................ 9

*SK Hynix Semiconductor v. Rambus*
  No. 00-cv-20905 (N.D. Cal. filed Aug. 29, 2000) ....................................... 13

*STX, Inc. v. Trik Stik, Inc.*
  708 F. Supp. 1551 (N.D. Cal. 1988) ........................................................... 17

*Swami v. Title Source, Inc.*
  No. 17-cv-1175-WHA, Dkt. 49 (N.D. Cal. May 18, 2017) ........................... 24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
  No. 07-md-01827 (N.D. Cal. filed Apr. 20, 2007) ........................................ 7

*Z-Tel Commc'ns, Inc. v. SBC Commc'ns Inc.*
  331 F. Supp. 2d 567 (E.D. Tex. 2004) ........................................................ 10

Statutes

15 U.S.C. § 22 .................................................................................... 10, 11, 20

28 U.S.C. § 1404(a) ................................................................. 1, 6, 9, 10, 11, 19

California's Unfair Competition Law ................................................................ 19

Other Authorities

F.R.C.P. 45(c) .............................................................................................. 22

## I.      **INTRODUCTION**

This case will profoundly impact an entire global industry—the Internet of Things, including automotive connectivity—the epicenter of which is in this District.  The IoT, which refers to the application of cellular and other connectivity technologies to physical objects like cars and appliances, has a projected worth of $11 trillion by 2025.  Avanci seeks to license the entire Internet of Things.  (*See* Vision, http://avanci.com/vision  (last accessed Aug. 28, 2019).)  Avanci comprises and represents titans of the SEP licensing business, such as Qualcomm, Ericsson, and Nokia—international conglomerates with major operations in this District.  (*See* Licensors in the Avanci Marketplace, http://avanci.com (last accessed Aug. 28, 2019).)  What this Court rules regarding the FRAND terms and conditions for a license to Avanci's platform will have immediate and lasting effects on the whole IoT industry, in this District, nationally, and around the world.

Defendants seem to acknowledge the international nature of this dispute, conceding that witnesses, parties, and non-parties are located all around the country and the world.  Indeed, members of Avanci hail from three continents—Asia, North America, and Europe.  Yet Defendants brush all of that aside and argue for transfer to Texas by focusing myopically on minor differences in flight times down to the hour and minute.  But ultimately, the San Francisco Bay Area and Dallas are both major metropolitan areas with international airports (indeed, the Bay Area has three).  The small differences in flight times to reach the two areas from places abroad like Frankfurt, Sweden, and Japan are relatively meaningless, especially compared to how much the Court's rulings regarding what constitutes FRAND rates to the Avanci license will impact this District.

Perhaps the most conspicuous and telling omission from Defendants' Motion is that in evaluating a 28 U.S.C. § 1404(a) motion, the Ninth Circuit considers "the respective parties' contacts with the forum."  *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000).  Yet Defendants hardly use the word "contact" in their brief, and for good reason:  the parties' contacts with this District are legion.  Continental has a major facility in San Jose, spanning 65,000 square feet, which develops and sells services and products

facilitating keyless operation of vehicles, which rely on cellular standards.  This San Jose operation counts ███████ ridesharing companies as customers, ███████ of which are based in this District.  As to Avanci, it regularly and frequently has sent representatives to this District in pursuit of licensing revenues.  Conversant's CEO Boris Teksler lives and works in Silicon Valley, and will be a key witness in this case.  Nokia has four offices here, in San Jose, Mountain View, Petaluma, and Sunnyvale, the last of which employs numerous licensing personnel.  Sharp also has an office in San Jose.  Defendants cannot avail themselves of the benefits of doing business in this District, and then complain it is not a "convenient" location to defend their business practices.

This Court has broad discretion in deciding whether to transfer a case for "convenience," and in so doing, must consider the interests of justice.  *Jones*, 211 F.3d at 498.  This case should not be transferred.  As Continental will demonstrate below, this District is a just, sensible, and convenient venue for this action.  Defendants' Motion should be denied.

## II.     FACTUAL BACKGROUND

### A.     Continental Has Significant Operations, and Develops and Sells Products Relying on the Cellular Standards, in This District.

Continental has a major facility in this District, located in San Jose less than eight miles from this courthouse, on North 1st Street.  (Decl. of Jennifer Wahnschaff ¶ 2.)  This facility spans more than 65,000 square feet and employees nearly 100 people.  (*Id.*)  It houses the Continental Intelligent Transportation Systems ("ITS") segment, a Silicon Valley tech startup and incubator, including its central management, sales, and engineering functions.  (*Id.*)  As explained below, ITS develops services and products that utilize and rely on cellular connectivity technologies that are the subject of this dispute.

ITS's leading business line is its Key as a Service ("KaaS").  (*Id.*)  Using KaaS, a person can use her phone to lock, unlock, start, stop, and operate the vehicle in other ways.  (*Id.*; Decl. of Lai Yip, Ex. 3.)  In other words, this technology enables keyless entry and use of a vehicle.  (Wahnschaff Decl., ¶ 2.)  The user's phone communicates with a Remote

Cloud Key ("RCK") device typically installed in the vehicle, which also provides information about the vehicle to the phone, such as speed, fuel levels, and location.  (*Id.*) KaaS also utilizes devices (*e.g.*, ACCM and CSM modules) that rely on 3G connectivity. (*Id.*)  ITS has 44 engineers working on KaaS, all located in San Jose.  (*Id.*)

ITS's KaaS line has been very popular in the ridesharing industry.  Globally, ITS has ███████ ridesharing companies as customers, of which ███████ are located in this District.  (*Id.* ¶ 3.)  One of ITS's largest customers is Turo, considered to be the "Airbnb of the car rental industry," which is located in this District.  (*Id.*; Yip Decl., Exs. 4–7.) Vehicle owners can rent out their vehicles through Turo, and with ITS's KaaS, the owner need not exchange physical keys with the renter.  (Wahnschaff Decl., ¶ 3.)  Instead, after downloading the Turo app, the renter can unlock the vehicle by having her phone communicate with the RCK installed in the vehicle.  (*Id.*)  Other ITS KaaS customers include ridesharing startups ███████, as well as established, traditional car companies such as Avis, ███████.  (*Id.*)  Vehicles on the road utilizing KaaS number ███████ throughout the world, with ███████ in California, including in this District.  (*Id.*)  Sales people located in San Jose are responsible for negotiating and finalizing the purchase of the KaaS service with any U.S. customers.  (*Id.*) Technical discussions regarding the KaaS service with any U.S. customers also take place out of ITS in San Jose.  (*Id.*)

Another ITS business line managed out of San Jose that relies on the cellular standards is its "fleet management" service, which uses a TCU with cellular connectivity capability installed in the vehicle.  (*Id.*, ¶ 4)  This service provides logistics support, vehicle tracking, routing information, and other telematics.  (*Id.*)  A further ITS business line managed out of San Jose is its "telematics platform," which provides various "microservices" using a TCU with cellular connectivity.  (*Id.*)  These microservices include locking and unlocking of the vehicle, turning headlights on and off, linking to insurance, driver training, and fleet management.  (*Id.*)  Customers of these ITS business lines are located all over Asia.  (*Id.*)

The San Jose facility also houses its Silicon Valley Research and Development Center (the "Center"). (*Id.*, ¶¶ 5-6.) The Center, together with ITS, develop new technologies to be incorporated into Continental's TCUs, which rely on cellular standards to communicate telematics information. (*Id.*) Such technologies include those relating to self-driving cars, artificial intelligence, 3D maps created by moving vehicles, and intelligent mobility solutions. (*Id.*)

## B.   Avanci Travels Regularly to This District in Pursuit of Business.

Although Avanci is based in Texas, it targets all "companies creating connected products for the Internet of Things," both in this District and all around the "connected world." (Yip Decl., Ex. 8.) One of Avanci's initial targets was Tesla, based in this District. (Decl. of Jeff Risher ¶ 3.) Shortly after Avanci was formed, its CEO Kasim Alfalahi called Jeff Risher, then Chief IP Counsel at Tesla, to request that Tesla join the Avanci platform. (*Id.*) Thereafter, Alfalahi and Luke McLeroy, Avanci's SVP of Business Development, traveled to this District multiple times to meet with Risher and negotiate an Avanci license with Tesla. (*Id.*) It is also likely that Alfalahi and McLeroy had further meetings in this District with Chris Lubeck, who took over IP matters at Tesla after Risher left. (*Id.* ¶ 4.) On information and belief, Avanci has also met or negotiated with Apple, Inc. in this District regarding a license. (*Id.* ¶ 5.)

Although Avanci says this District is too far to be "convenient," it has presumably traveled far past California, to Asia, to woo patent owners to its platform. Members include ASUSTeK (Taiwan); China Mobile, Datang Mobile, and ZTE (China); NTT Docomo, Fujitsu IP Bridge, NEC, Panasonic, and Sony (Japan); and SK Telecom (South Korea). Similarly, Avanci has presumably flown to Europe to meet with some or all of its members there: BT Group and Vodafone (U.K.); Ericsson (Sweden); KPN amd TNO (Netherlands); Siemens, Volkswagen Group, and BMW (Germany); and Sisvel (Luxembourg). (Section II.E, *infra*.) Likewise, on information and belief, Avanci has pursued lucrative licensing arrangements with automobile manufacturers around the world, including via in-person visits with manufacturers in Asia, Europe, and throughout the U.S.

1    Avanci representatives also travel frequently to this District to specifically promote

2    and advance the Avanci agenda.  Just this year, McLeroy spoke on 5G technology at

3    Stanford in January; 5G licensing at Oracle in Redwood City in April; and technical

4    standards in San Jose in May.  (Yip Decl., Exs. 9–11; *see also* Ex. 12.)  He presumably

5    arranged meetings around these events with potential licensees and other business partners

6    in this District.  To market Avanci, representatives have even traveled for speaking

7    engagements to other continents.  (*Id.* Ex. 13 (Japan in 2017); Exs. 14, 15 (Japan twice in

8    2018); Ex. 16 (China in 2018); Ex. 17 (Switzerland in 2019).)

9       **C.    Conversant's Key Representative, Boris Teksler, Is Located in This**

10              **District.**

11    Conversant's Boris Teksler, whom Defendants seek to minimize in the Motion, is a

12    key witness in this case who lives and works in this District.  (Dkt. 110-1, ¶ 3.)  Teksler

13    negotiated the Master License Management Agreement with Avanci.  (*See* Dkt. 110, pp. 1-

14    2; Dkt. 110-1, ¶ 6(b); Dkt. 110-2, ¶ 3; Yip Decl., Ex. 18.)  He is an officer or director of at

15    least three Conversant entities, one of which is a defendant in this case.  (Dkt. 110-1, ¶¶ 3-

16    4; Yip Decl., Exs. 19–21.)  He is CEO of two of those entities, which primarily handle the

17    licensing of the Conversant patent portfolio.  (*Id.*; Yip Decl., Ex. 21 (statement filed with

18    California Secretary of State regarding Conversant entity, identifying "IP Licensing" as its

19    business, Palo Alto as "Principal Business Office," and Teksler as agent for service of

20    process).)

21    Teksler is significantly involved in Conversant's licensing activities.  His job is "to

22    lead Conversant in fulfilling the value of its patent assets," including "bringing a new scale

23    and efficiency to effective commercialization strategies."  (Yip Decl., Ex. 22.)  He

24    participated in Conversant's acquisition of Core Wireless (along with its patent portfolio)

25    and Conversant's joining of Via Licensing's LTE patent pool.  (*Id.* Exs. 23–25.)  He was

26    directly involved in making Conversant's IPR declarations to ETSI, executing at least

27    eight declarations.  (*Id.* Ex. 26.)  He has firsthand knowledge of Conversant's involvement

28    with ETSI and 3GPP.  (*Id.* Ex. 27 (stating in a press release that Conversant's "staff in the

1  past has participated in 3GPP<sup>TM</sup> standard-setting meetings, and [] look[s] forward to

2  actively contributing to ETSI's ongoing standard-setting research and development").)

3      This is not the first time Conversant has resisted venue in this District.  When

4  Conversant SARL sued Apple, Inc. in the Eastern District of Texas, Apple successfully

5  moved to transfer venue to this District pursuant to 28 U.S.C. § 1404(a).  *See Conversant*

6  *Wireless Licensing SARL v. Apple Inc.*, No. 5:15-cv-05008-NC, Dkt. Nos. 112, 121 (N.D.

7  Cal.) (E.D. Tex. Opinion & Order; District Judge's Adoption).  Thereafter, Conversant

8  SARL litigated the case through trial, appeal, remand, and now a second appeal.  *See id.*,

9  Dkt. Nos. 506, 532, 538, 581.

10          **D.      Nokia Has Major Facilities and Operations in This District.**

11     Nokia operates four separate facilities in this District, in Sunnyvale, San Jose,

12  Mountain View, and Petaluma.  (Yip Decl., Exs. 28–31.)  Nokia's "West Coast home . . .

13  in Sunnyvale" opened almost a decade ago.  (*Id.* Ex. 32.)  It "has 56,960 square feet on

14  five floors," employs 40 researchers and is home to Nokia Bell Labs, among others.  *Id.*

15  This Sunnyvale operation will soon substantially expand, with the addition of 231,000

16  square feet of office space.  (*Id.* Exs. 33–35.)

17     Nokia's licensing activities appear to operate significantly out of Sunnyvale.

18  According to its 2018 Annual Report, Nokia's licensing activities are performed by or

19  within Nokia Technologies, which calls Nokia's Sunnyvale location its home.  (*Id.* Ex. 36,

20  p. 67; Ex. 32).  Nokia Technologies asserts that it "possess[es] one of the industry's

21  strongest intellectual property portfolios, including numerous standardized or proprietary

22  patented technologies."  (*Id.* Ex. 36, p. 67.)

23     Defendants acknowledge that Michael Schmidt, Nokia's Licensing Manager for

24  Mobile Devices, negotiated directly with Continental's affiliate Zonar regarding a license.

25  Although Schmidt purportedly moved last month to Seattle, that is closer to this District

26  than to Texas, and he still publicly identifies his location as the "San Francisco Bay Area."

27  (*Id.* Exs. 37, 38.)  This District appears to be home to many other Nokia licensing

28  personnel.  (*E.g., id.* Ex. 39 (LinkedIn profile for Micah Jeppsen, responsible for "licensing

1   activities including asset valuation, infringement review, and claim mapping"), Ex. 40

2   (Arthur Mimnaugh, who drives "long-term growth and monetization within licensing"),

3   Ex. 41 (Christopher Iwata, responsible for licensing "the [Nokia] patent portfolio"); Ex. 42

4   (Petri Koskelainen, involved with "patent portfolio management").)

5          Nokia representatives speak frequently in this District regarding issues relevant

6   here.  (*Id.* Ex. 43 (in San Jose in April 2020 at IoT World); Ex. 44 (in San Jose in

7   September 2019 on 5G and self-driving vehicles); Ex. 45 (in Redwood City in April 2019

8   at Licensing Executive Society regarding 5G licensing); Ex. 46 (in Palo Alto in November

9   2018 on 5G); Ex. 47 (in Palo Alto in April 2015 at conference for automotive technology

10  executives).)

11         Nokia has litigated extensively in this District, litigating approximately 33 other

12  cases here in just the past 13 years.  (*Id.* Ex. 131.)  Nokia voluntarily filed at least two of

13  these cases as plaintiff or co-plaintiff in this District.  (*Id.*; *Nokia Corp. v. AU Optronics

14  Corp.*, No. 09-cv-05609 (filed Nov. 25, 2009); *In re TFT-LCD (Flat Panel) Antitrust

15  Litig.*, No. 07-md-01827 (filed Apr. 20, 2007)).)

16         **E.     Other Avanci Members Are Located in or Near This District.**

17         ***Qualcomm.***  Qualcomm was an original licensor on the Avanci platform, along

18  with Ericsson.  (Yip Decl., Ex. 48, p. 26.)  The individual who executed the Avanci Master

19  License Management Agreement on behalf of Qualcomm, former Qualcomm executive

20  Derek Aberle, is located in San Diego.  (*Id.* & Ex. 49.)  Qualcomm is headquartered in San

21  Diego and has nine offices in this District.  (*Id.* Exs. 50, 51.)  On information and belief,

22  numerous licensing professionals of Qualcomm are located in this District or in California.

23  (*See id.* Ex. 52.)  Qualcomm has litigated about 58 cases in this District.  (*Id.* 132.)

24         ***Ericsson.***  Ericsson is headquartered in Sweden and maintains an office in Santa

25  Clara, which it calls its "regional hub for the West Coast."  (*Id.* Exs. 53–55.)  The

26  establishment of Ericsson's Santa Clara location was part of its effort to "win in mobile,"

27  allowing Ericsson the opportunity to "[f]ulfill[] the potential of 5G" by being "active in the

28  Silicon Valley ecosystem with companies that have their headquarters [there]."  (*Id.*, Ex.

56.)  According to Ericsson, "[t]he core of mobile technologies is in Silicon Valley, so we have to be [there]."  (*Id.*, Ex. 55.)  Nina Macpherson and Gustav Brismark, former executives of Ericsson who executed the Avanci Master License Management Agreement, are located in Sweden (not Texas).  (*Id.*, Ex. 48, p. 26; Exs. 57, 58.)  John Han, another former Ericsson licensing executive who, on information and belief, was likely involved in discussions surrounding the launch of Avanci, now works for Qualcomm and is based in San Diego.  (*Id.* Ex. 126.)  Ericsson has litigated about 30 cases in this District.  (*Id.* 133.)

*BlackBerry.*  BlackBerry is headquartered in Canada and has four offices in this District, in San Ramon, Martinez, San Mateo, and Mountain View.  (*Id.* Ex. 83.)  BlackBerry's former employees Jerald Gnuschke and Roland Williams corresponded directly with Continental regarding a license to BlackBerry's SEPs out of the San Ramon office.  (*Id.* Ex. 59.)  Both individuals are located in this District.  (*Id.* Ex. 60.)  While Gnuschke and Williams are no longer with BlackBerry, on information and belief, BlackBerry still operates its licensing program from the San Ramon office.

*Nonmoving Defendants Sharp and Optis.*  Sharp is headquartered in Japan and maintains an office in San Jose.  (*Id.* Ex. 61.)  As to Optis, it acquired a large portion of its patents from Unwired Planet in 2016.  (*Id.* Exs. 62, 63.)  At the time, Teksler was CEO of Unwired Planet, and the sale was announced in an Unwired Planet press release identifying the location as Los Altos (where Teksler lives).  (*Id.* Ex. 63.)  On information and belief, the negotiations regarding Optis's acquisition of the Unwired Planet portfolio took place out of this District, and Teksler will be a key witness regarding same.

*Remaining members of Avanci.*  Of the remaining 21 Avanci members, nine have offices in this District (ASUSTek, NTT Docomo, Fujitsu, InterDigital, Siemens, NEC, Sony, Vodafone, and BT).  (*Id.* Ex. 127.)  Twelve have headquarters in Asia, closer to this District than to Texas (ASUSTek, Innovative Sonic, China Mobile, DT Mobile, ZTE, NTT Docomo, Fujitsu, IP Bridge, NEC, Panasonic, Sony, and SK Telecom).  (*Id.*)  And six are headquartered in Europe (BT Group, KPN, TNO, Siemens, Sisvel, and Vodafone).  (*Id.*)

## III.   <u>LEGAL STANDARD</u>

Districts courts have "broad discretion in refusing to transfer under section 1404(a)." A "district court's denial of [a section 1404(a)] transfer motion [is reviewed] for an abuse of discretion." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 842 (9th Cir. 1986). "[O]nly in rare instances have appellate courts overridden a trial court's decision not to transfer." *Commodity Futures Trading Com. v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979). "The moving party bears the burden of showing that transfer is appropriate." *Sillah v. Command Int'l Sec. Servs.*, No. 14-cv-01960-LHK, 2014 U.S. Dist. LEXIS 145948, at *10 (N.D. Cal. Oct. 13, 2014). The "movant must make a 'strong showing' to displace the plaintiff's choice of venue, as it is accorded substantial weight." *Mycone Dental Supply Co. v. Creative Nail Design, Inc.*, No. 12-cv-00747, 2012 WL 12920620, at *2-3 (N.D. Cal. Apr. 20, 2012) (citing *Decker*, 805 F.2d at 843).[1]

"Pursuant to Section 1404(a), a Court should consider: (1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interest of justice." *Orange Cty. IBEW-NECA Labor Mgmt. Cooperation Comm. v. Pro Tech Eng'g Corp.*, No. 14-cv-04225-LHK, 2015 U.S. Dist. LEXIS 127915, at *6 (N.D. Cal. Sep. 23, 2015). While this District has stated that "the interest of justice is the most important consideration," *Alere Med., Inc. v. Health Hero Network, Inc.*, No. 07-cv-05054-CRB, 2007 WL 4351019, at *1 (N.D. Cal. Dec. 12, 2007), "[t]here is no clear authority in the Ninth Circuit as to which factor—convenience of the parties, convenience of the witnesses, or the interests of justice—carries the most weight." *Reese v. Malone*, No. 07-cv-7511, 2008 WL 11342462, at *2 (C.D. Cal. June 19, 2008). "It is well established, however, that multiple factors govern transfer within the federal court system and must be weighed at the Court's discretion." *Id.*, citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988). Courts in the Ninth Circuit also consider the "*Jones* factors" in deciding a transfer motion. *Jones*,

---

[1] In all quotations, internal citations and quotations, as well as footnotes, are omitted unless indicated otherwise; and underlining is added for emphasis.

1   211 F.3d at 498–99 (9th Cir. 2000); *see* Section IV.C, *infra* (addressing the *Jones* factors).

2       "Unless the balance of the Section 1404(a) factors weighs heavily in favor of the

3   defendants, the plaintiff's choice of forum should rarely be disturbed." *Nat. Wellness*

4   *Centers of Am., Inc. v. J.R. Andorin Inc.*, No. 11-cv-04642 EDL, 2012 WL 216578, at *10

5   (N.D. Cal. Jan. 24, 2012). Here, the balance of factors does not weigh in favor of transfer,

6   let alone "heavily" in favor of transfer.

7   **IV.    TRANSFERRING THIS CASE WOULD BE UNWARRANTED AND**

8   **INAPPROPRIATE.**

9       **A.    The Interests of Justice Favor This District.**

10          1.    The antitrust "special venue provision" gives Continental's choice of

11              forum greater deference.

12      Defendants' Motion does not dispute that venue is proper in this District. This

13   action includes several antitrust claims, and under 15 U.S.C. § 22, "Any suit, action, or

14   proceeding under the antitrust laws against a corporation may be brought not only in the

15   judicial district whereof it is an inhabitant, but also in any district wherein it may be found

16   or transacts business . . . ." The "more permissive standard" of the antitrust venue statute

17   means that Continental's choice of venue is given greater deference. *Ellis v. Costco*

18   *Wholesale Corp.*, 372 F. Supp. 2d 530, 537 (N.D. Cal. 2005) ("Where venue is governed

19   by a more permissive standard, a plaintiff's choice is entitled to greater deference as a

20   matter of law"); *Clipper Carloading Co. v. Rocky Mountain Motor Tariff Bureau*, No. 72-

21   cv-863, 1972 U.S. Dist. LEXIS 11373, at *7-8 (N.D. Cal. Oct. 30, 1972) ("Unless the

22   plaintiffs' choice of forum is for the purpose of harassing the defendant, it should rarely be

23   disturbed. This is especially true in an antitrust case, because Congress has intentionally

24   provided the plaintiff with a wide choice of venue."), citing 15 U.S.C. § 22; *see also Z-Tel*

25   *Commc'ns, Inc. v. SBC Commc'ns, Inc.*, 331 F. Supp. 2d 567, 572 (E.D. Tex. 2004)

26   ("[T]he Court is inclined to at least give some deference to [plaintiff's] choice [of forum],

27   especially in light of the fact that § 12 of the Clayton Act [15 U.S.C. § 22] allows a federal

28   antitrust suit to be commenced 'not only in the judicial district whereof [defendant] is an

inhabitant, but also in any district wherein it may be found or transacts business.'"); *but see In re Funeral Consumers Antitrust Litig.,* No. 05-cv-03305, 2005 U.S. Dist. LEXIS 48243, *23-24 (N.D. Cal. Sept. 23, 2005) (finding no deference, but distinguishable on factual grounds because that case was brought on behalf of nationwide class of plaintiffs, weakening deference to representative plaintiffs' choice of forum).

Moreover, "factors that are expressly identified as a basis for venue in [the special venue statute] should be key factors in analyzing the interests of justice prong of the section 1404(a) analysis." *Consumer Fin. Prot. Bureau v. Nationwide Biweekly Admin., Inc.*, No. 15-cv-02106, 2015 WL 4463790, at *4 (N.D. Cal. July 21, 2015). For example, where the special venue statute provides that an action "may be brought in a forum 'in which the defendant . . . is doing business,'" and "Defendants clearly conduct business in California," plaintiff's "choice of forum in the Northern District of California is [] properly given substantial deference." *Id.* Here, 15 U.S.C. § 22 provides that venue lies against a defendant "in any district wherein it may be found or transacts business." Defendants may be found in this District or transact business here. (Sections II.B-E, *supra*.)

> 2.    This District has great local interest in this dispute.

Defendants argue this case is "entirely unrelated to this District." As set forth above and below, this is false. Moreover, "[e]ven if key events here took place [in another District], that does not detract from plaintiff's arguments that operative events have occurred in this forum, or that this District has a clear interest in the parties or subject matter of this case." *Consumer Fin. Prot. Bureau v. Nationwide Biweekly Admin., Inc.*, No. 15-cv-02106, 2015 WL 4463790, at *4 (N.D. Cal. July 21, 2015).

Defendants, including through Avanci, have targeted licensees in this District; key witnesses are located in this District; and relevant negotiations took place in this District. (Sections II.B-E, *supra*; *Rafton v. Rydex Series Funds*, No. 10-cv-1171, 2010 WL 2629579, at *3 (N.D. Cal. June 29, 2010) ("[B]y choosing to market and sell [the product] nationwide, rather than just in the state of Maryland, Defendants exposed themselves to the risk of being sued in the districts in which the [products] were sold.").) Also, "the fact that

1   another forum also has an interest in the outcome of this dispute does not override

2   Plaintiff's choice to litigate in this forum." *California v. U.S. Bureau of Land Mgmt.*, No.

3   17-cv-03804, 2017 WL 8294171, at *4 (N.D. Cal. Sept. 7, 2017) (denying transfer).

4          Importantly, the Court should consider the impacts on this District of Defendants'

5   actions, even if they occurred elsewhere. *See Shultz v. Hyatt Vacation Mktg. Corp.*, No.

6   10-cv-04568-LHK, 2011 U.S. Dist. LEXIS 24692, at *15 (N.D. Cal. Feb. 28, 2011)

7   ("Simply because [defendant] determines policies or makes [relevant] decisions in Florida

8   does not negate the <u>local impact</u> of those decisions when they are implemented

9   elsewhere.").  The Court's decisions, including as to what constitutes FRAND terms and

10  conditions for a license to Avanci's "Internet of Things patent licensing platform" (Yip

11  Decl., Ex. 64.), will have a significant impact here.  This District is the epicenter of the IoT

12  industry, which is projected to be an $11 trillion industry by 2025.  (*See id.* Exs. 65–72.)

13          Silicon Valley also has become a focal point of automotive technology.  The map

14  below shows automotive technology companies based in this District and the extraordinary

15  density of this industry here.  (*See id.* Ex. 73 (full-size version).)

16

17

18

19

20

21

22

23

24

25

26

27

28

CONTINENTAL'S OPPOSITION TO MOTION TO TRANSFER VENUE

1    Prominent electric vehicle companies such as Tesla, Lucid, Rivian, and Faraday,

2    and other automotive technology companies like Uber, Lyft, and Cruise, are all based here

3    or have significant operations here.  (*See id.*; *see also* Exs. 74, 75.)  Established, traditional

4    carmakers Ford, BMW, General Motors, Honda, Mercedes-Benz and Nissan-Renault all

5    have opened research labs in this District, "chasing a vision of cars connected to the Web,

6    cars that integrate seamlessly with smartphones and other mobile devices that Silicon

7    Valley pioneered."  (*Id.* Ex. 76.)  Volvo, Mitsubishi, Porsche, and Toyota—as well as

8    Denso, Harman, and Valeo, all Tier-1 automotive suppliers of TCUs and direct

9    competitors of Continental—have offices in the District.  All these automotive technology

10   and IoT companies are current or potential licensing targets of Defendants.  This Court's

11   findings regarding what constitutes FRAND terms and conditions for an Avanci license

12   will have a direct impact on these San Francisco Bay Area companies.

13               3.    Judicial economy favors this District.

14   Courts consider judicial economy when deciding whether to transfer a case.  *Bureau*

15   *of Land Mgmt.*, 2017 WL 8294171 at *3.  Where the court "is already familiar with the

16   legal issues in this lawsuit because it recently decided another case involving [similar legal

17   issues]," transfer is disfavored.  *Id.* (denying transfer); *Kremen v. Cohen*, No. 5:11-cv-

18   05411-LHK, 2012 U.S. Dist. LEXIS 1988 (N.D. Cal. Jan. 7, 2012), at *34-35 (finding that

19   contempt ruling in another proceeding against key third party "for actions related to those

20   alleged in the Complaint" favors "retaining the case in the Northern District of California,"

21   as "the district is already familiar with the background of the case").  This Court is

22   extremely familiar with the legal issues in this lawsuit because it recently decided *FTC v.*

23   *Qualcomm, Inc.*, No. 17-cv-00220-LHK, another case involving FRAND, SEP, and related

24   antitrust issues.

25   Other cases involving such issues in this District include:  *SK Hynix Semiconductor*

26   *v. Rambus*, No. 00-cv-20905 (filed Aug. 29, 2000); *Apple, Inc. v. Samsung Elec. Co.*, 11-

27   cv-1846-LHK (filed Apr. 15, 2011); *Apple, Inc. v. Samsung Elec. Co.*, No. 12-cv-630-

28   LHK (filed Feb. 8, 2012); *GPNE Corp. v. Apple, Inc.*, No. 12-cv-02885-LHK (filed June 8,

2012); *Realtek Semiconductor Corp. v. LSI Corp.*, No. 12-cv-03451 (filed June 29, 2012); *Chrimar Systems v. Cisco Systems*, No. 13-cv-1300 (filed Mar. 22, 2013); *Apple Inc. v. Telefonaktiebolaget LM Ericsson, Inc.*, 15-cv-154 (filed Jan. 12, 2015); *ASUS Computer Int'l v. InterDigital, Inc.*, No. 15-cv-01716 (filed Apr. 15, 2015); *Conversant Wireless Licensing S.A.R.L. v. Apple Inc.*, No. 15-cv-05008 (filed Nov. 3, 2015); *Funai Electric v. LSI Corp.*, No. 16-cv-01210 (filed Mar. 11, 2016); *Huawei Tech. v. Samsung Elec. Co.*, No. 16-cv-02787 (filed May 24, 2016); *In re Qualcomm Antitrust Litigation*, No. 17-md-2773 (filed Apr. 6, 2017).  By contrast, the Northern District of Texas has had few, if any, cases involving FRAND, SEP, or related antitrust issues.

> ### 4.     <u>This District is better able to monitor compliance with an injunction than the Northern District of Texas.</u>

In deciding a transfer motion, a court also considers its ability to oversee and enforce an injunction where one is being sought.  *See Ergos Software, Inc. v. Benflah*, No. 08-cv-908-AG, 2009 WL 10674043, *4 (C.D. Cal. Sep. 15, 2009).  Continental has requested that this Court "[e]njoin defendants from demanding excessive royalties from Continental and its customers that are not consistent with Defendants' FRAND obligations to the relevant SSOs, including ETSI, TIA, and/or ATIS."  (FAC, p. 62.)  Continental has also requested that this Court "[e]njoin Defendants from enforcing their alleged 2G, 3G, and/or 4G SEPs against Continental and its customers via patent infringement lawsuits or other proceedings in other jurisdictions, while Continental remains a willing licensee and seeks an adjudication of the FRAND terms and conditions from this Court."  (*Id.*)

Continental and many of its customers and prospective customers are located in this District.  (Section II.A, *supra*.)  All are current or potential licensing targets of Defendants, would be subject to the protections of any injunction, and could more readily seek relief here than in Texas if Defendants fail to comply.  Notably, whether Defendants are principally located here is of no moment, as the Court has jurisdiction over them due at least to their respective contacts with this District.  *See Ergos*, 2009 WL 10674043 at *4 (denying transfer motion and rejecting defendants' argument that any injunction "could

1   most effectively be enforced in New Jersey since Defendants reside there," as the "Court

2   has jurisdiction over Defendants and can enforce any injunction it grants in this case").

3           5.      Relative court congestion does not weigh in favor of transfer.

4           Defendants say that to "measure congestion, courts compare the two fora's median

5   time from filing to disposition or trial."  But they identify a mere two-week difference in

6   this metric between this District and the Northern District of Texas (Mot., p. 17), which is

7   insufficient to weigh in favor of transfer.  *See Rafton*, 2010 WL 2629579 at *4 (finding

8   congestion factor "fail[s] to strongly favor a transfer" where "the median time from filing

9   to disposition in a civil case in the District of Maryland is 7.0 months, while the median

10  time in the Northern District is 9.4 months"); *Gem Acquisitionco, LLC v. Sorenson Grp.*

11  *Holdings, LLC*, No. 09-cv-1484-SI, 2009 WL 1621456, at *6 (N.D. Cal. June 6,

12  2009) (finding that while "the median time for a case to be resolved in this district was

13  25.5 months, [and] the median time for resolution in Utah was 29.4 months," this

14  "difference is not great enough to demonstrate that one district is significantly less busy

15  than another"); *Getz v. Boeing Co.*, 547 F. Supp. 2d 1080, 1085 (N.D. Cal. 2008) (finding

16  congestion factor to be "neutral because the four and a half month difference between the

17  median times is not significant enough to impact this decision.").  Notably, the median

18  time to trial is actually faster in this District (25.9 months) than in the Northern District of

19  Texas (26.3 months).  (Yip Decl., Ex. 77.)

20          Defendants' suggestion that this case should be transferred for expediency is also

21  highly disingenuous, in view of their repeated requests to slow this case down.  (Dkts. 11,

22  12, 13 (Optis requesting extension to respond to the complaint); Dkts. 45, 48 (Nokia and

23  Avanci moving for extension to respond to motion for antisuit injunction); Dkt. 68

24  (Conversant requesting similar extension by joint stipulation); Dkt. 86 (Optis requesting

25  additional time to respond to FAC).)  Indeed, they proffered a proposed schedule which

26  likely would have had this case start trial in early 2022, over 30 months after the filing of

27  the complaint.  (*See* Dkt. 136, p. 33 (Jt. Case Management Conference Rpt.).)

28

**B.     Convenience Considerations Do Not Weigh in Favor of Transfer.**

A defendant must "meet the requisite strong showing of inconvenience necessary to upset[] the plaintiff's choice of forum." *Powerteq, LLC v. Moton*, No. 15-cv-2626, 2016 WL 80558, at *3 (N.D. Cal. Jan. 7, 2016). Where "the lawsuit is sufficiently related to the Northern District of California to afford substantial deference to Plaintiffs' choice of forum under [the applicable] liberal venue rules," the "Court will defer to Plaintiffs' choice of forum unless the balance of convenience is <u>strongly</u> in favor" of defendant. *Orange*, 2015 U.S. Dist. LEXIS 127915 at *6. Here, the "balance of convenience" does not favor transferring to Texas at all, let alone "strongly."

1.     <u>This District is more convenient for Continental.</u>

This District is more convenient for Continental as a matter of law. *Sharma v. Globalfoundries U.S., Inc.*, No. 15-cv-03631, 2016 WL 2742399, at *2 (N.D. Cal. May 11, 2016) ("[T]he court will assume a plaintiff's selected forum is convenient for the plaintiff, given that the plaintiff chose to litigate there and provided several legitimate reasons for why the forum was convenient"); *Gem*, 2009 WL 1621456 at *4 (finding that even if plaintiff does not have "offices in California, [] it can be inferred that this forum is more convenient for [plaintiff] as it chose to initiate the case here"). Defendants' argument that this District is not convenient for Continental has no merit. *Sharma*, 2016 WL 2742399 at *5 ("[A]lthough Plaintiff is a resident of [another state], Plaintiff also chose this forum. The relative convenience of a particular district is presumably a consideration in a plaintiff's decision to file suit in that district. Thus, it is unconvincing for Defendants to advance a convenience argument based primarily on the logic that Plaintiff's choice of forum would be inconvenient to Plaintiff.").

Even if convenience for Continental was not presumed as a matter of law, Continental also has a major location in this District, which develops and sells services and products directly related to the subject of this lawsuit. (Section II.A, *supra*.) By contrast, Continental has no locations in the Northern District of Texas. (Yip Decl., Ex. 78.) As to any Continental witnesses who may be located in Germany, flying to this District will be

more convenient than flying to Dallas.  From Frankfurt and Munich, in a given week there

are 35 direct flights to the airports in San Jose, San Francisco, and Oakland, collectively,

compared to only 21 per week to Dallas.  (*Id.* Ex. 128.)  Transferring this case to Texas

would merely shift inconvenience to Continental.  *See STX, Inc. v. Trik Stik, Inc.*, 708 F.

Supp. 1551, 1556 (N.D. Cal. 1988) ("If the gain of convenience to one party is offset by

the added inconvenience to the other, the courts have denied transfer of the action.");

*Heartland Payment Sys., Inc. v. Mercury Payment Sys., LLC*, No. 14-cv-0437-CW, 2014

WL 5695051, at *3 (N.D. Cal. Nov. 4, 2014) ("[Plaintiff] has[] two offices in California

and 181 employees in the state.  It has only one Colorado office.  Transferring this case to

the District of Colorado would shift the inconvenience of one party to the other

party.  Thus, this factor weighs against transfer.").

> ### 2. This is a national and global dispute, with party and nonparty witnesses located all around the country and the world.

Defendants do not dispute that this case spans countries and continents.  Witnesses

of parties and nonparties are located everywhere, with some in or closer to this District,

and some in or closer to Texas.  (*Compare* Section II, *supra with* Motion.)  Witnesses in

Europe may be geographically closer, slightly, to the Northern District of Texas, but have

fewer flights to Dallas than to the San Francisco Bay Area.  (*See id.* Exs. 128, 130.)

Meanwhile, witnesses in Asia are geographically closer to this District, and also have more

flight options to the Bay Area than to Dallas.  (*See id.* Ex. 129.)  Further, many of the

witnesses in this case will be experts, and those experts will presumably come from all

around the country and the world.  Ultimately, there may be no experts at all from Texas.

No matter where this case is venued, the reality is that significant travel will be

necessary by many witnesses.  In such situations, this District disfavors transfer.  *Getz*, 547

F. Supp. 2d at 1083–84 ("[Defendant] argues that [certain third-party] witnesses

'presumably reside near Fort Campbell, Kentucky, Fort Rucker, Alabama, Redstone

Arsenal, Alabama, and Corpus Christi Texas.' [] Although these locations might be closer

to Phoenix than Oakland, [Defendant] does not attempt to, nor can it, argue that travel

1   from those locations to Oakland will pose any greater inconvenience than travel to

2   Phoenix."); *CES Grp., LLC v. DMG Corp.*, No. 14-cv-02919-BLF, 2015 WL 457405, at *3

3   (N.D. Cal. Feb. 3, 2015) ("To be sure, witnesses located in Oregon will be as

4   inconvenienced by traveling to the Northern District as they would be if the case is

5   transferred to the Southern District."); *Kremen*, 2012 U.S. Dist. LEXIS 1988 at *34

6   (finding that where the "witness . . . is presently located in Mexico . . . , there is only a

7   minimal difference in burden between requiring [him] to appear in this case in Arizona or

8   California").

9        Defendants also do significant business and operate facilities in this District, and/or

10  regularly travel to this District.  (Sections II.B-E, *supra*.)  This weighs against any finding

11  of "inconvenience."  *CFA N. Cal., Inc. v. CRT Partners LLP*, 378 F. Supp. 2d 1177, 1189

12  (N.D. Cal. 2005) (denying transfer to defendants' home forum where "Defendants

13  regularly travel outside of [their home forum] for business purposes"); *Sharma*, 2016 WL

14  2742399 at *2 ("[A]lthough Defendants both operate in New York, this fact is

15  unpersuasive on the question of convenience when both Defendants also operate in

16  California.").  A number of parties and nonparties, including Qualcomm, Ericsson, and

17  Nokia, also have extensive litigation history in this District.  *See Eggers v. Campagnolo*

18  *North America, Inc*., No. 08-cv-0198, 2009 WL 311124, at *3 (S.D. Cal. Feb. 9, 2009)

19  (denying motion to transfer because "the perceived efficiencies in any convenience

20  transfer are significantly undermined by the extensive litigation history conducted by the

21  parties in this judicial district").

22       Furthermore, Defendants' representatives regularly travel around the world in

23  pursuit of their licensing business (and the many millions of dollars of revenue that come

24  with it).  Defendants cannot travel to and meet with licensing targets in Asia, Europe, and

25  throughout the United States, and then be heard to complain that it is too inconvenient for

26  them to defend their business practices in this District, which covers one of the largest

27  metropolitan areas in not just the U.S., but the world.

28

**C.     The *Jones* Factors Favor This District.**

In deciding a motion to transfer venue, courts in the Ninth Circuit consider "(1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the  costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof."  *Jones*, 211 F.3d at 498.  Additionally, the "relevant public policy of the forum state, if any, is at least as significant a factor in the § 1404(a) balancing."  *Id.*  Evaluation of these factors shows that transferring this case would be inappropriate.

**1.     Relevant agreements were negotiated in this District.**

Numerous relevant agreements were negotiated in this District.  Conversant's CEO Boris Teksler negotiated the Avanci Master License Management Agreement from this District.  (Section II, *supra*.)  BlackBerry corresponded with Continental regarding a license from this District.  (*Id.*)  Nokia corresponded with Continental's affiliate Zonar regarding a license from this District.  (*Id.*)  Avanci sought licenses with Tesla, as well as Apple on information and belief, in this District.  (*Id.*)  Given the rich base of licensing targets in the IoT and automotive technology industry here (Section IV.A.2, supra), discovery is likely to show that significant additional licensing discussions involving Defendants occurred in this District.

**2.     This District is more familiar with the UCL.**

Continental asserts a claim for violation of California's Unfair Competition Law, which this District is more familiar with than the Northern District of Texas.  Therefore, this factor weighs against transfer.  *Heartland*, 2014 WL 5695051 at *4 ("[I]t is clear that this Court is more familiar with California law than any non-California district court.  Thus, this factor weighs against transfer."); *Shultz*, 2011 U.S. Dist. LEXIS 24692 at *11 ("This Court is likely more familiar than the Middle District of Florida with the

1  California laws underlying the California [] claims," and therefore this factor weighs

2  against transfer).[2]

3              3.     Continental's choice of forum is entitled to deference.

4         Continental's choice of forum is entitled to deference in view of the antitrust venue

5  statute, 15 U.S.C. § 22.  (Section IV.A.1, *supra*.)  But that is not the only reason.

6  Continental has significant contacts with this District and many of the activities alleged in

7  the Complaint occurred here.  *See Nat. Wellness Centers*, 2012 WL 216578, at *11 (giving

8  deference to plaintiff's choice of forum where it "asserts that it chose this forum, even

9  though it does not reside in this district, because it has significant contacts with Northern

10 California," including customers and research and development activities); *Gem*, 2009 WL

11 1621456 at *4 ("[Plaintiff] does not reside in California. Many of the activities alleged in

12 the complaint occurred here, [and thus the] Court will therefore afford [plaintiff's] choice

13 of this forum some deference.").  Moreover, Defendants cannot complain about deference

14 to Continental's choice of forum when they have targeted licensees in this District and

15 conducted business here.  *Consumer Fin. Prot. Bureau v. Nationwide Biweekly Admin.,*

16 *Inc.*, No. 15-CV-02106-RS, 2015 WL 4463790, at *4 (N.D. Cal. July 21, 2015) (finding

17 that "by choosing to market and sell its [product] nationwide, defendants opened

18 themselves up to the risk of litigation in multiple states, particularly ones in which they

19 conduct a substantial amount of business activity. . . .  In light of the foregoing,

20 defendants' arguments for according little weight to plaintiff's choice of forum are not

21

22 _____

23 [2] Defendants argue that the UCL claim will not survive a motion to dismiss because it does
   not cover "injuries suffered by non-California residents, caused by conduct occurring
24 outside of California's borders, by defendants whose headquarters and principal places of
   operations are outside of California."  The argument is incorrect.  Courts deny motions to
25 dismiss UCL claims brought by non-residents where, as here, the defendants conduct
   business and have committed misconduct in California, or when the plaintiffs have
26 suffered harm in California.  *E.g.*, *Diva Limousine, Ltd. v. Uber Technologies, Inc*., No.
27 18-cv-5546-EMC, 2019 WL 2548459, at *21 (N.D. Cal. Jun. 20, 2019) (plaintiffs alleged a
   "causal link between [defendant's] alleged misconduct in California and the out-of-state
28 [plaintiffs'] loss in revenue").

1    persuasive.").

2           4.    The parties have copious amounts of contact with this District.

3           Continental, Conversant, Nokia, and Sharp all have offices, employees, major

4    ongoing operations, and business dealings here.  (Section II, *supra.*)  This weighs against

5    transfer.  *Ryan v. Microsoft Corp.*, No. 14-CV-04634-LHK, 2015 WL 1738352, at *7

6    (N.D. Cal. Apr. 10, 2015) (denying transfer where "in addition to Plaintiffs' decision to

7    file the instant action in this District, the Court finds that the parties have substantial

8    contacts with this District").  That some Defendants may not be headquartered or

9    incorporated in this District (something Defendants rely on heavily in the Motion) is not

10   material.  *Id.* ("While Microsoft argues that its corporate headquarters and the majority of

11   its employees are located in Washington, Microsoft does not contest that it has extensive

12   contacts with the Northern District of California, including the aforementioned corporate

13   offices [in Mountain View and San Francisco] and several hundred California

14   employees."); *Ctr. for Biological Diversity v. Export-Import Bank of the United States*, No.

15   12-cv-6325-SBA, 2013 WL 5273088, at *5 (N.D. Cal. Sep. 17, 2013) (denying transfer

16   because of plaintiff's contacts with the forum, notwithstanding that "the operative facts

17   giving rise to this action occurred in Washington, D.C." and "Defendants are both located

18   in Washington D.C.").

19          5.    There are numerous contacts relating to Continental's causes of action
                  in this District.

21          Defendants eschew any contacts in this District relating to this dispute, but the facts

22   show otherwise.  Numerous relevant licenses and agreements were negotiated in this

23   District.  (Sections II.B, II.C, II.E, *supra.*)  Continental develops and sells services and

24   products in this District that rely on cellular standards, which are purportedly covered by

25   the patents in the Avanci platform owned by the other Defendants.  *CES*, 2015 WL 457405

26   at *2 (finding "the fact that one of the allegedly infringing acts occurred in this district is

27   sufficient to establish a connection between Plaintiff's claims and this venue").  This

28   District is also home to witnesses like Teksler, who can testify regarding Conversant's

intent in making the IPR declarations, a relevant factual issue.  (Section II.C, *supra*; FAC, ¶ 90 ("While making such declarations to the relevant SSOs, Conversant concealed its intent to, among other things, refuse to license certain users of the standards in a given supply chain, charge supra-competitive royalty rates, and demand discriminatory terms and conditions for a license to its alleged SEPs.").)

> 6. Litigating in this District is less costly due to location of counsel.

In *Arreola v. Finish Line*, No. 14-cv-03339-LHK, 2014 WL 6982571, at *10 (N.D. Cal. Dec. 9, 2014), a case cited by Defendants, the Court stated that "while convenience to the parties' attorneys is 'not an appropriate factor for the Court to consider when deciding a motion to transfer,' the 'differences in the costs of litigation in the two forums' is relevant."  The case was transferred in part because "counsel for both [parties] are located in the Central District" and thus litigation would be less costly there.  *Id.*; *see also Mays v. Wal-Mart Stores, Inc.*, No. 17-cv-07174-LHK, 2018 WL 1400468, at *4 (N.D. Cal. Mar. 19, 2018) (another case cited by Defendants, stating, "Travel costs would certainly be lower and scheduling court appearances would be easier if the case were litigated where Plaintiff and all counsel live," and transferring).  Of the approximately 28 counsel of record in this case, 19 of them (68%) are officed in California, including this District.

> 7. Key nonparty witnesses would be immune from compulsory process if this case is transferred to Texas.

Courts consider the "availability of compulsory process to compel attendance of unwilling non-party witnesses" in deciding transfer motions.  *Jones*, 211 F.3d at 498–99.  Under F.R.C.P. 45(c), a subpoena may command a nonparty to attend a trial, hearing, or deposition "within 100 miles of where the person resides, is employed, or regularly transacts business in person," or "within the state where the person resides, is employed, or regularly transacts business in person, if the person . . . is commanded to attend a trial and would not incur substantial expense."  Nonparty Qualcomm will be the source of key witnesses in this case, nearly all of whom are located in San Diego (Section II.E, *supra*) and can be compelled to attend trial anywhere in California, but not in Texas.  The same is

1  true of BlackBerry's former employees located in this District who negotiated a SEP

2  license with Continental, as well as nonparty witnesses knowledgeable regarding Avanci's

3  licensing demands against targets in Silicon Valley and elsewhere in California.

4         8.    This District has as much ease of access to proof as the Northern

5                District of Texas.

6        Defendants claim that "documents maintained by Avanci in Dallas are likely to be

7  among the most relevant to this action," and "[o]ther relevant documents from various of

8  the defendants are also likely to be located in or near the Northern District of Texas."  But

9  even if true, that does not weigh in favor of transfer.  *Orange*, 2015 U.S. Dist. LEXIS

10  127915 at *16 ("Defendant argues that all relevant documents are based in Orange County,

11  where Defendant maintains its principal place of business, where the audit was performed,

12  and where the audit firm is located.  However, this factor is neutral, because [w]ith

13  technological advances in document storage and retrieval, transporting documents does not

14  generally create a burden.").  In any event, Defendants' documents are likely to be

15  produced electronically, as is typical in modern litigation.  *Shultz*, 2011 U.S. Dist. LEXIS

16  24692 at *21-22 (N.D. Cal. Feb. 28, 2011) (rejecting defendant's argument regarding

17  purported shipping costs for production, as this "argument seems to ignore the modern

18  realities of document production"; "electronic document storage and production is a

19  routine part of litigation as contemplated by the [F.R.C.P.]").

20        9.    Public policy favors maintaining this action in this District.

21        This Court has evaluated this "public policy" factor by weighing the competing

22  venues' interest in the dispute.  *Shultz*, 2011 U.S. Dist. LEXIS 24692 at *23.  This District

23  has a greater interest in this matter than the Northern District of Texas does, because of the

24  disproportionately significant impact of this Court's rulings on the IoT and automotive

25  technology industry here.  (Section IV.A.2, *supra*.)[3]

26  

27  [3] The Court should reject Defendants' accusations of forum shopping, which have no

28  merit.  *Heartland*, 2014 WL 5695051 at *4 ("While [plaintiff] does not reside in this

**D.     To the Extent the Court Is Inclined to Transfer, It Should Permit Venue Discovery Instead.**

The known facts supporting venue in this District are abundant and more than sufficient to warrant denial of the Motion.  But to the extent the Court has any inclination to grant the Motion, Continental requests that the Court permit venue discovery instead.  Venue discovery is proper where it "may be useful in resolving issues of fact presented by the motion, particularly since the necessity of resolving such issues is created by the movant himself and the relevant evidence is peculiarly within the movant's possession."  *Powerteq*, 2016 WL 80558 at *3.  "Whether to permit discovery relating to venue is within the Court's discretion."  *Kaia Foods, Inc. v. Bellafiore*, 70 F.Supp.3d 1178, 1183-84 (N.D. Cal. 2014).  Courts have granted venue discovery when requested by a plaintiff opposing a motion to transfer venue under 1404(a).  *E.g.*, *Swami v. Title Source, Inc.*, No. 17-cv-1175-WHA, Dkt. 49 (N.D. Cal. May 18, 2017) (granting leave to take a deposition and propound five interrogatories, to be responded to within seven days).

Venue discovery (in lieu of granting the transfer motion) would be appropriate on at least the following subjects:  (1) Defendants' meetings and negotiations with potential or current licensees and patent owners in this District; (2) Defendants' promotional activities in this District, and other evidence of Defendants targeting businesses or industries operating in this District; (3) Defendants' personnel in this District for licensing, research, and development of cellular technology; (4) all meetings and negotiations in this District relating to the Master License Management Agreement; and (5) the full scope and extent of the licensing operations and related personnel of Avanci and its members in this District.

---

district, it does have significant contacts in the district due to its California office and employees. Thus, the Court does not find sufficient evidence to support an inference that [plaintiff] is forum-shopping.")  For all the reasons set forth herein, this District was not only a permissible venue for this action, but was also a very logical and appropriate venue.

1  **V.**   <u>**CONCLUSION**</u>

2        This case should not be transferred to Texas, for "convenience" or any other reason.

3  It was properly filed here, where the IoT industry will feel the substantial effects of the

4  Court's rulings regarding Defendants' anticompetitive practices and FRAND obligations.

5  Continental develops IoT products and services here, and sells those products and services

6  to ▆▆▆▆▆ customers located here.  Likewise, Defendants do business and have offices

7  and hundreds of employees here.  This is also where Avanci has actively and aggressively

8  targeted licensees for years, and hopes to extract the greatest amount of revenue in the

9  United States.  The Court should maintain this case here in this District, and deny

10 Defendants' Motion.

11 Dated:  August 28, 2019

12                              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

13

14                   By      _/s/ Lai L. Yip_

15                              STEPHEN S. KORNICZKY
                               MARTIN R. BADER
16                             MATTHEW W. HOLDER
                               MICHAEL W. SCARBOROUGH
17                             MONA SOLOUKI
                               LAI L. YIP
18

19                             Attorneys for Plaintiff
20                             Continental Automotive Systems, Inc.

21

22

23

24

25

26

27

28

CONTINENTAL'S OPPOSITION TO MOTION TO TRANSFER VENUE